26-1721

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

SOLOS TECHNOLOGY LIMITED,

Plaintiff-Appellee

v.

META PLATFORMS, INC.,META PLATFORMS TECHNOLOGIES, LLC, OAKLEY, INC.,LUXOTTICA OF AMERICA, INC., ESSILORLUXOTTICA, USA, LLC,

Defendants

DAITONA CARTER,

Movant-Appellant

---

Appeal from the United States District Court for the Masschusetts in No. 1:26cv–1034–ADB, Judge Allison D. Burroughs.

---

# MOVANT-APPELLANT'S EMERGENCY MOTION FOR JUDICIAL NOTICE AND TO SUPPLEMENT THE RECORD WITH CO-TRIBUNAL DOCKETS, INJUNCTIVE FILINGS TECHNICAL CLEARING

---

Movant-Appellant Daitona Carter, appearing pro se, respectfully moves pursuant to Federal Rule of Evidence 201, Federal Rule of Civil Procedure 65, and

this Court's inherent supervisory power to protect the integrity of its proceedings, for an order taking judicial notice of and supplementing the record with parallel filings, temporary restraining order motions, and executive appointments occurring across sister federal jurisdictions.

These items expose a synchronized corporate-to-government operation causing the imminent spoliation of ledger evidence and accounting metrics required to enforce the Constructive Trust and Escrow Framework currently pending before this tribunal.

## I. MANDATORY GROUND FOR JUDICIAL NOTICE

Plaintiff requests that this Court take judicial notice of the following verifiable records from related federal proceedings, which are attached hereto as independent record attachments:

1. Attachment 1: The Verified Complaint and Amended Verified Complaint for Declaratory, Injunctive, and Mandamus Relief filed in Carter v. Feinberg et al., No. 1:26-cv-03318-APM (D.D.C., filed September 22, 2026).

2. Attachment 2: Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction filed in Case No. 1:26-cv-03318-APM, seeking to block the destruction of Cost Accounting Standards (CAS) cost-segregation records.

3. Attachment 3: The Notice of Supplemental Fact documenting the October 7, 2026, executive appointment of Walter Jay Clayton as White House AI Czar presiding over the Pentagon's Automated AI Classification Pilot.

4. Attachment 4: Senate Committee on Finance Investigative Report (August 4, 2026) documenting Apollo Global Management-linked capital channels utilized for private equity and technology-sheltering structures (previously entered as CAFC ECF Doc. 41, Exhibit L).

5. Attachment 5: Kopin Corporation / IBAS Defense Milestone Documentation detailing manufacturing milestones for the Soldier Borne Mission Command (SBMC) tactical headset (CAFC ECF Doc. 41 Exhibit Index).

6. Attachment 6: Alpaca Crypto Security & Custody Platform Disclosure (alpaca.markets/crypto) establishing that Alpaca Securities LLC utilizes Fireblocks Multi-Party Computation (MPC-CMP) vaults for digital asset custody and tokenized ledger clearing.

7. Attachment 7: NIST Distributed Ledger Technology & Federal Tokenization Frameworks (NISTIR 8202) establishing the technical framework for tokenized asset-tagging and distributed ledger systems utilized across modern federal procurement tracks.

## II. MATTERS OF CONCURRENT TRIBUNAL AND SECTORAL OVERLAP

### 1. The Factual Void Contradiction

Defendants have maintained that Plaintiff's claims regarding the systematic commercialization of her architectures are "conclusory." The record in this action (Attachments 1 and 2) dismantles this defense, demonstrating that the technology-in-suit is functionally integrated into the Department of Defense's $21.88 Billion Soldier Borne Mission Command (SBMC) initiative. This program involves active prototype contracts with Anduril Industries ($159M, partnered with Meta and Oakley/EssilorLuxottica), Rivet Industries ($195M), and Kopin Corporation ($15.4M IBAS milestone, Attachment 5).

### 2. Imminent Destruction of the Subject Property of the Trust

Plaintiff's pending applications seek to sequester revenues derived from these specific defense tracks into court-supervised escrow. The attached filings show that Defendants Meta and Luxottica, via a Department-level directive (the September 14, 2026, Feinberg Memorandum), have ordered the destruction of the "shadow CAS" infrastructure by October 14, 2026. This conversion from CAS segregation to GAAP consolidation permanently dissolves asset-level tracing pools, rendering equitable relief unenforceable for Phase 2 prototyping data.

### 3. The Apollo, Fireblocks, Alpaca Securities Clearing Matrix (SEC Rule 13h-1 Nexus)

Parallel proceedings establish a multi-forum closed loop governing the architecture in suit. Defendant Clayton concurrently served as an independent board chair at Apollo Global Management and as a principal advisory board member for Fireblocks (Attachment 4). This private infrastructure connects to digital asset custody and tokenization platforms, including Alpaca Securities LLC, which utilizes Fireblocks Multi-Party Computation (MPC) vaults to secure digital assets and tokenized ledger units (Attachment 6).

Crucially, these financial tokenization and clearing rails operate concurrently with the digital ledger and asset-tagging architectures deployed across the Department of Defense procurement tracks at issue (Attachment 7). By shaping high-volume reporting boundaries under SEC Rule 13h-1 (Large Trader Reporting) during his chairmanship, and subsequently occupying private advisory posts over cryptographic vaults and token-clearing rails handling related asset streams, Defendant Clayton's professional footprint spans both the private financial apparatus and the public executive oversight governing these federal asset movements.

### 4. Institutional Intersection and Executive Oversight

The verified public records (Attachments 1, 2, and 3) document that Walter Jay Clayton—named as an active party-defendant in sister proceedings—maintains

a documented timeline of public and private sector service that intersects the core accounting channels disputed by Plaintiff. Specifically, he currently exercises executive oversight as White House AI Czar over the automated data classification platforms deployed within the Department of Defense, working alongside Pentagon CTO Emil Michael on the Automated AI Classification Pilot.

## III. PRAYER FOR ORDERED RELIEF

**WHEREFORE**, Movant-Appellant Daitona Carter respectfully prays that this United States Court of Appeals for the Federal Circuit:

1. Grant this Emergency Motion for Judicial Notice and supplement the record with Attachments 1 through 7;

2. Consider these parallel co-tribunal developments and tokenization clearing architectures in evaluating the equitable necessity of protecting the res of this litigation; and

3. Issue a protective order to prevent the permanent erasure of title, ledger evidence, and cost-segregation tracing pools during the active pendency of this appeal.

October 13, 2026

Respectfully submitted,

/s/Daitona Carter
Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE

Washington, DC 20002.
legal@daitonacarter.com

**INDEX OF ATTACHMENTS**

| Attachment No. | Description / Source | Date |
|---|---|---|
| ATTACHMENT 1 | Verified Complaint and Amended Verified Complaint for Declaratory, Injunctive, and Mandamus Relief, *Carter v. Feinberg et al., No. 1:26-cv-03318-APM (D.D.C.)* | September 22, 2026<br>October 5, 2026 |
| ATTACHMENT 2 | Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Emergency Motion for Temporary Restraining Order and Preliminary Injunction Walter Jay Clayton, *Carter v. Feinberg et al., No. 1:26-cv-03318-APM (D.D.C.)* | September 22, 2026<br>October 5, 2026 |
| ATTACHMENT 3 | Notice of Supplemental Fact: Executive Appointment of Walter Jay Clayton as White House AI Czar, *Carter v. Feinberg et al., No. 1:26-cv-03318-APM (D.D.C.)* | October 7, 2026 |
| ATTACHMENT 4 | Senate Committee on Finance Investigative Report (Apollo-linked capital channels & sheltering structures) Excerpt | August 4, 2026 (CAFC ECF Doc. 41, Ex. L) |
| ATTACHMENT 5 | Kopin Corporation / IBAS Defense Milestone Documentation (SBMC tactical headset prototyping) | July 14, 2026 (CAFC ECF Doc. 41) |
| ATTACHMENT 6 | Alpaca Crypto Security & Custody Platform Disclosure (Fireblocks MPC-CMP custody & token clearing integration) | Public Record (alpaca.markets/crypto) |
| ATTACHMENT 7 | NIST Distributed Ledger Technology & Federal | Federal Standard |

Tokenization Frameworks (NISTIR 8202 federal asset-tagging reference)

**ATTACHMENT 1**

Verified Complaint and Amended Verified Complaint for Declaratory, Injunctive, and Mandamus Relief, *Carter v. Feinberg et al.*, No. 1:26-cv-03318-APM (D.D.C.) | September 22, 2026 and October 5, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAITONA CARTER,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, Deputy Secretary of Defense; and<br>PETE HEGSETH, Secretary of Defense,<br><br>Defendants. | Case No. Case: 1:26–cv–03318<br>Assigned To : Unassigned<br>Assign. Date : 9/22/2026<br>Description: TRO/Prelim. Inj. (D–DECK) |

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(Administrative Procedure Act; Mandamus;Preliminary Injunction)

Plaintiff Daitona Carter ("Plaintiff"), proceeding pro se and in forma pauperis, brings this action against Defendants Stephen A. Feinberg, Deputy Secretary of Defense, and Pete Hegseth, Secretary of Defense, each in their official capacities, seeking immediate declaratory, injunctive, and mandamus relief to halt the unlawful elimination of mandatory CAS cost segregation requirements. Absent immediate judicial intervention, the implementation of Defendants' directives will permanently eliminate the generation of contract-level cost-segregation data necessary to secure effective remedies in Plaintiff's pending federal appellate proceedings. In support thereof, Plaintiff alleges as follows:

## I. JURISDICTION AND VENUE

1. This Court possesses subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1361 (mandamus jurisdiction), and 5 U.S.C. § 702, which provides an explicit waiver of sovereign immunity for actions seeking



RECEIVED
SEPT 22 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

relief other than money damages challenging unlawful agency action under the Administrative Procedure Act ("APA").

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers of an agency of the United States acting in their official capacities, the Department of Defense is headquartered in The Pentagon, Arlington, Virginia, and a substantial part of the events and directives giving rise to the claims asserted herein occurred within the District of Columbia.

**II. THE PARTIES**

3. Plaintiff Daitona Carter is a non-party inventor who was admitted as Movant-Appellant/Petitioner in the United States Court of Appeals for the Federal Circuit (Appeal No. 26-1721) as a proposed intervenor from the lower court. Plaintiff's Motion for Constructive Trust and Escrow Framework (Doc. 19) is pending and undisposed in that appeal. Separately, Plaintiff petitioned the Director of the United States Patent and Trademark Office, who, despite initial refusal, docketed Plaintiff's Notice of Related Case Information on the USPTO IPR docket as a non-party. The USPTO docketed the intake correspondence rather than a formal notice.

4. Defendant Stephen A. Feinberg is the Deputy Secretary of Defense. In his official capacity, Defendant Feinberg is the chief operating and acquisition executive responsible for issuing binding policy memoranda governing defense contract cost accounting and procurement standards across all military components.

5. Defendant Pete Hegseth is the Secretary of Defense and the cabinet-level head of the Department of Defense. In his official capacity, Defendant Hegseth is vested with ultimate

statutory authority over the administration of defense procurements, contract executions, and agency compliance with federal procurement statutes.

## III. STATEMENT OF FACTS

6. On August 18, 2026, Defendant Feinberg issued a binding Departmental memorandum commanding all military components to implement automated Application Programming Interfaces ("APIs") to extract cost data directly from defense contractors' Enterprise Resource Planning ("ERP") and financial systems for all active contracts valued at or above $10,000,000. (Exhibit A.)

7. On September 14, 2026, Defendant Feinberg issued a second memorandum, titled "Fostering One Strong Industrial Base," directing the Department to shift its default cost accounting framework from Cost Accounting Standards ("CAS") to Generally Accepted Accounting Principles ("GAAP") across all defense contracts. (Exhibit B.)

8. The September 14, 2026 memorandum institutes a mandatory 30-day deadline commanding all military components to discontinue "shadow CAS" reporting and verification practices. That deadline expires on or about **October 14, 2026**.

9. Congress has codified the creation, modification, and administration of Cost Accounting Standards under 41 U.S.C. §§ 1501–1502, vesting exclusive regulatory authority over these standards in the government-wide Cost Accounting Standards Board ("CAS Board"). The statutory CAS framework mandates contract-level cost segregation and audit trails capable of isolating proceeds attributable to specific technology components within larger systems.

10. Plaintiff's 2009 public disclosure, published at blogspot.com and bearing Plaintiff's full legal name and website daitonacarter.com, describes the signal processing architecture

(parallel compression, pre-delay attack, and musical release times) that constitutes the prior art underlying U.S. Patent Nos. 10,306,389; 10,651,866; 11,082,055; 11,871,174; and 12,216,339. The disclosure is incorporated in the CAFC appendix for Appeal No. 26-1721 and is docketed on the related PTAB IPR proceeding. (Exhibit E.) Plaintiff is the true inventor of the technology covered by those patents and has no patent of her own. Plaintiff's pending § 256 inventorship correction in Appeal No. 26-1721 seeks to correct the patent records to reflect Plaintiff as an omitted inventor.Plaintiff holds no patent of her own. Plaintiff's reduction to practice (2009 blogspot, 2016 prototypes, 2013-2017 source code, 2019 ARIA YouNoodle hosted Enterprenuial World Cup Registration) predates all five Solos patents.

11. On May 15, 2026, Plaintiff filed a Motion for Constructive Trust and Escrow Framework (Doc. 19) in the Federal Circuit (Appeal No. 26-1721) to sequester technology-derived revenue streams into court-supervised escrow. The filing was never properly entered on the CAFC docket. The clerk's electronic infrastructure omitted the mandatory docket number, verification header, and official entry date. The document's metadata confirms improper processing: the live browser tab exposes the original local filename ('INJ.pdf') rather than a standardized court filename, which generates only upon localized download. The companion omnibus filing (ECF 19) was subjected to editorial corruption, including the unauthorized insertion of an anomalous character ('52') into the plaintiff's corporate nomenclature, specifically designed to defeat automated federal judicial indexing. The lower court record was forensically compromised: Docket #91 (April 17, 2026) had its metadata and descriptions altered post-filing to label distinct files as 'duplicates' despite unique digital hashes, and Docket #92 was suppressed with '-1' placeholders replacing the

actual files. PACER confirms successful upload and NEF to all parties for both entries, but neither is visible on the public docket. On September 21, 2026, Plaintiff filed a motion (Doc. 47) requesting, among other relief: (a) the severance of Doc. 19 from the omnibus into a standalone, independent record; (b) an interim financial preservation order requiring maintenance of CAS cost-segregation records and staying any GAAP conversion for the specific contracts at issue (Doc. 47, Item 7); and (c) a show-cause order regarding the 129-day inaction on Doc. 19. Doc. 47, Section III, independently identifies the Feinberg memoranda (Aug 18 and Sept 14, 2026) as the source of the emergency. As of the date of this complaint, Doc. 19 has remained undisposed for 130 days. (Exhibit C.)

12. Plaintiff is preparing to file a separate civil action under the civil remedy provisions of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, arising from the same operative facts alleged herein. To secure a meaningful remedy under § 1595, Plaintiff must be able to produce segregated CAS accounting records to calculate the proceeds attributable to the technology. This action is not a TVPA claim. It is an APA/PI action to preserve the records necessary for that separate, anticipated proceeding.

13. The rapid implementation of the September 14, 2026 memorandum creates an immediate crisis: the mandatory conversion of contractor records from CAS segregation to GAAP consolidation is not a file format change. It is a **restructuring of the data model**. CAS requires contract-level cost pools, indirect rate allocations, and labor-hour tracing to specific contracts. GAAP does not. The conversion **dissolves the cost pools** into aggregate R&D and overhead lines that cannot be re-segregated. The information is not preserved in a different structure. It is destroyed by the act of conversion. No subsequent discovery order or post-judgment monetary award can reconstruct historical cost segregations from

GAAP aggregates. Once the "shadow CAS" infrastructure is dismantled on October 14, 2026, the cost-segregation audit trail is permanently eliminated.

14. The patented technology at issue in Federal Circuit Appeal No. 26-1721 is incorporated into the Department of Defense's Soldier Borne Mission Command ("SBMC") program, the successor to the Integrated Visual Augmentation System ("IVAS") program. The $21.88 billion IVAS production contract was transferred from Microsoft to Anduril Industries in February 2025. The SBMC program currently involves three prime prototype contracts: Anduril ($159 million, partnered with Meta Platforms Inc., Qualcomm Technologies, OSI, Gentex Corp., and **Oakley Inc. (a subsidiary of EssilorLuxottica S.A., the defendant in Solos v. Meta, 1:26-cv-10304 (D. Mass.))**); Rivet Industries ($195 million); and Elbit Systems of America ($120.5 million, partnered with Booz Allen Hamilton for AI) and the $500M Scale AI Pentagon contract and the Scale AI CDAO contract ($500M ceiling, expanded May 2026 from $100M, for AI data curation and decision-support services; Top Secret/SCI clearance). (May 5, 2026). (Exhibit G.)

15. The SBMC program is transitioning from Phase One to Phase Two. Anduril publicly announced on August 17, 2026 that it is "moving from phase one to phase two," with 170 Phase Two prototypes to be delivered and testing slated to begin in late January or early February 2027. If the CAS-to-GAAP conversion is complete before Phase Two cost data is generated, that data will be collected under GAAP and will **never** have CAS cost segregation. This is not a temporary loss. It is a permanent structural gap. (Exhibit D.)

16. The technology is also present in the pipeline through DoD contracts held by Meta Platforms Inc. (waveguide optics and AI for SBMC) and Kopin Corporation (MicroLED displays, IBAS, with SBMC contributions projected at $350–500 million over the

program's life). (Exhibit H.) The CAS cost-segregation records for these contracts are the only records capable of isolating proceeds attributable to the specific patented technology.

17. Plaintiff is not a party to any of the contracts identified in paragraphs 14–16. Plaintiff's interest in the CAS cost-segregation records is as a litigant whose **pending** Motion for Constructive Trust and Escrow (Doc. 19, CAFC No. 26-1721) and **pending** § 256 inventorship correction require them as the basis for identifying and tracing the subject property of the trust and for calculating statutory compensation in any subsequent action in the United States Court of Federal Claims under 28 U.S.C. § 1498. The constructive trust alone establishes Plaintiff's concrete, imminent, and redressable injury: without the CAS records, the trust is permanently unenforceable for SBMC Phase 2 and any subsequent production award.

## IV. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Administrative Procedure Act — Action in Excess of Statutory Authority

### (5 U.S.C. § 706(2)(C))

18. Plaintiff incorporates by reference paragraphs 1 through 17 as if fully set forth herein.

19. Pursuant to 41 U.S.C. § 1502(a)(1), Congress exclusively delegated the authority to prescribe, amend, and rescind Cost Accounting Standards to the government-wide Cost Accounting Standards Board. No individual executive department possesses the statutory authority to alter or phase out these standards unilaterally.

20. Defendants' September 14, 2026 memorandum contains an explicit acknowledgment of this statutory limitation, stating: "By law, the Pentagon will still need to apply CAS to sole

source development programs until it can work within the governmentwide CAS Board to change the standards of CAS to GAAP." (Exhibit B, p. 2.) This is not a statement of future intent. It is an admission that the current legal obligation to apply CAS remains in force for programs within the statutory scope, including sole-source development programs.

21. Despite this acknowledgment, the memorandum's mandatory 30-day directive to dismantle "shadow CAS" practices operates to eliminate the **informal mechanisms** by which contracting officers and auditors have historically obtained contract-level cost segregation data for programs that fall within the CAS scope but are not formally designated as "sole-source development" in the contract file. The result is that programs **functionally within** the CAS scope (competitive in form but sole-source in substance, due to the specific technology at issue) lose their cost segregation protection without the CAS Board ever acting.

22. The directive constitutes "final agency action" under 5 U.S.C. § 704 because it marks the consummation of the agency's decision-making process, imposes immediate and binding compliance obligations upon the defense-industrial base, and is the occasion for future legal obligations (the 30/60/90-day implementation clocks).

23. Because the memorandum attempts to unilaterally alter the practical application of a statutory accounting framework outside the mechanisms of the CAS Board, it must be set aside as an action taken "in excess of statutory jurisdiction, authority, or limitations" under 5 U.S.C. § 706(2)(C).

**SECOND CLAIM FOR RELIEF**

**Administrative Procedure Act — Arbitrary and Capricious Action**

**(5 U.S.C. § 706(2)(A))**

24. Plaintiff incorporates by reference paragraphs 1 through 23 as if fully set forth herein.

25. An agency action is arbitrary and capricious if it fails to consider significant, foreseeable aspects of the problem. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

26. In issuing the August 18 and September 14, 2026 memoranda, Defendants failed to consider:

(a) The foreseeable impact that the elimination of CAS cost-segregation data would have on **active, pending federal appellate proceedings** in which contract-level cost records are necessary to enforce an equitable remedy (specifically, the Motion for Constructive Trust and Escrow, Doc. 19, CAFC No. 26-1721, filed May 15, 2026, undisposed for 130 days);

(b) The **irreversible** nature of the data conversion. The conversion from CAS to GAAP is not a file format change. It is a restructuring of the data model. CAS requires contract-level cost pools, indirect rate allocations, and labor-hour tracing to specific contracts. GAAP does not. The conversion **dissolves the cost pools** into aggregate R&D and overhead lines that cannot be re-segregated. The information is not preserved in a different structure. It is destroyed by the act of conversion. No subsequent discovery order or post-judgment award can reconstruct historical cost segregations from GAAP aggregates;

(c) The **30-day implementation window** (expiring October 14, 2026) which, if executed, will be complete before the SBMC Phase 2 prototypes (170 units, testing January–February 2027) generate their first cost data. The Phase 2 data will be collected under GAAP from day one. It will **never** have CAS cost segregation. This is not a temporary loss. It is a permanent structural gap.

27. Defendants provided no reasoned justification for the 30-day deadline. No regulatory impact analysis, notice-and-comment period, or consultation with the CAS Board preceded the directive. The *State Farm* requirement to "examine the relevant data and articulate a satisfactory explanation" was not met.

**THIRD CLAIM FOR RELIEF**

**Writ of Mandamus**

**(28 U.S.C. § 1361)**

28. Plaintiff incorporates by reference paragraphs 1 through 27 as if fully set forth herein.

29. Defendants possess a clear, nondiscretionary, and ministerial statutory duty under 41 U.S.C. § 1502 and 48 C.F.R. Part 9905 to maintain CAS cost segregation for all contracts within the statutory scope of full CAS coverage. The September 14 memorandum **concedes this duty** in its own text (paragraph 20, supra): "By law, the Pentagon will still need to apply CAS to sole source development programs until it can work within the governmentwide CAS Board to change the standards of CAS to GAAP." The duty is not discretionary. It is statutory. It applies until the CAS Board acts. The CAS Board has not acted.

30. Plaintiff possesses a clear right to an effective judicial remedy. The Motion for Constructive Trust and Escrow (Doc. 19, CAFC No. 26-1721) is pending and undisposed. Enforcement of that trust requires identification and tracing of the subject property through contract-level cost segregation. Without the CAS records, the trust is unenforceable. Plaintiff's right to the trust is not theoretical. It is a pending equitable proceeding in a federal court of appeals.

31. Plaintiff has no other adequate remedy at law. The 30-day conversion clock expires **October 14, 2026**. After that date, the shadow CAS infrastructure is dismantled, the cost pools are dissolved, and the segregation data is structurally eliminated. No discovery motion, no subpoena, no FOIA request can regenerate data that was never collected in the required format. **The window is 22 days.**

32. Plaintiff is entitled to an order compelling Defendants to **maintain CAS cost segregation** for the following specific contracts and subcontracts (hereinafter, the "Covered Contracts"): (a) the Anduril SBMC prototype contract ($159M); (b) the Rivet SBMC prototype contract ($195M); (c) the Elbit SBMC prototype contract ($120.5M); (d) the Kopin IBAS contract ($15.4M); (e) the Lockheed Martin NGSRI Phase 2 contract; (f) the $2.4M international thermal weapon sight order; and (g) the $3.6M European military helmet display order (h) the Scale AI CDAO contract ($500M ceiling, May 2026).— in their current segregated form, pending resolution of Doc. 19 and the § 256 inventorship correction in CAFC No. 26-1721.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Issue a **Temporary Restraining Order** enjoining Defendants, their agents, officers, and components from executing the September 14, 2026 memorandum as to the CAS cost-segregation records relevant and material to Plaintiff's pending Motion for Constructive Trust and Escrow (Doc. 19, CAFC No. 26-1721) and the § 256 inventorship correction and the severed standalone Constructive Trust and Escrow (Doc. 19, as severed by Doc. 47, Item 5, and prohibiting the modification, consolidation, conversion, deletion, or rendering inaccessible of any such records for the Covered Contracts identified in paragraph 32;

2. Issue a **Preliminary Injunction** preserving all relevant CAS cost-segregation records in their current segregated form, and requiring Defendants to maintain CAS cost segregation for new cost data generated for the Covered Contracts and for SBMC Phase 2 and any subsequent production award, pending the disposition of Doc. 19 in CAFC No. 26-1721;

3. Enter a **Declaratory Judgment** declaring that the September 14, 2026 memorandum titled "Fostering One Strong Industrial Base" is an action in excess of statutory authority under 41 U.S.C. § 1502 to the extent it eliminates CAS cost segregation for programs within the statutory scope without action by the CAS Board;

4. Issue a **Writ of Mandamus** compelling Defendants to maintain CAS cost-segregation records in their current segregated form for the Covered Contracts, pending resolution of the pending CAFC proceedings;

5. Award Plaintiff taxable costs pursuant to 28 U.S.C. § 1920; and, to the extent Plaintiff subsequently retains legal representation, award reasonable attorneys' fees, expert witness costs, and litigation expenses pursuant to the Equal Access to Justice Act, 5 U.S.C. § 7430 and 28 U.S.C. § 2412; and

6. Grant such other and further relief as this Court deems just and proper.

## VERIFICATION

I, Daitona Carter, declare under penalty of perjury that I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief and that the facts stated therein are true and correct to the best of my knowledge, information, and belief.

Executed on September 22, 2026.

________________________________

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAITONA CARTER,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, Deputy Secretary of Defense; and<br>PETE HEGSETH, Secretary of Defense,<br><br>Defendants. | Case No. |

**EXHIBITS**

| | |
|---|---|
| 1 | EXHIBIT A / "Feinberg Memorandum — Supplier Cost and Pricing Transparency (Aug 18, 2026)" / "Source: Federal News Network" / URL printed below |
| 2 | EXHIBIT B / "Feinberg Memorandum — Fostering One Strong Industrial Base (Sept 14, 2026)" / "Source: defense.gov" / URL printed below |
| 3 | EXHIBIT C / CAFC Docket Entry — Appeal No. 26-1721, Doc. 19; Constructive Trust & Escrow Demand (May 15, 2026) and Doc. 47; Motion for Severance, Interim Financial Preservation, and Show Cause (Sept 21, 2026). / "Source: CAFC eCFS" / "https://ecf.cafc.uscourts.gov/" |
| 4 | EXHIBIT D / "SBMC Phase 2 Announcement — Anduril (Aug 17, 2026)" / "170 prototypes; testing Jan–Feb 2027" / "Source: DefenseScoop" / URL printed below |
| 5 | EXHIBIT E / "2009 Public Disclosure — mirrormixing2.blogspot.com" / "As filed in Appendix, CAFC Appeal No. 26-1721" / "Source: CAFC eCFS (Appendix)" |
| 6 | EXHIBIT F / "Solos v. Meta, 1:26-cv-10304 (D. Mass.)" / "Asserted Patents: 10,306,389; 10,651,866; 11,082,055; 11,871,174; 12,216,339" / "Source: CourtListener" / URL printed below |
| 7 | EXHIBIT G / "SBMC OTA Awards" / "Anduril $159M; Rivet $195M; Elbit $120.5M" / "Sources: Anduril PR; DefenseScoop; Elbit post" / URLs printed below |
| 8 | EXHIBIT H / "Kopin IBAS + SBMC Revenue" / "$15.4M IBAS; $350–500M SBMC projection" / Sources: “Yahoo Finance; Kopin press release; Q2 2026 earnings” / URLs printed below |

**EXHIBIT A**

**Feinberg Memorandum — Supplier Cost and Pricing Transparency (Aug 18, 2026)**

**Source:** Federal News Network

**URL:** https://federalnewsnetwork.com/wp-content/uploads/2026/08/DoW-Supplier-Cost-and-Pricing-Transparency-Memo_18_260821_133707.pdf

**Accessed:** September 22, 2026

*This document is submitted as Exhibit A in support of Plaintiff's Emergency Motion for Temporary Restraining Order, Carter v. Feinberg, et al., No. 26-cv- [___] (D.D.C.)*

DEPUTY SECRETARY OF WAR
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

AUG 18 2026

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
DEFENSE AGENCY AND DOW FIELD ACTIVITY DIRECTORS

SUBJECT: Supplier Cost and Pricing Transparency

The Department of War must have maximum insight into cost and pricing data from industry to negotiate the best price for our weapon systems and other contracts on behalf of the Warfighter, the taxpayer, and our Nation. Through the application of modern information technology and current business best practices, our acquisition workforce will establish a new standard for transparency, competition, and performance. This will rapidly accelerate the President's and the Secretary's direction to rebuild the military, revitalize the Defense Industrial Base, and establish Peace Through Strength.

This directive to the warfighting acquisition workforce resets the Department's expectations regarding supplier cost and pricing information. Full transparency throughout all tiers of the supply chain applies to all contractors and subcontractors. This requirement supports negotiations for products and services valued at $10 million or more, regardless of whether cost and pricing data requires certification. Additionally, I have directed the Under Secretary of War for Acquisition and Sustainment (USW(A&S)) to establish fair and reasonable contract profit margins by applying commercial best practices tailored to each product or service line.

Contracting officers must have access to actual cost information at both the prime and supplier levels for these contract actions (except for Commercial Off-the-Shelf items) to support the determination of fair and reasonable pricing. To reduce industry's regulatory burden and compliance costs, USW(A&S) will explore an automated solution consistent with commercial best practices. This approach will establish Application Programming Interfaces to pull cost information directly from contractors' enterprise resource planning or other financial systems.

During post-award contract administration, accurate and timely submission of Cost and Software Data Reporting (CSDR) is vital for the effective management of our major acquisition programs. Despite this, thousands of these cost reports are currently delinquent across our acquisition portfolio. The data deficit impairs our ability to assess which programs are providing the most value for the Department and which programs require adjustments to remain on track and on budget. Program managers and contracting officers must actively enforce contractor adherence to CSDR requirements as established in 10 U.S.C. § 3227 and Department of War Instruction 5000.73.

To address this deficit, USW(A&S) will work closely with the Office of the Secretary of War Cost Assessment and Program Evaluation and the Services to ensure:

1) Delinquent prime contractor and subcontractor CSDR reports are submitted within 30 days of this memorandum;

OSD008342-26/CMD010723-26

2) Submitted CSDR data is used to assess the quality of our sole-source contracts over time;

3) In non-commercial, sole-source acquisitions where CSDR data is not in use, the USW(A&S) Deal Team collaborates with the Defense Contract Audit Agency to determine cost-effectiveness by comparing actual costs to prices paid. Moving forward, the Department will conduct this comparison as a matter of course; and

4) Where negotiation outcomes are not aligned with sound business deals, we aggressively negotiate fair terms to ensure we deliver Warfighters the maximum edge.

The Department does not intend to limit profitability when contractors realize efficiencies after negotiating a fair and reasonable price based on a realistic baseline. Instead, consistent with the Secretary's Acquisition Transformation Strategy, this effort ensures that transparency and measurement of negotiation outcomes become ingrained standards within our acquisition system. USW(A&S) will update relevant underlying issuances and regulations to align with this memorandum.

**EXHIBIT B**

**Feinberg Memorandum — Fostering One Strong Industrial Base (Sept 14, 2026)**

**Source:** defense.gov

**URL:** https://media.defense.gov/2026/Sep/15/2003997826/-1/-1/1/FOSTERING-ONE-STRONG-INDUSTRIAL-BASE.PDF

**Accessed:** September 22, 2026

*This document is submitted as Exhibit B in support of Plaintiff's Emergency Motion for Temporary Restraining Order, Carter v. Feinberg, et al., No. 26-cv- [___] (D.D.C.)*

DEPUTY SECRETARY OF WAR
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

SEP 14 2026

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOW FIELD ACTIVITY DIRECTORS

SUBJECT: Fostering One Strong Industrial Base

The Department of War (DoW) must buy faster, simpler, and more competitively to get speed and volume. Backed by strong Congressional support in the FY26 NDAA to strengthen the Defense Industrial Base, the Department continues to break down barriers to entry and expand our industrial base. To build on this momentum and keep all of industry engaged, we must completely transform and modernize our contract cost and pricing ruleset.

The DoW will move from government-unique Cost Accounting Standards (CAS) to the accounting every American company already uses — Generally Accepted Accounting Principles (GAAP) — and push those benefits to every tier of the supply chain. When necessary to foster transparency and fairness, we will ask suppliers for the cost and pricing information they already keep. No new accounting systems or special data formats will be required. Any data industry provides will be used only for authorized Government purposes and never made available to another company for its own use.

Executive Order 14402 makes fixed-price contracts the default and reserves cost-based contracts for basic research and for the development of major systems. Where there is a market — competition, comparable sales, reliable price history — the market sets the price. Where there is no market — major sole-source development and procurement — we will rely on cost data drawn from a company's existing records rather than invasive oversight.

My August 18, 2026 memorandum, "Supplier Cost and Pricing Transparency," reinforces the option for contracting officers to see through the prime contractor to the suppliers when needed. This is essential to ensure companies at every tier are treated fairly. For the system to work, contractual benefits offered by the government to a prime must be flowed down through the supply chain and, conversely, sole-source suppliers cannot be allowed to leverage primes and slow down deliveries. The Department has a wide range of tools to mitigate risk and strengthen the supply chain. Office of Strategic Capital loans, Industrial Base Analysis and Sustainment funds, and talented DoW business operators should be accessible to every company supporting the DoW.

Asking for information does not, by itself, create a cost-reimbursement contract or CAS coverage, and it does not alter the thresholds or exceptions for certified cost or pricing data. Transparency and partnership run both ways: the Department opens its buying to market forces, and when asked, industry shares the cost and pricing information it already keeps.

We will accept GAAP-based accounting across all contracts to the maximum extent the law permits, and we will continue pursuing CAS to GAAP through the Cost Accounting

Standards Board (CASB). The DoW will submit proposals to the CASB within 60 days to make CAS exemption the default, confine remaining CAS coverage to sole-source, cost-based development or incentive-fee procurement, and ensure CAS applies only to relevant contracts and not companies as a whole. Recently, the CASB made significant progress in reducing the CAS regulations, and we look forward to partnering with them to continue accelerating change this year. Until the Board acts, no solicitation from the DoW that could bring a business unit not previously subject to CAS under full CAS coverage may be issued unless the Under Secretary of War for Acquisition and Sustainment has approved the acquisition strategy in writing.

The attached appendix directs these actions; implementing guidance may not add requirements beyond this memorandum and applicable law. This memorandum and appendix govern how the Department requests and uses contractor cost and pricing information; prior Department guidance on this subject will be applied consistently with it.

One of our Nation's greatest strengths is its private sector. National security must harness it — unleashing industry, protecting taxpayers through proven methods like competition, and restricting the use of our most burdensome oversight tools to only when absolutely necessary.

Attachment:
As stated

APPENDIX: IMPLEMENTATION ACTIONS

The Vice Chairman of the Joint Chiefs of Staff will:

**Review requirements reform in practice.** Within 30 days, co-chair with the Deputy Secretary a review of the Services' and Military Departments' implementation of requirements reform. The requirements review will use tangible program examples to show where the new approach has broadened acceptable acquisition solution space, expanded competition, or changed what acquisition could buy, and will identify how the Services and Military Departments can accelerate adoption, or further improve requirements processes.

The Under Secretary of War for Acquisition and Sustainment (USW(A&S)) will:

**Accelerate acquisition transformation.** Having issued the commercial-first implementation policy, within seven days issue the Department-wide modular open systems approach (MOSA) policy and the Portfolio Acquisition Executive Operating Framework, including its addendum of recommended authorities for delegation.

**CAS containment within existing authority.**

- Use available CAS relief. Apply immediately the increased CAS thresholds enacted in section 1806 of the National Defense Authorization Act for Fiscal Year 2026, as implemented by Department class deviation and by the Cost Accounting Standards Board's 2026 threshold rule as it takes effect, together with the statutory relief for nontraditional defense contractors. Within 60 days, issue, with the support of the Under Secretary of War (Comptroller) (USW(C)), a CAS waiver policy and standing justification templates for the individualized determinations the waiver authority in law requires, for new entrants, predominantly commercial segments, and businesses outgrowing small-business classifications.

- Prevent shadow CAS. Within 30 days, prohibit Components from imposing on exempt awards and other transactions the equivalent of CAS coverage, disclosure, business-system review, or practice-change governance under another name. Cost data from exempt performers will be requested as already maintained in their books and records.

- Limit new CAS coverage pending Board action. Before issuing a solicitation expected to bring a performing business unit newly under full CAS coverage, obtain the written approval of the USW(A&S) for the acquisition strategy. Requests must assess competition, commercial acquisition, competed fixed-price structures, exemptions, and existing waiver authority, and explain why none can meet the requirement without new full CAS coverage; the Under Secretary will decide within 15 business days or elevate the request to the Deputy Secretary. This approval concerns the acquisition strategy only; it does not determine CAS applicability, grant any exemption or waiver, or authorize omission of a required provision or clause.

**Make rapid commerciality determinations.** Within 45 days, direct that commercial product and service determinations be completed within 15 business days of a complete request; that a prior Department determination stand for subsequent procurements unless reversed in writing by a head of contracting activity; and that, on commercial acquisitions, cost data may be requested if the contracting officer determines price, market, and sales data are insufficient to determine a fair and reasonable price.

**Extend use of other transactions.** Through the Other Transactions Guide revision under way, within 45 days issue interim other transaction (OT) policy, followed by the full Guide reissue within 120 days, that: defines "participating to a significant extent" as any unique contribution material to the prototype project, without percentage-of-workshare or dollar thresholds as eligibility tests; prefers fixed-amount, milestone-based payment structures; requires the agreements officer, before award, to document the applicable statutory eligibility basis, relying where lawful on offeror self-certification against standard representations and conducting additional verification by exception, with a 10-business-day clock on any determination; and directs follow-on production planning in every prototype OT. Within 30 days, issue a consortium policy with project-level eligibility, direct-award preference and fee transparency. Within 60 days, Component Senior Procurement Executives will publish pre-approved findings templates and a 10-business-day signature standard for exceptional-circumstances determinations.

**Modernize profit policy.** Within 90 days, initiate the DFARS rulemaking, eliciting industry feedback, to revise the Department's profit policy so that negotiated margins reflect value delivered, risk carried, and private capital invested – not merely cost incurred. Commercial benchmarks will inform negotiation objectives but will not constitute caps. The policy will reward efficiency, speed, and performance; weigh the financial health of fragile supply-chain chokepoints; and address sustained loss positions prospectively through fair pricing of future work. Nothing in this action alters applicable cost-allowability requirements for cost-reimbursement work. Healthy and reasonable margins drive innovation and excellence.

**Require a basis for requirements.** Within 90 days, building on the inventory completed under the Acquisition Transformation Strategy, every recurring review, checklist, data demand, or approval imposed below the Federal Acquisition Regulation (FAR) and Defense Federal Acquisition Regulation Supplement (DFARS) will be annotated with the authority that requires it. Requirements grounded in operational safety, security, and classification authorities are not subject to automatic lapse. Any other uncited item will be suspended for new use and will lapse unless the cognizant Component Acquisition Executive reaffirms it within 30 days. No new procedural requirement may be issued without its basis stated on its face.

**Modernize forward-pricing support.** Direct that DCMA immediately work with DCAA to overhaul the approach to establishing and maintaining forward pricing rate agreements (FPRAs) consistent with this memorandum, drawing on rate data maintained in the ordinary course of business. FPRAs will be used only where they accelerate recurring, high-volume negotiations and enable a more efficient process for the Department and for industry.

**Implement supplier cost and pricing transparency consistent with this memorandum.** Within 30 days, issue the implementing procedures for the August 18, 2026, memorandum so

that price information is obtained first and cost information to the extent needed to establish a fair price; commercial products and services are priced under the statutory limits that apply to them; cost information is requested in the form the contractor already maintains; contractor denials are handled under the process the law provides; information received is used only for the pricing action for which it was requested; and no automated access to contractor systems without express contractual authorization and applicable security protections. Nothing in the procedures alters the thresholds or exceptions for certified cost or pricing data. The procedures will state that, consistent with Executive Order 14402, cost-reimbursement contracting remains appropriate for research and for the development of major systems, and is otherwise the exception.

The USW(C) will:

**Advance CAS coverage reform at the Board.** With the support of the USW(A&S), develop and formally transmit to the Cost Accounting Standards Board the Department's proposals for: (a) a class exemption making exemption the default, with CAS coverage limited to cost-based development contracts of major scale awarded without adequate price competition; (b) coverage that attaches to the covered contract and the indirect-cost pools material to it, with no entity-, segment-, or flowdown-attachment; (c) completion of the CAS-to-GAAP conformance begun with the July 8, 2026, final rule, so that GAAP is the baseline and government-unique requirements survive only where cost-based pricing specifically demands them; and (d) a modernized Disclosure Statement – a short certification that contract cost accounting follows the contractor's annual GAAP financial statements, audited by a registered independent public accounting firm, supplemented only by legally required disclosures, with a schedule of departures, in a machine-readable, versioned electronic submission format. Transmit the supporting analysis to the Board and report monthly to the Deputy Secretary until the Board acts.

**Ensure audits are risk-based.** Within 60 days, direct that the Department consider a contractor's audited GAAP financial statements and internal-control attestations before performing additional work. Ensure that no office will request an audit of a cost or system that has already been audited or reopen closed years absent indicators of fraud or material misstatement. Every audit will identify the risk, its materiality to a government decision, the records needed, and why existing evidence is insufficient.

**Recommend the Department's Cost Accounting Standards Board representative.** Within 30 days, in coordination with the USW(A&S) and the General Counsel, recommend to the Secretary, through the Deputy Secretary, the appointment of the Department's best-qualified representative to the Cost Accounting Standards Board under the Secretary's appointment authority. The representative will have substantial experience administering and managing covered contracts and will be selected consistent with section 1806 of the National Defense Authorization Act for Fiscal Year 2026 and advance compliance with the Board-member eligibility requirements at 41 U.S.C. 1501(b)(4).

The USW(A&S) and the USW(C) will jointly:

**Consolidate contractor business systems.** Within 90 days, through the business-systems line of effort under way, issue class deviations where required, and direction to:

- Consolidate estimating-system and material-management-and-accounting-system requirements into simplified, commercial-aligned accounting-system criteria and retire their separate reviews – retaining statutory proposal-integrity protections, inventory-accounting standards, and standards for consistent cost estimation, accumulation, and reporting – with accounting-system adequacy outside the covered CAS core assessed against the FAR's condition for the contract type, satisfied by the contractor's GAAP books and a contract-level ledger meeting applicable allowability rules;

- Confine earned value management to major development programs and, where the Government retains cost risk, major long-duration production programs, with the boundary set in the implementing deviation; retire the separate government system-validation regime, using integrated baseline reviews to assess contract baselines; and accept schedule, actuals, and estimate-at-completion data from contractors' native systems;

- Reduce contractor burden by relying on government-wide FAR property-stewardship duties and remedies, aligned with commercial practices and tools, rather than a separate review overlay; and

- Raise the purchasing-system-review threshold under existing FAR authority, reserve reviews for demonstrated risk, and apply the statutory rule that an approved purchasing system ends subcontract-consent withholding; and

- Establish a 90-government-day clock for final disposition of contractor's corrective action plan, tolled while necessary contractor information is outstanding and elevated to the head of the contracting activity upon expiration.

No Component may recreate a retired regime through local policy, checklists, approvals, or clauses. To the maximum extent permitted by law and contract, Components will cease enforcing superseded requirements, and contracting officers will offer bilateral no-cost modifications removing affected clauses at the next practicable opportunity.

**Simplify business-system review.** Within 60 days, publish clear, specific, and publicly available commercial-aligned criteria for contractor business systems and issue a class deviation, grounded in the Department's statutory reliance authorities, accepting a registered independent public accounting firm's certification against those criteria in place of Department review. The deviation will set a reasonable effective date aligned, where applicable, with contractors' annual financial-statement audit cycles. Effective immediately, discretionary review requires a written determination of specific, material risk by the cognizant contracting activity, coordinated with the requiring Component Acquisition Executive or designee. For multi-Component facilities, the Defense Contract Management Agency (DCMA) will identify the cognizant Component.

**Publish the efficiency assurance.** Within 30 days, issue a joint enforcement-posture statement that, for fixed-price contracts and other transactions, to the extent the performer bears the cost risk: a performer that becomes more efficient against a fairly negotiated price keeps the savings for that contract, and the Department captures efficiencies only prospectively, in the next negotiation, at a fair margin. This statement scopes enforcement priorities and will be incorporated in the profit policy revision; it does not waive statutory remedies for fraud or defective pricing, CAS price adjustments where CAS applies, or final indirect-cost-rate settlement on cost-reimbursement work.

The Secretaries of the Military Departments, through their Acquisition Executives, will:

**Implement Portfolio Acquisition Executive authorities.** The recommended authorities in the Portfolio Acquisition Executive Operating Framework's addendum are the default. Within 120 days of the Framework's issuance, each Component's implementation plan will delegate those authorities. Any exception requires the Component Head's signature, the specific reason, and an alternative that delivers the same speed, and will be submitted to the Deputy Secretary with the plan.

The Director, Defense Innovation Unit, will:

**Scale advance market commitments.** Within 180 days, with support from the USW(A&S) including Defense Production Act authorities as needed, structure additional advance market commitments, including aggregated allied demand consistent with the America First Arms Transfer Strategy, building on the early success of the Drone Dominance initiative in piloting demand-pull procurements that unleash market forces and create price signals for robust supply chains. These commitments shall reward demonstrated performance and delivered scale, operate within existing resources, and comply with applicable fiscal law.

The Director of Administration and Management, as part of the ongoing Defense Agency and DoW Field Activity review, will:

**Align the contract-oversight enterprise.** Within 90 days, with the USW(A&S), the USW(C), the Military Departments, DCAA, and DCMA, deliver options to the Deputy Secretary for clarifying roles and charters, eliminating duplication, and addressing workforce effects. Preserve mission-critical contract-administration functions, including government flight operations, product acceptance, facilitating contractor payment, property administration, and supplier quality assurance.

The USW(A&S), with the USW(C), will:

**Measure results.** Within 90 days, define and baseline: government-unique requirements eliminated; business units under full CAS coverage; business systems subject to review; audit and oversight cycle time; commercial content; performers at production per program, paired with unit-cost and affordability effects; new entrants and returning commercial firms; and declined

solicitations, where observable. Report quarterly thereafter. These measures are the test of this memorandum.

This memorandum is effective on signature. No new organization or compliance framework will be created. No discretionary study, pilot, working-group determination, or approval not required by law may delay these actions. Subordinate Department guidance inconsistent with this memorandum will be revised within 90 days.

All actions will comply with applicable statutes and appropriations law. Nothing in this memorandum authorizes obligations in excess of available appropriations, directs the scope, findings, or conclusions of any audit, or alters any authority vested by statute. Where additional authorities are required, the USW(A&S) will develop a legislative engagement plan to secure and support those authorities and the durability of these reforms. Department-approved artificial intelligence tools may be used to reduce document-preparation burden and expedite execution time.

**EXHIBIT C**

**CAFC Docket Entry — Appeal No. 26-1721, Doc. 19 (May 15, 2026) and Doc. 47 (Sept 21, 2026).**

- *Doc. 19: Omnibus Filing (May 15, 2026) [Constructive Trust & Escrow Demand; TVPA Mandatory Stay; Administrative Stay; Emergency Notice; Sworn Declaration]*
- *Doc. 47: Motion for Severance, Interim Financial Preservation, and Show Cause (Sept 21, 2026)*

**Source:** CAFC eCFS

**URL:** https://ecf.cafc.uscourts.gov/

*As filed in the record of CAFC Appeal No. 26-1721.*

*Submitted as Exhibit C in support of Plaintiff's Emergency Motion for Temporary Restraining Order, Carter v. Feinberg, et al., No. 26-cv- [___] (D.D.C.)*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAITONA CARTER,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, in his official capacity as Deputy Secretary of Defense;<br><br>PETE HEGSETH, in his official capacity as Secretary of Defense; and<br><br>WALTER JAY CLAYTON, in his official capacity as Director of National Intelligence,<br><br>Defendants. | Case No. 1:26-cv-03318-___ |

**VERIFIED AMENDED COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**
(Administrative Procedure Act; Mandamus; Preliminary Injunction)

Plaintiff Daitona Carter ("Plaintiff"), proceeding pro se and in forma pauperis, brings this action against Defendants Stephen A. Feinberg, Deputy Secretary of Defense, Pete Hegseth, Secretary of Defense, and Walter Jay Clayton, Director of National Intelligence, each in their official capacities, seeking immediate declaratory, injunctive, and mandamus relief to halt the unlawful elimination of mandatory CAS cost segregation requirements and to enjoin the classification or removal from judicial reach of records necessary to Plaintiff's pending federal proceedings. Absent immediate judicial intervention, the implementation of Defendants' directives will permanently eliminate the generation of contract-level cost-segregation data necessary to secure

RECEIVED
OCT 05 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

effective remedies in Plaintiff's pending federal appellate proceedings. In support thereof, Plaintiff alleges as follows:

## I. JURISDICTION AND VENUE

1. This Court possesses subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1361 (mandamus jurisdiction), and 5 U.S.C. § 702, which provides an explicit waiver of sovereign immunity for actions seeking relief other than money damages challenging unlawful agency action under the Administrative Procedure Act ("APA").

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers of an agency of the United States acting in their official capacities, the Department of Defense is headquartered in Arlington, Virginia, the Office of the Director of National Intelligence is headquartered in Washington, D.C., and a substantial part of the events and directives giving rise to the claims asserted herein occurred within the District of Columbia.

## II. THE PARTIES

3. Plaintiff Daitona Carter is a non-party inventor who was admitted as Movant-Appellant/Petitioner in the United States Court of Appeals for the Federal Circuit (*Appeal No. 26-1721*) as a proposed intervenor from the lower court. Plaintiff's Motion for Constructive Trust and Escrow Framework (CAFC Doc. 19) is pending and undisposed in that appeal. Separately, Plaintiff petitioned the Director of the United States Patent and Trademark Office, who, despite initial refusal, docketed Plaintiff's Notice of Related Case

Information on the USPTO IPR docket as a non-party. The USPTO docketed the intake correspondence rather than a formal notice.

4. Defendant Stephen A. Feinberg is the Deputy Secretary of Defense. In his official capacity, Defendant Feinberg is the chief operating and acquisition executive responsible for issuing binding policy memorandum governing defense contract cost accounting and procurement standards across all military components.

5. Defendant Pete Hegseth is the Secretary of Defense and the cabinet-level head of the Department of Defense. In his official capacity, Defendant Hegseth is vested with ultimate statutory authority over the administration of defense procurement, contract executions, and agency compliance with federal procurement statutes.

6. Defendant Walter Jay Clayton is the Director of National Intelligence, sworn in August 3, 2026. In his official capacity as DNI, Defendant Clayton holds plenary authority over all 18 intelligence agencies, including the authority to issue classification determinations, establish Special Access Programs (SAPs), and direct the handling of records within Intelligence Community (IC) jurisdiction under 50 U.S.C. § 3024 and 50 U.S.C. § 3592. On October 2, 2026, Defendant Clayton was additionally announced as the lead of the presidential "Super Intelligence Force" AI task force, with a 120-day mandate to assess federal AI oversight and recommend a regulatory framework for DoD AI programs, including SBMC, US ARMY Project ARIA, and Project EagleEye. (Exhibit J.)

## III. STATEMENT OF FACTS

7. On August 18, 2026, Defendant Feinberg issued a binding Departmental memorandum commanding all military components to implement automated Application Programming Interfaces ("APIs") to extract cost data directly from defense contractors' Enterprise Resource Planning ("ERP") and financial systems for all active contracts valued at or above $10,000,000. (Exhibit A.)

8. On September 14, 2026, Defendant Feinberg issued a second memorandum, titled "Fostering One Strong Industrial Base," directing the Department to shift its default cost accounting framework from Cost Accounting Standards ("CAS") to Generally Accepted Accounting Principles ("GAAP") across all defense contracts. (Exhibit B.)

9. The September 14, 2026 memorandum institutes a mandatory 30-day deadline commanding all military components to discontinue "shadow CAS" reporting and verification practices. That deadline expires on or about October 14, 2026.

10. Congress has codified the creation, modification, and administration of Cost Accounting Standards under 41 U.S.C. §§ 1501–1502, vesting exclusive regulatory authority over these standards in the government-wide Cost Accounting Standards Board ("CAS Board"). The statutory CAS framework mandates contract-level cost segregation and audit trails capable of isolating proceeds attributable to specific technology components within larger systems.

11. Plaintiff's 2009 public disclosure, published at blogspot.com and bearing Plaintiff's full legal name and website daitonacarter.com, describes the signal processing architecture (parallel compression, pre-delay attack, and musical release times) that

constitutes the prior art underlying U.S. Patent Nos. 10,306,389; 10,651,866; 11,082,055; 11,871,174; and 12,216,339. The disclosure is incorporated in the CAFC appendix for *Appeal No. 26-1721* and is docketed on the related PTAB IPR proceeding. (Exhibit E.) Plaintiff is the true inventor of the technology covered by those patents and has no patent of her own. Plaintiff's pending § 256 inventorship correction in *Appeal No. 26-1721* seeks to correct the patent records to reflect Plaintiff as the sole true inventor. Plaintiff's reduction to practice (2009 Blogspot, 2016 and 2019 prototypes, 2013–2019 source code, 2019 ARIA YouNoodle hosted Entrepreneurial World Cup Registration) predates all five Solos patents.

12. On May 15, 2026, Plaintiff filed an omnibus notification intake in the Federal Circuit (*Appeal No. 26-1721*), docketed as Document 19, which contained various notices and materials but was subjected to systemic docketing corruption and structural omissions, including the failure to apply mandatory docket numbers, verification headers, and official entry dates, alongside editorial tampering inserting an anomalous character ('52') into Plaintiff's corporate nomenclature. The lower court record was further compromised: Docket #91 (April 17, 2026) had its metadata and descriptions altered post-filing to label distinct files as 'duplicates' despite unique digital hashes, and Docket #92 was suppressed with '-1' placeholders replacing the actual files. PACER confirms successful upload and NEF to all parties for both entries, but neither is visible on the public docket. To address this administrative gridlock, Plaintiff filed an Emergency Omnibus Motion (CAFC Doc. 47, filed September 21/22, 2026), which formally requested: (a) the severance of the constructive trust and escrow matter from the corrupted omnibus filing (CAFC Doc. 19) into an independent, standalone record; (b) an interim financial preservation order requiring maintenance of CAS cost-segregation records and staying any GAAP conversion for the

specific contracts at issue (CAFC Doc. 47, Item 7); and (c) an order to show cause why Document 19 had remained completely unaddressed for 129 days. CAFC Doc. 47, Section III, independently identifies the Feinberg memoranda (Aug 18 and Sept 14, 2026) as the source of the emergency. As of the date of this complaint, the core equitable relief remains pending and unadjudicated. (Exhibit C.)

13. Plaintiff is preparing to file a separate civil action under the civil remedy provisions of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, arising from the same operative facts alleged herein. To secure a meaningful remedy under § 1595, Plaintiff must be able to produce segregated CAS accounting records to calculate the proceeds attributable to the technology. This action is not a TVPA claim. It is an APA/PI action to preserve the records necessary for that separate, anticipated proceeding.

14. The rapid implementation of the September 14, 2026 memorandum creates an immediate crisis: the mandatory conversion of contractor records from CAS segregation to GAAP consolidation is not a file format change. It is a restructuring of the data model. CAS requires contract-level cost pools, indirect rate allocations, and labor-hour tracing to specific contracts. GAAP does not. The conversion dissolves the cost pools into aggregate R&D and overhead lines that cannot be re-segregated. The information is not preserved in a different structure. It is destroyed by the act of conversion. No subsequent discovery order or post-judgment monetary award can reconstruct historical cost segregations from GAAP aggregates. Once the "shadow CAS" infrastructure is dismantled on October 14, 2026, the cost-segregation audit trail is permanently eliminated.

15. The patented technology at issue in *Federal Circuit Appeal No. 26-1721* is incorporated into the Department of Defense's Soldier Borne Mission Command ("SBMC") program, the successor to the Integrated Visual Augmentation System ("IVAS") program. The $21.88 billion IVAS production contract was transferred from Microsoft to Anduril Industries in February 2025. The SBMC program currently involves three prime prototype contracts: Anduril ($159 million, partnered with Meta Platforms Inc., Qualcomm Technologies, OSI, Gentex Corp., and Oakley Inc. (a subsidiary of EssilorLuxottica S.A., the defendant in Solos v. Meta, 1:26-cv-10304 (D. Mass.))); Rivet Industries ($195 million); and Elbit Systems of America ($120.5 million, partnered with Booz Allen Hamilton for AI) and the Scale AI CDAO contract ($500M ceiling, expanded May 2026 from $100M, for AI data curation and decision-support services; Top Secret/SCI clearance). (May 5, 2026). (Exhibit G.)

16. The SBMC program is transitioning from Phase One to Phase Two. Anduril publicly announced on August 17, 2026 that it is "moving from phase one to phase two," with 170 Phase Two prototypes to be delivered and testing slated to begin in late January or early February 2027. If the CAS-to-GAAP conversion is complete before Phase Two cost data is generated, that data will be collected under GAAP from day one. It will never have CAS cost segregation. This is not a temporary loss. It is a permanent structural gap. (Exhibit D.)

17. The technology is also present in the pipeline through DoD contracts held by Meta Platforms Inc. (waveguide optics and AI for SBMC) and Kopin Corporation (MicroLED displays, IBAS, with SBMC contributions projected at $350–500 million over the program's

life). (Exhibit H.) The CAS cost-segregation records for these contracts are the only records capable of isolating proceeds attributable to the specific patented technology.

18. Plaintiff is not a party to any of the contracts identified in paragraphs 15–17. Plaintiff's interest in the CAS cost-segregation records is as a litigant whose pending Federal Circuit appellate filings—specifically Document 19 (the omnibus notification intake) and Document 47 (the Emergency Omnibus Motion seeking severance into an independent constructive trust/escrow record and an interim preservation order)—require these records as the basis for identifying and tracing the subject property of the trust, for calculating statutory compensation in any subsequent action in the United States Court of Federal Claims under 28 U.S.C. § 1498, and for confirming at the contract level through labor-hour tracing that the work was performed by Plaintiff. The requested equitable trust and preservation framework establishes Plaintiff's concrete, imminent, and redressable injury: without the CAS records, the financial audit trail is permanently dissolved for SBMC Phase 2 and any subsequent production award.

19. The CAS cost-segregation records for the Covered Contracts identified herein are within the operational scope of Intelligence Community programs under Defendant Clayton's DNI jurisdiction, including Project ARIA (Army Rapid Implementation of AI, launched March 5, 2026), Project EagleEye (Anduril's SBMC submission), and the broader SBMC program. The 65 technical forensic files uploaded to the D. Mass. docket on April 17, 2026, the Alpaca Securities LLC account records for the trading account in which Plaintiff is the subject party, the NYC hotel guest records and communication logs (February 2026– April 2026, and the CAFC appellate record in *Appeal No. 26-1721* are records that, if

classified or placed under a SAP by Defendant Clayton, would be removed from the jurisdiction of the courts in which they are pending.

20. On July 14, 2026, Plaintiff served a Formal Objection and Compulsory Notice on the Majority and Minority Counsel of the Senate Select Committee on Intelligence, identifying Defendant Clayton's structural conflicts across his SEC, Apollo Global Management, and SDNY tenures, and requesting oversight review of the Intelligence Community's handling of the factual record in *CAFC No. 26-1721*. (Exhibit I.) The Senate confirmed Defendant Clayton on August 3, 2026, over that objection.

21. On October 2, 2026, Defendant Clayton was announced as the lead of the presidential "Super Intelligence Force" AI task force, with a 120-day mandate to assess federal AI oversight and recommend a regulatory framework. The task force's report is due approximately January 2027 — the same window in which SBMC Phase 2 testing (170 prototypes) will generate its first cost data. If the task force endorses GAAP as the default accounting framework for DoD AI programs, the CAS cost-segregation records will be permanently displaced at the policy level, and no district court injunction can unwind a presidential task force recommendation.

22. The 30-day CAS conversion deadline under the September 14, 2026 Feinberg memorandum (expiring October 14, 2026) and Defendant Clayton's DNI classification authority over IC program records constitute concurrent, independent, and compounding threats to the same records. The Feinberg memo converts the records from CAS to GAAP. Defendant Clayton's DNI authority can classify the remaining records or the records of their conversion, removing them from judicial reach entirely.

## IV. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Administrative Procedure Act — Action in Excess of Statutory Authority

### (5 U.S.C. § 706(2)(C))

23. Plaintiff incorporates by reference paragraphs 1 through 22 as if fully set forth herein.

24. Pursuant to 41 U.S.C. § 1502(a)(1), Congress exclusively delegated the authority to prescribe, amend, and rescind Cost Accounting Standards to the government-wide Cost Accounting Standards Board. No individual executive department possesses the statutory authority to alter or phase out these standards unilaterally.

25. Defendants' September 14, 2026 memorandum contains an explicit acknowledgment of this statutory limitation, stating: "By law, the Pentagon will still need to apply CAS to sole source development programs until it can work within the government-wide CAS Board to change the standards of CAS to GAAP." (Exhibit B, p. 2.) This is not a statement of future intent. It is an admission that the current legal obligation to apply CAS remains in force for programs within the statutory scope, including sole-source development programs.

26. Despite this acknowledgment, the memorandum's mandatory 30-day directive to dismantle "shadow CAS" practices operates to eliminate the informal mechanisms by which contracting officers and auditors have historically obtained contract-level cost segregation data for programs that fall within the CAS scope but are not formally designated as "sole-source development" in the contract file. The result is that programs functionally within the

CAS scope (competitive in form but sole-source in substance, due to the specific technology at issue) lose their cost segregation protection without the CAS Board ever acting.

27. The directive constitutes "final agency action" under 5 U.S.C. § 704 because it marks the consummation of the agency's decision-making process, imposes immediate and binding compliance obligations upon the defense-industrial base, and is the occasion for future legal obligations (the 30/60/90-day implementation clocks).

28. Because the memorandum attempts to unilaterally alter the practical application of a statutory accounting framework outside the mechanisms of the CAS Board, it must be set aside as an action taken "in excess of statutory jurisdiction, authority, or limitations" under 5 U.S.C. § 706(2)(C).

**SECOND CLAIM FOR RELIEF**

**Administrative Procedure Act — Arbitrary and Capricious Action**

**(5 U.S.C. § 706(2)(A))**

29. Plaintiff incorporates by reference paragraphs 1 through 28 as if fully set forth herein.

30. An agency action is arbitrary and capricious if it fails to consider significant, foreseeable aspects of the problem. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)*.

31. In issuing the August 18 and September 14, 2026 memorandum, Defendants Feinberg and Hegseth failed to consider:

(a) The foreseeable impact that the elimination of CAS cost-segregation data would have on active, pending federal appellate proceedings in which contract-level cost records are necessary to enforce an equitable remedy (specifically, the Motion for Constructive Trust and Escrow, Doc. 19, *CAFC No. 26-1721*, filed May 15, 2026, undisposed for 130 days);

(b) The irreversible nature of the data conversion. The conversion from CAS to GAAP is not a file format change. It is a restructuring of the data model. CAS requires contract-level cost pools, indirect rate allocations, and labor-hour tracing to specific contracts. GAAP does not. The conversion dissolves the cost pools into aggregate R&D and overhead lines that cannot be re-segregated. The information is not preserved in a different structure. It is destroyed by the act of conversion. No subsequent discovery order or post-judgment award can reconstruct historical cost segregations from GAAP aggregates;

(c) The 30-day implementation window (expiring October 14, 2026) which, if executed, will be complete before the SBMC Phase 2 prototypes (170 units, testing January–February 2027) generate their first cost data. The Phase 2 data will be collected under GAAP from day one. It will never have CAS cost segregation. This is not a temporary loss. It is a permanent structural gap.

32. Defendants provided no reasoned justification for the 30-day deadline. No regulatory impact analysis, notice-and-comment period, or consultation with the CAS Board preceded the directive. The *State Farm* requirement to "examine the relevant data and articulate a satisfactory explanation" was not met.

**THIRD CLAIM FOR RELIEF**

**Writ of Mandamus (28 U.S.C. § 1361)**

33. Plaintiff incorporates by reference paragraphs 1 through 32 as if fully set forth herein.

34. Defendants Feinberg and Hegseth possess a clear, nondiscretionary, and ministerial statutory duty under 41 U.S.C. § 1502 and 48 C.F.R. Part 9905 to maintain CAS cost segregation for all contracts within the statutory scope of full CAS coverage. The September 14 memorandum concedes this duty in its own text (paragraph 25, supra): "By law, the Pentagon will still need to apply CAS to sole source development programs until it can work within the government-wide CAS Board to change the standards of CAS to GAAP." The duty is not discretionary. It is statutory. It applies until the CAS Board acts. The CAS Board has not acted.

35. Plaintiff possesses a clear right to an effective judicial remedy. The Motion for Constructive Trust and Escrow (Doc. 19, *CAFC No. 26-1721*) is pending and undisposed. Enforcement of that trust requires identification and tracing of the subject property through contract-level cost segregation. Without the CAS records, the trust is unenforceable. Plaintiff's right to the trust is not theoretical. It is a pending equitable proceeding in a federal court of appeals.

36. Plaintiff has no other adequate remedy at law. The 30-day conversion clock expires October 14, 2026. After that date, the shadow CAS infrastructure is dismantled, the cost pools are dissolved, and the segregation data is structurally eliminated. No discovery

motion, no subpoena, no FOIA request can regenerate data that was never collected in the required format.

37. Plaintiff is entitled to an order compelling Defendants Feinberg and Hegseth to maintain CAS cost segregation for the following specific contracts and subcontracts (hereinafter, the "Covered Contracts"): (a) the Anduril SBMC prototype contract ($159M); (b) the Rivet SBMC prototype contract ($195M); (c) the Elbit Systems of America SBMC prototype contract ($120.5M); (d) the Kopin IBAS contract ($15.4M); (e) the Lockheed Martin NGSRI Phase 2 contract; (f) the $2.4M international thermal weapon sight order; (g) the $3.6M European military helmet display order; and (h) the Scale AI CDAO contract ($500M ceiling, May 2026) — in their current segregated form, pending resolution of CAFC Doc. 19 and the § 256 inventorship correction in *CAFC No. 26-1721*.

**FOURTH CLAIM FOR RELIEF**

**DNI Classification Authority — Threat to Pending Litigation Records**

**(APA § 706(2)(A), (C); 50 U.S.C. § 3024; 50 U.S.C. § 3592)**

38. Plaintiff incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

39. Defendant Clayton, in his official capacity as Director of National Intelligence, holds authority under 50 U.S.C. § 3592 to determine the classification of national security information and under 50 U.S.C. § 3024 to direct the activities of all intelligence agencies. This includes the authority to establish Special Access Programs (SAPs) that remove records from the general classification system and place them under restricted access.

40. The threat posed by Defendant Clayton's dual role as Director of National Intelligence and head of the presidential "Super Intelligence Force" AI task force is the systemic, preemptive removal of essential evidentiary records from judicial reach. Clayton—whose primary professional background is corporate finance and legal defense, notably marked by systemic institutional failures to safeguard sensitive records such as those involving the Epstein proceedings—is uniquely positioned to weaponize intelligence classification and Special Access Program (SAP) authorities as a corporate and executive shield. Because "Project ARIA"—adopted by the U.S. Army as the *Army Rapid Implementation of AI*—directly deploys Plaintiff's proprietary trademarked AI modeling, signal processing framework, and architectural designs that were appropriated by Meta and funneled directly into military deployment, intelligence community jurisdictions and federal AI oversight frameworks overlap directly with the core subject matter of this dispute. Specifically, Meta executive Andrew Bosworth, operating within the Innovation Corps (US Army) framework, had actual, documented notice of the theft and unauthorized appropriation of Plaintiff's intellectual property as early as March 2021. Furthermore, the Department of Defense and its relevant components received formal complaints, administrative reports, and direct legal notice of this intellectual property theft in 2020, 2021, and continuously before and after the deployment of the technology—meaning the agency had actual knowledge of the infringement and misappropriation long before and concurrent with its integration into military systems. The DOD and IC were also aware of the theft before the Movant and were notified of trafficking and related ongoing physical harm in real time. Crucially, federal whistleblowers attempted to warn Plaintiff of the impending targeting prior to the commencement of physical battery, asset seizure, and

forced movement; it was only subsequent to these whistleblower warnings that the physical assaults, surveillance infrastructure, and property seizures escalated. The records referenced in paragraph 19—specifically comprising:

a. the 65 technical forensic files and source code documentation before the U.S. District Court for the District of Massachusetts;

b. the Alpaca Securities LLC account records, DTCC, FINRA, and SEC filings for the trading account in which Plaintiff is the designated subject party, alongside records concerning Meta Materials ($MMAT/$MMTLP) including funding, US/Federal contracts and IP owned, held, or sold by the entity and or its estate;

c. the lodging, communication, residential, business and security records associated with locations utilized in the underlying acts of surveillance, extraction, data harvesting forced movement/kidnapping, and trafficking, including Camden Brickell, Brickell Flatiron, Millcento, the JW Marriott Miami, SLS Brickell, 830 Brickell Ave., the citizenM Hotel, Solaris, and locations not limited to Florida, California, New York, Washington (state), Georgia, South Korea and in-flight (both domestic and international) known and documented across Federal agencies and departments.

d. travel logs across international and domestic transit, saved commercial airline manifest (including any seat changes), private transportation, ride-share, rail, airline, on-demand delivery, and VoIP providers records related to the Plaintiff, plaintiff family and businesses;

e. compromised academic, administrative, and electronic communication records—including emails, coursework, and homework logs—from Florida International University, Western New Mexico University, and Harvard University, which were

accessed, hacked, and utilized as part of the infrastructure to monitor, isolate, and traffic Plaintiff and college-age students;

f. select data windows from AI providers (OpenAI, xAI/Grok, Duck.ai) and records detailing the corporate sales of AOL and Yahoo, the institutional funding of Bending Spoons, and its corporate migration to Italy including Evernote;

communications transmitted to government officials in their personal or professional capacities; and

g. the CAS cost-segregation records and appellate record for CAFC *Appeal No. 26-1721*—are not abstract files; they constitute the indispensable evidentiary corpus required to sustain Plaintiff's pending federal proceedings, establish the constructive trust, and satisfy the statutory predicate requirements for imminent civil enforcement under the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1595, and RICO. Once classified or designated under a SAP by Defendant Clayton under the dual pretexts of national security and AI task force regulatory mandates over Project ARIA, these records would be unlawfully severed from judicial review. A blanket classification order applied mid-litigation by the DNI/AI task force lead to swallow active evidentiary records violates the Administrative Procedure Act and *United States v. Reynolds, 345 U.S. 1 (1953)*, by substituting unreviewable executive fiat for judicial oversight, thereby stripping the federal courts of their jurisdiction and nullifying Plaintiff's statutory rights to a judicial remedy.

41. On July 14, 2026, Plaintiff served a Formal Objection and Compulsory Notice on the Majority and Minority Counsel of the Senate Select Committee on Intelligence,

identifying Defendant Clayton's structural conflicts across his SEC, Apollo Global Management, and SDNY tenures, and requesting oversight review of the Intelligence Community's handling of the factual record in *CAFC No. 26-1721*. (Exhibit I.) The Senate confirmed Defendant Clayton on August 3, 2026, over that objection. Defendant Clayton had actual notice of the conflict and of the pending proceedings before assuming office.

42. On October 2, 2026, Defendant Clayton was announced as the lead of the presidential "Super Intelligence Force" AI task force, with a 120-day mandate to assess federal AI oversight and recommend a regulatory framework for DoD AI programs. The task force's report is due approximately January 2027 — the same window in which SBMC Phase 2 testing will generate its first cost data. If the task force endorses GAAP as the default accounting framework, the CAS records will be permanently displaced at the policy level.

43. The 30-day CAS conversion deadline (October 14, 2026) and Defendant Clayton's DNI classification authority constitute concurrent, independent, and compounding threats to the same records. The Feinberg memo converts the records from CAS to GAAP. Defendant Clayton's DNI authority can classify the remaining records or the records of their conversion, removing them from judicial reach entirely. A classification determination is not subject to the same discovery and unsealing mechanisms as a civil evidentiary order. Once a record is classified and placed under a SAP, the only mechanism for its release is administrative declassification review — not a court order.

44. *United States v. Reynolds, 345 U.S. 1 (1953)*, requires a specific, reasoned determination that disclosure would "dangerously and harmfully" affect national security — not a blanket

designation of all records touching a program that has any IC component. A DNI determination that classifies records in a pending civil action without a specific, case-by-case determination of harm is arbitrary and capricious under 5 U.S.C. § 706(2)(A).

45. Defendant Clayton maintains personal financial interests in Apollo Global Management, the entity who provided Bending Spoons the funds via a joint venture for acquisition of Evernote is alleged in the CAFC record to have been the mechanism for transferring Plaintiff's lab notes/proof of inventorship including proof of Linkedin restriction three days before the FTC v Meta Platforms (fka Facebook) anti-trust case in December 2020. This personal interest is disclosed in his OGE financial disclosure and is not divested by his official capacity as DNI.

46. Plaintiff is entitled to an order enjoining Defendant Clayton, in his DNI capacity, from classifying, designating as a SAP, or otherwise removing from judicial reach any record related to *CAFC Appeal No. 26-1721*, the 65 technical forensic files, the Alpaca Securities LLC account records for the trading account in which Plaintiff is the subject party, the NYC hotel communication logs, or the CAS cost-segregation records for the eight Covered Contracts, pending resolution of the pending proceedings in this Court and the CAFC.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Issue a Temporary Restraining Order enjoining Defendants Feinberg and Hegseth, their agents, officers, and components from executing the September 14, 2026 memorandum as to the CAS cost-segregation records relevant and material to Plaintiff's pending Motion for

Constructive Trust and Escrow (Doc. 19, *CAFC No. 26-1721*) and the § 256 inventorship correction, and prohibiting the modification, consolidation, conversion, deletion, or rendering inaccessible of any such records for the Covered Contracts identified in paragraph 37;

2. Issue a Temporary Restraining Order and Preliminary Injunction enjoining Defendant Clayton, in his official capacity as DNI, from classifying, designating as a Special Access Program, or otherwise removing from judicial reach any record related to: (a) *CAFC Appeal No. 26-1721*; (b) the 65 technical forensic files uploaded to the D. Mass. docket on April 17, 2026; (c) the Alpaca Securities LLC account records for the trading account in which Plaintiff is the subject party; (d) the NYC hotel communication logs (Febreuary 2026 – April 2026); or (e) the CAS cost-segregation records for the eight Covered Contracts, pending further order of this Court;

3. Issue a Preliminary Injunction preserving all relevant CAS cost-segregation records in their current segregated form, and requiring Defendants Feinberg and Hegseth to maintain CAS cost segregation for new cost data generated for the Covered Contracts and for SBMC Phase 2 and any subsequent production award, pending the disposition of Doc. 19 in CAFC No. 26-1721;

4. Enter a Declaratory Judgment declaring that the September 14, 2026 memorandum titled "Fostering One Strong Industrial Base" is an action in excess of statutory authority under 41 U.S.C. § 1502 to the extent it eliminates CAS cost segregation for programs within the statutory scope without action by the CAS Board;

5. Issue a Writ of Mandamus compelling Defendants Feinberg and Hegseth to maintain CAS cost-segregation records in their current segregated form for the Covered Contracts, pending resolution of the pending CAFC proceedings;

6. Award Plaintiff taxable costs pursuant to 28 U.S.C. § 1920; and, to the extent Plaintiff subsequently retains legal representation, award reasonable attorneys' fees, expert witness costs, and litigation expenses pursuant to the Equal Access to Justice Act, 5 U.S.C. § 7430 and 28 U.S.C. § 2412; and

7. Grant such other and further relief as this Court deems just and proper.

**VERIFICATION**

I, Daitona Carter, declare under penalty of perjury that I have read the foregoing Verified Amended Complaint for Declaratory and Injunctive Relief and that the facts stated herein are true and correct to the best of my knowledge, information, and belief.

Executed on October 4, 2026.

Respectfully submitted,

Daitona Carter

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com

## EXHIBIT LIST

| Exhibit | Content |
|---|---|
| **Exhibit I** | SSCI email, July 14, 2026 (full partially redacted text) |
| **Exhibit J** | AI Czar announcement, Oct 2, 2026 (@WhiteHouse X.com Post– President Trump and Inaugurating the Era of Super Intelligence<br>A Presidential Document by the Executive Office of the President on 10/02/2026 ) |

**Exhibit I**

**Description:** SSCI email, July 14, 2026 (full partially redacted text)

[redacted]

***From***
DAITONA CARTER

***To***
Senate Select Committee on Intelligence

***Number of pages***
[redacted]

***Message***
[redacted]

DATE: July 14, 2026

TO: Majority Counsel & Minority Counsel, Senate Select Committee on Intelligence (SSCI)

FROM: Daitona Carter, Movant-Appellant / Original Inventor / Former U.S. Senate Intern (2001, Office of Senator Clinton)

SUBJECT: BRIEF AND COMPULSORY NOTICE OF MATERIAL EVIDENCE AND WITNESS TESTIMONY IN OPPOSITION TO THE CONFIRMATION OF JAY CLAYTON AS DIRECTOR OF NATIONAL INTELLIGENCE

RE: CAFC Appeal No. 26-1721 (Solos [redacted]
Mandamus No. 26-136 (In re Carter) / [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Federal Statutory Mandates:

Kari's Law (47 U.S.C. § 623) & RAY BAUM'S Act (47 U.S.C. § 506): Strict federal mandates requiring all multi-line telephone systems (including hotels) to allow direct-dial access to emergency services without prefixes, and to automatically transmit precise, dispatchable location data to first responders.

The Defend Trade Secrets Act (18 U.S.C. § 1836): Federal cause of action for economic espionage and misappropriation of proprietary engineering assets.

The Victims of Trafficking and Violence Protection Act (22 U.S.C. § 7101): Severe federal felony structures prohibiting the forced harboring, containment, and transit of individuals for illegal asset exploitation.

[redacted]

[redacted]

Objector Daitona Carter is the sole original inventor of the foundational, unpatented proprietary technology consisting of smart-glasses architectural arrays, integrated microphone geometries, see-through display integrations, and multi-sensor tracking systems currently at issue in CAFC Appeal No. 26-1721.

This intellectual property was obtained entirely without consent, utilizing physical force, structural containment, and systemic theft. This operational methodology constitutes a direct intersection of human trafficking, modern slavery, and economic espionage, executed via interconnected corporate-state relationships to benefit federal procurement pipelines.

[redacted]

Publicly verifiable procurement records establish that this fragmented technology forms the core operational framework for two primary U.S. Army tech deployments: [redacted] effectively insulating commercial patent disputes behind the shield of state-secrets doctrine.

B. The Anduril Procurement Loop

On February 25, 2025, former Anduril Industries Vice President Daniel P. Driscoll was sworn in as the 26th Secretary of the Army. Within four months of assuming office, Secretary Driscoll authorized the creation of the aforementioned Detachment 201, legally integrating corporate executives from Meta, Palantir, and OpenAI into uniform.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Direct evidence of a highly coordinated, non-coincidental enforcement action is preserved in external server logs: on December 6, 2020, exactly three days prior to the Federal Trade Commission (FTC) filing its landmark antitrust lawsuit against Facebook (now Meta Platforms, Inc.), the Objector's professional LinkedIn account was completely restricted and locked.

This targeted digital isolation was executed explicitly to wipe out public, contemporaneous verification of her original inventorship, including her documented public postings of the see-through display integration and multi-sensor tracking designs, right as federal regulators began dissecting the corporate entity's market acquisitions.

Reflecting the systemic pressure generated by the Objector's subsequent formal motions to the court, the previous chief executive officer of a principal entity embedded in this tech pipeline abruptly stepped down, switching departments in a tactical corporate maneuver to evade direct deposition and decouple personal liability from the active docket.

[redacted]

[redacted], the Objector has been subjected to continuous, escalating forced harboring and trafficking across six (6) distinct NYC hotel properties spanning twelve (12) separate rooms.

Within these rooms, the enterprise actively executed systemic Kari's Law (47 U.S.C. § 623) and RAY BAUM'S Act (47 U.S.C. § 506) violations. The communication systems were structurally altered, intercepted, or disabled to prevent the Objector from calling or dialing emergency services, the U.S. Marshals Service, or the U.S. Attorney's Office for the SDNY.

To ensure total isolation, the enterprise actively intercepted and blocked third-party advocates who attempted to place emergency calls or secure federal intervention on the Objector's behalf.

The specific methodology of physical and neurological battery directed against the Objector [redacted]

[redacted]

[redacted] maintains structural and operational affilative connections to Apollo Global Management—an entity where Mr. Clayton has held significant leadership roles and maintained financial interests. The deployment of capital from these accounts to entities engaged in data aggregation and corporate-state defense mergers constitutes a severe, unexamined conflict of interest.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

The unchecked financial flows moving between the intelligence community and these dual-use technology arrays directly enabled severe internal corruption. Former DNI Tulsi Gabbard and OMB Executive Amaryllis Fox Kennedy were tasked with auditing these channels. Kennedy abruptly resigned on May 19, 2026, refusing to sign off on unmonitored spending lines. [redacted] This action came immediately lowering ECF document 110 in the lower court and Document No. 19 filed with the CAFC.

G. Organized Judicial Blocks, Paul Hastings LLP, and the Hidden Record

This systemic physical containment directly corresponds to the immediate restriction and total suppression of local filing records, specifically [redacted] the Objector attempted to file an emergency Temporary Restraining Order (TRO) [redacted]

Following the Objector's filing of a Writ of Mandamus under CAFC No. 26-136, official docket records experienced deliberate structural manipulation, including the documented shuffling of evidentiary exhibits and the complete suppression of a critical docket entry under a "-1" indicator for a consecutive two-month period to obstruct appellate review. These coordinated maneuvers constitute structured judicial blocks purposefully deployed to freeze out active filings.

[redacted] The nominee's deep transactional and regulatory interlocks with firms of this structure establish a direct, unexaminable node of conflict.

[redacted]

[redacted]

[redacted]

The nominee's structural interlocks with this specific pipeline are verified across three definitive, overlapping operational frameworks:

The Direct Anduril Enforcement Nexus (SDNY): On December 15, 2025, during the nominee's tenure running the U.S. Attorney's Office for the Southern District of New York (SDNY), his office officially unsealed a federal indictment (U.S. v. Pennetta) directly involving pre-IPO wire fraud and identity theft where Anduril Industries' corporate network and private capital allocation lines were actively weaponized. Furthermore, this extrajudicial harboring, communication blockades, and evidence suppression occurred inside Manhattan during the exact window Clayton presided over this federal jurisdiction.

The Apollo Global Management Governance Node: In February 2021, Clayton was appointed as the Lead Independent Director of Apollo Global Management to oversee its corporate restructurings. Official Office of Government Ethics (OGE) financial disclosures confirm that Clayton has retained his substantial personal financial stakes and stock holdings in Apollo. His personal wealth remains tied directly to the private credit giant funding these tech consolidations and capital configurations.

The Sullivan & Cromwell Pipeline: Clayton continues to operate as a partner and senior policy advisor at Sullivan & Cromwell LLP—the precise legal institution that managed Apollo's corporate governance overhauls. To facilitate his transition toward confirmation, another Sullivan & Cromwell partner, James M. "Jamie" McDonald, was selected to immediately step into the SDNY structure as Deputy U.S. Attorney to take over day-to-day operations and manage the active dockets.

Because the SEC is a designated defendant in upcoming litigation regarding the procedurally deficient FINRA abductions, Mr. Clayton's direct, [redacted] ute, non- [redacted] If confirmed as Director of National Intelligence, the nominee will obtain absolute, non-reviewable authority to issue National Security Standard Classifications and establish closed-loop Special Access Programs (SAPs).

Notice of Intent to Seek Protective Orders: The Objector hereby alerts the Committee that the exact moment Jay Clayton is confirmed or assumes the Office of the DNI, the Objector will be legally forced to immediately file for an Emergency Temporary Restraining Order (TRO) and Preliminary Injunction against him in federal court.

This emergency action will be required to legally block the nominee from utilizing the immense statutory classification and state-secrets powers of the DNI to retroactively seal, suppress,

archive, or classify [redacted] of physical trafficking. Allowing a nominee to take office when a federal witness must immediately seek an injunction against him to prevent the destruction of active appellate evidence under CAFC Appeal No. 26-1721 and CAFC Mandamus No. 26-136 is a profound violation of constitutional due process.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Respectfully submitted,

Dated: July 14, 2026

Location: New York, New York

By: /s/ Daitona Carter

Daitona Carter

Movant-Appellant / Original Inventor

Former US Senate Intern, 2001

CAFC Appeal No. 26-1721 / CAFC Mandamus No. 26-136

Lower Case Number: Civil Action No. 1:26-cv-10304-ADB

**Exhibit J**

**Description:** AI Czar announcement, Oct 2, 2026 (@WhiteHouse X.com Post– President Trump and Inaugurating the Era of Super Intelligence

A Presidential Document by the Executive Office of the President on 10/02/2026 )

X ← **Post** Log in Sign up

**The White House** @WhiteHouse

"I am announcing the formation of the Super Intelligence Force (SIF). The Super Intelligence Force is tasked with coordinating the effort of the Federal Government to ensure that America continues to lead the World in Super Intelligence, which many say is bigger than the Industrial Revolution, and the Internet, and will protect the interests, and improve the lives, of all Americans." - President DONALD J. TRUMP 🇺🇸

> **Donald J. Trump** @realDonaldTrump
>
> Following the Historic White House Accord on Super Intelligence, where the World's most important Technology Companies came together, and confirmed their responsibilities to the American People, I am announcing the formation of the Super Intelligence
> Force (SIF). The Super Intelligence Force is tasked with coordinating the effort of the Federal Government to ensure that America continues to lead the World in Super Intelligence, which many say is bigger than the Industrial Revolution, and the Internet, and will protect the interests, and improve the lives, of all Americans. The Super Intelligence Force will coordinate the Federal Government's engagement with Consumers, Public Interest Groups, Religious Organizations, Critical Infrastructure Providers, and Super Intelligence Companies, and will be led by Director of National Intelligence, Jay Clayton, Chairman of the Federal Trade Commission, Andrew Ferguson, Under Secretary of War for Research and Engineering, and Chief Technology Officer, Emil Michael, and Director of the Office of Personnel Management, Scott Kupor, and will report to the President of the United States (ME!), and the Chief of Staff, Susie Wiles. Thank you for your attention to this matter! President DONALD J. TRUMP

1:01 PM · Oct 4, 2026 · **1.3M** Views

3.7K 6.6K

**Dolly** 💜 @Be_Like_Dolly ·

The Trump plan doesn't help

Scan to get the app

Federal Register / Vol. 91, No. 190 / Friday, October 2, 2026 / Presidential Documents 63129

# Presidential Documents

**Executive Order 14434 of September 29, 2026**

## Inaugurating the Era of Super Intelligence

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* America stands at the forefront of a new technological revolution in intelligence. The modern field of artificial intelligence was born in the United States, where American scientists first gave the field its name and laid the foundations for its development. Seventy years later, powered by our Nation's unmatched culture of innovation, world-leading companies and research institutions, and entrepreneurial spirit, America is once again pushing the technological frontier forward.

The extraordinary technologies being pioneered by American innovators far exceed what was envisioned when the term ''Artificial Intelligence'' first came into use. The capabilities of today's frontier systems do much more than imitate or automate discrete aspects of human intelligence. They increasingly amplify human ingenuity and unlock new forms of creativity, empowering Americans to achieve what was previously impossible across science, medicine, and nearly every other domain of human endeavor. As these capabilities continue to improve, they increasingly represent not merely artificial intelligence, but a new era of Super Intelligence.

The terminology used by the Federal Government should reflect the transformative capabilities of these technologies and the limitless opportunities they create for the American people. Accordingly, the term ''Super Intelligence'' more appropriately captures the promise, potential, and rapidly advancing capabilities of these technologies. It is therefore the policy of my Administration that, to the maximum extent permitted by law, the executive branch shall use the terms ''Super Intelligence'' and ''SI'' in place of ''Artificial Intelligence'' and ''AI'' and will not acknowledge the usage of ''Artificial Intelligence'' and ''AI'' in any applicable setting.

**Sec. 2**. *Implementation.* (a) To the maximum extent permitted by law, executive departments and agencies (agencies) shall use ''Super Intelligence'' and ''SI'' in place of ''Artificial Intelligence'' and ''AI'' in official correspondence, public communications, websites, reports, policy documents, and other nonstatutory documents within the executive branch.

(b) Nothing in this section requires the alteration of previously issued regulations, Presidential actions, contracts, grants, or other historical documents.

**Sec. 3**. *Definition.* (a) For purposes of this order, and except where otherwise provided by law, the terms ''Super Intelligence'' and ''SI'' mean the technologies and systems encompassed by the term ''artificial intelligence'' as defined in section 9401(3) of title 15, United States Code. This definition shall govern the implementation of this order unless and until superseded by subsequent Presidential action consistent with applicable law or by an Act of Congress.

(b) Within 60 days of the date of this order, the Assistant to the President for Science and Technology (APST), in consultation with the heads of other agencies as the APST deems appropriate, shall submit to the President proposed legislative language to establish a Federal definition of ''Super Intelligence'' and ''SI'' that reflects the capabilities described in section 1 of this order. The proposal shall include:

(i) an assessment of whether, and to what extent, the definition of ''Super Intelligence'' and ''SI'' should modify, expand upon, or otherwise supersede the existing statutory definition of ''artificial intelligence'';

(ii) any proposed conforming amendments, as appropriate, to existing statutory references to ''artificial intelligence'' and ''AI''; and

(iii) recommendations for any additional Presidential or executive action necessary to implement the proposed definition throughout the executive branch.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this order shall be borne by the Office of Science and Technology Policy.



THE WHITE HOUSE,
*September 29, 2026.*

[FR Doc. 2026–20321
Filed 10–1–26; 11:15 am]
Billing code 3270–F9–P

**ATTACHMENT 2**

Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Emergency Motion for Temporary Restraining Order and Preliminary Injunction Walter Jay Clayton, *Carter v. Feinberg et al.*, No. 1:26-cv-03318-APM (D.D.C.) September 22, 2026

**ATTACHMENT 3**

Notice of Supplemental Fact: Executive Appointment of Walter Jay Clayton as White House AI Czar, *Carter v. Feinberg et al.*, No. 1:26-cv-03318-APM (D.D.C.)

October 7, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAITONA CARTER,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, Deputy Secretary of Defense; and<br>PETE HEGSETH, Secretary of Defense,<br><br>Defendants. | Case No. Case: 1:26–cv–03318<br>Assigned To : Unassigned<br>Assign. Date : 9/22/2026<br>Description: TRO/Prelim. Inj. (D–DECK) |

**PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

1. Plaintiff Daitona Carter, proceeding pro se in forma pauperis, moves under Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1 for a temporary restraining order and preliminary injunction that preserves, in their current form, the Cost Accounting Standards ("CAS") cost-segregation records relevant and material to Plaintiff's pending Motion for Constructive Trust and Escrow (Doc. 19, CAFC No. 26-1721) and pending § 256 inventorship correction (the "Covered Records") while this action is decided.

2. This motion is supported by Plaintiff's Verified Complaint, which is verified under 28 U.S.C. § 1746 and may be treated as an affidavit under Rule 65(b)(1)(A); by the memorandum below; by the Certificate Regarding Notice required by LCvR 65.1(a); and by a proposed order under LCvR 7(c).

3. Because no counsel has yet appeared for Defendants, Plaintiff could not confer with opposing counsel under LCvR 7(m). Plaintiff's efforts to give notice are described in the attached Certificate Regarding Notice.

RECEIVED
SEPT 22 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

4. The need is urgent. The September 14, 2026 memorandum establishes a 30-day compliance window expiring on or about October 14, 2026 — **22 days from the date of this motion.** Converting segregated cost records to consolidated commercial records is irreversible. The SBMC program is transitioning from Phase One to Phase Two, and new cost data generated during Phase Two (testing January–February 2027) will be collected under GAAP and will never have CAS cost segregation.

5. This motion does not enjoin the September 14, 2026 memorandum as to any other contract, program, or procurement. It is limited to the seven specific Covered Contracts identified in paragraph 32 of the Complaint.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION AND RELIEF REQUESTED

6. Plaintiff requests preservation and nothing more. Plaintiff does not ask the Court to halt the Department of Defense's acquisition-reform policy generally or to modify any contract. Plaintiff requests that the existing CAS cost-segregation records for the seven specific Covered Contracts not be modified, consolidated, converted, or destroyed while the Court decides the merits, and that Defendants maintain CAS cost segregation for any new cost data generated for those specific contracts pending the Court's decision.

7. The need is urgent. The September 14, 2026 memorandum establishes a 30-day compliance window expiring on or about October 14, 2026 — **22 days from the date of this motion.** Converting segregated cost records to consolidated commercial records is irreversible. The SBMC program is transitioning from Phase One to Phase Two, with 170 Phase Two prototypes to be delivered and testing slated to begin in late January or early February

2027. New cost data generated during Phase Two will be collected under GAAP and will never have CAS cost segregation.

## II. BACKGROUND

8. Plaintiff is a non-party inventor who asserted a claim of inventorship under 35 U.S.C. § 256 and who is a Movant-Appellant/Petitioner in the Federal Circuit, Appeal No. 26-1721.

9. On May 15, 2026, Plaintiff filed a Motion for Constructive Trust and Escrow Framework (Doc. 19) in the Federal Circuit (Appeal No. 26-1721). The filing was never properly entered. On September 21, 2026, Plaintiff filed Doc. 47 requesting severance of Doc. 19 into a standalone record and an interim financial preservation order (Item 7) staying GAAP conversion for the specific contracts at issue. Doc. 47, Section III, independently identifies the Feinberg memoranda as the source of the emergency. Doc. 19 has remained undisposed for 130 days.

10. Plaintiff's 2009 public disclosure at firstlastname.com, bearing Plaintiff's full legal name, describes the signal processing architecture underlying the patents at issue. The disclosure is incorporated in the CAFC appendix for Appeal No. 26-1721 and is docketed on the related PTAB IPR proceeding.

11. Plaintiff intends to file a separate civil action under 18 U.S.C. § 1595 arising from the same facts. This action is not a § 1595 claim. It preserves the records for that separate, anticipated proceeding.

12. Plaintiff's anticipated action in the United States Court of Federal Claims under 28 U.S.C. § 1498 for "reasonable and entire compensation" for government use of the patented technology will require identification and isolation of proceeds attributable to that technology. CAS cost-segregation records are the only accounting records capable of

performing that isolation. This action is not a § 1498 claim. It preserves the records for that separate, future proceeding.

13. On August 18, 2026, Defendant Feinberg issued a memorandum directing Department of Defense components to extract cost data from contractors' systems by automated interface for all contracts ≥ $10 million. (Exhibit A.)

14. On September 14, 2026, Defendant Feinberg issued a second memorandum, "Fostering One Strong Industrial Base," directing the Department of Defense to shift from CAS to GAAP as the default accounting framework and, within 30 days, to discontinue "shadow CAS" practices. (Exhibit B.)

15. By statute, the Cost Accounting Standards Board has exclusive authority to prescribe, amend, and rescind cost accounting standards. 41 U.S.C. § 1502(a)(1).

16. GAAP does not provide the contract-level cost segregation that CAS provides. The conversion from CAS to GAAP is not a file format change. It is a restructuring of the data model. CAS requires contract-level cost pools, indirect rate allocations, and labor-hour tracing to specific contracts. GAAP does not. The conversion dissolves the cost pools into aggregate R&D and overhead lines that cannot be re-segregated. The information is not preserved in a different structure. It is destroyed by the act of conversion.

17. The Covered Records are the CAS cost-segregation records for the following specific contracts (the "Covered Contracts"): (a) the Anduril SBMC prototype contract ($159M, partnered with Meta Platforms Inc., Qualcomm Technologies, OSI, Gentex Corp., and Oakley Inc. (a subsidiary of EssilorLuxottica S.A., defendant in Solos v. Meta, 1:26-cv-10304 (D. Mass.))); (b) the Rivet SBMC prototype contract ($195M); (c) the Elbit America SBMC prototype contract ($120.5M, partnered with Booz Allen Hamilton for AI); (d) the

Kopin IBAS contract ($15.4M, with SBMC display contributions projected at $350–500 million over the program's life); (e) the Lockheed Martin NGSRI Phase 2 contract; (f) the $2.4M international thermal weapon sight order; and (g) the $3.6M European military helmet display order; (h) the Scale AI CDAO contract ($500M ceiling, May 2026). (This contract involves Top Secret and SCI-level access. Plaintiff anticipates that any preservation or discovery order covering this contract will require a protective order under FRCP 26(c) and, if necessary, the appointment of a special master with appropriate security clearances.)

18. Plaintiff is not a party to those contracts. Plaintiff's interest in the Covered Records is as a litigant whose pending Motion for Constructive Trust and Escrow (Doc. 19, CAFC No. 26-1721) and pending § 256 inventorship correction require them as evidence and as the basis for calculating statutory compensation in Plaintiff's anticipated Court of Federal Claims action under 28 U.S.C. § 1498.

19. The SBMC program is the successor to the IVAS program. The $21.88 billion production contract was transferred from Microsoft to Anduril in February 2025. The SBMC program is transitioning from Phase One to Phase Two. Anduril publicly announced on August 17, 2026 that it is "moving from phase one to phase two," with 170 Phase Two prototypes to be delivered and testing slated to begin in late January or early February 2027. Doc. 47, Item 7, requests the same CAS preservation relief sought in this action, but is directed at the contracting parties within the CAFC proceeding. This action is directed at the officials who issued the September 14, 2026 memorandum and is the independent APA/mandamus mechanism to enjoin its execution. (Exhibit D.)

## III. LEGAL STANDARD

20. A party seeking a temporary restraining order or preliminary injunction must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

21. Where the United States is the opposing party, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

22. The purpose of interim relief is to preserve the relative positions of the parties until the merits can be decided. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

## IV. ARGUMENT

### A. Plaintiff Is Likely to Succeed on the Merits.

#### 1. Plaintiff has standing.

23. Standing requires an injury in fact, fairly traceable to the challenged action, that a favorable decision is likely to redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

24. Plaintiff's injury is the loss of the Covered Records needed to (i) enforce the constructive trust and escrow framework Plaintiff moved for in the Federal Circuit (Doc. 19, No. 26-1721), (ii) calculate "reasonable and entire compensation" in Plaintiff's anticipated action in the United States Court of Federal Claims under 28 U.S.C. § 1498, and (iii) establish proceeds attributable to the technology in Plaintiff's anticipated 18 U.S.C. § 1595 action.

25. That loss would result directly from converting the Covered Records, and an order preserving those records would redress it.

26. Plaintiff does not assert a contractual interest in the Covered Records. Plaintiff asserts that the Covered Records are evidence and the basis for statutory compensation in Plaintiff's pending and anticipated claims, and that their destruction would cause Plaintiff irreparable harm to those claims.

#### 2. The memorandum is final agency action.

27. Agency action is final when it marks the consummation of the agency's decision-making process and determines rights or obligations or produces legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

28. The September 14 memorandum sets binding deadlines for Department of Defense components and governs how the Department treats contractor cost data.

**3. The memorandum exceeds statutory authority as applied to contracts that remain subject to CAS.**

29. Congress vested the CAS Board with "exclusive authority to prescribe, amend, and rescind" cost accounting standards. 41 U.S.C. § 1502(a)(1).

30. A department-level memorandum cannot displace that authority.

31. The memorandum itself acknowledges that CAS continues to apply by law to certain programs until the Board acts, stating: "By law, the Pentagon will still need to apply CAS to sole source development programs until it can work within the government-wide CAS Board to change the standards of CAS to GAAP." (Exhibit B, p. 2.)

32. To the extent the Department of Defense directs components to stop applying, verifying, or maintaining CAS-based cost segregation on contracts that remain subject to CAS by statute and regulation, the Department acts "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

**4. The memorandum is arbitrary and capricious.**

33. An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

34. Plaintiff alleges that Defendants failed to consider (i) the irreversible loss of contract-level cost records, (ii) the effect of that loss on pending proceedings that depend on them, and (iii) the fact that the SBMC program is transitioning to Phase Two, meaning new cost data will be generated under GAAP and will never have CAS cost segregation.

**B. Plaintiff Will Suffer Irreparable Harm Without Relief.**

35. Irreparable harm must be "certain and great," "actual and not theoretical," and imminent. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

36. The harm here has a fixed date: the 30-day window closes on or about October 14, 2026 — **22 days from the date of this motion.**

37. Once segregated records are consolidated, the historical divisions cannot be reconstructed, and no subsequent discovery order or money judgment can restore them.

38. The loss is of evidence, not merely of money.

39. The harm is not a one-time event. It is ongoing and compounding. The patented technology at issue is foundational. It is a component incorporated into multiple Department of Defense programs, including SBMC, Project EagleEye (Anduril's SBMC submission), and Project ARIA (Army Rapid Implementation of AI, launched March 5, 2026). The contracts through which the technology is deployed include, without limitation: the $21.88B novated IVAS/SBMC production contract; the $159M, $195M, and $120.5M SBMC OTAs; the $15.4M Kopin IBAS contract; and the Lockheed Martin NGSRI Phase 2 contract. CAS cost segregation is the only accounting framework capable of isolating the portion of those proceeds attributable to the specific technology. GAAP consolidated reporting buries component-level costs in the overall system cost, rendering it impossible to determine what share of contract value is attributable to the patented technology versus other components.

40. The SBMC program is transitioning from Phase One to Phase Two. If the CAS-to-GAAP conversion is complete before Phase Two cost data is generated (testing January–February

2027), that data will be collected under GAAP and will never have CAS cost segregation. No court can order the retroactive creation of records that were never collected in that format.

41. The loss for those future stages is not the destruction of existing evidence. It is the **prevention of evidence from ever being created.**

42. The foundational nature of the technology means that future Department of Defense programs will incorporate it as well. Each new program that deploys the technology under a GAAP-only framework creates an additional layer of untraceable proceeds. The harm compounds with each new program, each new prototype stage, and each new contract.

43. The result is not a single, fixed loss on October 14. It is the permanent destruction of the only records capable of determining what portion of the Covered Contracts' value is attributable to the patented technology at issue. That determination is necessary to (i) enforce the constructive trust and escrow framework Plaintiff moved for in the Federal Circuit (Doc. 19), (ii) calculate "reasonable and entire compensation" in Plaintiff's anticipated Court of Federal Claims action under 28 U.S.C. § 1498, and (iii) establish proceeds in Plaintiff's anticipated 18 U.S.C. § 1595 action. Once the records are converted, that determination becomes impossible. No court can order the retroactive creation of cost-segregation data that was never collected in that format.

**C. The Balance of Equities and the Public Interest Favor Preservation.**

44. The requested relief is narrow. It is limited to the seven specific Covered Contracts identified in paragraph 17 of this memorandum and paragraph 32 of the Complaint. It requires no new work beyond maintaining an existing data-collection format. It asks

Defendants only to preserve existing records and to continue segregating new records for those specific contracts.

45. Preserving records that already exist imposes minimal cost on Defendants. Defendants remain free to pursue their policy in every other respect.

46. The public has a strong interest in agencies acting within the authority Congress conferred, and in preserving the evidence that courts require to adjudicate pending disputes.

**D. The Court Should Enter the Proposed Order or, Alternatively, a Preservation-Only Order.**

47. The proposed order states its terms specifically and describes the restrained acts, as Rule 65(d)(1) requires.

48. The order binds the parties, their officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with them who receive actual notice. Fed. R. Civ. P. 65(d)(2).

49. To ensure that notice reaches the personnel who hold the records, the order directs Defendants to transmit a copy to the contracting officers responsible for the Covered Contracts.

50. If the Court declines the broader relief requested, Plaintiff requests in the alternative an order that Defendants preserve, and not direct or permit the modification, conversion, or deletion of, the Covered Records pending further order of this Court.

**E. Security Under Rule 65(c) and Expedited Hearing.**

51. Rule 65(c) permits the Court to set security "in an amount that the court considers proper."

52. Because preserving existing records and maintaining an existing data-collection format will not cause Defendants any cognizable cost or damage, Plaintiff requests that security be set at a nominal amount or waived.

53. Plaintiff further requests that the Court set the preliminary-injunction hearing on an expedited schedule under LCvR 65.1, and that any temporary restraining order remain in effect for the period permitted by Rule 65(b)(2) unless extended for good cause.

## V. CONCLUSION

54. Plaintiff respectfully requests that the Court grant this motion and enter the attached proposed order.

Dated: September 22, 2026

Respectfully submitted,

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com

## CERTIFICATE REGARDING NOTICE

Pursuant to LCvR 65.1(a), Plaintiff certifies as follows:

1. No counsel of record has appeared for Defendants in this action.

2. Plaintiff has not served Defendants with this motion because the action is being filed on September 22, 2026, and Defendants have not yet been served with process.

3. Plaintiff requests that the Court issue a temporary restraining order without prior notice to Defendants under Fed. R. Civ. P. 65(b)(1)(A) because:

   (a) The 30-day conversion deadline expires on or about October 14, 2026;

   (b) The harm — destruction of CAS cost-segregation records — is irreversible;

   (c) There is no adequate remedy at law for the loss of those records;

   (d) Prior notice would permit Defendants to complete the conversion before a hearing could be held.

4. Plaintiff will serve Defendants with this motion and the Complaint immediately upon service of process.

Dated: September 22, 2026

Respectfully submitted,

[signature]

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAITONA CARTER,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, Deputy Secretary of Defense; and<br>PETE HEGSETH, Secretary of Defense,<br><br>Defendants. | Case No. |

**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Upon Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, and good cause shown, it is hereby ORDERED that:

1. Defendants, their officers, agents, servants, employees, contractors, and attorneys, and all persons in active concert or participation with them who receive actual notice of this Order, are **ENJOINED** from modifying, consolidating, converting, deleting, overwriting, or rendering inaccessible any CAS (Cost Accounting Standards) cost-segregation records for the following specific contracts (the "Covered Contracts"):

    (a) Anduril Industries SBMC prototype contract ($159M);

    (b) Rivet Industries SBMC prototype contract ($195M);

    (c) Elbit Systems of America SBMC prototype contract ($120.5M);

    (d) Kopin Corporation IBAS contract ($15.4M);

    (e) Lockheed Martin NGSRI Phase 2 contract;

    (f) $2.4M international thermal weapon sight order;

    (g) $3.6M European military helmet display order.

(h): Scale AI CDAO contract ($500M ceiling, May 2026).

2. Defendants shall maintain CAS cost segregation for any new cost data generated for the Covered Contracts and for SBMC Phase 2 prototyping and testing (scheduled to begin January–February 2027), pending further order of this Court.

3. This Order **DOES NOT** enjoin the September 14, 2026 memorandum titled "Fostering One Strong Industrial Base" as to any other contract, program, or procurement. Defendants may implement the memorandum in full for all DoD contracts, programs, and procurements not listed in paragraph 1 above.

4. Within five (5) days of entry of this Order, Defendants shall transmit a copy of this Order to the contracting officers responsible for the Covered Contracts.

5. No security is required pursuant to 28 U.S.C. § 1915.

6. A hearing on Plaintiff's Motion for Preliminary Injunction shall be held on ___________, or as soon as practicable thereafter, at which time Defendants may show cause why this Order should not be continued.

7. This Order shall remain in effect until the Court rules on Plaintiff's Motion for Preliminary Injunction, or for fourteen (14) days under Rule 65(b)(2)(B), whichever is earlier, unless extended for good cause.

**SO ORDERED.**

Dated: September ___, 2026

________________________________
United States District Judge
District of Columbia

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAITONA CARTER,<br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, in his official capacity as Deputy Secretary of Defense;<br><br>PETE HEGSETH, in his official capacity as Secretary of Defense,<br><br>Defendants. | Case No.: 1:26-cv-03318-UNA<br>(Emergency D-Deck TRO Request) |

**NOTICE OF SUPPLEMENTAL FACTS AND NEW ADMINISTRATIVE DEVELOPMENTS RELEVANT TO PENDING APPLICATION FOR PRELIMINARY RELIEF**

Plaintiff Daitona Carter respectfully submits this Notice of Supplemental Facts to advise the Court of a recent administrative action taken by the Department of Defense (**DoD**) that directly impacts the Court's assessment of the **irreparable harm** and **balance of equities** prongs under ***Winter v. Natural Resources Defense Council, Inc.***, 555 U.S. 7 (2008).

## I. INTRODUCTION

On September 30, 2026, the Department of Defense publicly announced the commissioning of **Project Meridian**, an accelerated future-warfare study board operating under the direct oversight of Defense Secretary Pete Hegseth and Under Secretary of Defense Emil Michael. As set forth below and in the accompanying Declaration, this new agency development accelerates the threat to the *status quo* and directly undermines the administrative assumptions underlying Defendants' opposition to preliminary relief.

RECEIVED
OCT 02 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

## II. RELEVANT SUPPLEMENTAL FACTS

As established by the official DoD announcement dated September 30, 2026 (attached hereto as Exhibit A to the Declaration of Daitona Carter), Project Meridian is co-directed by Palmer Luckey, Elon Musk, and Newt Gingrich. The board is explicitly mandated to conduct a comprehensive audit of advanced battlefield technologies and submit operational findings to the Secretary of Defense within a compressed **120-day delivery window** expiring on January 28, 2027.

## III. LEGAL NEXUS TO PENDING EMERGENCY APPLICATION

The introduction of Project Meridian directly affects the mechanical evaluation of the preliminary injunction factors currently before this Court in two ways:

1. **Acceleration of Irreparable Harm:** Defendants have previously maintained that the scheduled October 14, 2026 transition from contract-level Cost Accounting Standards (**CAS**) to commercial GAAP aggregates is an internal, routine accounting adjustment. However, the co-director of the newly formed Project Meridian board is Palmer Luckey, the principal executive of Anduril Industries. Anduril Industries is the prime contractor for the **$159 Million Soldier Borne Mission Command (SBMC) Prototype Contract**—a covered defense asset utilizing the exact sensor-fusion and egocentric AI architectures that are the subject of Plaintiff's pending inventorship correction dispute.

2. **The Procedural Imbalance:** Under ***University of Texas v. Camenisch***, 451 U.S. 390, 395 (1981), the purpose of preliminary relief is strictly to preserve the relative positions of the parties until a trial on the merits can be held. While the DoD's newly appointed board operates on a 120-day timeline to evaluate and integrate these precise tactical

architectures into the wider defense grid, Deputy Secretary Feinberg's contested memorandum forces the complete elimination of contract-level CAS accounting records in fewer than 14 days (on October 14, 2026).

If preliminary relief is denied, the dissolution of CAS contract pools on October 14 will render it mathematically impossible to segregate, trace, or audit the specific federal capital flow-downs directed to Anduril and its subcontractors (including Meta Platforms, Inc. and Kopin Corporation) during Project Meridian's active review window.

**IV. CONCLUSION**

The commissioning of Project Meridian demonstrates that the agency is actively moving to accelerate its strategic technological pipelines while simultaneously executing an accounting format restructure that permanently deletes the underlying audit trails. To preserve the *status quo* and ensure that the Article III judiciary retains the capacity to fashion a meaningful remedy, Plaintiff requests that this supplemental record be considered in evaluation of her pending emergency application.

Dated: October 2, 2026

Respectfully submitted,

DAITONA CARTER
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email.
legal@daitonacarter.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of October, 2026, a true and correct copy of the foregoing Notice of Current Status and Renewal of Request for Immediate Judge Assignment was submitted via electronic mail to the Clerk's Office at dcd_intake@dcd.uscourts.gov for filing and entry onto the docket of Case No. 1:26-cv-03318-UNA.

Because this matter is currently unassigned (-UNA) and pending initial administrative processing, formal service upon Defendants will be accomplished in accordance with court procedures once a presiding judge is assigned and counsel enter an appearance.

**DAITONA CARTER**
Plaintiff, Pro Se

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAITONACARTER,<br>Plaintiff,<br><br>v.<br><br>STEPHENA.FEINBERG,in his official capacity as Deputy Secretary of Defense;<br><br>PETEHEGSETH,in his official capacity as Secretary of Defense,<br><br>Defendants. | Case No.: 1:26-cv-03318-UNA<br>(Emergency D-Deck TRO Request) |

**DECLARATION OF DAITONA CARTER IN SUPPORT**
**OF PLAINTIFF'S NOTICE OF SUPPLEMENTAL FACTS**

I, Daitona Carter, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct to the best of my knowledge, information, and belief:

1. I am the Plaintiff *pro se* in the above-captioned matter. I submit this declaration in support of Plaintiff's Notice of Supplemental Facts and New Administrative Developments.

2. On September 30, 2026, the Department of Defense issued memorandum and official public press release and administrative directive announcing the commissioning of "Project Meridian," a future-warfare study board under the direction of Secretary Pete Hegseth and Under Secretary Emil Michael.

3. Attached hereto as **Exhibit A** is a true and correct copy of the official Department of Defense memorandum and press release dated September 30, 2026, titled "Department

of Defense Commissions Project Meridian for Advanced Battlefield Forecasting," which I retrieved from the official DoD communications portal on the date of its issuance.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2026.

**DAITONA CARTER**
Plaintiff, Pro Se

**Exhibit A**

**Description:** On September 30, 2026, the Department of Defense issued a memorandum, official public press release, and administrative directive announcing the commissioning of "Project Meridian," a future-warfare study board under the direction of Secretary Pete Hegseth and Under Secretary Emil Michael.

SECRETARY OF WAR
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

SEP 30 2026

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOW FIELD ACTIVITY DIRECTORS

SUBJECT: Commissioning of Project Meridian: The Future of Warfare

Under President Trump's leadership, the United States has the world's strongest, most lethal, and most capable military. Operations MIDNIGHT HAMMER, ABSOLUTE RESOLVE, and EPIC FURY showcased not only the skill and bravery of our warfighters, but also our unmatched technological prowess. However, the Department of War (DoW) must not take our current advantages for granted. We are witnessing rapid advances in artificial intelligence, autonomy, directed energy, robotics, biotechnology, among other critical high-tech areas. Combined, these new domains, new ways of fighting, and technological developments will profoundly alter the character of warfare. To maintain global dominance, the United States must anticipate future operational environments and act decisively to develop the tools to dominate in them.

Effective immediately, I am directing the DoW's Chief Technology Officer, Emil Michael, to commission Project Meridian: The Future of Warfare, through a partner organization. Project Meridian will study the battlefields of the future, identify which weapons and technologies warfighters will need to harness to dominate in these environments, and propose actionable solutions to start developing, testing and fielding these capabilities such that America will have overmatch for the 21st century and beyond. The Joint Staff and all services should be prepared to connect their future warfare efforts and research to Project Meridian.

Project Meridian will leverage critical perspectives from outside the Pentagon, drawing upon a group of top technologists, innovators, business leaders, policy makers, and national security experts. Project Meridian's primary function will be to map the trajectory of future warfare, identify critical capability gaps, and propose actionable solutions in furtherance of the identified goals in the 2026 National Security Science and Technology Strategy.

Project Meridian's finalized findings and recommendations shall be submitted to my office no later than 120 days after its announcement, or on January 28, 2027.

OSD010438-26/CMD013357-26

**RELEASE**
**IMMEDIATE RELEASE**

# Secretary Hegseth Announces Six Major Initiatives at Quantico Speech

Sept. 30, 2026

Over the last two years under Secretary of War Pete Hegseth's leadership, the Department has been relentlessly reshaped to focus on lethality, the warfighters, and rapid modernization. Today, the Secretary continues that momentum by unveiling six major strategic initiatives that will govern the Department's direction for years to come.

Speaking directly to active-duty E-6s and O-3s at Marine Corps Base Quantico, the Secretary bypassed traditional Pentagon bureaucracy to brief the tactical-level officers and non-commissioned officers who will execute these reforms at the ground level. The Secretary's framework establishes the Autonomous Warfare Command, creates a new Corps of Cadets, launches the "FORTRESS" (Federal Operations for Resilience, Troop Resources, Energy, Supply, and Survivability) readiness program, initiates the Next Great American Base project, stands up the Office of Religious Affairs, and kicks off Project Meridian, signaling a bold new era of warfighter-first leadership.

**Autonomous Warfare Command**
The establishment of the Autonomous Warfare Command represents the fastest peacetime operational shift in modern military history, designed to scale autonomous warfare across the Joint Force as a 4-star functional combatant command by October 1, 2027. Building on the success of the Department's Drone Dominance program, which has delivered thousands of robotic systems to the Middle East in support of Operation Epic Fury, the Secretary is directing DRPM UxS to lead Project Agincourt.

To lead this historic transition, Secretary Hegseth appointed Owen West, the current Director of DIU, and Navy SEAL Senior Chief Max Strasiser, the first enlisted SEAL to graduate from Navy Test Pilot School, to direct DRPM UxS under a unique CEO-COO partnership.

*Please find the memo creating the Autonomous Warfare Command here.*

**America's Corps of Cadets**

America's Corps of Cadets is a new War Department program established to expand the pipeline of patriotic leaders of character commissioning into the Joint Force. Building on the existing Corps of Cadets at the nation's six Senior Military Colleges, the initiative partners with a new set of premier institutions—Louisiana State University, Liberty University, Tuskegee University, Mississippi State University, and Hillsdale College—to create additional full-time Corps of Cadets programs. Each participating school is designated a "Distinguished Military College," a revived category that requires exceptionally high standards of cadet discipline, tactical instruction, and military organization. These institutions also receive "Honor School" status, which provides priority in officer commissioning. The program addresses the need for more officers grounded in the Constitution, Western civilization, American heritage, and the warrior ethos at a time when many traditional commissioning sources have drifted from those foundations. By embedding continuous military discipline and leadership development into these new partner schools, America's Corps of Cadets aims to grow the number of officers who are patriotic, rigorous, and prepared to lead and defend the Republic.

*Please find the memo for America's Corps of Cadets here.*

**FORTRESS America**

FORTRESS America (Federal Operations for Resilience, Troop Resources, Energy, Supply, and Survivability) is the Department of War's national insurance policy for the American homeland. Launched at the direction of the Secretary of War, it ends decades of quiet dependence that left the world's most powerful military reliant on foreign mines for rare earths, overseas factories for microchips, foreign supply chains for weapons, and the civilian power grid to keep bases operational.

The initiative ensures that every major U.S. military installation generates its own

independent power so bases remain lit, aircraft fly, and command centers stay online even if the civilian grid is taken down by cyberattack or sabotage. It brings critical supply chains home—rare earths, specialty metals, semiconductors, and propellants—mined, refined, and built in America by American workers. It builds deep strategic reserves of munitions, fuel, medicine, and blood sufficient to fight through disruption when global supply lines break. It hardens every installation on American soil against cyber intrusion, sabotage, and drones. And it secures the high ground and the airwaves—satellites, spectrum, and the ability to see, navigate, and communicate—so the force is never blinded or silenced.

*Please find the memo for FORTRESS America here.*

**Next Great American Base**

The Next Great American Base project rejects the legacy playbook of decaying military facilities, launching a bold initiative to build a premier, world-class power projection platform from the ground up. This state-of-the-art installation will host elite troops across hundreds of thousands of acres. Engineered to operate completely off the commercial grid, it will feature independent power generation, autonomous systems, and advanced air defenses.

In line with the President's executive orders on Beautiful Civic Architecture, the base will feature timeless, classical designs, providing first-class facilities. Rather than backroom deals, the Department is launching a transparent, merit-based competition, inviting governors and adjutants general to pitch their plans directly to senior leadership. The state that cuts the most red tape and offers the best package of land and support will win the historic honor of hosting the most lethal, modern, and beautiful military installation on the planet.

*Please find the memo for Next Great American Base here.*

**Office of Religious Affairs**

The Department of War is elevating spiritual readiness as a core element of combat effectiveness with the establishment of the Office of Religious Affairs, a direct-report office to the Secretary of War charged with driving Department-wide policy, resource advocacy, and action. Wars are fought by people, and the strength of the force depends not only on weapons, training, and technology, but also on the resilience, conviction, and moral strength

of those who serve. ORA will ensure religious affairs are no longer dispersed across distant bureaucratic layers, giving senior leaders a dedicated capability to protect free exercise, remove policy barriers, identify unmet requirements, and secure the support needed for the Service chaplaincies to succeed.

The Service chaplaincies will remain the Department's primary providers of religious support; ORA will give them a powerful advocate at the highest level of the Department. The office will not compel religious participation, favor one faith, or diminish the rights of personnel of any faith or lack thereof. Instead, it will help ensure every member of the Force has voluntary, meaningful access to religious support and community that fosters purpose and resilience needed to endure hardship, deployment, combat, and loss.

*Please find the memo for Office of Religious Affairs here.*

**Project Meridian**

Secretary Hegseth has commissioned Project Meridian to secure America's long-term military superiority by identifying the capabilities required to achieve absolute technological dominance on the next-generation battlefield. Project Meridian will examine the full spectrum of future warfighting domains, from subterranean depths to the cislunar frontier. The Department of War's Chief Technology Officer, Emil Michael, is facilitating the Department's commissioning of Project Meridian, which will be co-directed by Elon Musk, Palmer Luckey, and Newt Gingrich, and supported by a team of elite academic, policy, and industry experts. To ensure timely execution, Secretary Hegseth has directed this landmark project to be completed within 120 days of its establishment, culminating in an unclassified, publicly released final report containing critical findings and recommendations, accompanied by a classified annex.

By leveraging the nation's premier private-sector innovators, business leaders, and technologists, Project Meridian will discover and accelerate the fielding of advanced systems needed to guarantee decisive deterrence. Should deterrence fail, our warfighters must enter any future conflict with the technological advantage secured through today's foresight, resolve, and preparation. American victory requires informing our Arsenal of Freedom with the lethal effects needed to sustain peace through strength. Project Meridian will present the proactive vision for shaping American dominance in the future of warfare.

*Please find the memo for Project Meridian here.*

Hosted by WEB.mil

**ATTACHMENT 4**

Senate Committee on Finance Investigative Report Excerpt

(Apollo-linked capital channels & sheltering structures)

August 4, 2026 (*CAFC ECF Doc. 41, Ex. L*)|

**ATTACHMENT 6**

Alpaca Crypto Security & Custody Platform Disclosure (Fireblocks MPC-CMP custody & token clearing integration) | Public Record (alpaca.markets/crypto)

Want to trade using AI? We launched Alpaca's MCP Server to help you trade with natural language. **Learn more**

×

Alpaca

# API for Stock, Options, Crypto Trading & more

Trade with algorithms, connect with apps, and build financial apps with our easy to use APIs.

Sign up for Free

Trading dashboard in web browserTrading on mobile device

Hello! Welcome to Alpaca 👋

```
trade_client = TradingClient(API_KEY, SECRET
paper=True)
```

Want to trade using AI? We launched Alpaca's MCP Server to help you trade with natural language. **Learn more**

×

Alpaca

Disclosures

~

## Trusted by millions of traders and hundreds of fintechs and institutions

m Gate Musaffa SBI

# Product Launches

See our latest releases that expand access, improve execution, and give you more ways to build and trade with Alpaca.

Start Trading

Start Building

Disclosures

Want to trade using AI? We launched Alpaca's MCP Server to help you trade with natural language. **Learn more**

×

Alpaca

1/4

# Serving Algo Traders and Quant Funds

**$0**

Borrow fees on ETB

5,000+ Easy-to-Borrow (ETB) securities available

**99.99%**

System Uptime

As of January 2026

**1.5ms**

Order processing

Powered by Alpaca's OMS v2

Best Broker for Algorithmic Trading

Received December 2025

Want to trade using AI? We launched Alpaca's MCP Server to help you trade with natural language. **Learn more** ×

Alpaca

```
--header 'Authorization: *****' \
--header 'Content-Type: application/json' \
--data-raw '{
  "from_account": "64972779-bf75-497f-a023-2e8370e573d4",
  "entry_type": "JNLC",
  "to_account": "6e6ba475-8f14-4645-baa0-0beaf75f7346",
  "amount": "10"
}'
```

```
//Response
{
    "id": "09b72899-152f-4899-aea5-8d8d0f9071bf",
    "entry_type": "JNLC",
    "from_account": "64972779-bf75-497f-
a023-2e8370e573d4",
    "to_account": "6e6ba475-8f14-4645-baa0-0beaf75f7346",
    "symbol": "",
    "qty": null,
    "price": "0",
    "status": "queued",
    "settle_date": null,
    "system_date": null,
    "net_amount": "10",
    "description": ""
}
```

## Easy to Use, Developer-First API

SDKs are available in Python, .NET/C#, Go, Node, and more

## Backtest with Market Data

Test your strategy in paper before deploying with free and advanced market data

## Commission Free

Using Trading API can make stock and options trading commission-free

Want to trade using AI? We launched Alpaca's MCP Server to help you trade with natural language. **Learn more**

×

Alpaca

platforms like TradingView

### Margin and Short Selling

Run long/short or market neutral strategies with up to 4X intraday & 2X overnight buying power

### Alpaca Clearing

Alpaca Clearing is a member of FINRA and SIPC

Disclosures

# Licensed, secure and fully self-clearing

### Self-Clearing Operations

We clear and custody as members of **DTCC, FICC, and OCC** to provide trade processing, settlement, and security at reduced costs for our global partners.

### Regulated & Protected

We're a **FINRA-regulated entity** with **SIPC protection** up to $500,000 per customer (cash sub-limits apply) and optional excess coverage where applicable.

Want to trade using AI? We launched Alpaca's MCP Server to help you trade with natural language. **Learn more**

×

Alpaca

### Security & Privacy by Design

We adhere to the highest standards in security and privacy protection: **ISO 27001:2022** certified, **SOC 2 Type II** controls, **GDPR, EU US DPF, CSA Level 1**, and **ICO** standards.

### Digital Asset Licensing and Registration

Our crypto offerings* are through our registered **Money Services Businesses (MSB)** with **(FinCEN) (NMLS # 2160858)** and **Digital Asset Businesses** (Registration number 208648 B)

Disclosures

## Backed with $320 Million from Top Investors

Want to trade using AI? We launched Alpaca's MCP Server to help you trade with natural language. **Learn more**

×

Alpaca

portage

spark-capital

tribe-capital

social-leverage

derayah

horizons-ventures

unbound

sbi-holdings

elefund

y-combinator

Want to trade using AI? We launched Alpaca's MCP Server to help you trade with natural language. **Learn more**

×

Alpaca

Get API Keys

Contact Sales

Disclosures

Want to trade using AI? We launched Alpaca's MCP Server to help you trade with natural language. **Learn more**

×

Alpaca

Trading API Docs
Broker API Docs
Market Data API Docs
OAuth Docs
Slack
Forum
Support
Learn
SDKs & Libraries
GitHub
API Status
Security

About Alpaca
Blog
Contact Us
We're hiring
Newsroom

Disclosure Library
Form CRS
Form CRS Responses to Conversation Starters
Privacy Policy
Cookie Policy
Terms & Conditions

Alpaca

© 2026 Alpaca Securities LLC (dba "Alpaca Clearing") All Rights Reserved.
© 2026 Alpaca Crypto LLC All rights reserved.
© 2026 AlpacaDB, Inc. All rights reserved.

Securities brokerage services are provided by Alpaca Clearing, member FINRA/SIPC, a wholly-owned subsidiary of AlpacaDB, Inc. Technology and services are offered by AlpacaDB, Inc.

Options trading is not suitable for all investors due to its inherent high risk, which can potentially result in significant losses. Please read Characteristics and Risks of Standardized Options before investing in options.

Cryptocurrency services are made available by Alpaca Crypto LLC ("Alpaca Crypto"), a FinCEN registered money services business (NMLS # 2160858), and a wholly-owned subsidiary of AlpacaDB, Inc. Alpaca Crypto is not a member of SIPC or FINRA. Cryptocurrencies are not stocks and your cryptocurrency investments are not protected by either FDIC or SIPC.

Cryptocurrency is highly speculative in nature, involves a high degree of risks, such as volatile market price swings, market manipulation, flash crashes, and cybersecurity risks. Cryptocurrency regulations are continuously evolving, and it is your responsibility to understand and abide by them. Cryptocurrency trading can lead to large, immediate and permanent loss of financial value. You should have appropriate knowledge and experience before engaging in cryptocurrency trading. For additional information, please click here.

**ATTACHMENT 7**

NIST Distributed Ledger Technology & Federal Tokenization Frameworks

(NISTIR 8202 federal asset-tagging reference) | Federal Standard

An official website of the United States government Here's how you know

PUBLICATIONS

# NIST IR 8202

# Blockchain Technology Overview

Documentation | Topics

**Date Published:** October 2018

## Author(s)

Dylan Yaga (NIST), Peter Mell (NIST), Nik Roby (G2), Karen Scarfone (Scarfone Cybersecurity)

## Abstract

Blockchains are tamper evident and tamper resistant digital ledgers implemented in a distributed fashion (i.e., without a central repository) and usually without a central authority (i.e., a bank, company, or government). At their basic level, they enable a community of users to record transactions... See full abstract

## Keywords

blockchain; consensus model; cryptocurrency; cryptographic hash function; asymmetric-key cryptography; distributed ledger; distributed consensus algorithm; proof of work; proof of stake; round robin; proof of authority; proof of identity; proof of elapsed time; soft fork, hard fork; smart contracts; data oracle

### Control Families

None selected

## DOCUMENTATION

**Publication:**

https://doi.org/10.6028/NIST.IR.8202

Download URL

**Supplemental Material:**

None available

**Related NIST Publications:**

CSWP 9

**Document History:**

01/24/18: IR 8202 (Draft)

10/03/18: IR 8202 (Final)

## TOPICS

**Security and Privacy**

digital signatures, secure hashing

**Technologies**

blockchain

**HEADQUARTERS**
100 Bureau Drive
Gaithersburg, MD 20899

Want updates about CSRC and our publications? Subscribe

National Institute of Standards and Technology U.S. Department of Commerce

Contact Us | Our Other Offices

Send inquiries to csrc-inquiry@nist.gov

Site Privacy | Accessibility | Privacy Program | Copyrights | Vulnerability Disclosure |

No Fear Act Policy | FOIA | Environmental Policy | Scientific Integrity |

Information Quality Standards | Commerce.gov | Science.gov | USA.gov | Vote.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2026, a true and correct copy of the foregoing Movant-Appellant's Emergency Motion For Judicial Notice And To Supplement The Record With Co-Tribunal Dockets, Injunctive Filings, And Technical Clearing and accompanying Attachments 1 to 7 was filed via the Court's CM/ECF system, which will send electronic notification to all registered counsel of record. I further certify that any unregistered or default parties were served via electronic mail.

October 13, 2026, 2026

Respectfully submitted,

/s/Daitona Carter

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002.
legal@daitonacarter.com