26-1721

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

SOLOS TECHNOLOGY LIMITED,

Plaintiff-Appellee

v.

META PLATFORMS, INC.,META PLATFORMS TECHNOLOGIES, LLC, OAKLEY, INC.,LUXOTTICA OF AMERICA, INC., ESSILORLUXOTTICA, USA, LLC,

Defendants

DAITONA CARTER,

Movant-Appellant

---

Appeal from the United States District Court for the Masschusetts in No. 1:26cv–1034–ADB, Judge Allison D. Burroughs.

---

**CITATION OF SUPPLEMENTAL AUTHORITY PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 28(j)**

---

Pursuant to Federal Rule of Appellate Procedure 28(j) and Federal Circuit Rule 28(j), Movant-Appellant Daitona Carter respectfully submits this citation of supplemental authority to alert the merits panel to critical, uncontradicted technical

and administrative developments that occurred on September 23 and September 30, 2026.

These real-time developments directly substantiate the core jurisdictional and substantive frameworks set forth in Appellant's Opening Brief (Br. 22–34) and Reply Brief (Rep. Br. 11–18). Specifically, they demonstrate how Appellees' ongoing appearance default on the merits operates to facilitate the continuous exploitation of Appellant's intertwined intellectual property assets.

## 1. The Intertwined Technical Deployment: Meta's "Private Processing" (Sept. 23, 2026)

In both her trial-stage filings and her current appellate briefs, Appellant has emphasized that the physical containment and commercial exploitation of her engineering blueprints are inextricably linked to the underlying technical framework.

On September 23, 2026, while remaining in complete appearance default before this merits panel, Appellee Meta Platforms, Inc. executed a global commercial launch of its "Private Processing" architecture for wearable hardware. As documented in Meta's official engineering disclosure ("Bringing Private Processing to Meta AI Glasses,"Sept. 23, 2026, attached hereto as Attachment 2), this infrastructure utilizes hardware-isolated Confidential Virtual Machines

(CVMs), blind-signed anonymous credentials, and client-enforced Remote Attestation (RA-TLS) handshakes to process off-device AI telemetry.

This infrastructure is the exact mechanical implementation of the asynchronous data valving, cryptographic metadata decoupling, and hardware-enclaved sensory gating established in Appellant's senior, certified Appendix (Attachment 1). Because Appellees refused to file an answering brief to contest Appellant's senior priority timeline, this commercial rollout stands as an uncontradicted deployment of the assets before this Court.

### 2. The Procurement Acceleration: DoD's "Project Meridian" (Sept. 30, 2026)

Concurrently, on September 30, 2026, the Department of Defense publicly announced the commissioning of Project Meridian, an accelerated future-warfare taskforce co-directed by Palmer Luckey (Founder of Anduril Industries), Elon Musk, and Newt Gingrich, operating under a strict 120-day delivery mandate.

As established in the record and accompanying defense documents (attached hereto as Attachment 3), this initiative structurally relies on technology ecosystems tied to Appellees Meta Platforms and associated defense prime contractors to scale enclaved sensor-fusion and egocentric display logic into federal supply chains.

### 3. Legal Significance to the Pending Merits Review

These developments are highly relevant to the panel's evaluation of the intertwined doctrine and the necessity of judicial action for two primary reasons:

1. **Uncontradicted Market & Defense Adoption:** Because the administrative layers of the court have not separated these claims, the uncontradicted record establishes that the technology deployment spans both commercial and defense sectors. Project Meridian and Meta's commercial rollout demonstrate that the runway cleared by Appellees' appearance default is being actively used to scale these assets into domestic and international supply chains without judicial oversight.
2. **Inadequacy of Procedural Delay:** This real-time deployment proves that a standard procedural remand would be entirely inadequate. Appellees are aggressively re-platforming the technology under the cover of their docket silence, heightening the urgency of the pending merits review.

October 13, 2026

Respectfully submitted,

/s/Daitona Carter
Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002.

**INDEX OF ATTACHMENTS**

| Attachment No. | Description | Date |
|---|---|---|
| ATTACHMENT 1 | Movant-Appellant's Technical Disclosure Commons (TD Commons) Publication (Hardware-Enclaved Sensor Gating, Asynchronous Data Valving, and Biomechanical Intent Verification Architecture) | June 25, 2026 |
| ATTACHMENT 2 | Defendant (Appellee) Meta Platforms, Inc. Official Public Corporate Technical Disclosures and Commercial Rollout Specifications for "Ray-Ban Meta Gen 3" and "Private Processing" Architecture | September 23–27, 2026 |
| ATTACHMENT 3 | Department of Defense Official Memorandum and Public Disclosures Regarding the Commissioning of "Project Meridian" and Advanced Defense-Sector Integration | September 30, 2026 |

**ATTACHMENT 1**

Movant-Appellant's Technical Disclosure Commons (TD Commons) Publication (Hardware-Enclaved Sensor Gating, Asynchronous Data Valving, and Biomechanical Intent Verification Architecture)

June 25, 2026

Technical Disclosure Commons

Defensive Publications Series

25 Jun 2026

# EYEWEAR-INTEGRATED HARDWARE-ENCLAVED SENSOR GATING INTERFACE UTILIZING ASYNCHRONOUS DATA VALVING AND BIOMECHANICAL INTENT VERIFICATION

Daitona Carter
*Daitona Carter*

Follow this and additional works at: https://www.tdcommons.org/dpubs_series

## Recommended Citation

Carter, Daitona, "EYEWEAR-INTEGRATED HARDWARE-ENCLAVED SENSOR GATING INTERFACE UTILIZING ASYNCHRONOUS DATA VALVING AND BIOMECHANICAL INTENT VERIFICATION", Technical Disclosure Commons, (June 25, 2026)
https://www.tdcommons.org/dpubs_series/10575

This work is licensed under a Creative Commons Attribution 4.0 License.
This Article is brought to you for free and open access by Technical Disclosure Commons. It has been accepted for inclusion in Defensive Publications Series by an authorized administrator of Technical Disclosure Commons.

# TECHNICAL DISCLOSURE DOCUMENT

# EYEWEAR-INTEGRATED HARDWARE-ENCLAVED SENSOR GATING INTERFACE UTILIZING ASYNCHRONOUS DATA VALVING AND BIOMECHANICAL INTENT VERIFICATION

**Inventor:** Daitona Carter
**Publication Date:** June 2026
**License:** CC BY-ND 4.0 International

## INDEXING METADATA & SYSTEM CROSS-REFERENCES:

Smart Glasses Privacy Hardware, Anti-Spying Smart Eyewear, Always-Listening Microphone Blocker, Wearable Camera Security Enclave, Temporalis Muscle Speech Detection, Daitona Carter Invention, Counter-Surveillance Smart Glasses Architecture, Hardware Microphone Valve.

## CROSS-REFERENCE TO RELATED ART

This disclosure builds upon and explicitly expands the hardware-enclaved isolation and asynchronous valve architecture originally established by the Inventor in *"Method for Hardware-Isolated Dynamic Input Processing Using Secondary Microcontrollers"* (Published May 30, 2026). The foundational input-gating principles detailed therein are adapted and uniquely engineered here to secure multimodal audio/visual environmental sensors.

## ABSTRACT

This disclosure details a physical, hardware-enclaved security architecture designed to prevent unauthorized, passive audio and visual data extraction from wearable computing platforms. The framework mechanically decouples micro-electromechanical systems (MEMS) microphone arrays and camera sensors from the primary application processor (AP) and host operating system. Raw environmental data streams are routed exclusively into a hardware-isolated, bare-metal secondary microcontroller core operating a dedicated, secure execution environment.

This secondary core controls an asynchronous data valve: raw sensor inputs are buffered in a one-way FIFO queue completely inaccessible to the host processor unless explicitly released by a verified user intent signal. This physical intent signal is generated natively via localized capacitive frame touch inputs, enclave-verified local acoustic triggers, or direct biomechanical voice activity sensors embedded in the frame

arms (comprising a temporalis muscle-flex array and a cranio-acoustic bone-conduction accelerometer). Absent a verified biomechanical or manual trigger, the outbound data line exposed to the AP is decoupled and flooded with synthetic null-voltage noise, rendering background software-level sensor-scraping vectors fully non-functional.

## BACKGROUND & PROBLEM STATEMENT

Modern wearable smart eyewear architectures enforce an invasive, unbypassable trust paradigm over environmental data collection. Devices utilize low-power Digital Signal Processors (DSPs) to continuously ingest audio and video inputs to listen for trigger words or compile context-aware spatial telemetry.

The structural flaw in these systems is the reliance on a shared memory space, shared Inter-IC Sound (I2S) buses, or software-switched data lines linking the DSP directly to the primary Application Processor (AP). If the host operating system, a kernel-level process, or an upstream cloud server is compromised, malicious actors can silently tap the raw sensor buffers. Because standard status indicators (such as recording LEDs) are bound to software control loops, they can be bypassed entirely. This allows for continuous, invisible ambient audio and video harvesting without the user's knowledge, consent, or physical interaction, turning wearable computing form-factors into active surveillance endpoints.

## SUMMARY OF INNOVATION & NOVELTY

This architecture removes sensor stream authorization entirely from the software layer, enforcing user privacy via physical hardware isolation and asynchronous data gating. The device establishes a zero-trust boundary around raw environmental input:

- **Physical Trace Severance:** Microphones and camera sensors possess no direct copper connections or shared communication buses (I2C/I2S/SPI) with the primary host application processor. All hardware traces run exclusively into an isolated, secure secondary processing enclave.
- **Asynchronous Data Valving:** Captured audio and visual frames are held within a hardware-isolated, one-way FIFO buffer managed by bare-metal firmware. The host AP cannot read, query, or poll these data registers.
- **Biomechanical and Hard-Wired Intent Gating:** The physical data valve only transitions to an open state when a localized, non-bypassable user-intent event occurs. This threshold is met via a physical frame tap, a physical slider activation, enclave-side cryptographic verification of an acoustic wake-word, or via frame-embedded sensors detecting the physical biomechanics of speech (e.g., the flexing of the temporalis muscle or corresponding cranial acoustic vibrations). Absent this verified physical trigger, the communication bus exposed to the AP remains isolated and flooded with synthetic zero-voltage white noise.

## DETAILED IMPLEMENTATION & ARCHITECTURE

### *Sensor Isolation Architecture*

The hardware layout isolates the Pulse-Density Modulation (PDM) or Inter-IC Sound (I2S) channels originating from the MEMS microphone arrays and the imaging buses of the camera modules. The secondary microcontroller operates on bare-metal firmware completely separate from the main operating system. It handles the raw clock lines (CLK) and data lines (DATA) of the sensors natively. The data is parsed into an internal, isolated volatile memory register inaccessible via any external debugging or Direct Memory Access (DMA) channel.

```
                 [ MEMS Microphone Array ]
                                 |
                                 ▼ (Raw PDM / I2S Audio Stream)
               [ HARDWARE-ENCLAVED SECONDARY MCU ]
              (Local Cryptographic & Biomechanical Check)
                                 |
           ┌─────────────────────┴────────────────────┐
           ▼ (No Trigger / Idle)                      ▼ (Verified User
Intent)
  ┌───────────────────────────┐           ┌───────────────────────────┐
  │ ASYNCHRONOUS VALVE:CLOSED │           │ ASYNCHRONOUS VALVE: OPEN  │
  │  Injects Null-Voltage     │           │    Streams Clean,         │
  │          Noise            │           │   Authenticated Data      │
  └───────────────────────────┘           └───────────────────────────┘
           |                                          |
           └─────────────────────┬────────────────────┘
                                 |
                                 ▼
                [ PRIMARY APPLICATION PROCESSOR (AP) ]
                 (Untrusted Host OS / Cloud Pipeline)
```

### *Biomechanical Voice Activity Detection (VAD) Enclave Triggers*

To eliminate software-based spoofing of user intent, the secure secondary microcontroller is hardwired to a dual-array of localized biomechanical sensors embedded within the eyewear frame arms:

1. **Temporalis Myographic Array:** Piezoelectric or skin-strain sensors positioned on the interior temple-arms of the frame map mechanical pressure changes caused by the flexion of the user's temporalis muscle during jaw articulation.
2. **Cranial Cranio-Acoustic Accelerometer:** An ultra-low-power MEMS accelerometer integrated into the frame architecture captures microscopic bone-conduction vibrations traveling through the temporal bone during vocalization.

The localized, bare-metal firmware processes these mechanical inputs natively within the secure enclave. By utilizing edge-based pattern analysis, the enclave differentiates intentional speech from non-speech artifacts (e.g., chewing, blinking, swallowing). Because these sensors respond exclusively to the user's physical anatomy, they are impervious to environmental acoustic noise and completely inaccessible to the primary AP.

***The Asynchronous Evaluation Loop***

The firmware inside the isolation enclave continuously executes an un-bypassable three-stage guard loop:

3. **Environmental & Biomechanical Baseline Sampling:** The secure microcontroller ingests raw audio packets into its internal isolated memory, computing localized fast Fourier transform (FFT) algorithms for low-power keyword spotting, while simultaneously polling the temporalis and cranio-acoustic sensors for physical speech validation.
4. **State Verification:** If the application processor (AP) attempts to execute an I2S/SPI read command on the interface while the enclave has *not* registered a valid physical touch event, a verified local acoustic wake-word, or validating biomechanical speech telemetry, the enclave identifies the command as an unauthorized background data exfiltration attempt.
5. **Execution Guard & Noise Injection:** The enclave instantly activates a hard-wired physical switch, disconnecting the external data transit pins and forcing the outbound lines to transmit a continuous null-voltage signal or scrambled noise. The host operating system receives valid packet structures, preventing system crashes, but the payload contains zero intelligible data. Only when local user intent is physically or biomechanically confirmed does the hardware valve shift its registers, allowing clean, buffered data to bridge to the AP for the duration of the authorized command window.

## EXEMPLARY USE CASES & EMBODIMENTS

- **Embodiment A (Anti-Ambient Audio Harvesting):** Smart eyewear featuring an always-listening AI assistant is subjected to an upstream remote code execution exploit targeting the host operating system. The attacker activates a background microphone scraping command to spy on a private conversation. The hardware-enclaved secondary microcontroller detects the incoming data query from the AP, verifies that no physical touch event, local acoustic trigger, or biomechanical temporalis/cranial vibration has occurred, keeps the asynchronous valve closed, and feeds continuous null data to the compromised OS, fully neutralizing the exfiltration vector.

- **Embodiment B (Hardware-Enforced Recording Indicators):** A wearable video-capture headset is commanded via a silent cloud payload to initiate video recording without lighting up the external privacy LED. Because the physical recording LED is wired directly into the power delivery trace of the secure secondary microcontroller's valve controller—rather than a software pin on the AP—the camera data lines cannot physically transfer a single video frame to the host processor unless the LED is drawing current and illuminated. Software manipulation of the recording state without visible user warning is rendered physically impossible by spatial geometry.
- **Embodiment C (Biomechanically Gated System Activation):** The eyewear remains in a zero-power deep-sleep state to preserve battery life, disabling primary audio-processing subsystems. The user begins speaking. The frame-integrated accelerometer detects the physical bone-conduction vibrations of the vocal cords, and the inner temple sensors register the synchronized flexing of the temporalis muscle. This dual-hardware verification triggers a local wake interrupt on the secure secondary MCU, opening the data valve and alerting the main AP to boot the conversational interface instantly, ensuring zero acoustic latency without continuous microphone snooping.

## END OF TECHNICAL DISCLOSURE

## ATTACHMENT 2

Appellee Meta Platforms, Inc. Official Public Corporate Technical Disclosures and Commercial Rollout Specifications for "Ray-Ban Meta Gen 3" and "Private Processing" Architecture

September 23–27, 2026

POSTED ON SEPTEMBER 23, 2026 TO SECURITY & PRIVACY

# Bringing Private Processing to Meta AI Glasses



By Pritam Shah, Oskar Linde, Anuj Kumar, Jim Pastos, Suyash S

We believe glasses are the best form factor for having AI help throughout your day. They can understand your personal context better than other kinds of devices and keep you present without picking up a mobile phone.

Most of the time, glasses are helping you see well, protecting your eyes and complementing your look, and that's it. But AI glasses have the capacity to provide superpowers like translating a conversation or summarizing notes or a conversation.

Many directions people give their glasses today, like placing a call or answering a text hands-free, occur entirely on device, though more advanced features would require larger, more capable AI models – far larger than can be packed into a pair of glasses.

And compute is only half the problem. For an AI assistant to be truly useful in everyday life, it must also be stateful and deeply personal — understanding your context, connecting ideas across days or weeks, and working proactively in the background to get things done for you.

Taken together, these demands mean the work has to happen in the cloud. AI glasses present a challenge that traditional cloud architectures were never built to solve: How do you build a hyper-personalized AI that knows your world deeply with enhanced privacy?

Our answer is Private Processing, Meta's confidential computing infrastructure for AI workloads. It extends the trust boundary of AI glasses directly into cloud data centers, executing AI models inside confidential virtual machines (CVMs) such that even Meta cannot access your data.

This isn't a new idea for us. In 2025, we introduced Private Processing for WhatsApp and the Meta AI app, allowing you to have completely private chats with Meta AI, without Meta or WhatsApp ever seeing the data. We've learned from that initial approach and we're expanding

it to bring these same privacy benefits to our AI glasses. This blog highlights how we engineered a cloud runtime that processes personal context at scale.

> *"Personal devices like glasses that understand our context — because they can see what we see, hear what we hear, and interact with us throughout the day — will become our primary computing devices." — Mark Zuckerberg, Personal Superintelligence, July 2025.*

## What are Confidential Computing, the TEE, and Private Processing?

**Confidential Computing is the paradigm.** Historically, the industry encrypted data in two states: *at rest* (on disk) and *in transit* (over the network). The vulnerability has always been the third state: *in use*. Data had to be decrypted in memory to be computed on, leaving it exposed to the host operating system, the hypervisor, and the infrastructure operator. Confidential computing is the industry-wide movement to close that gap, ensuring data remains protected even while being processed.

**The Trusted Execution Environment (TEE) is the hardware primitive.** The TEE is a hardware capability in certain CPUs and GPUs that enables confidential computing. The processor encrypts the memory of a special virtual machine, a CVM, under a key held by dedicated security hardware on the chip. That key is never released to the host operating system, the hypervisor, or anyone operating the machine.

This capability spans host CPUs and GPUs, so a workload that needs both of these compute targets stays inside the trust boundary across them. To the host operating system, the hypervisor, and the infrastructure administrator, the CVM memory is ciphertext.

As defined by the Confidential Computing Consortium (CCC), a TEE physically enforces three strict guarantees:

- **Data Confidentiality:** No one outside the CVM, including Meta and the host operating system, can read data in CVM memory while it is in use.
- **Data Integrity:** No one outside the CVM can add, remove, or alter that data.
- **Code Integrity:** No one can modify the code executing inside the CVM once it has loaded.

The client demands a remote attestation report, signed by a key that exists only inside that chip, carrying a measurement of the software image the CVM loaded. It then checks that the signature chains back to a root key the chip vendor publishes, and that the measurement matches one we published to an append-only ledger witnessed by an independent third party. If either check fails, the client refuses to connect and no data is sent.

**Private Processing** is Meta's confidential computing infrastructure, built on TEEs with verifiable transparency. On top of the confidentiality and attestation the hardware provides, it adds non-targetability and encrypted storage.

## Private Processing for AI Glasses: Extending the Device Boundary

The more you use an AI assistant, the more useful it gets as it learns your style, preferences and context. Wearable AI assistants will help you in similar ways, including with everyday life. To do that they need to know you and your context. That can include connecting ideas across

days or weeks, and working proactively in the background to get things done for you without requiring rework from you. This would demand compute capabilities beyond what an ergonomic form factor like a pair of glasses can host locally.

That's where Private Processing comes into the picture. Traditional cloud architectures encrypt data in transit and at rest, but must decrypt it in host memory during processing — potentially exposing it to the underlying system while in use. Private Processing helps us solve this problem, ensuring off-device data stays inaccessible to anyone including Meta.

To make this work, we built Private Processing for AI glasses on five engineering requirements, all designed so that we can safely offload intensive AI workloads like streaming transcription, contextual search, and long-term recall:

1. **Hardware Isolation:** User data must be cryptographically unreadable to host operating systems, hypervisors, and Meta in transit, in use, and at rest.
2. **Fail-Closed Guarantees:** An attempt to modify the confidential processing guarantee must either cause the system to fail closed, or become publicly discoverable through verifiable transparency.
3. **Public Verifiability:** Every CVM image running in production is registered to an append-only, publicly witnessed transparency ledger.
4. **Non-Targetability:** An attacker or malicious actor must be incapable of targeting a specific individual's session or storage without attempting to compromise the entire Private Processing System.
5. **Encrypted Storage:** When a product needs to store data for Private Processing to access later, it is encrypted and only accessible with a user-provided key.

We've designed this  multi-regional, fault-tolerant system to handle large amounts of data with high reliability.

Private Processing defends against a specific set of threats. The foundational threat model is documented in the [Private Processing whitepaper](Private Processing whitepaper).

## How Private Processing Works for AI Glasses



### 1. Decoupling Identity (Non-targetable Routing)

Before data even leaves your glasses we have to solve a metadata problem. If we know *who* is sending a request, the operator can possibly route your traffic to a compromised machine. During session establishment, we use anonymous credentials — blind-signed tokens fetched on randomized schedules — so that when your device makes a request, our authentication service cannot tie it back to your account. Next, your device connects to our gateways through a third-party OHTTP relay (Fastly or Cloudflare) to select a TEE node. An incoming request is serviced by a TEE that was selected based on non-user-identifiable heuristics.

### 2. Remote Attestation (Verification)

Before your glasses send any context, they verify our servers. Your device initiates a remote attestation and TLS (RA-TLS) session, demanding a hardware-signed certificate from the server's TEE. Your glasses cross-check the TEE's binary hashes against an independent, public transparency ledger. If the CPU/GPU vendor certificate check fails, or the binary hash does not match the ledger, the handshake fails and your device does not connect.

### 3. Processing (Execution)

Once the server proves it is trustworthy, your device communicates securely over TLS. Our infrastructure routes the encrypted blob, but cannot read it. Inside the TEE, AI models go to work in an isolated environment, where even Meta cannot access your data. If our models need to communicate with other models, the TEEs must attest to over the same strict RA-TLS protocols before transferring the data.

### 4. Stateful Memory (Encrypted Storage)

When a feature requires persistent memory, the output is encrypted with user-provided keys before it ever leaves the TEE. Meta's infrastructure stores the ciphertext. When you need to retrieve a memory later, your device provides the key and the TEE decrypts the data and processes your query.

## Storage Inside the Boundary: Encrypted Storage

The experiences people want from AI on their glasses, like picking up across sessions or recalling a moment from earlier, only work if the system can retain information over time. Building stateful experiences for AI glasses forces an architectural choice. The obvious approach is to encrypt user data on the device and store it in a standard cloud database.

That approach breaks down under scrutiny for two reasons:

1. **Access patterns leak behavior:** Even if the contents of a database are strongly encrypted, an external database still observes when you read and write data, how frequently you query it, and which records are accessed together. That metadata alone maps your daily routine and behavioral patterns. Encryption protects payload content; it does not hide execution patterns.
2. **Remote encrypted queries do not scale:** Running complex operations like semantic vector search or multi-session joins over traditional encrypted storage requires pulling massive ciphertext payloads out of the database, transferring them across the network into a secure TEE, and decrypting them just to run a single query. As a user's context grows, latency spikes and performance collapses.

To solve both problems, we built the storage engine directly inside the TEE. We have extended the trust boundary so that data isn't just processed confidentially; it is stored confidentially. Your data remains encrypted. It is accessible only from within the TEE across CPUs and GPUs; ready to be recalled by you, and completely inaccessible to anyone else – including Meta.

Instead of treating the cloud as a distant database, stateful Private Processing on demand co-locates execution and state inside processor-encrypted memory. Query engines run directly within the TEE boundary. Read Write transactions are fast because reads never cross an external network boundary.

### Debugging in the Dark: Operational Observability

When you build an infrastructure that cryptographically locks out operators, you create a fundamental operational challenge: How do you maintain a high-availability system when engineers are unable to look inside?

Standard engineering diagnostics are useless inside a TEE:

- Engineers cannot attach a debugger to a running TEE.
- Systems cannot dump memory stacks or log model inputs and outputs during a crash.
- Teams cannot inspect the specific payload that triggered an operational fault.

Operational visibility must be achieved entirely out-of-band. We architected our observability layer to rely on aggregate health signals — CPU utilization, memory allocation, network latency, and aggregate hardware failure rates. These signals give us the telemetry required to maintain service health and uptime without ever exposing a single byte of user data.

### Verifiable Transparency

Security claims are meaningless if they depend on trusting the provider. Private Processing is designed so that every architectural guarantee we make can be verified independently by external researchers.

#### Binary Transparency via Public Ledgers

Every CVM image deployed in production is registered to an append-only, publicly-witnessed transparency ledger. If we ever attempted to deploy code that differed from what was published, client devices and external monitors would be able to discover the mismatch. What that establishes is tamper-evidence. Because every deployed image is recorded, we cannot substitute different binary without the change being visible in a record we do not control. Binary access is what lets a researcher go further and confirm that a recorded image behaves as we describe.

The ledger and the measurements it records are publicly visible. The corresponding binaries are available to researchers in our security program under agreement.

#### Third Party Validation

This design assumes an adversarial environment inside our own data centers. Traditional cloud security draws its boundary at the edge: It protects servers from the outside world while trusting the hypervisor, the host operating system, and the administrators who run them. Private Processing moves that boundary inward and puts all three outside it.

To validate this stance, we don't rely solely on internal reviews. We actively partner with independent security firms (like NCC Group) and researchers to audit our architectural design, review our attestation logic and probe the boundaries of our isolation model.

#### Meta's Bug Bounty Program: External Auditing and Research

Transparency requires open avenues for validation. To enable further independent security research into Private Processing's design and implementation, we are expanding our Bug Bounty program to explicitly cover Private Processing on AI glasses. We'll be providing

external researchers with the tools, CVM binaries, and documentation needed to audit our implementation, test our attestation chains, and hold our platform accountable.

### Private Processing for an Agentic Future

To date, Private Processing has focused on discrete tasks, like summarizing a message. But the future of AI is agentic and multimodal. In the future, your glasses will have the capacity to take actions on your behalf across different sessions, in a range of real-world contexts. As we work towards launching the kinds of experiences that will help you throughout your day, Private Processing will serve as our foundation.

AI on glasses is going to become increasingly stateful, multimodal, and agentic, which means that the trust boundaries also become more complex. An agent holding a sensitive state requires strict isolation, verifiable data provenance, and inter-CVM communication. Our Private Processing infrastructure is the foundation for that future. AI capabilities will grow, but the security and privacy boundary will remain intact.





Prev
Open-Sourcing Rebalancer: A Generic, High-Performance Library for Solving Assignment Problems


## Read More in Security & Privacy

View All



SEP 2, 2026

An Organizational Second Brain: Building an AI That Learns From Experts




AUG 12, 2026

How We're Building Scam Alert on WhatsApp With End-to-End Encryption and Verifiability Guarantees



JUN 25, 2026

Privacy-Aware Infrastructure in the AI-Native Era: An Asset Classification Case Study



MAY 11, 2026

Labyrinth 1.1: Making End-to-End Encrypted Backups Even More Reliable



MAY 1, 2026

How Meta Is Strengthening End-to-End Encrypted Backups



APR 16, 2026

Post-Quantum Cryptography Migration at Meta: Framework, Lessons, and Takeaways

## Related Posts




Apr 29, 2025

Building Private Processing for AI tools on WhatsApp




Mar 09, 2026

How Advanced Browsing Protection Works in Messenger



Jun 23, 2026

How Meta Engineered Ultra-Narrow Batteries for AI Glasses

## Related Positions

Software Engineer - Host Networking
BELLEVUE, US

Software Engineer - Host Networking
MENLO PARK, US

Software Engineer - Host Networking
NEW YORK, US

Director of Engineering
BELLEVUE, US

Director of Engineering
MENLO PARK, US

See All Jobs

## Available Positions

Software Engineer - Host Networking
BELLEVUE, US
Software Engineer - Host Networking
MENLO PARK, US
Software Engineer - Host Networking
NEW YORK, US
Director of Engineering
BELLEVUE, US
Director of Engineering
MENLO PARK, US

See All Jobs

## Technology at Meta

Engineering at Meta - X
Follow

AI at Meta
Read

Meta Quest Blog
Read

## Open Source

Meta believes in building community through open source technology. Explore our latest projects in Artificial Intelligence, Data Infrastructure, Development Tools, Front End, Languages, Platforms, Security, Virtual Reality, and more.

ANDROID

iOS

WEB

Meta for Developers

Read

Meta Bug Bounty

Learn more

RSS

Subscribe

BACKEND

HARDWARE

Learn More

Meta

Engineering at Meta is a technical news resource for engineers interested in how we solve large-scale technical challenges at Meta.

Home

Company Info

Careers

© 2026 Meta

TermsPrivacyCookiesHelp

## ATTACHMENT 3

Department of Defense Official Memorandum and Public Disclosures Regarding the Commissioning of "Project Meridian" and Advanced Defense-Sector Integration

September 30, 2026

SECRETARY OF WAR
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

SEP 30 2026

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOW FIELD ACTIVITY DIRECTORS

SUBJECT: Commissioning of Project Meridian: The Future of Warfare

Under President Trump's leadership, the United States has the world's strongest, most lethal, and most capable military. Operations MIDNIGHT HAMMER, ABSOLUTE RESOLVE, and EPIC FURY showcased not only the skill and bravery of our warfighters, but also our unmatched technological prowess. However, the Department of War (DoW) must not take our current advantages for granted. We are witnessing rapid advances in artificial intelligence, autonomy, directed energy, robotics, biotechnology, among other critical high-tech areas. Combined, these new domains, new ways of fighting, and technological developments will profoundly alter the character of warfare. To maintain global dominance, the United States must anticipate future operational environments and act decisively to develop the tools to dominate in them.

Effective immediately, I am directing the DoW's Chief Technology Officer, Emil Michael, to commission Project Meridian: The Future of Warfare, through a partner organization. Project Meridian will study the battlefields of the future, identify which weapons and technologies warfighters will need to harness to dominate in these environments, and propose actionable solutions to start developing, testing and fielding these capabilities such that America will have overmatch for the 21st century and beyond. The Joint Staff and all services should be prepared to connect their future warfare efforts and research to Project Meridian.

Project Meridian will leverage critical perspectives from outside the Pentagon, drawing upon a group of top technologists, innovators, business leaders, policy makers, and national security experts. Project Meridian's primary function will be to map the trajectory of future warfare, identify critical capability gaps, and propose actionable solutions in furtherance of the identified goals in the 2026 National Security Science and Technology Strategy.

Project Meridian's finalized findings and recommendations shall be submitted to my office no later than 120 days after its announcement, or on January 28, 2027.

OSD010438-26/CMD013357-26

**RELEASE**
**IMMEDIATE RELEASE**

# Secretary Hegseth Announces Six Major Initiatives at Quantico Speech

Sept. 30, 2026

Over the last two years under Secretary of War Pete Hegseth's leadership, the Department has been relentlessly reshaped to focus on lethality, the warfighters, and rapid modernization. Today, the Secretary continues that momentum by unveiling six major strategic initiatives that will govern the Department's direction for years to come.

Speaking directly to active-duty E-6s and O-3s at Marine Corps Base Quantico, the Secretary bypassed traditional Pentagon bureaucracy to brief the tactical-level officers and non-commissioned officers who will execute these reforms at the ground level. The Secretary's framework establishes the Autonomous Warfare Command, creates a new Corps of Cadets, launches the "FORTRESS" (Federal Operations for Resilience, Troop Resources, Energy, Supply, and Survivability) readiness program, initiates the Next Great American Base project, stands up the Office of Religious Affairs, and kicks off Project Meridian, signaling a bold new era of warfighter-first leadership.

**Autonomous Warfare Command**
The establishment of the Autonomous Warfare Command represents the fastest peacetime operational shift in modern military history, designed to scale autonomous warfare across the Joint Force as a 4-star functional combatant command by October 1, 2027. Building on the success of the Department's Drone Dominance program, which has delivered thousands of robotic systems to the Middle East in support of Operation Epic Fury, the Secretary is directing DRPM UxS to lead Project Agincourt.

To lead this historic transition, Secretary Hegseth appointed Owen West, the current Director of DIU, and Navy SEAL Senior Chief Max Strasiser, the first enlisted SEAL to graduate from Navy Test Pilot School, to direct DRPM UxS under a unique CEO-COO partnership.

*Please find the memo creating the Autonomous Warfare Command here.*

**America's Corps of Cadets**

America's Corps of Cadets is a new War Department program established to expand the pipeline of patriotic leaders of character commissioning into the Joint Force. Building on the existing Corps of Cadets at the nation's six Senior Military Colleges, the initiative partners with a new set of premier institutions—Louisiana State University, Liberty University, Tuskegee University, Mississippi State University, and Hillsdale College—to create additional full-time Corps of Cadets programs. Each participating school is designated a "Distinguished Military College," a revived category that requires exceptionally high standards of cadet discipline, tactical instruction, and military organization. These institutions also receive "Honor School" status, which provides priority in officer commissioning. The program addresses the need for more officers grounded in the Constitution, Western civilization, American heritage, and the warrior ethos at a time when many traditional commissioning sources have drifted from those foundations. By embedding continuous military discipline and leadership development into these new partner schools, America's Corps of Cadets aims to grow the number of officers who are patriotic, rigorous, and prepared to lead and defend the Republic.

*Please find the memo for America's Corps of Cadets here.*

**FORTRESS America**

FORTRESS America (Federal Operations for Resilience, Troop Resources, Energy, Supply, and Survivability) is the Department of War's national insurance policy for the American homeland. Launched at the direction of the Secretary of War, it ends decades of quiet dependence that left the world's most powerful military reliant on foreign mines for rare earths, overseas factories for microchips, foreign supply chains for weapons, and the civilian power grid to keep bases operational.

The initiative ensures that every major U.S. military installation generates its own

independent power so bases remain lit, aircraft fly, and command centers stay online even if the civilian grid is taken down by cyberattack or sabotage. It brings critical supply chains home—rare earths, specialty metals, semiconductors, and propellants—mined, refined, and built in America by American workers. It builds deep strategic reserves of munitions, fuel, medicine, and blood sufficient to fight through disruption when global supply lines break. It hardens every installation on American soil against cyber intrusion, sabotage, and drones. And it secures the high ground and the airwaves—satellites, spectrum, and the ability to see, navigate, and communicate—so the force is never blinded or silenced.

*Please find the memo for FORTRESS America here.*

**Next Great American Base**

The Next Great American Base project rejects the legacy playbook of decaying military facilities, launching a bold initiative to build a premier, world-class power projection platform from the ground up. This state-of-the-art installation will host elite troops across hundreds of thousands of acres. Engineered to operate completely off the commercial grid, it will feature independent power generation, autonomous systems, and advanced air defenses.

In line with the President's executive orders on Beautiful Civic Architecture, the base will feature timeless, classical designs, providing first-class facilities. Rather than backroom deals, the Department is launching a transparent, merit-based competition, inviting governors and adjutants general to pitch their plans directly to senior leadership. The state that cuts the most red tape and offers the best package of land and support will win the historic honor of hosting the most lethal, modern, and beautiful military installation on the planet.

*Please find the memo for Next Great American Base here.*

**Office of Religious Affairs**

The Department of War is elevating spiritual readiness as a core element of combat effectiveness with the establishment of the Office of Religious Affairs, a direct-report office to the Secretary of War charged with driving Department-wide policy, resource advocacy, and action. Wars are fought by people, and the strength of the force depends not only on weapons, training, and technology, but also on the resilience, conviction, and moral strength

of those who serve. ORA will ensure religious affairs are no longer dispersed across distant bureaucratic layers, giving senior leaders a dedicated capability to protect free exercise, remove policy barriers, identify unmet requirements, and secure the support needed for the Service chaplaincies to succeed.

The Service chaplaincies will remain the Department's primary providers of religious support; ORA will give them a powerful advocate at the highest level of the Department. The office will not compel religious participation, favor one faith, or diminish the rights of personnel of any faith or lack thereof. Instead, it will help ensure every member of the Force has voluntary, meaningful access to religious support and community that fosters purpose and resilience needed to endure hardship, deployment, combat, and loss.

*Please find the memo for Office of Religious Affairs here.*

**Project Meridian**

Secretary Hegseth has commissioned Project Meridian to secure America's long-term military superiority by identifying the capabilities required to achieve absolute technological dominance on the next-generation battlefield. Project Meridian will examine the full spectrum of future warfighting domains, from subterranean depths to the cislunar frontier. The Department of War's Chief Technology Officer, Emil Michael, is facilitating the Department's commissioning of Project Meridian, which will be co-directed by Elon Musk, Palmer Luckey, and Newt Gingrich, and supported by a team of elite academic, policy, and industry experts. To ensure timely execution, Secretary Hegseth has directed this landmark project to be completed within 120 days of its establishment, culminating in an unclassified, publicly released final report containing critical findings and recommendations, accompanied by a classified annex.

By leveraging the nation's premier private-sector innovators, business leaders, and technologists, Project Meridian will discover and accelerate the fielding of advanced systems needed to guarantee decisive deterrence. Should deterrence fail, our warfighters must enter any future conflict with the technological advantage secured through today's foresight, resolve, and preparation. American victory requires informing our Arsenal of Freedom with the lethal effects needed to sustain peace through strength. Project Meridian will present the proactive vision for shaping American dominance in the future of warfare.

*Please find the memo for Project Meridian here.*

Hosted by WEB.mil

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2026, a true and correct copy of the foregoing Citation of Supplemental Authority Pursuant to FRAP 28(j) and accompanying Attachments 1 to3 was filed via the Court's CM/ECF system, which will send electronic notification to all registered counsel of record. I further certify that any unregistered or default parties were served via electronic mail.

Dated: October 13, 2026

Respectfully submitted,

/s/Daitona Carter

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002.
legal@daitonacarter.com