26-1721

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

---

SOLOS TECHNOLOGY LIMITED,

Plaintiff-Appellee

v.

META PLATFORMS, INC.,META PLATFORMS TECHNOLOGIES, LLC, OAKLEY, INC.,LUXOTTICA OF AMERICA, INC., ESSILORLUXOTTICA, USA, LLC,

Defendants

DAITONA CARTER,

Movant-Appellant

---

Appeal from the United States District Court for the Massachusetts in No. 1:26-cv–10304–ADB, Judge Allison D. Burroughs

---

**CITATION OF SUPPLEMENTAL AUTHORITY
PURSUANT TO FED. R. APP. P. 28(j)**

---

Appellant Daitona Carter respectfully cites the following supplemental authority and facts that arose after the filing of her Reply Brief (Aug 20, 2026):

## I. Destruction of Evidence (Oct 14, 2026)

On October 14, 2026 — the same day the D.C. District Court denied Plaintiff's Emergency Renewed Motion for TRO (1:26-cv-03318-APM, ECF No. 22, Minute Order) — the Department of Defense executed its CAS-to-GAAP data conversion, permanently dissolving contract-level cost pools, audit trails, and labor-hour tracing for the Anduril ($159M), Rivet ($195M), and Elbit Systems ($120.5M) defense contracts. This conversion was set by the September 14, 2026 Feinberg memo (30-day execution window).

The D.C. District Court's denial was the last remaining preservation mechanism. The CAFC had a pending motion for a preservation order (Doc. 19, filed May 15, 2026) and a motion to show cause why that motion remained unaddressed (Doc. 47, filed Sep 21, 2026). Neither has been ruled on.

The destruction renders the inventorship question before this panel unresolvable absent immediate intervention.

## II. NAVER Commercialization (Oct 12, 2026)

On October 12, 2026 — two days before the TRO denial — NAVER announced a partnership with Meta, Google, and Samsung to deploy AI glasses

navigation on Ray-Ban Meta and Oakley Meta devices, featuring voice-guided walking directions in Korean, location-based AR, and real-time local information.

These features match the specific technical specifications in Appellant's docket Attachments (D. Mass. 1:26-cv-10304, ECF No. 92): location-based AR (Attachments 3-4), Korean translation interface (Attachments 17-18), NLP real-time translation wearable (Attachment 29), and speech processing source code (Attachment 14). Appellant's notes were stored on NAVER's platform during the 2017-2019 development period.

The District Court for the District of Massachusetts characterized Appellant's technical work as 'generalized' in denying her motion to intervene. The D.C. District Court relied on a single text order from that docket (ECF No. 90) and found irreparable harm 'speculative' and Appellant's intervention argument 'unconvincing.' The NAVER announcement — public, dated, and matching the specific specifications in ECF No. 92 — contradicts both findings.

## III. Anduril Tender Offer (Oct 13, 2026)

On October 13, 2026 — the same day the D.C. District Court denied the TRO — Anduril opened a $90B employee tender offer at $94.80/share ($1.3B cap, 16 countries, closing Nov 9, 2026). This is a liquidity event that converts equity in the commercialized technology to cash before any constructive trust or TVPA gross income claim can attach to the proceeds.

## IV. Request

Appellant respectfully requests that this Court take judicial notice of the above facts.

October 15, 2026

Respectfully submitted,

/s/Daitona Carter
Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002.
legal@daitonacarter.com

**ATTACHMENT INDEX - Supplemental Authority (28(j))**

| # | Attachment | Source |
|---|---|---|
| 1 | NAVER-Meta-Google-Samsung AI glasses navigation announcement (Oct 12, 2026) | Korea Times / Seoul Economic Daily (Oct 12) |
| 2 | Meta-NAVER partnership announcement (Sept 29, 2026) | Meta press release / DigiTimes (Oct 2) |
| 3 | DCD Minute Order denying TRO renewal (Oct 14, 2026) | PACER, 1:26-cv-03318-APM |
| 4 | DCD Batch Order denying TROs, IFP, etc. (Oct 13, 2026) | PACER, 1:26-cv-03318-APM |
| 5 | Feinberg memo, "Fostering One Strong Industrial Base" (Sept 14, 2026) | Public release |
| 6 | Anduril $90B employee tender offer announcement (Oct 13, 2026) | Bloomberg / CNBC |
| 7 | D. Mass. ECF No. 92 — 65 technical Attachments (unsealed ~June 5, 2026) | Already in the CAFC appendix (Docs 29-1 through 29-3). Cite by reference: "D. Mass. 1:26-cv-10304, ECF No. 92, incorporated by reference via CAFC Appendix Docs. 29-1 through 29-3" |
| 8 | D. Mass. ECF No. 90 — text order cited by DCD (one of three) | Cite by reference: "D. Mass. 1:26-cv-10304, ECF No. 90" |

**Attachment 1 — NAVER announcement (Oct 12):**

The Korea Times



# Naver Map to offer voice guidance on Meta, Google, Samsung smart glasses




A promotional image for Naver Map's artificial intelligence smart glass feature / Courtesy of Naver

By Jhoo Dong-chan

Published Oct 12, 2026 1:45 PM KST

Naver Map, Korea’s most widely used online map service, will offer real-time, step-by-step voice navigation through artificial intelligence (AI)-powered smart glasses, becoming the first Korean

map service to do so, its operator, Naver, said Monday.

The feature is available first on Meta's Ray-Ban Meta and Oakley Meta glasses, according to the internet portal operator. It will also support "intelligent eyewear" being jointly developed by Google and Samsung Electronics, which is set for release later this year.

Users can receive voice directions to their destination without repeatedly checking their smartphone screens. The glasses also tell them which way to turn and whether stairs or escalators lie ahead.

The service will first be available on Android phones, with iPhone support to follow.

Naver Map has also introduced voice commands designed for the glasses. Users can ask questions such as "When will I arrive?" or "Find a convenience store nearby" while walking and get answers right away. On the Google-Samsung glasses, users will also be able to launch Naver Map and start navigation by voice through Gemini, Google's AI assistant.

The move builds on a real-time walking navigation feature that Naver Map launched in June. That feature added car navigation-style voice guidance to walking directions.

Naver said it plans to link the glasses with the local information accumulated on Naver Map, such as restaurant and cafe listings, to connect physical spaces with digital information more naturally. Once glasses with built-in displays become available, the company expects to offer augmented reality walking routes. Users would also see information on nearby stores and available discount coupons.

"Users will be able to focus on walking without constantly checking their smartphone screens while naturally receiving directions and rich local information," said a Naver official in charge of the map service.

*This article was published with the assistance of generative AI and edited by The Korea Times.*

**Map** **Naver**



**Jhoo Dong-chan**

Do not go gentle into that good night, old age should burn and rave at close of day; Rage, rage against the dying of the light, though wise men at their end know dark is right, because

their words had forked no lightning they, do not go gentle into that good night.


## Interesting contents

Taboola 후원링크

**Kim Jong-un watches live execution**

Former K-pop idol goes viral after group disbands, juggles 4 part-time jobs while starting over at 22

California couple arrested on child abuse charges in horrifying surrogacy probe

It's Not Salt: Heart Surgeons Now Tie High Blood Pressure to a Drink Most Seniors Have

Spinal Stenosis Isn't An Age Problem — The Real Cause May Surprise You(Stop Doing This)

**Recommended Contents For You**

Taboola 후원링크

**Why these Korean stars had breast implants — then chose to remove them**

**Why are more Japanese women drawn to Korean men?**

**Why Japan's average height stopped growing while Korea, China surged**

**Bipartisan US Senate bill reaffirms 'ironclad' nuclear deterrence pledge to S. Korea**

**Still better than Trump**




# Seoul Economic Daily




Samsung

# Seoul Economic Daily

Voice Guidance Covers Walking Directions and Nearby Dining Information

Service Also Coming to Google, Samsung 'Intelligent Eyewear'



Technology | Published 2026.10.12. 14:13:57 | By Kim Ji-won one@sedaily.com

Summary Save

A A A




*Naver said on Dec. 12 it will extend its Naver Map navigation service to AI glasses. Photo courtesy of Naver*

NAVER (035420.KS) is expanding its mapping service so users can receive NAVER Map walking directions by voice through artificial intelligence glasses, in partnership with Meta, Google and Samsung.




Meta's Ray-Ban Meta and Oakley Meta devices, and will also work on the Google-Samsung "Intelligent Eyewear" scheduled for release later this year.



Through AI glasses, users can receive directions as well as details needed for getting around, such as



The latest partnership extends that support to AI glasses.

The company is also adding a voice command function designed for AI glasses. Users can ask questions out loud and receive immediate answers, and the service provides real-time voice information on restaurants and cafes near a destination. On the Intelligent Eyewear jointly developed by Google and Samsung, users will be able to make a voice request to Gemini, which will launch NAVER Map and begin navigation.

NAVER said it plans to link AI glasses with the local information accumulated in its mapping service to connect physical spaces and digital information more seamlessly. On AI glasses equipped with displays, the company expects to offer augmented reality route guidance along with information on nearby stores and Place coupons.

"We expect users will be able to focus on moving rather than repeatedly checking their smartphone screens, while still getting directions and rich local information," said Jung Kyung-hwa, a NAVER leader. "As a platform that connects the physical and digital worlds more vividly, we will continue to provide users with new mapping experiences."

VISUAL BRIEFING NEW
**Card News**
Daily news as visual cards.

#NAVER #NAVERMap #AIGlasses #RayBanMeta #IntelligentEyewear #VoiceNavigation #AR

## Companies in this story

NAVER


Beyond.the boundaries of finance
Beyond.the limits of investment



Original reporting by Kim Ji-won for Seoul Economic Daily.



View Korean original ↗ Translation Policy

WATCH · SEOUL ECONOMIC DAILY MORE →




### Chip Stocks Crash, Retail Keeps Buying | October 15 2026

3:25

## Related Articles

### NAVER's Chzzk Tops 10 Million Downloads on Sports Streaming Push

PUBLISHED 2026.10.14. 18:10:30

### Firms Say Disclosure Rules Undervalue In-House Security Technology

PUBLISHED 2026.10.14. 11:27:23

### DeepX NPU Runs AI on 3 Watts, Featured by Raspberry Pi

PUBLISHED 2026.10.16. 05:37:05

## Most Read This Week

1-5 ‹ ›

1  **Eurozone Rules Out Rescue as France Debt Fears Spread**

2  **FIFA Leaves $4 Million Trump Tower Office Sitting Empty**






## Korea Company Atlas PREVIEW ↗

MARKET ONTOLOGY · THE FEEDBACK LOOP

KFTC 2025 · 92 GROUPS · 121,954 ARTICLES

An English ontology of the Korean market — how companies, the media, the government and the National Assembly move each other in a loop. Korea's named controlling persons and designated business groups are a mechanism, not a risk to be priced blind.




Seoul Economic Daily



Click to explore the atlas →

Open Atlas in full screen ↗

## AI KEY PREVIEW ↗

KOREAN CORPORATE INTELLIGENCE HUB

KOSPI · KOSDAQ · 12 SECTORS

A live, cap-weighted view of every KOSPI and KOSDAQ sector, with same-day Korean reporting distilled by company — built for foreign investors, correspondents and analysts who need to scan Korea before the next session.


Beyond the boundaries of finance
Beyond the limits of investment



Click to explore AI KEY →

Open AI KEY in full screen ↗

SIGNAL NOW LIVE ↗

ENGLISH EDITION · CAPITAL MARKETS

M&A · IPO · PE · FUND FLOWS

SIGNAL English Edition is live — Korea's deal desk reporting in English. M&A, IPOs, private equity and fund flows, covered daily for global institutional investors. Browse free; subscriber-only scoops at the 50% intro rate.




Seoul Economic Daily

Markets Property Finance Business Technology Politics Society Culture Sports

Click to explore SIGNAL →

Open SIGNAL in full screen ↗

Seoul Economic Daily

AI PRISM Companies Topics Newsletter About Contact Terms Privacy

Copyright © Sedaily, All right reserved

**Attachment 2 — Meta-NAVER partnership (Sept 29):**

# Meta AI glasses tap Naver Map for hands-free navigation

Published : Sept. 29, 2026 - 11:26:23



Jung Young-seon



Ray-ban Meta (Meta)




Meta and Naver will bring voice-guided walking directions to Ray-Ban Meta and Oakley Meta AI glasses by year-end, allowing users to navigate via Naver Map without glancing down at their phones.

Naver said it is the first Korean internet company to partner with Meta on artificial intelligence glasses. The collaboration connects the devices to Naver Map's real-time walking navigation service, launched in June.

Editor's picks

KH Explains
Why Korea's industrial giants want a piece of...

International students lend rescue dogs a...
From the Scene



Hyundai vice chair maps out $15.5b Ind...
Herald Interview



Recommended Series more




Herald Interview
A series of in-depth interviews.
Interview
In-depth



Users will pair the glasses with the Naver Map app to hear directions through built-in open-ear speakers. Guidance will include details on entrances and facilities, as well as stairs or escalators along the route. Users can also ask the voice assistant about nearby places, including cafes and hospitals.

Naver Map's walking navigation service is currently available on Android, with an iOS rollout to follow. Naver plans to refine navigation accuracy ahead of the feature's launch.

The partnership extends the companies' cooperation from advertising into everyday services. They already work together through ADVoost, Naver's AI-powered advertising solution, combining Naver's commerce and shopping data with Meta's AI targeting technology.

"Users will be able to reach their destinations safely and conveniently without repeatedly checking their phones," a Meta official said. "By combining our AI glasses with Naver Map, we expect users to experience greater convenience from AI wearables in their daily lives."

Developed by Meta and eyewear group EssilorLuxottica, Ray-Ban Meta and Oakley Meta glasses let users interact with Meta AI through voice commands.

Powered by GliaStudi

Most Read Business All

1 Samsung to expand chip capacity in...



2 Korea's GDP per capita to top $40,0...



3 Inside Burger King Korea's 90-minute...



4 Why Hyundai's Atlas has four fingers —...



5 Kakao Bank brings full-app banking t...











jyoungseon8@heraldcorp.com

Jung
Young-seon

- Bentley hits the battlegrounds in PUBG's la...
- Bibigo adds K-food flavor to Seoul palace t...
- Taihan Cable wins W120b US cable supply ...

good 0 | sad 0 | angry 0 | recommended 0

## More from Headlines



**Defense minister says Seoul ready for OPCON transfer despite USFK concerns**

The transfer of wartime operational control from the US to South Korea is in the spotlight once again after a top USFK command...

Kospi slides over 7% as chip stock...




Why a memory chip glut could b...



Beyond blood and marriage, who...





Address : Huam-ro 4-gil 10, Yongsan-gu,Seoul, Korea | Tel : +82-2-727-0114 | Online newspaper registration No : Seoul 아03711
Date of registration : 2015.04.28 | Publisher. Editor : Choi Jin-Young | Juvenile Protection Manager : Choi He-suk
The Korea Herald by Herald Corporation. Copyright Herald Corporation. All Rights Reserved.

Games & Commerce

# Meta to work with Naver on AI glasses walking directions

**AI Summary**

Meta is working with Naver to connect Naver Map-based real-time walking directions to its AI glasses, including Ray-Ban Meta and Oakley Meta, with the feature due this year. The tie-up links Naver's walking navigation introduced in June and will provide route guidance via open-ear speakers. Guidance is to expand to entrances, nearby facilities and stair or escalator use, and add voice queries for nearby places.

Ho-jeong Lee published 2026-09-29 09:47:24 updated 2026-09-29 09:53:06

가




Shinsegae Duty Free said on the 3rd that it is running a Meta AI Glasses pop-up zone on the 9th floor of its Myeongdong store. The photo shows the 'Meta AI Glasses' pop-up zone on the 9th floor of Shinsegae Duty Free's Myeongdong store. [Photo: Yonhap News Agency]

Meta is teaming up with Naver to connect Naver Map-based walking directions to its AI glasses.

Meta said on Sept. 29 it is working with Naver to enable real-time walking directions from Naver Map on Ray-Ban Meta and Oakley Meta. The feature is set to be introduced within the year.

Naver is the first South Korean company Meta is working with in the AI glasses sector.

The partnership links Naver's real-time walking directions feature, introduced in June, with Meta AI glasses. Once users connect their glasses in the Naver Map app, they can receive route guidance through the glasses' open-ear speakers without repeatedly checking their smartphone screen while moving.

The scope of guidance is set to expand beyond basic directions to include entrances, nearby facilities

Search...

AI Editor's Pick | Trending

1 Atomic substitution

2 Korea's internet speed ranking

3 Inverse bets grow as South

4 KOSPI, Kosdaq plunge on 'Black


5 South Korean stocks plunge,


6 Row over South Korea ranked 22nd in global internet speed;
7 Financial sector hacking leaks 100,000 records; FSC tightens
8 Korea expands eligibility for national integrated bio big data
9 Nvidia says South Korea could take over Taiwan supply chain
10 44 central government agencies to relocate to Sejong from 2027,

and whether to use stairs or escalators.

A feature to check nearby information while on the move will also be added. The plan is to let users ask by voice for route-related information such as nearby cafes or hospitals and hear answers by calling a Naver Map-based voice agent.

Naver's real-time walking directions are currently supported first on Android and will be rolled out to iOS in stages. Meta and Naver will continue work to improve guidance precision until the official launch.

The collaboration will also expand the Meta-Naver partnership from advertising into daily-life services. The two companies are also working together on an advertising business that links Naver's AI ad solution AdBoost with Meta's AI-based targeting technology.

A Meta official said the collaboration is expected to let users reach their destinations without frequently checking their smartphone screens when finding their way. The official added the company will expand everyday convenience provided by AI wearables.

Ray-Ban Meta and Oakley Meta are AI glasses developed by Meta in cooperation with global eyewear company EssilorLuxottica. Users can interact with the AI assistant Meta AI by voice.

**Ho-jeong Lee** lhj@d-today.co.kr

#Meta #Naver #Naver Map #Ray-Ban Meta #Oakley Meta

This content was produced with the assistance of AI and reviewed by our editorial team. You can read the original version in Korean here.

Copyright © DigitalToday. All rights reserved. Unauthorized reproduction and redistribution are prohibited.

14F, Taekwang Tower, 6, Teheran-ro 34-gil, Gangnam-gu, Seoul, Republic of Korea | Tel : +82-2-786-1104

Copyright © 2026 DigitalToday. All rights reserved. mail to d-today@d-today.co.kr

**Attachment 3 — DCD Minute Order (Oct 14):**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAITONA CARTER,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, in his official capacity as Deputy Secretary of Defense;<br><br>PETE HEGSETH, in his official capacity as Secretary of Defense; and<br><br>WALTER JAY CLAYTON, in his official capacity as Director of National Intelligence,<br><br>Defendants. | Case No. 1:26-cv-03318-APM<br>Judge Amit P. Mehta |

**EMERGENCY RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER**
**UNDER FED. R. CIV. P. 65(b)**

Plaintiff renews her motion for a temporary restraining order under Rule 65(b) on the ground that the circumstances have materially changed since the Court's Order of October 13, 2026. The conversion that was 22 days away when the original motion was filed is executing tomorrow. The Order failed to address multiple independent grounds for relief raised in the motions and the Amended Complaint.

This is a renewed motion. The Court's Order of October 13, 2026 (ECF No. 21) denied Plaintiff's prior TRO/PI motions (ECF Nos. 3, 13, 15). This is a renewed motion for a temporary restraining order under Rule 65(b). The Court's Order of October 13, 2026 (ECF No. 21) denied Plaintiff's prior TRO/PI motions (ECF Nos. 3, 13, 15). The circumstances have materially changed since the Order was entered: the conversion that was 22 days away when the original

RECEIVED
OCT 13 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

motion was filed is executing tomorrow. The Order also failed to address multiple independent grounds for relief raised in the motions and the Amended Complaint, and the 'speculative injury' finding is built on a legal and factual error in the underlying D. Mass. intervention denial.

## I. THE "SPECULATIVE" FINDING IS BUILT ON A LEGAL AND FACTUAL ERROR

### A. The D. Mass. court applied the wrong procedural standard.

The Court's "speculative" finding (ECF No. 21) rests entirely on the D. Mass. court's holding that Plaintiff "ha[d] not sufficiently alleged that she has a protectible interest" (*Solos Tech. Ltd. v. Meta Platforms, Inc.*, 26-cv-10304 (D. Mass. Apr. 15, 2026), ECF No. 90). That holding required Plaintiff to *prove* § 256 inventorship at the intervention stage. Rule 24(a)(2) does not require proof of the underlying claim. It requires a showing of "an interest relating to the property or transaction" that "may, as a practical matter, impair or impede" the movant's ability to protect that interest. The D. Mass. court's own order cites *B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 543 (1st Cir. 2006), for the proposition that "the Court accepts as true non-conclusory allegations made in support of the motion to intervene."

Plaintiff's 2009 public disclosure (bearing her full legal name), 2013–2019 source code with file-system timestamps, 2016 and 2019 physical prototypes, and 2019 EWC registration are specific, dated, and verifiable. They are not "conclusory" in any legally cognizable sense. The D. Mass. court's "conclusory" finding is unsupported by the record. See Attachment 1 - Exhibit K, attached hereto, which indexes the specific source code files, directory logs, OCR scripts, prototype documentation, and contemporaneous public records from D. Mass. Doc. 83 (Attachments 83-1 through 83-10), preserved in the certified Federal Circuit Appendix (Case No. 26-1721, Doc. 29-1 through 29-3).

**B. The supplemental exhibits were in the docket before the denial was entered.**

Plaintiff filed a Rule 15(d) motion (D. Mass. Doc. 85) to supplement the record with technical exhibits. The procedural record shows:

- **March 26, 2026:** Plaintiff conferred with opposing counsel (LCvR 7.1(A)(2) certification under penalty of perjury)
- **April 10, 2026:** Supplemental exhibits uploaded to the docket
- **April 13, 2026:** Notice provided to all counsel of record
- **April 15, 2026:** ECF No. 90 entered, denying intervention as "conclusory" and all pending motions as moot

The "conclusory" finding was entered **two days after opposing counsel was notified** of the supplemental exhibits. The exhibits were in the docket. The Rule 15(d) motion formally bound them to the record. The court had them. The court still ruled the allegations were "conclusory."

**C. The procedural sequence.**

On April 9, 2026, the D. Mass. court granted Plaintiff leave to file ECF Nos. 77, 78, and 79. On April 10, Plaintiff filed a Motion for Status Conference (ECF 80) flagging the bottleneck created by the unruled sealing and protective motions (ECF 59, 62). A writ of mandamus was posted compelling ADA accommodation and ECF access. **Forty-seven minutes later**, ECF No. 90 was entered.

The motions that would have allowed Plaintiff to file the technical evidence (ECF No. 65) and to have it reviewed in camera (ECF No. 62) were not ruled on. They were denied as a consequence of the intervention denial.

After ECF No. 90, Plaintiff filed ECF No. 92 (65 technical attachments, including source code with file-system timestamps of October 25, 2017 and May 2, 2017 — predating Meta's September 16, 2020 Project Aria announcement by approximately 3 years). The system displayed them as "-1" placeholders (ECF No. 94, system stamp ID 1029851931). Reconsideration (ECF No. 107) and Rule 60 relief (ECF No. 113) were denied. The complete record is preserved in the certified Federal Circuit Appendix (Case No. 26-1721, Doc. 29-1 through 29-3).

**D. This Court's "speculative" finding is derivative.**

The "speculative" characterization in ECF No. 21 is a restatement of the D. Mass. "no protectible interest" holding. That holding applied the wrong procedural standard and was entered after the supplemental exhibits were in the docket and opposing counsel was on notice. The "speculative" finding is likewise unsupported.

## II. THE ORDER FAILED TO ADDRESS MULTIPLE INDEPENDENT GROUNDS FOR RELIEF

The Order (ECF No. 21) analyzes only the "speculative" nature of Plaintiff's pending CAFC appeal. It does not address the following independent grounds raised in the motions and the Amended Complaint:

**A. The trademark and Project ARIA.**

Plaintiff's Amended Complaint (ECF No. 14, ¶ 39) alleges that the U.S. Army's active deployment of "Project ARIA" (Army Rapid Implementation of AI, launched March 5, 2026) within the SBMC procurement pipeline constitutes ongoing infringement of Plaintiff's common-law mark "ARIA." The Order does not address this claim. The trademark deployment was public and ongoing for five months before the complaint was filed. The injury is not contingent on the

CAFC appeal. The Anduril SBMC contract partner Oakley Inc. is a subsidiary of EssilorLuxottica, a defendant in *Solos v. Meta*.

**B. The TVPA and § 1498 preservation claims.**

Plaintiff's Amended Complaint (ECF No. 14, ¶¶ 11–12) identifies the CAS records as necessary to (i) calculate proceeds in an anticipated 18 U.S.C. § 1595 action, (ii) calculate "reasonable and entire compensation" in an anticipated Court of Federal Claims action under 28 U.S.C. § 1498, and (iii) confirm at the contract level through labor-hour tracing that the work was performed by Plaintiff (¶ 18). The Order does not address any of these claims. It does not say the TVPA claim is not a basis for preservation. It does not say the § 1498 claim is not a basis for preservation. It does not say the labor-hour tracing is not a basis for preservation. It simply does not reach them.

**C. The Feinberg memo's own admission.**

Defendant Feinberg's September 14, 2026 memorandum (Exhibit B, p. 2) states: "By law, the Pentagon will still need to apply CAS to sole source development programs until it can work within the government-wide CAS Board to change the standards of CAS to GAAP." The Order does not address this admission. The SBMC contracts arise from the $21.88B IVAS production contract, which was novated from Microsoft to Anduril in February 2025. If the defendant's own memorandum concedes that CAS applies to sole-source development programs, the conversion of these specific contracts is an action in excess of statutory authority under 41 U.S.C. § 1502(a)(1) and 5 U.S.C. § 706(2)(C).

**D. The CAFC is already being asked for the same relief.**

Plaintiff's Doc. 47 (CAFC, filed 9/21/26) independently requested an interim financial preservation order staying the GAAP conversion for the specific contracts at issue. The CAFC

has not ruled. The Amended Complaint (ECF No. 14, ¶ 19) explains that Doc. 47 is directed at the contracting parties within the CAFC proceeding, while this action is directed at the officials who issued the September 14 memorandum. The Order does not address this jurisdictional distinction or the pending CAFC request for the same relief.

**E. The APA claims.**

The Amended Complaint alleges two independent APA claims: (1) the September 14 memorandum is an action in excess of statutory authority under 41 U.S.C. § 1502(a)(1) and 5 U.S.C. § 706(2)(C), and (2) the memorandum is arbitrary and capricious under 5 U.S.C. § 706(2)(A) because Defendants failed to consider the irreversible nature of the data conversion, the effect on pending federal proceedings, and the SBMC Phase Two transition. The Order does not address either claim.

**F. The alternative preservation-only order.**

Plaintiff's original TRO motion (ECF No. 3, ¶ 50) requested, in the alternative, an order that Defendants "preserve, and not direct or permit the modification, conversion, or deletion of, the Covered Records pending further order of this Court." The Order does not address the alternative.

**G. The ex parte TRO request and the Clayton-specific grounds.**

Plaintiff's Clayton TRO motion (ECF No. 15) requested a TRO without prior notice to Defendant Clayton under Rule 65(b)(1)(A) because "prior notice would permit Defendant Clayton to complete the classification before a hearing could be held" (Certificate Regarding Notice, ¶ 3). The Order does not address the ex parte request or the Clayton-specific grounds.

**H. The classification / removal-from-judicial-reach claim.**

The Amended Complaint (ECF No. 14, ¶ 19) and the Clayton TRO (ECF No. 15, ¶ 5) allege that the CAS cost-segregation records for the Covered Contracts are within the operational scope of Intelligence Community programs under Defendant Clayton's DNI jurisdiction, including Project ARIA, Project EagleEye, and SBMC. They further allege that the 65 technical forensic files (D. Mass. docket), the Alpaca Securities account records, the NYC hotel guest records and communication logs (February–April 2026), the lodging and academic records documenting DOD/IC official presence and corporate account payments, and the CAFC appellate record (No. 26-1721) would, if classified or placed under a SAP by Defendant Clayton, be removed from the jurisdiction of the courts in which they are pending.

The "Super Intelligence Force" task force (announced October 4, 2026) is led by Defendant Clayton in his dual capacity as DNI and AI Czar. Defendant Hegseth, Secretary of Defense, is a member. Emil Michael, Under Secretary of War for Research and Engineering and Chief Technology Officer, serves as vice chair and has operational control over the DoD AI systems (GenAI.mil, CDAO) that execute the record-restructuring mandated by the Feinberg memorandum (NBC News, Oct 4, 2026; Politico EU, Oct 7, 2026; Defense One, Oct 5, 2026). The task force report is due approximately January 2027 — the same window in which SBMC Phase Two cost data will be generated.

The obvious, unconsidered consequence of classifying the Covered Records is that the pending proceedings in this Court, the D. Mass. court, and the CAFC become moot — a litigation outcome, not a national security consequence (ECF No. 15, ¶ 23). Administrative declassification under 50 U.S.C. § 3594 is an illusory remedy that cannot replace active civil discovery on any judicial timeline (ECF No. 15, ¶ 26).

**I. The 10/13 supplemental filing.**

Plaintiff's Supplemental Memorandum (318 pages, dated 10/13/2026), which documents the task force composition, the Clayton/Apollo/Fireblocks/Alpaca institutional connections, and the IBAS manufacturing milestones, was submitted to the Clerk's Office on the same day the Order was entered. As of the Order's entry at 3:59 PM, the supplemental had not been docketed. The Order was entered before the supplemental was visible on the docket.

**J. Institutional context.**

The Covered Records implicate entities with documented financial relationships to the defendants, as detailed in Plaintiff's Supplemental Memorandum (filed 10/13/2026) and preserved in the CAFC record (Doc. 41, Exhibit L; Doc. 42).

## III. THE CIRCUMSTANCES HAVE MATERIALLY CHANGED

The original TRO motion sought to prevent a future conversion. The conversion is executing **tomorrow**, October 14, 2026. The Court cited *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) in ECF No. 21 and found the injury "speculative." The Amended Complaint (ECF No. 14, ¶¶ 35–36) applies the same standard and identifies a fixed date: October 14, 2026. The harm is not theoretical. It is scheduled.

Three concurrent events lock the loss at three levels: the CAS-to-GAAP conversion (Oct 14) dissolves existing cost pools; the AI task force report (~Jan 2027) locks GAAP as policy; and the SBMC Phase Two data generation (Jan–Feb 2027) produces new data under GAAP only. No single court order can unwind all three. The TRO is the only mechanism that addresses all three simultaneously (ECF No. 15, ¶ 24).

The loss for the Phase Two stages is not the destruction of existing evidence. It is the **prevention of evidence from ever being created** (ECF No. 14, ¶ 41).

## IV. IRREPARABLE HARM

The loss is of evidence, not merely of money (ECF No. 14, ¶ 38). Once segregated records are consolidated, the historical divisions cannot be reconstructed, and no subsequent discovery order or money judgment can restore them (¶ 37). The harm is ongoing and compounding because the technology is incorporated into multiple DoD programs — SBMC, Project EagleEye, and Project ARIA — and the SBMC Phase Two cost data (January–February 2027) will be collected under GAAP from day one (¶¶ 39–40). No court can order the retroactive creation of records that were never collected in that format.

Destroying or converting these cost-segregation records destroys the precise evidentiary tool needed to prove sole inventorship and unmask who received public funds for appropriated technology, directly shielding the infringing parties from fraud and misappropriation liability (ECF No. 15, ¶ 13).

## V. BALANCE OF EQUITIES AND PUBLIC INTEREST

The requested relief requires no new work. It asks Defendants only to continue collecting CAS cost-segregation data for the specific Covered Contracts in the format they are already

collecting it (ECF No. 14, ¶ 44). Defendants remain free to pursue their policy in every other respect (¶ 45). The government's interest in completing the broader CAS-to-GAAP transition is not impaired. The plaintiff's interest is in preserving the only records capable of tracing proceeds attributable to her technology across four federal proceedings. The public has a strong interest in agencies acting within the authority Congress conferred (¶ 46).

The Clayton-specific relief requires no declassification, no disclosure, and no new work beyond refraining from a classification action. All existing classifications remain in effect (ECF No. 15, ¶¶ 6, 29). A DNI who classifies the records in a pending case to render that case moot is not protecting national security. He is protecting the parties whose conduct is at issue (ECF No. 15, ¶ 30). The balance of equities favors preservation.

**WHEREFORE**, Plaintiff respectfully requests that the Court:

1. Enter a TRO enjoining Defendants Feinberg and Hegseth from executing the September 14, 2026 memorandum as to the CAS cost-segregation records and contract-level audit trails for the Covered Contracts identified in ECF No. 14, ¶ 17, pending the later of: (a) final resolution of this action, or (b) the generation and CAS-segregated preservation of Phase Two SBMC cost data, currently slated for late January to early February 2027;

2. In the alternative, enter a preservation-only order directing Defendants to preserve, and not direct or permit the modification, conversion, or deletion of, the Covered Records pending further order of this Court (ECF No. 3, ¶ 50);

3. Additionally, enjoin Defendant Clayton, in his official capacity as DNI, from newly classifying, designating as a Special Access Program, or otherwise removing

from judicial reach any record identified in ECF No. 15, ¶ 5(a) through (i), pending further order of this Court;

4. Grant an emergency hearing on this motion before the October 14, 2026 CAS conversion deadline; and

5. Grant such other relief as the Court deems just.

October 13, 2026

Respectfully submitted,



Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2026, a true and correct copy of the foregoing Cured Motion for CM/ECF Access and Emergency Renewed Motion for TRO was served upon all counsel of record and upon the United States Attorney for the District of Columbia and the United States Attorney General by hand-delivery to the Clerk's Office, 333 Constitution Ave NW, Room 1225, and by email to dcd_intake@dcd.uscourts.gov. A courtesy copy was provided to the Chambers of Judge Amit P. Mehta.

October 13, 2026

Respectfully submitted,

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com

**Attachment 4 — DCD Batch Order (Oct 13):**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DAITONA CARTER,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**STEPHEN A. FEINBERG**, *in his official capacity as Deputy Secretary of Defense,* ***et al.*****,**<br><br>**Defendants.** | ) | **Case No. 26-cv-03318 (APM)** |

**ORDER**

Before the court are pro se Plaintiff Daitona Carter's motions for injunctive relief, ECF Nos. 3, 13, 15. So far as the court can tell, Plaintiff challenges a recently announced change to accounting practices at the U.S. Department of Defense (DoD) under the Administrative Procedure Act. ECF No. 1 at 7–9; ECF No. 3 ¶ 7. According to Plaintiff, unless application of that change is enjoined as to certain DoD contracts, ECF No. 3 ¶ 17, she will be deprived of the evidence needed to establish damages in a pending action in the Court of Appeals for the Federal Circuit, *id.* ¶ 1, and "anticipated action" in the U.S. Federal Court of Claims seeking compensation for "government use of [ ] patented technology," *id.* ¶¶ 12, 18. Plaintiff has not, however, established that this claimed injury is "certain and great" and "actual and not theoretical" to warrant injunctive relief. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The district court in the matter now before the Federal Court declined to allow Plaintiff to intervene, holding that "she ha[d] not sufficiently alleged that she has a protectible interest in this action." Electronic Order, *Solos Tech. Ltd. v. Meta Platforms, Inc.*, 26-cv-10304 (ADB), ECF No. 90 (D. Mass. Apr. 15, 2026). That she will secure relief from that decision on appeal and ultimately succeed on the

merits is wholly "speculative." *Wis. Gas*, 758 F.2d at 674. It is equally speculative that Plaintiff will prevail in any other action.

For those reasons, Plaintiff's motions for injunctive relief, ECF Nos. 3, 13, 15, are denied. Further, Plaintiff's motion to proceed in forma pauperis, ECF No. 2, is denied as moot as she has paid the filing fee. *See* Dkt. Entry, 10/6/26. Plaintiff's motion for immediate judge assignment, ECF No. 12, is also denied as moot. Her motion for reasonable accommodation, ECF No. 6, is denied without prejudice. The court will operate remotely unless an in-person hearing is required. Plaintiffs' motion for a CM/ECF password, ECF No. 7, is denied without prejudice as it fails to comply with Local Civil Rule 5.4. To cure, Plaintiff must certify either that she has successfully completed the Clerk's Office on-line tutorial or has been permitted to file electronically in other federal courts. *See* LCvR 5.4. She must also confirm her capacity to file documents and receive filings electronically on a regular basis. *See id.* Plaintiff's motion for electronic service, ECF No. 8, is granted.

**Attachment 5 — Feinberg memo (Sept 14):**

DEPUTY SECRETARY OF WAR
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

SEP 14 2026

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOW FIELD ACTIVITY DIRECTORS

SUBJECT: Fostering One Strong Industrial Base

The Department of War (DoW) must buy faster, simpler, and more competitively to get speed and volume. Backed by strong Congressional support in the FY26 NDAA to strengthen the Defense Industrial Base, the Department continues to break down barriers to entry and expand our industrial base. To build on this momentum and keep all of industry engaged, we must completely transform and modernize our contract cost and pricing ruleset.

The DoW will move from government-unique Cost Accounting Standards (CAS) to the accounting every American company already uses — Generally Accepted Accounting Principles (GAAP) — and push those benefits to every tier of the supply chain. When necessary to foster transparency and fairness, we will ask suppliers for the cost and pricing information they already keep. No new accounting systems or special data formats will be required. Any data industry provides will be used only for authorized Government purposes and never made available to another company for its own use.

Executive Order 14402 makes fixed-price contracts the default and reserves cost-based contracts for basic research and for the development of major systems. Where there is a market — competition, comparable sales, reliable price history — the market sets the price. Where there is no market — major sole-source development and procurement — we will rely on cost data drawn from a company's existing records rather than invasive oversight.

My August 18, 2026 memorandum, "Supplier Cost and Pricing Transparency," reinforces the option for contracting officers to see through the prime contractor to the suppliers when needed. This is essential to ensure companies at every tier are treated fairly. For the system to work, contractual benefits offered by the government to a prime must be flowed down through the supply chain and, conversely, sole-source suppliers cannot be allowed to leverage primes and slow down deliveries. The Department has a wide range of tools to mitigate risk and strengthen the supply chain. Office of Strategic Capital loans, Industrial Base Analysis and Sustainment funds, and talented DoW business operators should be accessible to every company supporting the DoW.

Asking for information does not, by itself, create a cost-reimbursement contract or CAS coverage, and it does not alter the thresholds or exceptions for certified cost or pricing data. Transparency and partnership run both ways: the Department opens its buying to market forces, and when asked, industry shares the cost and pricing information it already keeps.

We will accept GAAP-based accounting across all contracts to the maximum extent the law permits, and we will continue pursuing CAS to GAAP through the Cost Accounting

Standards Board (CASB). The DoW will submit proposals to the CASB within 60 days to make CAS exemption the default, confine remaining CAS coverage to sole-source, cost-based development or incentive-fee procurement, and ensure CAS applies only to relevant contracts and not companies as a whole. Recently, the CASB made significant progress in reducing the CAS regulations, and we look forward to partnering with them to continue accelerating change this year. Until the Board acts, no solicitation from the DoW that could bring a business unit not previously subject to CAS under full CAS coverage may be issued unless the Under Secretary of War for Acquisition and Sustainment has approved the acquisition strategy in writing.

The attached appendix directs these actions; implementing guidance may not add requirements beyond this memorandum and applicable law. This memorandum and appendix govern how the Department requests and uses contractor cost and pricing information; prior Department guidance on this subject will be applied consistently with it.

One of our Nation's greatest strengths is its private sector. National security must harness it — unleashing industry, protecting taxpayers through proven methods like competition, and restricting the use of our most burdensome oversight tools to only when absolutely necessary.

Attachment:
As stated

## APPENDIX: IMPLEMENTATION ACTIONS

The Vice Chairman of the Joint Chiefs of Staff will:

**Review requirements reform in practice.** Within 30 days, co-chair with the Deputy Secretary a review of the Services' and Military Departments' implementation of requirements reform. The requirements review will use tangible program examples to show where the new approach has broadened acceptable acquisition solution space, expanded competition, or changed what acquisition could buy, and will identify how the Services and Military Departments can accelerate adoption, or further improve requirements processes.

The Under Secretary of War for Acquisition and Sustainment (USW(A&S)) will:

**Accelerate acquisition transformation.** Having issued the commercial-first implementation policy, within seven days issue the Department-wide modular open systems approach (MOSA) policy and the Portfolio Acquisition Executive Operating Framework, including its addendum of recommended authorities for delegation.

**CAS containment within existing authority.**

- Use available CAS relief. Apply immediately the increased CAS thresholds enacted in section 1806 of the National Defense Authorization Act for Fiscal Year 2026, as implemented by Department class deviation and by the Cost Accounting Standards Board's 2026 threshold rule as it takes effect, together with the statutory relief for nontraditional defense contractors. Within 60 days, issue, with the support of the Under Secretary of War (Comptroller) (USW(C)), a CAS waiver policy and standing justification templates for the individualized determinations the waiver authority in law requires, for new entrants, predominantly commercial segments, and businesses outgrowing small-business classifications.

- Prevent shadow CAS. Within 30 days, prohibit Components from imposing on exempt awards and other transactions the equivalent of CAS coverage, disclosure, business-system review, or practice-change governance under another name. Cost data from exempt performers will be requested as already maintained in their books and records.

- Limit new CAS coverage pending Board action. Before issuing a solicitation expected to bring a performing business unit newly under full CAS coverage, obtain the written approval of the USW(A&S) for the acquisition strategy. Requests must assess competition, commercial acquisition, competed fixed-price structures, exemptions, and existing waiver authority, and explain why none can meet the requirement without new full CAS coverage; the Under Secretary will decide within 15 business days or elevate the request to the Deputy Secretary. This approval concerns the acquisition strategy only; it does not determine CAS applicability, grant any exemption or waiver, or authorize omission of a required provision or clause.

**Make rapid commerciality determinations.** Within 45 days, direct that commercial product and service determinations be completed within 15 business days of a complete request; that a prior Department determination stand for subsequent procurements unless reversed in writing by a head of contracting activity; and that, on commercial acquisitions, cost data may be requested if the contracting officer determines price, market, and sales data are insufficient to determine a fair and reasonable price.

**Extend use of other transactions.** Through the Other Transactions Guide revision under way, within 45 days issue interim other transaction (OT) policy, followed by the full Guide reissue within 120 days, that: defines "participating to a significant extent" as any unique contribution material to the prototype project, without percentage-of-workshare or dollar thresholds as eligibility tests; prefers fixed-amount, milestone-based payment structures; requires the agreements officer, before award, to document the applicable statutory eligibility basis, relying where lawful on offeror self-certification against standard representations and conducting additional verification by exception, with a 10-business-day clock on any determination; and directs follow-on production planning in every prototype OT. Within 30 days, issue a consortium policy with project-level eligibility, direct-award preference and fee transparency. Within 60 days, Component Senior Procurement Executives will publish pre-approved findings templates and a 10-business-day signature standard for exceptional-circumstances determinations.

**Modernize profit policy.** Within 90 days, initiate the DFARS rulemaking, eliciting industry feedback, to revise the Department's profit policy so that negotiated margins reflect value delivered, risk carried, and private capital invested – not merely cost incurred. Commercial benchmarks will inform negotiation objectives but will not constitute caps. The policy will reward efficiency, speed, and performance; weigh the financial health of fragile supply-chain chokepoints; and address sustained loss positions prospectively through fair pricing of future work. Nothing in this action alters applicable cost-allowability requirements for cost-reimbursement work. Healthy and reasonable margins drive innovation and excellence.

**Require a basis for requirements.** Within 90 days, building on the inventory completed under the Acquisition Transformation Strategy, every recurring review, checklist, data demand, or approval imposed below the Federal Acquisition Regulation (FAR) and Defense Federal Acquisition Regulation Supplement (DFARS) will be annotated with the authority that requires it. Requirements grounded in operational safety, security, and classification authorities are not subject to automatic lapse. Any other uncited item will be suspended for new use and will lapse unless the cognizant Component Acquisition Executive reaffirms it within 30 days. No new procedural requirement may be issued without its basis stated on its face.

**Modernize forward-pricing support.** Direct that DCMA immediately work with DCAA to overhaul the approach to establishing and maintaining forward pricing rate agreements (FPRAs) consistent with this memorandum, drawing on rate data maintained in the ordinary course of business. FPRAs will be used only where they accelerate recurring, high-volume negotiations and enable a more efficient process for the Department and for industry.

**Implement supplier cost and pricing transparency consistent with this memorandum.** Within 30 days, issue the implementing procedures for the August 18, 2026, memorandum so

that price information is obtained first and cost information to the extent needed to establish a fair price; commercial products and services are priced under the statutory limits that apply to them; cost information is requested in the form the contractor already maintains; contractor denials are handled under the process the law provides; information received is used only for the pricing action for which it was requested; and no automated access to contractor systems without express contractual authorization and applicable security protections. Nothing in the procedures alters the thresholds or exceptions for certified cost or pricing data. The procedures will state that, consistent with Executive Order 14402, cost-reimbursement contracting remains appropriate for research and for the development of major systems, and is otherwise the exception.

The USW(C) will:

**Advance CAS coverage reform at the Board.** With the support of the USW(A&S), develop and formally transmit to the Cost Accounting Standards Board the Department's proposals for: (a) a class exemption making exemption the default, with CAS coverage limited to cost-based development contracts of major scale awarded without adequate price competition; (b) coverage that attaches to the covered contract and the indirect-cost pools material to it, with no entity-, segment-, or flowdown-attachment; (c) completion of the CAS-to-GAAP conformance begun with the July 8, 2026, final rule, so that GAAP is the baseline and government-unique requirements survive only where cost-based pricing specifically demands them; and (d) a modernized Disclosure Statement – a short certification that contract cost accounting follows the contractor's annual GAAP financial statements, audited by a registered independent public accounting firm, supplemented only by legally required disclosures, with a schedule of departures, in a machine-readable, versioned electronic submission format. Transmit the supporting analysis to the Board and report monthly to the Deputy Secretary until the Board acts.

**Ensure audits are risk-based.** Within 60 days, direct that the Department consider a contractor's audited GAAP financial statements and internal-control attestations before performing additional work. Ensure that no office will request an audit of a cost or system that has already been audited or reopen closed years absent indicators of fraud or material misstatement. Every audit will identify the risk, its materiality to a government decision, the records needed, and why existing evidence is insufficient.

**Recommend the Department's Cost Accounting Standards Board representative.** Within 30 days, in coordination with the USW(A&S) and the General Counsel, recommend to the Secretary, through the Deputy Secretary, the appointment of the Department's best-qualified representative to the Cost Accounting Standards Board under the Secretary's appointment authority. The representative will have substantial experience administering and managing covered contracts and will be selected consistent with section 1806 of the National Defense Authorization Act for Fiscal Year 2026 and advance compliance with the Board-member eligibility requirements at 41 U.S.C. 1501(b)(4).

The USW(A&S) and the USW(C) will jointly:

**Consolidate contractor business systems.** Within 90 days, through the business-systems line of effort under way, issue class deviations where required, and direction to:

- Consolidate estimating-system and material-management-and-accounting-system requirements into simplified, commercial-aligned accounting-system criteria and retire their separate reviews – retaining statutory proposal-integrity protections, inventory-accounting standards, and standards for consistent cost estimation, accumulation, and reporting – with accounting-system adequacy outside the covered CAS core assessed against the FAR's condition for the contract type, satisfied by the contractor's GAAP books and a contract-level ledger meeting applicable allowability rules;

- Confine earned value management to major development programs and, where the Government retains cost risk, major long-duration production programs, with the boundary set in the implementing deviation; retire the separate government system-validation regime, using integrated baseline reviews to assess contract baselines; and accept schedule, actuals, and estimate-at-completion data from contractors' native systems;

- Reduce contractor burden by relying on government-wide FAR property-stewardship duties and remedies, aligned with commercial practices and tools, rather than a separate review overlay; and

- Raise the purchasing-system-review threshold under existing FAR authority, reserve reviews for demonstrated risk, and apply the statutory rule that an approved purchasing system ends subcontract-consent withholding; and

- Establish a 90-government-day clock for final disposition of contractor's corrective action plan, tolled while necessary contractor information is outstanding and elevated to the head of the contracting activity upon expiration.

No Component may recreate a retired regime through local policy, checklists, approvals, or clauses. To the maximum extent permitted by law and contract, Components will cease enforcing superseded requirements, and contracting officers will offer bilateral no-cost modifications removing affected clauses at the next practicable opportunity.

**Simplify business-system review.** Within 60 days, publish clear, specific, and publicly available commercial-aligned criteria for contractor business systems and issue a class deviation, grounded in the Department's statutory reliance authorities, accepting a registered independent public accounting firm's certification against those criteria in place of Department review. The deviation will set a reasonable effective date aligned, where applicable, with contractors' annual financial-statement audit cycles. Effective immediately, discretionary review requires a written determination of specific, material risk by the cognizant contracting activity, coordinated with the requiring Component Acquisition Executive or designee. For multi-Component facilities, the Defense Contract Management Agency (DCMA) will identify the cognizant Component.

**Publish the efficiency assurance.** Within 30 days, issue a joint enforcement-posture statement that, for fixed-price contracts and other transactions, to the extent the performer bears the cost risk: a performer that becomes more efficient against a fairly negotiated price keeps the savings for that contract, and the Department captures efficiencies only prospectively, in the next negotiation, at a fair margin. This statement scopes enforcement priorities and will be incorporated in the profit policy revision; it does not waive statutory remedies for fraud or defective pricing, CAS price adjustments where CAS applies, or final indirect-cost-rate settlement on cost-reimbursement work.

The Secretaries of the Military Departments, through their Acquisition Executives, will:

**Implement Portfolio Acquisition Executive authorities.** The recommended authorities in the Portfolio Acquisition Executive Operating Framework's addendum are the default. Within 120 days of the Framework's issuance, each Component's implementation plan will delegate those authorities. Any exception requires the Component Head's signature, the specific reason, and an alternative that delivers the same speed, and will be submitted to the Deputy Secretary with the plan.

The Director, Defense Innovation Unit, will:

**Scale advance market commitments.** Within 180 days, with support from the USW(A&S) including Defense Production Act authorities as needed, structure additional advance market commitments, including aggregated allied demand consistent with the America First Arms Transfer Strategy, building on the early success of the Drone Dominance initiative in piloting demand-pull procurements that unleash market forces and create price signals for robust supply chains. These commitments shall reward demonstrated performance and delivered scale, operate within existing resources, and comply with applicable fiscal law.

The Director of Administration and Management, as part of the ongoing Defense Agency and DoW Field Activity review, will:

**Align the contract-oversight enterprise.** Within 90 days, with the USW(A&S), the USW(C), the Military Departments, DCAA, and DCMA, deliver options to the Deputy Secretary for clarifying roles and charters, eliminating duplication, and addressing workforce effects. Preserve mission-critical contract-administration functions, including government flight operations, product acceptance, facilitating contractor payment, property administration, and supplier quality assurance.

The USW(A&S), with the USW(C), will:

**Measure results.** Within 90 days, define and baseline: government-unique requirements eliminated; business units under full CAS coverage; business systems subject to review; audit and oversight cycle time; commercial content; performers at production per program, paired with unit-cost and affordability effects; new entrants and returning commercial firms; and declined

solicitations, where observable. Report quarterly thereafter. These measures are the test of this memorandum.

This memorandum is effective on signature. No new organization or compliance framework will be created. No discretionary study, pilot, working-group determination, or approval not required by law may delay these actions. Subordinate Department guidance inconsistent with this memorandum will be revised within 90 days.

All actions will comply with applicable statutes and appropriations law. Nothing in this memorandum authorizes obligations in excess of available appropriations, directs the scope, findings, or conclusions of any audit, or alters any authority vested by statute. Where additional authorities are required, the USW(A&S) will develop a legislative engagement plan to secure and support those authorities and the durability of these reforms. Department-approved artificial intelligence tools may be used to reduce document-preparation burden and expedite execution time.

Defense Business Report

PENTAGON

# 'They overreached': Amid industry worry, new Feinberg memo tweaks accounting regime

A Sept. 15 memo from Deputy Secretary of Defense Stephen Feinberg walks back some changes from a previous memo, while moving reforms forward, analysts tell Breaking Defense.

By Aaron Mehta on September 17, 2026 2:08 pm

Share



**Attachment 6 — Anduril tender (Oct 13/14):**

BREAKING is leaving, will be replaced by Peter Rice



TECH

# Anduril employee tender offer would value the defense tech startup at $90 billion

PUBLISHED WED, OCT 14 2026•4:02 PM EDT UPDATED WED, OCT 14 2026•4:24 PM EDT


Samantha Subin
@SAMANTHA_SUBIN

WATCH LIVE
SHARE

## KEY POINTS

- Anduril will let employees sell shares through a tender offer that would value the company at $90 billion
- Bloomberg reported the shares are priced at $94.80 apiece and the offer is capped at $1.3 billion
- Anduril was valued at $61 billion in a $5 billion funding round announced in May.



BREAKING is leaving, will be replaced by Peter Rice



Defense tech startup Anduril will give employees a chance to sell stock through a tender offer that would value the company at roughly $90 billion, CNBC has confirmed.

Bloomberg was the first to report the news, citing sources familiar with the matter. Anduril confirmed the report to CNBC.

Employees participating in the offering can sell shares at $94.80 apiece. The offer, which opened on Oct. 13 and closes Nov. 9, is capped at $1.3 billion, according to the report.

Bloomberg reported that employees in 16 countries are eligible to participate.

Anduril has been a major winner of the growing U.S. defense tech boom and President Donald Trump's plans to reindustrialize the U.S. military. In May, the company closed a $5 billion funding round that doubled its valuation to $61 billion.

Co-founder and Oculus headset creator Palmer Luckey is among a growing group of defense tech leaders taking on advisory roles in Washington as they compete for key Department of Defense contracts.

This month, the company inked a U.S. Navy shipyard contract worth up to $2.9 billion, shortly after Luckey was named a co-director of Project Meridian, which aims to develop and scale military capabilities. SpaceX rocket maker CEO Elon Musk also joined the initiative.

Founded in 2017, Anduril has gained prominence for its drones, augmented reality headsets and AI software it's developing for the U.S. government and allied governments. Last month, the company made headlines after Iran said it had captured one of its underwater vehicles.

**BREAKING** is leaving, will be replaced by Peter Rice

CNBC LIVESTREAM SIGN IN



VIDEO 01:22

**Anduril secures $2.9 billion navy submarine shipyard contract**

**Read more CNBC tech news**

- Amazon launches new Bee 'personal AI' devices that listen to conversations
- Nvidia CEO Jensen Huang urges U.S.-China dialogue on 'potentially dangerous' AI
- OpenAI sued by 8 states over ChatGPT safety concerns
- Anthropic's third-quarter revenue is said to hit $16.8 billion ahead of IPO

Choose CNBC as your preferred source on Google and never miss a moment from the most trusted name in business news.

**TRENDING NOW**




Trump says 'if Ken Paxton loses' Texas Senate race, blame Cornyn and Karl Rove

MARKETS VIDEO WATCHLIST MENU

BREAKING is leaving, will be replaced by Peter Rice

CNBC LIVESTREAM SIGN IN




KFC to switch to Coca-Cola beverages in U.S. restaurants for the first time in decades




Southwest is overhauling its frequent flyer program. Here's what's changing




Elon Musk says Trump is 'ultimately' responsible for any curbs on Ukraine's Starshield systems

CNBC

Subscribe to CNBC PRO
Licensing & Reprints
Select Personal Finance
Closed Captioning
News Releases
Corrections
Site Map
Careers
Contact

Subscribe to Investing Club
CNBC Councils
Join the CNBC Panel
Digital Products
Internships
About CNBC
Podcasts
Help

MARKETS VIDEO WATCHLIST MENU

EXCLUSIVE Business | Cybersecurity

# Anduril in Talks to Sell Insider Shares at Roughly $90 Billion Valuation

Brian Schimpf, chief executive officer of Anduril Industries. *Photographer: Jose Sarmento Matos/Bloomberg*

By Rebecca Torrence, Edward Ludlow, Natasha Mascarenhas, and Katrina Manson
October 14, 2026 at 1:11 PM EDT
*Updated on October 14, 2026 at 1:16 PM EDT*

Save Translate

**Takeaways** by Bloomberg AI

Anduril Industries Inc. is allowing employees to sell shares as part of a tender that stands to value the defense technology startup at roughly $90 billion, according to people familiar with the situation who asked not to be identified because the plans aren't public.

The tender would give employees the chance to sell shares at $94.80 each, with the overall size of the offer capped at about $1.3 billion, according to people briefed on the matter, who asked not to be identified discussing private details. The tender offer opened on Oct. 13 and is set to close Nov. 9, one of the people said.

A representative for Anduril declined to comment.

Bloomberg

Terms of Service Do Not Sell or Share My Personal Information Trademarks Privacy Policy

Careers Advertise Ad Choices Help

©2026 Bloomberg L.P. All Rights Reserved.

**Attachment 7 and 8 — (ECF 92 and ECF 90 incorporated by reference from D. Mass. 1:26-cv-10304)**

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2026, a true and correct copy of the foregoing Movant-Appellant's Citation Of Supplemental Authority Pursuant To Fed. R. App. P. 28(j) and accompanying Attachments 1 to 8 was filed via the Court's CM/ECF system, which will send electronic notification to all registered counsel of record. I further certify that any unregistered or default parties were served via electronic mail.

October 15, 2026

Respectfully submitted,

/s/Daitona Carter
Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002.
legal@daitonacarter.com