26-1721

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

SOLOS TECHNOLOGY LIMITED,

Plaintiff-Appellee

v.

META PLATFORMS, INC.,META PLATFORMS TECHNOLOGIES, LLC,
OAKLEY, INC.,LUXOTTICA OF AMERICA, INC.,
ESSILORLUXOTTICA, USA, LLC,

Defendants

DAITONA CARTER,

Movant-Appellant

---

Appeal from the United States District Court for the Massachusetts in

No. 1:26-cv–10304–ADB, Judge Allison D. Burroughs

---

# MOTION FOR JUDICIAL NOTICE OF PUBLIC RECORDS AND SUBSEQUENT DEVELOPMENTS

---

# I. INTRODUCTION

Pursuant to Federal Rule of Evidence 201(b), Movant-Appellant Daitona Carter respectfully moves this Court to take judicial notice of the following public records and events occurring between March 23 and October 22, 2026, that are material to the pending merits review. Each fact set forth below is not subject to reasonable dispute and is accurately and readily determinable from the cited public sources.

This motion supplements the existing record, which already contains Movant's arguments regarding: [rest unchanged]

The facts noticed below confirm, extend, and supplement those existing record arguments.

This motion supplements the existing record, which already contains Movant's arguments regarding: the unauthorized commercial deployment of Appellant's proprietary technology; the § 1595 "knowingly benefits" analysis; the Fifth Amendment takings and conversion claims; the 13th Amendment involuntary servitude and indenture conditions; the data harvesting and mobile carrier breach connection; the 2009 public disclosure and beamforming architecture; the corporate integration; the national security justification's arbitrariness; the TRO/PI dis-

tinction; the CAS-to-GAAP conversion; the Clayton appointment and related D.D.C. action; the AUKUS connection; the Northrop Grumman pre-2014 presence; and the DOD-DOJ partnership and IG filings.

The facts noticed below confirm, extend, and supplement those existing record arguments.

## II. FACTS REQUESTED FOR JUDICIAL NOTICE

### 1. Berkshire Hathaway Investment in Bending Spoons (Oct. 14, 2026)

On October 14, 2026 — the same date the Department of Defense executed its CAS-to-GAAP conversion and the D.D.C. denied Appellant's Emergency Renewed Motion for TRO — Berkshire Hathaway invested an additional $330 million in Bending Spoons S.p.A. (Nasdaq: BSP), following its initial $600 million position at the July 1, 2026 IPO. BSP surged 38–41% on the announcement, reaching an all-time high of $59.50 on October 15, 2026 (market cap $33.5B).

*(Bending Spoons Investor Press Release, Oct. 14, 2026; CNBC, Oct. 14, 2026; SEC Form 4.)*

**2. Super Intelligence Force First Meeting (Oct. 16, 2026)**

The Super Intelligence Force (SIF) held its first meeting at the White House on October 16, 2026. Chair: Walter Jay Clayton (DNI + White House AI Czar). Vice Chair: Emil Michael (DoD CTO / Under Secretary of War for Research and Engineering). Members: Scott Kupor (OPM), Andrew Ferguson (FTC). The 120-day report is due approximately January 2027 — the same window in which SBMC Phase Two cost data will be generated. Defendant Clayton is named in *Carter v. Feinberg*, No. 1:26-cv-03318-APM (D.D.C.) and is the executive overseeing the Pentagon's Automated AI Classification Pilot, which would classify the CAS cost-segregation records and remove them from judicial reach.

*(Semafor, Oct. 16, 2026; Bloomberg, Oct. 15, 2026; CNBC, Oct. 16, 2026.)*

**3. Ray-Ban Meta Audio Shipment (Oct. 13, 2026)**

On October 13, 2026 — the same date the D.D.C. denied the TRO and Anduril opened its $90B tender — Meta shipped "Ray-Ban Meta Audio" ($349; 23 color/lens combinations; Clubmaster and Burbank styles). The product employs directional audio projection — the exact architecture documented in Appellant's senior priority record (2009 public disclosure; 2013–2017 source code; 2016–2019 prototypes).

*(Meta Official Blog, Sept. 23, 2026; Meta Newsroom, Sept. 24, 2026.)*

### 4. Meta Admits "Recording Without Activation Phrase" (Oct. 13–19, 2026)

Meta confirmed that Ray-Ban Meta glasses were "recording audio without the activation phrase" and that the "issue [was] resolved." This confirms the "Private Processing" architecture (CVMs, RA-TLS, blind-signed credentials — see Doc. 57, Attachment 2) is in active commercial deployment, and that the hardware-enclaved sensor gating documented in Appellant's TD Commons publication (June 25, 2026, Art. 10574) is the operational framework.

*(Meta engineering disclosure / public reporting, Oct. 13–19, 2026.)*

### 5. Kopin Additional $18.6M Sole-Source IBAS Award (Oct. 8, 2026)

Kopin Corporation (NASDAQ: KOPN) secured an additional $18.6M sole-source IBAS award for "two more MicroLED display configurations for ground-soldier and pilot applications," bringing its total SBMC-related awards to $34M. This is a new sole-source DoD contract on the exact hardware architecture at issue, post-dating Doc. 41.

*(Kopin Press Release via Business Wire, Oct. 8, 2026; DoD procurement record.)*

**6. Anduril $2.9B Shipyard Contract (Oct. 6, 2026)**

Anduril Industries announced a $2.9B shipyard contract on October 6, 2026 — five days after Palmer Luckey was named to Project Meridian. This confirms the Meridian → contract pipeline and adds a new revenue stream to the "knowingly benefits" analysis under 18 U.S.C. § 1595.

*(CNBC, Oct. 6, 2026; Defense Scoop, Oct. 6, 2026; Defense News, Oct. 7, 2026.)*

**7. Meta's Muse — Commercial Deployment of Appellant's Habitual AI Architecture**

Meta's "Muse" product represents the commercial deployment of Appellant's habitual AI architecture, as referenced in the lower court record and Appellant's briefs.

*(Meta Newsroom, Sept. 24, 2026; lower court record; Appellant's briefs.)*

**8. Palmer Luckey — Oculus VR, Facebook Acquisition, and Prior IP Litigation**

Palmer Luckey, CEO of Anduril Industries, is the founder of Oculus VR, which was acquired by Facebook (now Meta) in March 2014 for approximately $2 billion. In *ZeniMax Media, Inc. v. Oculus VR, Inc.*, No. 3:14-cv-02563 (N.D. Tex.), a jury found that Luckey violated a non-disclosure agreement but did not find that Oculus misappropriated trade secrets; the court subsequently eliminated Luckey's

individual liability on post-trial review. In *Total Recall Technologies, LLC v. Luckey* (N.D. Cal.), a jury returned a complete defense verdict. Luckey founded Anduril Industries in 2017.

*(ZeniMax v. Oculus, No. 3:14-cv-02563 (N.D. Tex. 2017); Total Recall Techs. v. Luckey (N.D. Cal. 2021); public reporting.)*

**9. AUKUS-Related Resignations (June 11, 2026)**

On June 11, 2026, UK Defence Secretary John Healey and Armed Forces Minister Al Carns resigned, forcing Australian Defence Minister Richard Marles to cancel scheduled joint AUKUS press events. These resignations occurred in the context of defense projects allied with AUKUS, a program that includes the disputed technology.

*(NYT, June 11, 2026; CNN, June 11, 2026; Sydney Morning Herald, June 11, 2026.)*

**10. Resignation of U.S. Army Secretary Dan Driscoll**

U.S. Army Secretary Dan Driscoll resigned in temporal proximity to Appellant's emergency legal outreach to Spanish and Italian authorities, Interpol, and foreign law enforcement channels.

*(Public reporting.)*

## 11. Intelligence Community Transitions

The following events occurred in temporal proximity to Appellant's filings:

- Arrest of senior CIA official David Rush;
- Resignation of DNI Tulsi Gabbard;
- Departure of Deputy DNI Amaryllis Fox Kennedy;
- Appointment of Jay Clayton as Director of National Intelligence, immediately following Judge Burroughs' dismissal in *Solos v. Meta et al.*

*(Public reporting; docket entries.)*

## 12. PTAB IPRs Targeting the Patent Family

The following inter partes reviews are pending before the PTAB, targeting the patent family at issue in this appeal:

- IPR2026-00376 (filed June 17, 2026): Luxottica + Meta, targeting U.S. Patent No. 12,216,339;
- IPR2026-00412 (filed Aug. 13, 2026): Luxottica + Meta, targeting U.S. Patent No. 10,306,389;
- IPR2026-00413 (filed Aug. 14, 2026): Luxottica + Meta, targeting U.S. Patent No. 11,871,174;

- IPR2026-00420 (filed Aug. 13, 2026): Luxottica + Meta, targeting U.S. Patent No. 11,082,055;
- IPR2026-00512 (filed Sept. 29, 2026): Luxottica + Meta, targeting U.S. Patent No. 10,651,866.

Collectively, these five petitions target all five patents in the asserted family (U.S. Patent Nos. 10,306,389; 10,651,866; 11,082,055; 11,871,174; 12,216,339). They seek to cancel the entire patent family while the § 256(b) inventorship correction remains pending before this Court. If the IPRs succeed, there is no patent remaining to correct.

*(PTAB Docket.)*

### 13. Meta's Rule 12(b)(7) Motion and the GoldenEye Timeline (Mar. 25, 2026)

On March 25, 2026 — two days after Appellant departed [LOCATION] and her hard drive containing the original motion to intervene and supporting notes was taken — Meta filed its Motion to Dismiss under Rule 12(b)(7) (ECF No. 49, D. Mass. No. 1:26-cv-10304-ADB), arguing that BlueRadios, Inc. is an indispensable party because the technology in Solos' asserted patents "appears" to have "come from the joint project between Kopin and BlueRadios" (the 2007–2009 "Golden-i"

collaboration, rooted in U.S. Provisional Application No. 60/567,132, filed April 30, 2004, "Head Worn Wireless Computer").

Meta does not map specific claims of the Solos patents to any element of the '132 provisional or the GoldenEye portfolio. Meta relies exclusively on "generalized features such as microphone-based voice input and sensor-based motion or context detection" to assert conceptual overlap between the 2004–2009 collaboration and the asserted patents (filed 2015, priority dates no earlier than 2013).

In its opposition (ECF No. 100), Solos confirmed: "Meta fails to identify any post-2009 work under the agreement, much less any work contributing to specific claims of the Asserted Patents. Nor does Meta identify a joint inventor... These materials fail to identify any specific inventive contribution to the conception of any claim of the Asserted Patents."

Solos further submitted a declaration from its program lead, Dr. Ernesto Martinez, testifying that the smart-glasses platform involved "different technical architecture, design objectives, and system integration" separate from the Golden-i project, and that the asserted patents were conceived independently by a "separate system innovation division" beginning in 2013.

The GoldenEye I portfolio (including U.S. Patent No. 10,672,860, "Headset Computer That Uses Motion and Voice Commands to Control Information Display and Remote Devices") covers **wireless data transmission and motion/voice command interfaces for head-worn displays**. It does not disclose the **acoustic beamforming architecture, microphone array directivity patterns, fractional time-delay oversampled sensor processing, or adaptive noise cancellation** embodied in the Solos/Kopin patent family at issue (U.S. Patent Nos. 10,306,389; 10,651,866; 11,082,055; 11,871,174; 12,216,339).

The GoldenEye portfolio is itself the subject of ongoing chain-of-title litigation in *BlueRadios, Inc. v. Kopin Corp.*, No. 1:16-cv-02052 (D. Colo.), in which BlueRadios contends that Kopin intentionally omitted BlueRadios inventors from the issued applications.

*(Meta's Motion to Dismiss, ECF No. 49; Solos' Opposition, ECF No. 100; Martinez Declaration; U.S. Prov. App. No. 60/567,132; US 10,672,860; BlueRadios v. Kopin, No. 1:16-cv-02052 (D. Colo.).)*

## 14. Feinberg Memo on CAS-to-GAAP Conversion (Sept. 14, 2026)

The Feinberg memo ("Fostering One Strong Industrial Base," Sept. 14, 2026) states: "By law, the Pentagon will still need to apply CAS to sole source de-

velopment programs until it can work within the government-wide CAS Board to change the standards of CAS to GAAP." The CAS Board has not acted. The October 14, 2026 conversion is therefore unlawful as applied to sole-source development programs.

*(Feinberg memo, Sept. 14, 2026.)*

## III. WHY THE NOTICED FACTS ARE MATERIAL TO PENDING RE VIEW

The foregoing facts are material to this Court's review of the existing record for the following reasons:

### (a) Ongoing Commercial Deployment Contradicts the "Factual Void" Assertion

The noticed commercial deployments (Items 3, 4, 5, 6, 7) confirm the continuous, real-time commercial and defense deployment of Appellant's proprietary architecture. This directly contradicts the "factual void" assertion in Solos' Response Brief (July 30, 2026) and confirms the § 1595 "knowingly benefits" analysis already presented in the record. The deployment is not historical or speculative; it is ongoing and expanding (Ray-Ban Meta Audio, Kopin IBAS, Anduril shipyard, Meta Muse).

### (b) The CAS-to-GAAP Conversion and the Prospective Preservation Distinction

The noticed accounting and procurement events (Items 1, 2, 14) confirm that the CAS-to-GAAP conversion has already occurred (October 14, 2026) and that Phase Two data will be generated solely in GAAP format (January–February 2027). The SIF 120-day report window (January 2027) coincides precisely with SBMC Phase Two data generation.

This confirms that the **prospective preservation order** (PI) — directing Defendants to maintain CAS cost-segregation format for Phase Two work — is the dispositive relief, distinct from the TRO which sought to prevent the October 14, 2026 conversion of existing records. The lower tribunals' failure to distinguish these two forms of relief, and their refusal to grant the PI, operated to facilitate the ongoing commercialization of revenue derived from Appellant's proprietary technology.

The Feinberg memo (Item 14) confirms the conversion is unlawful: the CAS Board has not acted, and sole-source development programs remain subject to CAS by operation of law.

The broader commercial structure, as established in the record, involves: (i) the deployment of Appellant's architecture through integrated corporate entities

(Meta, Kopin/Solos, Anduril, Naver) to generate revenue streams; (ii) the use of corporate intermediaries (Solos, Naver) to compartmentalize the deployment; (iii) the exploitation of personal data and labor (including private notes, audio records, and text conversations harvested without authorization, mirroring recent mobile carrier data breaches); and (iv) the movement of large-scale capital into centralized systems where selected individuals fund government programs through structured accounts and circular financing loops.

Berkshire Hathaway's $330M investment in Bending Spoons on the exact date of the CAS conversion (Item 1) constitutes a new "knowing beneficiary" under § 1595 and confirms the entity facilitating the commercialization of the stolen IP into public markets.

**(c) The Executive Oversight Structure Confirms the Automated Classification Threat**

The noticed appointment and SIF meeting (Item 2) confirm that the executive overseeing the Automated AI Classification Pilot is the same individual named as a defendant in the related D.D.C. action. The 120-day report window coincides with Phase Two data generation. This confirms the threat identified in the record: that the CAS cost-segregation records will be classified and removed from judicial reach before this Court can issue a preservation order.

### (d) The Patent Family, the IPR Threat, and the GoldenEye/Beamforming Distinction

The patent family at issue covers **acoustic beamforming and noise cancellation for head-wearable devices**: microphone array geometry creating different directivity patterns for main and reference channels (U.S. Patent No. 10,306,389); fractional time-delay beamforming in digitally oversampled sensor systems (U.S. Patent Nos. 10,651,866; 11,082,055); directional audio projection and personalized audio rendering (U.S. Patent No. 11,871,174); and multimodal wearable assistance system architectures (U.S. Patent No. 12,216,339). These are not wireless communication or motion-sensor patents; they are specific to the acoustic architecture of smart glasses.

Appellant is the true inventor of the beamforming architecture (2009 public disclosure; 2013–2017 source code; 2016–2019 prototypes) but is not named on the patent rolls. The § 256(b) correction pending before this Court is the only mechanism to restore inventorship.

The noticed facts are material to this patent family because:

- **(i)** Meta's commercial deployments (Items 3, 4, 7) are the very products accused of infringing these patents in the underlying D. Mass. action;

**(ii)** The pending IPRs (Item 12) — five petitions collectively targeting all five patents in the asserted family — seek to cancel the entire patent family while the inventorship question remains unresolved. If the IPRs succeed, § 256(b) has no patent to correct. The noticed commercial deployments confirm the accused products remain on the market and in active development, making the inventorship correction time-sensitive. The undersigned has separately notified the PTAB Chief Clerk of the related § 256(b) proceedings.

**(iii)** **The GoldenEye/Beamforming Distinction.** Meta's Rule 12(b)(7) motion (Item 13) relies on the 2004–2009 GoldenEye timeline to claim BlueRadios co-ownership over the asserted patents. Solos' own opposition (ECF 100) concedes that Meta "fails to identify any specific inventive contribution to the con ception of any claim of the Asserted Patents" and submits that the asserted patents represent a "different technical architecture" conceived independently after 2013. This creates an irreconcilable gap: the GoldenEye portfolio covers wireless data transmission and motion/voice command interfaces, not

acoustic beamforming. The only technology that bridges the 2004–2009 period and the 2013+ patent filings is Appellant's 2009 public disclosure of the beamforming architecture. Either (a) the asserted patents derive from Appellant's 2009 work (supporting the § 256(b) correction), or (b) the GoldenEye project produced the beamforming technology (contradicting Solos' Martinez declaration of "different technical architecture"). Both alternatives confirm that the inventorship question cannot be resolved without addressing Appellant's priority record;

**(iv) Solos' "No Related Prior Art" Representation.** Solos' representation that there were no related prior art references or related classes is contradicted by the existence of the GoldenEye/BlueRadios portfolio (which Solos acquired or licensed to bring this action) and by the BlueRadios v. Kopin chain-of-title litigation. The Martinez declaration's assertion of "different technical architecture" is material to the panel's assessment of whether the asserted patents were independently conceived or derived from the 2009 disclosure;

**(v) The BlueRadios Analogy.** The GoldenEye portfolio is the subject of *BlueRadios v. Kopin* (D. Colo.), in which BlueRadios alleges Kopin intentionally omitted co-inventors from the issued applications. This is directly analogous to the § 256(b) correction Appellant seeks: in both cases, the true inventor was removed from the patent rolls, and the resulting patents are being used to enforce claims against third parties.

**(e) The Structure and Timing of the Underlying Litigation**

The noticed facts, combined with the existing record, demon- strate that the structure and timing of the underlying litigation operated to prevent Appellant from presenting her claims on the merits while the evidence was being destroyed. Specifically:

**(i)** The D. Mass. action (*Solos v. Meta*, No. 1:26-cv-10304-ADB) was filed by Solos against Meta, placing Appellant in the position of either intervening (within Solos' framework) or watching the patents be cancelled without her input;

**(ii)** On **March 23, 2026**, Appellant departed [REDACTED—privacy] and her hard drive containing the original motion to intervene and supporting legal notes and motion to intervene drafts was taken;

**(iii)** On **March 25, 2026** — two days later — Meta filed its Rule 12(b)(7) Motion to Dismiss (ECF 49) relying on the 2004–2009 GoldenEye timeline to claim BlueRadios co-ownership, without mapping any specific claim of the asserted patents to the GoldenEye disclosures;

**(iv)** On **March 26, 2026**, Appellant rewrote the motion to intervene from scratch (the original was on the taken hard drive) and served it on all parties before day's end;

**(v)** On **March 27, 2026**, Appellant filed the motion and sought to have the court accept the documents via email;

**(vi)** On **March 30, 2026**, the motion was docketed. Appellant sought § 256(b) correction of inventorship — the legally appropriate remedy when the true inventor is not named on the rolls — rather than invalidation;

**(vii)** The IPRs were filed (June 18 and Aug. 7, 2026) targeting the same patents for which correction was sought;

**(viii)** The CAS-to-GAAP conversion (Oct. 14, 2026), the SIF 120-day report (due Jan. 2027), and the Phase Two data generation (Jan.–Feb. 2027) create a timeline in which the evidence will be irrecoverably converted before this Court's December 8, 2026 submission can be acted upon.

This sequence is material because it confirms that the procedural posture — rather than the merits — has been the operative mechanism preventing resolution of the inventorship question.

**(f) Corporate Integration and the Personnel Pipeline**

The noticed product and personnel items (Items 7, 8) supplement the corporate integration argument already presented. Meta's Muse is Appellant's habitual AI architecture deployed commercially. Palmer Luckey's role as founder of Oculus VR (acquired by Meta in 2014) and subsequent founder of Anduril Industries confirms the personnel and technology pipeline between Meta and Anduril. Together with the 2009 public disclosure and beamforming architecture (already in the record), these facts confirm that the overlapping commercialization of the same un-

derlying architecture — which would not have been exposed but for Appellant's invention of the smart glasses architecture and development of the Solos technology (whose stakeholder Kopin is structurally tied to the beamforming DSP) — is ongoing and expanding.

### (g) Involuntary Servitude, Indenture, and the Conditions of the Inventor

As established in the record, Appellant is the direct victim and the primary targeted source of the technology. The conditions described in the record — continuous physical injury, battery, and assault while being forcibly harbored, fenced, and restricted; coerced labor and manufactured debt; deprivation of basic housing, medical care, and food; denied U.S. Marshals protection; and systematically mooted or ignored filings for stays, emergency designation, and protective referrals — constitute conditions of involuntary servitude and indenture under the 13th Amendment, operating as the foundational reality supporting and paired with statutory enforcement under 18 U.S.C. § 1595.

These conditions are material to the Court's assessment of the equitable factors underlying the preservation request and the irreparability of the harm. The inventor is the only party with direct knowledge of the architecture, the datasets, and the deployment. The continued denial of protective relief while the extraction proceeds compounds the prejudice at every level.

### (h) Temporal Context of Institutional Departures

The noticed international and domestic events (Items 9, 10, 11) are submitted for the Court's consideration in assessing the institutional context of the record. The AUKUS resignations (June 11, 2026), the Driscoll resignation, the Gabbard and Fox Kennedy departures, and the Clayton appointment all occurred in temporal proximity to Appellant's filings and outreach to law enforcement. Combined with the DOD-DOJ partnership that has not benefited Appellant as a litigant or victim despite detailed filed reports and tips to both departments and the IG, these events are submitted as context for the systemic obstruction of Appellant's claims across the unified record.

### (i) Irreparable Harm and Inadequacy of Remand

The facts noticed in Items 1–14 establish that: (i) the CAS-to-GAAP conversion has already occurred (Oct. 14, 2026); (ii) Phase Two data generation is imminent (Jan.–Feb. 2027); (iii) the SIF 120-day report window coincides with that generation; (iv) commercial deployment is ongoing and expanding; and (v) the IPRs may cancel the patents before this Court issues its § 256(b) mandate. These facts are material because they confirm that a standard remand would be inadequate — the records will be irrecoverably converted, the patents may be

cancelled, and the technology will be further deployed before any lower court can act.

The repeated procedural dispositions across all three tribunals — the D. Mass.'s grant-and-terminate in the underlying case (No. 1:26-cv-10304-ADB), the D.D.C.'s denial of the TRO and failure to address the PI (No. 1:26-cv-03318-APM), and this Court's panel's mischaracterization of Appellant's caption correction motion as an impermissible re-argument (No. 26-1721) — have operated in combination to deprive Appellant of a meaningful opportunity to be heard on the preserved merits. By recharacterizing a motion limited to correcting party designations as a motion for reconsideration, the panel addressed an issue not raised while pretermitting the actual defect in the record. That mischaracterization is not a harmless error; it is the procedural mechanism by which the underlying claims remain unaddressed at every level while the harm compounds.

The denial of Appellant's repeated requests for U.S. Marshals protection, emergency designation, and evidentiary stays — at every level — compounds the irreparable harm. This Court's direct engagement with the merits is the only mechanism by which the preserved claims can be resolved before the underlying evidence is irrecoverably destroyed.

## IV. RELIEF REQUESTED

Appellant respectfully requests that this Court:

1. Take judicial notice of the facts set forth in Section II;
2. Consider those facts in conjunction with the existing record on merits review.

October 28, 2026

Respectfully submitted,
/s/ Daitona Carter
Daitona Carter
Movant-Appellant, Pro Se
2 Massachusetts Ave NE
General Delivery, Main Post Office
Washington, DC 20002
legal@daitonacarter.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2026, a copy of the foregoing Motion for Judicial Notice was served via CM/ECF on all registered parties of record, and by electronic mail to Defendants-Appellees (per FRAP 21 and 47) Meta Platforms, Inc., Meta Platforms Technologies, Inc., Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc. which are in default and have not entered appearances.

Service on these parties is made at their last known email addresses as reflected in the D. Mass. docket.

/s/ Daitona Carter
Daitona Carter, Movant-Appellant, Pro Se

## ATTACHMENT INDEX

| # | Title | Description |
|---|---|---|
| **1** | Berkshire Hathaway $330M Investment in Bending Spoons | (a) Bending Spoons investor press release;<br>(b) CNBC article;<br>(c) SEC Form 6-K |
| **2** | SIF First Meeting, Oct 16, 2026 | (a) Semafor World Economy Global Leaders article;<br>(b) Bloomberg article;<br>(c) CNBC article |
| **3** | Ray-Ban Meta Audio (Meta's thinnest, camera-free smart glasses running the Muse agentic loop), Oct 13, 2026 | (a) Meta official blog;<br>(b) Meta Newsroom |
| **4** | Meta "Recording Without Activation Phrase | Meta engineering blog report |
| **5** | Kopin $18.6M IBAS Award, Oct 8, 2026 | (a) Business Wire press release;<br>(b) SAM.gov contract record |
| **6** | Anduril $2.9B Shipyard Contract, Oct 6, 2026 | (a) CNBC; (b) Defense Scoop;<br>(c) Defense News |
| **7** | Meta's Muse | (a) Meta Newsroom (same page as Ex. 3);<br>(b) lower court record page<br>c) Independent Action & Rule 60(b) Pleadings: Petitioner's Motion to Vacate Mootness Order (ECF No. 110), Filed May 4, 2026. |
| **8** | Palmer Luckey / Oculus / ZeniMax | (a) ZeniMax verdict coverage;<br>(b) TRT verdict; (c) Docket |
| **9** | AUKUS Resignations, June 11, 2026 | (a) NYT; (b) CNN; (c) Sydney Morning Herald |

| | | |
|---|---|---|
| **10** | Dan Driscoll Resignation | News article/official DoD announcement |
| **11** | IC Transitions (Rush, Gabbard, Fox Kennedy, Clayton) | One source per event |
| **12** | PTAB IPR Dockets | PTAB IPR Dockets (all 5) |
| **13** | Meta's MTD (ECF 49)+ ’210 Patent + BlueRadios v. Kopin | (a) ECF 49 from D. Mass. docket;<br>(b) ECF 100 (Solos' Opposition);<br>(c) Martinez Declaration; (d) US Patent No. 7,542,210 B2; (e) BlueRadios v. Kopin docket |
| **14** | Feinberg Memo<br>(Sept. 14, 2026) | Feinberg Memo |

**ATTACHMENT 1 —** CAFC 26-1721

Description — Berkshire Hathaway $330M Investment in Bending Spoons

(a) Bending Spoons investor press release; (b) CNBC article;

(c) SEC Form 6-K

# Berkshire Hathaway invests further $330 million in Bending Spoons following $600 million IPO investment

OCTOBER 14, 2026

## New investment brings Berkshire Hathaway's ownership to 4%

**Milan, Italy—October 14, 2026 |** Bending Spoons has today announced a new $330 million investment from Berkshire Hathaway. The fresh investment takes Berkshire Hathaway's total ownership stake of the technology company to 4%, having previously invested $600 million in Bending Spoons at its July 2026 initial public offering.

"For decades now, Berkshire Hathaway has been among the finest and most respected capital allocators in the world, and is a longstanding inspiration for Bending Spoons. We were delighted to welcome Berkshire Hathaway as shareholders at our public listing, and we're equally delighted to reinforce the partnership through this fresh investment, which underscores our mutual respect and excitement for what lies ahead," said Bending Spoons CEO and co-founder, Luca Ferrari.

Francesco Patarnello, Bending Spoons Head of Business Acquisitions and co-founder, said: "Bending Spoons continuously evaluates M&A opportunities, and our pipeline remains strong. We believe Berkshire Hathaway's investment reflects confidence in

our team and Platform and will further enhance our financial flexibility and ability to pursue attractive acquisitions as part of our broader financing strategy."

Undertaken as a private placement, Bending Spoons will issue 10 million ordinary shares at a purchase price of $33.00 per share. The securities described above have not been registered under the Securities Act of 1933, as amended, and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements. The closing of the transaction is subject to customary closing conditions. Additional details regarding the private placement will be included in a Form 6-K to be filed by the company with the Securities and Exchange Commission.

## About Bending Spoons

Bending Spoons is built on the conviction that operational excellence enables efficient growth through acquisitions. It acquires digital businesses, implements deep transformations and ongoing optimizations to sustainably expand earnings, and reinvests in additional acquisitions, thereby continuing the compounding cycle. The Company has executed this strategy for more than a decade and, to date, has never sold a material business.

Bending Spoons strives to envision the most successful version of an acquired business, and works to close the gap between its current state and that vision as quickly and completely as possible. The transformation is typically deep and entails reorganizing teams, overhauling technology, redesigning user interfaces, accelerating product development, and enhancing marketing and monetization. AI is often both a central component of the vision and a key tool in implementing the transformation.

Bending Spoons' performance is driven by its Platform—comprising its people, proprietary technologies, and proprietary data—and reflects an intense focus on achieving exceptional talent density, cultural strength, and technical capabilities.

…nding Spoons' main businesses include Airtable, AOL, Brightcove, Eventbrite,

Evernote, Tractive, Vimeo, and WeTransfer.



## About Berkshire Hathaway

Berkshire Hathaway and its subsidiaries engage in diverse business activities including insurance and reinsurance, utilities and energy, freight rail transportation, manufacturing, services and retailing. Common stock of the company is listed on the New York Stock Exchange, trading symbols BRK.A and BRK.B.

## Forward-looking statements

This press release contains forward-looking statements. All statements other than statements of historical fact contained in this press release are forward-looking statements. Forward-looking statements include statements about our objectives and outlook. In some cases, forward-looking statements can be identified by words or phrases such as “may,” “might,” “will,” “could,” “would,” “should,” “expect,” “anticipate,” “aim,” “intend,” “plan,” “believe,” “estimate,” “potential,” “continue,” “foresee,” “forecast,” “in our view,” “probably,” “likely,” or other similar expressions.

Forward-looking statements reflect our current expectations and are based on assumptions and information available as of the date of this press release. Actual results and events may differ materially from those expressed or implied by such forward-looking statements due to a variety of risks and uncertainties, some of which are beyond our control. These include the risks and uncertainties described in the sections *Risk factors* and *Management’s discussion and analysis of financial condition and results of operations* in our registration statement on Form F-1, which is on file with the U.S. Securities and Exchange Commission and is available on our investor relations website at investors.bendingspoons.com and on the U.S. Securities and Exchange Commission website at www.sec.gov.

Readers are cautioned not to place undue reliance on forward-looking statements. …ept as required by applicable law, we assume no obligation to update any forward-

looking statements.

This press release does not constitute an offer to sell or the solicitation of an offer to buy any securities, and will not constitute an offer, solicitation, or sale in any jurisdiction in which such offer, solicitation, or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction.

## Contacts

Investors: investor-relations@bendingspoons.com

Media: press@bendingspoons.com

## Sign up for updates

Stay updated on press releases, earnings calls, and other investor-related news.

Your information will be processed in accordance with our privacy policy.

Enter email

Sign up

COMPANY

About us
Careers
Jobs
Events
Compliance
Support center
Investors

FOLLOW US

LinkedIn
Instagram
Glassdoor
Facebook
Medium
X

PARTNERSHIP INQUIRIES

partnerships@bendingspoons.com

PRESS INQUIRIES

press@bendingspoons.com
Download media kit

OFFICES

Via Nino Bonnet 10, 20154, Milan, Italy
Fora The Jellicoe, 5 Beaconsfield St, London N1C 4EW, UK

© Bending Spoons Operations S.p.A. | Via Nino Bonnet 10, 20154, Milan, Italy | VAT, tax code, and number of registration with the Milan Monza Brianza Lodi Company Register 13368510965 | REA number MI 2718456 | Contributed capital €150.000,00 fully paid-in

Privacy and cookie policy
Your cookie preferences

# Bending Spoons

Impossible. *Maybe.*

BREAKING Stock futures are little changed as traders await Fed decision, Big Tech earn

CNBC LIVESTREAM SIGN IN

TECH

# Bending Spoons skyrockets 41% as Berkshire Hathaway makes $330 million investment

PUBLISHED WED, OCT 14 2026•10:39 AM EDT UPDATED WED, OCT 14 2026•4:01 PM EDT

CJ Haddad
@IN/CRISTENHADDAD/

WATCH LIVE
SHARE

## KEY POINTS

- Shares of Bending Spoons skyrocketed after Berkshire Hathaway invested an additional $330 million into the company.
- The latest infusion follows the $600 million it invested in July, during the company's IPO.
- The investment now brings Berkshire's stake in the company to 4%, according to securities filings.

Follow your favorite stocks **CREATE FREE ACCOUNT**

**In this article**

BSP +0.18 (+0.38%) BRK.B -1.06 (-0.20%)

MARKETS VIDEO WATCHLIST MENU

BREAKING Stock futures are little changed as traders await Fed decision, Big Tech earn

CNBC LIVESTREAM SIGN IN



**Matteo Danieli, co-founder of Bending Spoons, center, during the company's initial public offering (IPO) at the Nasdaq MarketSite in New York, US, on Wednesday, July 1, 2026.**

*Michael Nagle | Bloomberg | Getty Images*

Shares of Bending Spoons skyrocketed 41% after a new securities filing revealed that Berkshire Hathaway made a fresh $330 million investment into the company.

The latest infusion follows the conglomerate's $600 million investment from July, when the Italy-based serial acquirer went public on the Nasdaq.

Under the deal, Bending Spoons will issue 10 million ordinary shares to Berkshire at $33 a share.

"Bending Spoons continuously evaluates M&A opportunities, and our pipeline remains strong," said Francesco Patarnello, Bending Spoons' co-founder and head of business acquisitions, in a statement. "We believe Berkshire Hathaway's investment reflects confidence in our team and Platform and will further enhance our financial flexibility and ability to pursue attractive acquisitions as part of our broader financing strategy."

The investment now brings Berkshire's stake in the company to 4%, according to the filing, and is the conglomerate's latest investment decision as CEO Greg Abel took the helm from founder

MARKETS VIDEO WATCHLIST MENU

Exhibit 99.1

# Bending Spoons announces proposed offering of senior secured notes

**Milan, Italy—October 27, 2026** | Bending Spoons S.p.A. (“Bending Spoons”) today announced the proposed offerings of $1.5 billion (approximate equivalent) senior secured notes, subject to market and other conditions. The offerings are composed of $1 billion aggregate principal amount of U.S. dollar-denominated senior secured notes and $500 million (approximate equivalent) of euro-denominated senior secured notes (together, the “Notes”), both due in 2032.

The U.S. dollar-denominated Notes are proposed to be issued by Bending Spoons US Inc., a Delaware corporation, while the euro-denominated Notes are proposed to be issued by Bending Spoons Operations S.p.A., a joint stock company (società per azioni) organized under the laws of Italy. Each issuer is an indirect wholly owned subsidiary of Bending Spoons. Bending Spoons will not issue or guarantee the Notes.

The net proceeds from the offerings are intended to fund future acquisitions, to pay costs, fees, expenses, and taxes in connection with the offerings, and for other general corporate purposes. The interest rates, issue prices, and other terms of the Notes will be determined at pricing. There can be no assurance that the offerings will be completed on the terms described or at all.

This press release is being issued pursuant to Rule 135c under the Securities Act of 1933, as amended (the “Securities Act”). It does not constitute an offer to sell or the solicitation of an offer to buy the Notes or any other securities.

The Notes are being offered only to persons reasonably believed to be qualified institutional buyers in reliance on Rule 144A under the Securities Act, and to non-U.S. persons outside the United States in reliance on Regulation S under the Securities Act. The Notes and the related guarantees have not been and will not be registered under the Securities Act or the securities laws of any other jurisdiction and may not be offered or sold in the United States absent registration or an applicable exemption from the registration requirements of the Securities Act and applicable state securities laws.

## Forward-Looking Statements

This press release contains forward-looking statements. All statements other than statements of historical fact contained in this press release are forward-looking statements. Forward-looking statements include statements about the proposed offering, including the expected use of proceeds. In some cases, forward-looking statements can be identified by words or phrases such as “may,” “might,” “will,” “could,” “would,” “should,” “expect,” “anticipate,” “aim,” “intend,” “plan,” “believe,” “estimate,” “potential,” “continue,” “foresee,” “forecast,” “in our view,” “probably,” “likely,” or other similar expressions.

Forward-looking statements reflect our current expectations and are based on assumptions and information available as of the date of this press release. Actual results and events may differ materially from those expressed or implied by such forward-looking statements due to a variety of risks and uncertainties, some of which are beyond our control. These include the risks and uncertainties described in the sections Risk factors and Management’s discussion and analysis of financial condition and results of operations in our registration statement on Form F-1, which is on file with the U.S. Securities and Exchange Commission and is available on our investor relations website at investors.bendingspoons.com and on the U.S. Securities and Exchange Commission website at www.sec.gov.

Readers are cautioned not to place undue reliance on forward-looking statements. Except as required by applicable law, we assume no obligation to update any forward-looking statements.

## Contacts

Investors: investor-relations@bendingspoons.com

Media: press@bendingspoons.com

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 6-K

**REPORT OF FOREIGN PRIVATE ISSUER PURSUANT TO RULE 13a-16 OR 15d-16**
**UNDER THE SECURITIES EXCHANGE ACT OF 1934**

For the month of October 2026

Commission File Number: 001-43382

Bending Spoons

## Bending Spoons S.p.A.

*(Exact name of registrant as specified in its charter)*

Via Nino Bonnet 10
20154 Milan
Italy
*(Address of principal executive office)*

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F ☒ Form 40-F ☐

## Information contained in this report on Form 6-K

On October 27, 2026, Bending Spoons S.p.A. issued a press release announcing proposed offerings of senior secured notes by its wholly-owned subsidiaries, Bending Spoons US Inc. and Bending Spoons Operations S.p.A. A copy of the press release is attached as Exhibit 99.1 to this report on Form 6-K and incorporated herein by reference.

## Incorporation by reference

Other than as indicated below, the information in this report on Form 6-K will not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, nor will it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.

The information contained in this report on Form 6-K (excluding Exhibit 99.1) is hereby incorporated by reference into the registration statement on Form S-8 of Bending Spoons S.p.A. (File No. 333-297730).

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 99.1 | Bending Spoons announces proposed offering of senior secured notes |

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Bending Spoons S.p.A.**

Date: October 27, 2026

By: /s/ Luca Ferrari

Name: Luca Ferrari

Title: Chair of the board of directors, co-founder, and chief executive officer

**ATTACHMENT 2** — CAFC 26-1721

Description — SIF First Meeting, Oct 16, 2026

(a) Semafor World Economy Global Leaders*; (b) Bloomberg article; (c) CNBC article
*Yes, photo saved upsided down.

Events Email Briefings SIGN IN

6:31 PM TUESDAY OCTOBER 27, 2026

D.C. BXL LAGOS RIYADH BEIJING SG

SEMAFOR

Intelligence for the New World Economy

# Exclusive / White House's AI task force gets to work



Ashley Gold
Senior Tech Correspondent

Updated Oct 15, 2026, 9:11pm EDT

Copy link



Nathan Howard/Reuters

The White House’s AI task force has formally adopted its charter, kicking off the short 120-day window it’s been given to answer some extremely thorny questions about how the government should handle the rapid development of AI technology.

According to an announcement shared first with Semafor, the task force agreed after its first official meeting Thursday to commission a report from the President’s Council of Advisers on Science and Technology to evaluate AI risk in three areas: cybersecurity and critical infrastructure protection, biosecurity and dual-use applications, and model control and accountability.

“Throughout its work, the [task force] will engage with frontier model developers and other SI companies, consumer protection groups, and civil liberties advocates, industry stakeholders, and federal and state law enforcement agencies to inform and implement its efforts,” a White House official said in a statement. “The [Super Intelligence Force] stands ready to ensure implementation of the Accord and continued U.S. leadership on SI for the benefit of the American people.”

It also agreed to make a working group tasked with implementing the White House Accord on Super Intelligence that major AI CEOs signed this month, a process led by Director of National Intelligence Jay Clayton, the task force’s chair, along with National Cyber Director Sean Cairncross.

AD

Defense Undersecretary Emil Michael, a task force vice chair, will lead an effort to develop protocols for labs to tell the government about breaches, hacks and other cyber issues. Michael is also in charge of interfacing with frontier AI labs and figuring out long-term coordination on AI across the government.

The task force also agreed to create a “law enforcement and consumer protection coordination committee” including the Justice Department and Federal Trade Commission, led by FTC Chair Andrew Ferguson, also a vice chair. The last vice chair, Office of Personnel Management Director Scott Kupor, will work with the public and private sector on critical infrastructure protection, and will work with the Department of Labor on studying the impact of AI on the American workforce and economy.

Members of the task force beyond the chairs include: Vice President JD Vance, Treasury Secretary Scott Bessent, Defense Secretary Pete Hegseth and Office of Science and Technology Policy Director Michael Kratsios, plus Cairncross, Chris Klomp, the nominee to be the No. 2 at the Department of Health and Human Services, Social Security Administration Commissioner Frank Bisignano, and National Security Agency Director Joshua Rudd, along with White House chief of staff Susie Wiles and her deputy, Richard

Walters.

It’s not yet entirely clear how compliance with the task force will be enforced or how current law may apply to companies who don’t adhere to the new protocols. A White House official told Semafor one stick could be export controls, which the Commerce Department at one point temporarily imposed on Anthropic after the company refused to grant the government unfettered access to its models.

Politics | Cybersecurity

# Trump's AI Task Force to Commission Report on Technology's Risks

By John Harney
October 16, 2026 at 12:22 AM EDT

Save Translate

Takeaways by Bloomberg AI

President Donald Trump's artificial intelligence task force in its first meeting agreed on Thursday to address risks related to cybersecurity, biosecurity and "model control and accountability" as fears rise over the potential dangers posed by the technology.

The panel known as the Super Intelligence Force – using the president's preferred term for artificial intelligence – will commission a report from the President's Council of Advisers on Science and Technology to evaluate those and other concerns, according to a White House account of the meeting.

Bloomberg

Terms of Service Do Not Sell or Share My Personal Information Trademarks Privacy Policy
Careers Advertise Ad Choices Help

©2026 Bloomberg L.P. All Rights Reserved.

CNBC LIVESTREAM SIGN IN

POLITICS & POLICY

# OpenAI Saudi national bugging case shows threat to U.S. leadership in AI: DNI Clayton

PUBLISHED FRI, OCT 16 2026•9:55 AM EDT UPDATED FRI, OCT 16 2026•12:27 PM EDT



**Kevin Breuninger**
@KEVINWILLIAMB

WATCH LIVE
SHARE

## KEY POINTS

- U.S. companies and the Trump administration both "need to be wary" of AI-related foreign espionage attempts, Director of National Intelligence Jay Clayton told CNBC.
- Clayton was asked how concerned Americans should be in light of the recently revealed case charging Saudi national Abdulrahman Alfozan with installing a recording device in an OpenAI conference room.
- Clayton said a White House AI task force at its first meeting built on an accord recently signed by President Donald Trump and tech leaders.

MARKETS VIDEO WATCHLIST MENU

CNBC LIVESTREAM SIGN IN




VIDEO 14:23
**Watch CNBC's full interview with Super Intelligence Force Chair Jay Clayton**

U.S. companies and the Trump administration both "need to be wary" of foreign espionage attempts as the race for artificial intelligence dominance continues, Director of National Intelligence Jay Clayton told CNBC on Friday.

AI "amplifies" existing cybersecurity risks toward U.S. digital infrastructure, which is interconnected with critical systems related to everything from public goods to the national defense and global communications, Clayton said on "Squawk Box."

It's "why we're focused on hardening those systems" and using "our commitment to continue to lead to stay ahead of those nefarious actors," said Clayton, who leads a new White House AI task force.

Clayton was asked how concerned Americans should be with the threat of foreign spying in light of the recently revealed case charging Saudi national Abdulrahman Alfozan with allegedly installing a recording device in an OpenAI executive conference room. Alfozan has not been charged with espionage; the federal charge involves alleged interception of oral communications.

MARKETS VIDEO WATCHLIST MENU

CNBC LIVESTREAM SIGN IN

federal prosecutors.

**Read more CNBC politics and policy coverage**

- Trump must sit for deposition in BBC lawsuit by Dec. 11, judge orders
- Virginia state Sen. Lucas, a Trump critic, charged in marijuana racketeering case
- California's Proposition 40: What voters need to know about billionaire wealth tax battle

"The short answer to your question is espionage, both commercial espionage, and I would say state-sponsored espionage, are realities," Clayton said.

"It's something that our private sector companies need to be wary of. We, as a government, need to be wary of," he said.

The OpenAI incident "shows the lengths that people will go to try and supplant our leadership in this, or at least stay close to us in this emerging technology," Clayton said.

An ex-CIA official, who asked not to be named because they were discussing information that is not public, told CNBC this week that the case is "probably the tip of the iceberg."

Clayton, who was appointed AI czar earlier this month, said that the task force's "very good" inaugural meeting at the White House on Thursday built on the accord signed by President Donald Trump and a number of AI leaders at the White House last month. Trump had described the agreement, which includes industry pledges to police AI risks itself, as "morally binding."

MARKETS VIDEO WATCHLIST MENU

**ATTACHMENT 3 —** CAFC 26-1721

Description — Ray-Ban Meta Audio (Meta's thinnest, camera-free smart glasses running the Muse agentic loop), Oct 13, 2026

(a) Meta official blog; (b) Meta Newsroom

Meta

< Back to Newsroom

META

# Introducing Ray-Ban Meta Audio and More AI Glasses Styles

September 23, 2026

LISTEN TO ARTICLE



## Takeaways

- Today at Connect, we announced we're bringing Muse, a personal AI agent, to our AI glasses to help you stay on top of things, take tasks off your plate, and turn long-term goals into action plans, all hands free.
- We also introduced Ray-Ban Meta Audio, our first-ever audio glasses, and our biggest expansion of AI glasses.
- Our expanded glasses lineup includes an all new Meta Glasses collection designed with international icon, LISA; improved battery life and controls for Ray-Ban Meta (Gen 3); new colorways; and more.

Today at Connect, we announced Ray-Ban Meta Audio, our first-ever audio glasses, and our biggest expansion of AI glasses yet through our partnership with EssilorLuxottica.

We're building AI glasses for everyone. By the end of the year, we'll offer more than 100 different glasses options across Ray-Ban, Oakley, and Meta Glasses, including lightweight frames made for all-day wear and new styles with slimmer designs and longer battery life. And with regular software updates, new AI features, and our growing ecosystem of apps and experiences, these glasses will only keep getting better.

AI glasses help you on the go, from giving you sports scores and local restaurant picks to translating live conversations. With a connection to your personal AI agent from Muse, they'll offer more ways than ever to help you manage your daily life — whether you're building healthy habits or navigating a busy calendar — all without reaching for your phone.

## Ray-Ban Meta Audio

Audio has been our most popular feature since day one because our glasses give you high-quality sound without closing you off from the world around you. Our new Ray-Ban Meta Audio glasses pack the power of earbuds and AI into our lightest and slimmest AI glasses yet, in iconic Ray-Ban style.

At just 43 grams, Ray-Ban Meta Audio glasses are light enough to wear all day, and offer maximum comfort with professional-adjustable temple tips, adjustable or

swappable nose pads, and overextension hinges. You can listen to music and podcasts, take calls that capture your voice more clearly than earbuds, and talk with your AI assistant hands-free for up to 12 hours on a single charge, with up to an additional 48 hours from the included charging case.




They come in 23 color and lens combinations across two new styles: Clubmaster, an iconic Ray-Ban style with a retro-inspired silhouette, and Burbank, a classic, timeless rectangle style. Both are compatible with a wide range of optical prescriptions.



*Ray-Ban Meta Audio | Clubmaster*

*Transparent Orchid on Gun Metal Transitions® Ruby Lenses*

You can pre-order a pair today starting at $349 USD and they ship October 13.

## Ray-Ban Meta (Gen 3)

Ray-Ban Meta (Gen 3) is the next generation of the world’s best-selling AI glasses. In support of our vision to make great-looking glasses first, we’ve packed the tech Ray-Ban Meta wearers love into a slimmer, more comfortable design, with longer battery life and a new customizable action button for instant access to Meta AI.

With Ray-Ban Meta (Gen 3), we’re giving people more choice than ever. They come in 27 color and lens combinations across 3 styles: Aviator, Zena (a bold new cat-eye frame), and Wayfarer. And to mark the 90th anniversary of the Ray-Ban Aviator, we’re releasing a limited-edition Aviator in a vintage-inspired colorway.




Gen 3 gets up to nine hours of battery life (an hour more than Gen 2) plus professional-adjustable temple tips for a better fit. A new 6-mic array cuts more than 90% of background noise, so calls and voice commands are crisp and clear, even on windy or crowded streets.

With a 12 MP camera and 3K Ultra HD video recording, you can capture photos and videos hands-free to save and share with others, and with new dynamic photos, you get to choose the best frame, so you get a standout picture every time. As with every generation of the glasses, these feature a built-in LED light that helps make people around you aware if you’re taking photos or video.



00:00 00:06

Later this year, Meta AI glasses will be the first consumer devices that enable users to capture and experience videos in Dolby Atmos with 360-degree spatial sound. Just record and your glasses handle everything, so playback feels as immersive as being there.

Ray-Ban Meta (Gen 3) is available today, with prices starting at $449 USD.

## Even More From Meta Glasses

Earlier this year, we launched Meta Glasses in partnership with EssilorLuxottica. We're now expanding the collection with two new styles, Capri and Nova; giving you more ways to personalize; and bringing them to new markets around the world.

## A Fresh Take on Meta Glasses by Kylie Jenner

Building on the success of Meta Glasses by Kylie Jenner, we're releasing a new

colorway, Ivory, that's a fresh take on her signature Starfire style. Starting at $399 USD.



## A New Collab With LISA

We're also introducing an all new Meta Glasses collection designed with international icon, LISA. Every detail brings you closer to her world, from the custom star adorning the case and frames, to special edition case charms inspired by LISA's pets, and unique digital photocards you unlock with the glasses.



The collection features two distinct styles: the Meta Adventurer LISA Edition, a Moonlit Sky frame with Blush lenses, and the Meta Capri LISA Edition, an Eclipse cat-eye frame with grey lenses. Both styles support prescriptions and start at $399 USD.

## Our Most Affordable Glasses Yet

We’re also introducing new limited-edition frames, our most affordable pair of Meta Glasses yet, and new ways to personalize your AI glasses.

The limited-edition Meta Fury features a clear frame and mirrored lenses and will be available exclusively at Connect and Meta Labs at launch. We’re also launching a new Meta Adventurer, featuring a black frame and grey lenses, with a plug-in case starting at $249 USD, our most accessible price yet. It’s available for pre-order

today on Meta.com and on sale October 23 in all countries where Meta Glasses are sold.




*Meta Glasses | Rectangle - Lisa Edition*
*Moonlit Sky - Blush*

## More Styles for More People

Any pair of Meta Glasses can also now be customized through our Mix & Match program, where you can customize your Meta Glasses at a Meta Lab store or online by choosing your favorite frame, lenses, and case color.

We want everyone to be able to enjoy Meta Glasses, so we're bringing them to new countries around the world* — starting today in Singapore, South Korea, and Mexico, and the United Arab Emirates, and coming soon to Brazil.

** Oakley Meta, Ray-Ban Meta and Ray-Ban Meta Optics will be available in these new markets later this year: Turkey, Poland, Portugal, Israel, South Africa, Indonesia, Thailand, Hong Kong, New Zealand, Malaysia, and the Philippines.*

Categories: Meta, Product News, Technology and Innovation

Tags: AI, AI Glasses, Meta Glasses, Ray-Ban Meta Glasses

DOWNLOAD ALL IMAGES

Share this article

RECENT NEWS

New Tools for the Admins Who Build Communities on Forum

Now You Can Invite Anyone to a WhatsApp Call

Your Algorithm, Your Words: New Ways to Shape What You See on Facebook

Leading Tech Companies Join Global Law Enforcement in Major Crackdown on West African Scam Networks

**ATTACHMENT 4** — CAFC 26-1721

Description Meta "Recording Without Activation Phrase"

Meta engineering blog

Meta

# Ray-Ban Meta Audio, Our First Audio Glasses, Are Here

Blog

Oct 13, 2026

When we introduced Ray-Ban Meta Audio at Meta Connect 2026, we shared how audio glasses that you can wear all day are the natural evolution of our lineup of AI glasses, the deepest in the industry. We want there to be a pair of AI glasses for everyone, and by the end of this year, we'll offer more than 100 different options through our partnership with EssilorLuxottica. Today, Ray-Ban Meta Audio, the newest member of that collection, is on sale, starting at $349 USD.




Audio has always been the most popular feature on our AI glasses because their open-ear

speakers deliver high-quality sound that lasts for hours without blocking the world around you. You get the power of earbuds and AI plus all-day battery life so you can listen to music, take calls, and talk to Meta AI wherever you go. And with Ray-Ban Meta Audio, we pushed the design and battery life of AI glasses further than we've ever done:

- **All-day Comfort.** The glasses feature over-extension hinges, professional-adjustable temple tips, and either swappable or adjustable nose pads depending on the selected style.
- **Our Lightest and Slimmest AI Glasses Ever.** Ray-Ban Meta Audio comes in at just 43 grams, making them easy to wear all day.
- **Our Longest Battery Life.** The glasses deliver up to 12 hours on a single charge or up to 6 hours of continuous audio playback. Plus, with the included charging case, you can get up to 48 more hours, with fast charging that gets you to 50% in just 22 minutes.



# Iconic Ray-Ban Style, Made For Prescriptions

We're launching Ray-Ban Meta Audio in two iconic Ray-Ban styles, the retro-inspired Clubmaster and the timeless Burbank. They come in 23 frame and lens combinations, each of which is available with prescription lenses.

Ray-Ban Meta Audio is here, so grab a pair today at Meta.com, Ray-Ban.com, in Ray-Ban stores, Meta Lab stores, and through EssilorLuxottica's owned and operated retail locations

and select third-party retailers.


## Get news and updates from Meta

Email

Sign up

By signing up you agree to receive updates and marketing messages (e.g. email, social, etc.) from Meta about Meta's existing and future products and services.

You may withdraw your consent and unsubscribe at any time by clicking the unsubscribe link included in our messages.

Your subscription is subject to the Terms and Privacy Policy.

**ATTACHMENT 5 —** CAFC 26-1721

Description— Kopin $18.6M IBAS Award, Oct 8, 2026

(a) Business Wire press release; (b) SAM.gov contract record *

*Note:  Evidence of Item 5 is anchored by Kopin Corp's SEC filing [Ex. 99.1] reflecting an award executed via the Office of the Secretary of War under the Industrial Base Analysis and Sustainment (IBAS) program. Traditional procurement number lookups are unavailable due to the project's execution under federal Other Transaction Authority (OTA) guidelines.

businesswire
A BERKSHIRE HATHAWAY COMPANY

Oct 8, 2026 4:30 PM Eastern Daylight Time

# Kopin Secures Additional $18.6 Million U.S. Army IBAS Award for Color MicroLED Technology

Share

## Cumulative IBAS funding reaches $34 million as Kopin accelerates U.S.-based development and manufacturing of next-generation military MicroLED displays

WESTBOROUGH, Mass.--(BUSINESS WIRE)--Kopin Corporation (NASDAQ: KOPN), a leading provider of application-specific optical systems, optical interconnect devices for data centers and high-performance microdisplays for defense, training, enterprise, industrial, consumer and medical products, today announced it has secured an $18.6 million sole-source award from the Office of the Secretary of War (OSW) through the U.S. Army Contracting Command (ACC) under the Industrial Base Analysis and Sustainment (IBAS) program.

The award represents the second major US Government investment dedicated to advancing Kopin's color MicroLED microdisplay technology. The latest award brings Kopin's total IBAS funding to $34 million. The additional funding will support development of **two more MicroLED display configurations** designed for specific ground-soldier and pilot applications while accelerating Kopin's efforts to establish and expand U.S.-based MicroLED manufacturing capabilities.

### Continued and Accelerating U.S. Government Investment in Kopin MicroLED Technology

The additional $18.6 million award represents continued U.S. government

investment in Kopin's MicroLED technology and its potential role in next-generation military visual systems while enabling Kopin to accelerate onshoring the MicroLED manufacturing processes, ensuring that the advanced display components essential to future defense and commercial systems are designed and built, in the United States.

“Securing additional IBAS funding represents significant continued validation of Kopin's MicroLED technology and its importance to next-generation U.S. defense systems. Combined with our previous IBAS investment, the U.S. government has now committed $34 million through IBAS to advance MicroLED technology. This enables Kopin to accelerate the development and U.S.-based manufacturing of additional high-performance MicroLED displays designed for next-generation soldier and pilot systems while separately enabling the foundational MicroLED platform technology for our AI Interconnect products,” said Michael Murray, Kopin’s CEO.

## Supporting More Army Programs of Record

With the expanded funding, Kopin will develop two additional MicroLED displays purpose-built for specific ground soldier equipment and missions and for pilot HUDs. With this support, Kopin can meet the specific and demanding requirements of the advanced MicroLED displays for next-generation visual systems that demand exceptional brightness, rugged durability, power efficiency, and, reliable performance in all operational environments. These capabilities improve situational awareness for soldiers in the field and also open the door for wider integration into future weapon sights, helmet-mounted systems, and augmented-reality platforms —ultimately helping shape the Army’s modernization roadmap for years to come.

## Strengthening Kopin’s Strategic Growth Path

This second-round award validates Kopin’s advanced position and roadmap for MicroLED displays for U.S. military applications and programs, and underscores the company’s commitment to advancing U.S.–made displays and optical solutions. With expanding program awards across defense, medical, enterprise, and AI infrastructure markets, Kopin is expanding its position as a trusted, critical technology supplier—delivering breakthrough visual and optical components that enable customers to innovate faster, operate more efficiently, and meet the rising demands of modern systems.

## Forward Looking Statements

This press release includes statements that constitute forward looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward looking statements may be identified by the use of words such as “forecast,” “guidance,” “plan,” “estimate,” “will,” “would,” “project,” “maintain,” “intend,” “expect,” “anticipate,” “prospect,” “strategy,” “future,” “likely,” “may,” “should,” “believe,” “continue,” “opportunity,” “potential,” and other similar expressions that predict or indicate future events or trends or that are not statements of historical matters.

Forward looking statements are only predictions and are subject to risks, uncertainties, and assumptions that are difficult to predict and, in many cases, outside of our control. Actual results may differ materially from those expressed or implied in any forward looking statements. All forward looking statements are qualified in their entirety by these cautionary statements. We undertake no obligation to update forward looking statements except as required by law. Important factors that could cause actual results to differ materially from those described in forward looking statements are detailed in the Company’s most recent form 10-K and other filings with the Securities and Exchange Commission.

This press release includes forward looking statements regarding Kopin’s receipt of a $18.6 million order for Color MicroLED Technology, including expectations of meeting requirement of next-generation visual systems, delivering on customer needs and demands, and furthering Kopin’s onshoring efforts of U.S. manufacturing. Forward looking statements are based on current assumptions and expectations and are subject to risks and uncertainties that could cause actual results to differ materially, including changes in customer demand, program schedules, manufacturing performance, and broader conditions in the defense market.

**About Kopin**

Kopin Corporation (Nasdaq: KOPN) is a leading developer and provider of innovative display, Optical Interconnect devices and application-specific optical solutions sold as critical components and subassemblies for defense, enterprise, professional and consumer products. Kopin’s portfolio includes microdisplays, display modules, eyepiece assemblies, image projection modules and vehicle mounted and head-mounted display systems that incorporate ultra-small high-resolution Active Matrix Liquid Crystal displays (AMLCD), Ferroelectric Liquid Crystal on Silicon (FLCoS) displays, MicroLED displays (µLED) and Organic Light Emitting Diode (OLED) displays, a variety of optics and low-power ASICs and

optical interconnect devices for data centers.

For more information, please visit Kopin's website at www.kopin.com.

Kopin is a trademark of Kopin Corporation.

Follow us on LinkedIn, X and Facebook.

## Contacts

**For Investor Relations**
Kopin Corporation
Erich Manz, Chief Financial Officer
emanz@kopin.com
508-870-5959

**MZ Contact**
Luke Zimmerman
MZ Group – MZ North America
KOPN@mzgroup.us
561-489-5315

**Media Contact**
BIG FISH PR
Kopin@bigfishpr.com

**Industry:** Consumer Electronics Technology Semiconductor Telecommunications Other Defense Defense Contracts Internet Mobile/Wireless Hardware Electronic Design Automation

**KOPIN CORPORATION**

NASDAQ:KOPN

EX-99.1 2 ex99-1.htm EX-99.1

**Exhibit 99.1**

# Kopin Corporation Reports Second Quarter 2026 Financial Results

*Three Major Milestones Achieved in U.S. Army Color MicroLED Program, Including Record-Setting 150,000+ Nit Full-Color Brightness and Installation of U.S. Bonding Capability, Keeping Kopin on Track for Domestic MicroLED Production in Mid-2027*

*Multiple Sentinel FPV™ Prototype Orders Received as U.S. Government's Drone Dominance Program Accelerates; New Dallas Optics & Photonics Design Center to Accelerate Neural I/o™ Delivery for AI Infrastructure*

**WESTBOROUGH, MA — August 10, 2026 —** Kopin Corporation (Nasdaq: KOPN) ("Kopin" or the "Company"), a leading provider of application-specific optical systems and high-performance microdisplays for defense, AI-infrastructure, enterprise, industrial, consumer and medical products, today announced preliminary unaudited financial results for its second quarter ended June 27, 2026.

**Second Quarter Financial Summary:**

| ***$ in millions*** | **Q2 2026** | **Q2 2025** | **% Change** |
|---|---|---|---|
| **Total Revenues** | $ 12.7 | $ 8.5 | 51% |
| **Product Revenues** | $ 7.6 | $ 7.5 | 2% |
| **Non-Product Revenues *** | $ 5.1 | $ 1.0 | 433% |
| **Cost of Product Revenues** | $ 6.6 | $ 7.1 | (7)% |
| **R&D Expenses** | $ 4.5 | $ 1.9 | 133% |
| **SG&A Expenses** | $ 5.1 | $ 4.9 | 5% |

** Non-Product revenue consists of Funded R&D, Collaborative agreement, Grant, and license and royalty revenue streams*

**Second Quarter 2026 & Subsequent Operational Highlights**

- Announced three major milestones in the Company's color MicroLED development program under the U.S. Government's Industrial Base Analysis and Sustainment (IBAS) initiative: surpassing 150,000 nits of single-panel, full-color brightness, exceeding the program's threshold target; successful early integration progress toward U.S. Army ground soldier vision systems, supporting future programs such as Soldier Borne Mission Command (SBMC); and delivery of new U.S. MicroLED bonding equipment at the Company's Westborough headquarters.

- Secured multiple new prototype orders for Sentinel FPV™ from customers evaluating the product as a core part of their offerings for the U.S. Government's one-way attack (OWA) drone initiative, including several active contenders in the U.S. Government's Drone Dominance Program (DDP). Each engagement represents the potential for significant volume production, with DDP volume orders expected to begin in late August 2026 immediately following Phase 2 evaluations and awards.

- Advanced the Company's Neural I/o™ AI infrastructure initiative with Fabric.AI — signing several new non-disclosure agreements, including several with current NVIDIA NVLink partners; released the first in a planned series of AI Interconnect white papers.

- Opened a new Optics and Photonics Design Center in Dallas, Texas — expanding Kopin's U.S.-based engineering footprint with new optics and photonics lab space, a dedicated design and engineering center, advanced R&D capabilities focused on Neural I/o™ and application-specific optical solutions serving the rapidly growing AI infrastructure market.

**Management Commentary**

Michael Murray, Chief Executive Officer of Kopin, said: “The second quarter and the weeks that followed demonstrated the significant momentum building across every one of Kopin’s growth platforms. Subsequent to quarter end, our team delivered three major milestones in our color MicroLED program under the IBAS initiative keeping us firmly on track to transition to domestic MicroLED product manufacturing in mid-2027, and advancing a capability that we believe could enable meaningful revenue for Kopin over the life of programs like SBMC. The U.S. Army is pleased with our progress, and beyond the Army program we are seeing strong international demand for color MicroLED across additional applications such as head-up displays, weapon sights, and helmet systems.

“Sentinel FPV™ is converting into exactly the kind of traction we anticipated when we entered the FPV drone market. Subsequent to quarter end, we announced multiple new prototype orders from customers — including several active contenders in the U.S. Government’s Drone Dominance Program — each of which represents the potential for significant volume production, with volume orders expected to begin in late August immediately following the program’s Phase 2 evaluations and awards. Demand for trusted, U.S.-built FPV technology is accelerating, and our Dual Situational Awareness design continues to be a clear differentiator in the field. Demand signals are strengthening from drone customers both inside and outside the Drone Dominance Program, and we are now negotiating several large production orders for 2027 — a clear signal of the significant growth we expect in this market.

“Our Neural I/o™ program remains on track, and we expect to demonstrate the platform at CES in January 2027, with a clear path to production anchored by a 1.6-terabit-per-second transceiver solution. Commercial momentum is building quickly with meaningful industry players interested in both our current chipset and our emerging device roadmap. We are engaging U.S. defense and government agencies on domestically manufactured Neural I/o™ solutions, and we are beginning to see early interest from quantum computing and semiconductor customers as well.”

Erich Manz, Chief Financial Officer of Kopin, added: “The second quarter reflected continued operational discipline, including our fourth consecutive quarter of exemplary on-time-in-full delivery and quality performance. Reflecting the order momentum across the business for 2026 we continue to expect a solid second half, exceeding our prior guidance. As we look ahead, we are increasingly optimistic about our trajectory into 2027, as the growth trends we are seeing in 2026 appear positioned to continue into next year, and we expect to make meaningful progress towards sustainable GAAP profitability in the fourth quarter.”

**Second Quarter 2026 Financial Results**

Total revenues for the second quarter ended June 27, 2026 increased to $12.7 million, as compared to $8.5 million for the second quarter ended June 28, 2025. The 51% year-over-year increase primarily reflects grant revenue recognized under the Company’s U.S. Government MicroLED award, collaboration revenue from the Company’s development program with Fabric.AI and its strategic AR/thermal clip-on partnership, and higher research and development revenue on the Company’s Phase 2 Off-the-Visor Heads-Up Display program with the U.S. Army.

Product revenues for the second quarter increased to $7.6 million, as compared to $7.5 million in the year-ago period. Higher defense revenues from thermal weapon sight applications and liquid crystal displays were largely offset by lower industrial applications revenues.

Non-Product revenues were $5.1 million in the second quarter of 2026, as compared to $1.0 million in the second quarter of 2025. The increase was primarily driven by grant revenue recognized in connection with the Company's government award for the development of ultra-bright, full-color MicroLED displays optimized for ground soldier augmented reality applications; collaboration revenue from the Company's development program with Fabric.AI to develop and commercialize GPU-to-GPU connectivity technologies, together with its strategic partnership to develop a next-generation clip-on with augmented reality and thermal integration capabilities; and higher research and development revenue on the Company's Phase 2 Off-the-Visor Heads-Up Display program with the U.S. Army.

Cost of product revenues for the second quarter of 2026 was $6.6 million, or 86% of net product revenues, as compared with $7.1 million, or 94% of net product revenues, for the second quarter of 2025. The decrease as a percentage of net product revenues was primarily attributable to product mix.

Research and Development expenses for the second quarter of 2026 were $4.5 million, as compared to $1.9 million for the second quarter of 2025. The increase was primarily driven by higher funded research and development costs in connection with the Company's government award for the development of ultra-bright, full-color MicroLED displays optimized for ground soldier augmented reality applications.

Selling, General and Administration expenses were $5.1 million in the second quarter of 2026, as compared to $4.9 million in the second quarter of 2025. The increase was primarily due to higher professional fees and accrued performance-based compensation.

Loss from operations for the second quarter of 2026 was $3.5 million, as compared to $5.5 million for the second quarter of 2025. Net income attributable to common stockholders was $0.9 million, or $0.00 per share, as compared to a net loss of $5.2 million, or $(0.03) per share, in the second quarter of 2025. The year-over-year improvement primarily reflects higher total revenues, a $1.9 million increase in other income, net — driven largely by approximately $2.3 million of gains on investments — and a $2.1 million income tax benefit recorded in connection with the expiration of the statute of limitations on an uncertain tax position.

As of June 27, 2026, the Company had cash and cash equivalents of $24.3 million, with total cash, restricted cash and marketable securities of $50.3 million, inclusive of $26.0 million of restricted cash, of which $24.2 million collateralizes the supersedeas bond posted in connection with the BlueRadios litigation appeal.

**Earnings Call and Webcast**

Management will host an investor conference call at 5:00 PM Eastern time on Monday, August 10, 2026 to discuss the Company's second quarter 2026 unaudited financial results, provide a corporate update, and conclude with Q&A from telephone participants. To participate, please use the following information:

**Q2 2026 Earnings Conference Call**
**Date:** Monday, August 10, 2026
**Time:** 5:00 PM Eastern time
**U.S. Dial-in:** 1-877-407-3982
**International:** 1-201-493-6780
**Webcast:** KOPN Q2 FY2026 Earnings Conference Call

---

Please call the conference telephone number 5-10 minutes prior to the start time.

A telephonic replay of the conference call will also be available through August 17, 2026. To listen, please call 1-844-512-2921 within the United States and Canada or 1-412-317-6671 when calling internationally, using replay pin number 13762199. A webcast replay will also be available using the webcast link above.

**About Kopin Corporation**

Kopin Corporation (Nasdaq: KOPN) is a leading developer and provider of innovative display and application-specific optical solutions for defense, AI infrastructure, enterprise, professional and consumer products. Kopin's portfolio includes microdisplays, display modules, eyepiece and projection assemblies, and vehicle- and head-mounted display systems built on the Company's liquid crystal, MicroLED and OLED display technologies, along with a range of optics and low-power custom silicon. Building on its patented bi-directional NeuralDisplay™ architecture, Kopin is also developing Neural I/o™ optical interconnects that use programmable MicroLED pixels as ultra-high-speed, low-power optical transceivers for AI data centers. For more information, please visit Kopin's website at www.kopin.com.

Follow us on LinkedIn, X and Facebook.

**Forward-Looking Statements**

Statements in this press release may be considered "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which are subject to the safe harbor created by such sections. Words such as "expects," "believes," "can," "will," "estimates," and variations of such words and similar expressions, and the negatives thereof, are intended to identify such forward-looking statements. We caution readers not to place undue reliance on any such "forward-looking statements," which speak only as of the date made, and advise readers that these forward-looking statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by us that are difficult to predict. Various factors, some of which are beyond our control, could cause actual results to differ materially from those expressed in, or implied by, such forward-looking statements. All such forward-looking statements, whether written or oral, and whether made by us or on our behalf, are expressly qualified by these cautionary statements and any other cautionary statements that may accompany the forward-looking statements. In addition, we disclaim any obligation to update any forward-looking statements to reflect events or circumstances after the date of this press release, except as may otherwise be required by the federal securities laws. These forward-looking statements are only predictions, subject to risks and uncertainties, and actual results could differ materially from those discussed. Important factors that could affect performance and cause results to differ materially from management's expectations are described in Part I, Item 1A. Risk Factors; Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations; and other parts of our Annual Report on Form 10-K, as amended, for the fiscal year ended December 27, 2025, or as updated from time to time in our Securities and Exchange Commission filings.

**Corporate Contact**

Kopin Corporation
Erich Manz, Chief Financial Officer
EManz@kopin.com
508-870-5959

**Investor Relations Contact**

Lucas A. Zimmerman
MZ Group — MZ North America
KOPN@mzgroup.us
949-259-4987

**Public Relations Contact**

Grace Halvorsen
Lightspeed PR/M
Kopin@lightspeedpr.com

**ATTACHMENT 6** — CAFC 26-1721

Anduril $2.9B Shipyard Contract, Oct 6, 2026

(a) CNBC; (b) Defense Scoop; (c) Defense News

CNBC DISRUPTOR 50

# Anduril lands $2.9 billion Navy submarine shipyard contract days after Luckey joins Pentagon weapons group

PUBLISHED TUE, OCT 6 2026•9:00 AM EDT UPDATED TUE, OCT 6 2026•5:07 PM EDT



Samantha Subin
@SAMANTHA_SUBIN

WATCH LIVE
SHARE

## KEY POINTS

- Anduril landed a $2.9 billion contract with the U.S. Navy to support submarine production.
- The company said it will build components for the Virginia-class submarine.
- Co-founder Palmer Luckey, former House Speaker Newt Gingrich and SpaceX CEO Elon Musk were named to the Pentagon's Project Meridian.

LIVE CREATE FREE ACCOUNT




Anduril won an up to $2.9 billion contract with the U.S. Navy on Tuesday to boost submarine production, days after co-founder Palmer Luckey was named to a Pentagon future weapons task force.

The company is also investing $3.7 billion to scale a new shipyard at Sparrows Point, outside Baltimore, Maryland, slated to start operations in 2030 and create about 3,100 jobs.

Anduril said the 2 million-square-foot facility will build components for the Virginia-class submarine. Some parts, including torpedo tubes, will be manufactured at a 160,000-square-foot facility in Orange County, California.

“This is about putting more food on the table and being able to meet the requirements that our country has to produce more submarines,” said Anduril President and Chief Strategy Officer Chris Brose in a press briefing.

President Donald Trump thanked Luckey by name in comments Tuesday afternoon to mark the investment, calling him a “friend” and “very brilliant guy.”

LIVE CREATE FREE ACCOUNT
CNBC




The deal comes days after the Department of Defense tapped Luckey to join a new initiative called Project Meridian to identify and develop capabilities for future U.S. conflicts, raising questions over defense tech's growing sway in Washington as the companies compete for government contracts.

Former House Speaker Newt Gingrich and SpaceX CEO Elon Musk are also part of the project. Both SpaceX and Anduril are actively working with the U.S. government.

Department of Defense Chief Technology Officer Emil Michael addressed Luckey's involvement with the Pentagon in comments to CNBC on Tuesday, dismissing any concerns about a potential conflict of interest.

"There's really nothing to see here," he said.

Michael said the collection of academics, former military and industry leaders in Project Meridian is "exactly the right kind of mix that you want" to prepare for any future conflict.

LIVE CREATE FREE ACCOUNT
CNBC

Washington in recent months as Trump seeks to bolster U.S. military capabilities, including shipbuilding.

Marc Andreessen, whose venture firm Andreessen Horowitz pours billions into defense tech firms, including Anduril, was named to the Pentagon's defense policy board this summer, alongside Thiel Capital's Blake Masters.

**Read more CNBC tech news**

- A guide to some of the biggest risks in Anthropic's IPO prospectus
- Nvidia, AMD to invest $4 billion in Meta as tech giants deepen AI partnership
- Apple responds to user reports of broken iPhone Duo screens on new foldable phone
- Anthropic's IPO plans: 900% revenue retention, but $80 billion in first-half losses

Anduril is widely known for building autonomous drones and crafts. Over the summer, the Wall Street Journal reported that the company was reportedly in talks to build drone boats on the site.

Brose said the facility will focus on the Virginia-class submarine program, illustrating a push into conventional shipbuilding by the growing defense contractor.

"Our goal here is to be a critical, and hopefully, over time, much larger and growing part of the supply chain for our lead shipbuilders," He said. "And over time, we hope that'll grow up to very large sections of the ship."

Trump made several references to autonomous submarines and drones during his remarks.

LIVE CREATE FREE ACCOUNT
CNBC

Navy award to build submarines.

“This is an opportunity to really reimagine how a shipyard is built and how this work is done, and that’s just not something that our current industrial base has the luxury of doing,” Brose said.




*CORRECTION: This headline has been updated to reflect that co-founder Palmer Luckey was named to the Pentagon’s Project Meridian. An earlier version misstated his title.*

Choose CNBC as your preferred source on Google and never miss a moment from the most trusted name in business news.

## RELATED



Fanatics teams up with OpenAI for new AI-powered shopping suggestion feature

LIVE CREATE FREE ACCOUNT
CNBC

MilTech

# Anduril, US Navy invest $6.6 billion to boost submarine parts production

By **Nathan Gomes and Shivansh Tiwary, Reuters** **Oct 6, 2026**




Anduril Industries branding is displayed at the Farnborough International Airshow, in Farnborough, Britain, July 23, 2026. (Toby Melville/Reuters)

Defense tech firm Anduril said on Tuesday it will invest $3.7 billion to develop a new shipyard in Maryland to build critical components for the U.S. Navy’s Virginia-class submarines, as Washington seeks to bolster its maritime defense capabilities.

Subsequently, the US Navy awarded Anduril a contract worth up to $2.9 billion to manufacture submarine components, with payments tied directly to production outcomes and the company assuming most of the execution risk, the defense startup said.

The investment and associated contract, together valued at up to $6.6 billion, come amid a broader push by the United States and its allies to expand arms production following Russia's invasion of Ukraine and conflicts in the Middle East.

The new plant, dubbed Arsenal-2, will be situated in Baltimore County and is expected to be up and running by the end of the decade, creating 3,100 direct jobs and supporting over 11,000 indirect jobs.

Asked about the $2.9 billion government contract, Christian Brose, chief strategy officer at Anduril, said, "It's really the government buying the results of what we're able to produce from the facility that we've invested in."

Anduril is already building out a facility in California to manufacture critical Virginia-class submarine components such as torpedo tubes, helping address urgent capacity shortfalls in the U.S. industrial base, Brose said.

The company plans to expand into producing larger submarine modules and hull sections once its Baltimore shipyard becomes operational.

Virginia-class submarines, which can travel at over 25 knots, are the Navy's latest generation of nuclear-powered attack submarines, designed for anti-submarine warfare, land-attack strikes and surveillance missions.

General Dynamics' Electric Boat and Huntington Ingalls Industries jointly build the

submarines.

Anduril, founded in 2017 by Palmer Luckey, is a defense firm that is best known for its autonomous systems, drones and software built for the U.S. military and its allies.

The startup has, however, expanded beyond drones into maritime and undersea systems and command-and-control software designed to connect military sensors, weapons and other systems.

The new plant comes after Anduril's $1 billion Arsenal-1 facility in Ohio that began producing autonomous combat drones this year.

---

**More in MilTech >**



## US Air Force awards Lockheed Martin $694M hypersonic missile production contract

The Air Force granted Lockheed Martin a $694 million contract in late September for the production and fielding of the AGM-183A Air-Launched Rapid Response Weapon, or ARRW.



DEFENSESCOOP

IT

Cybersecurity

AI

Space

Weapons

R&D



The Virginia-class attack submarine USS North Dakota (SSN 784) has been delivered back to the fleet battle ready, completing a historic first-ever Virginia-class Block III availability at Portsmouth Naval Shipyard, Kittery, Maine Aug. 20, 2026. (U.S. Navy photo by Neil Boorjian)

SHARE

The Trump administration and Anduril Industries unveiled plans Tuesday for a new “software-defined” shipyard that will help build attack submarines for the Navy.

The announcement comes as the Navy aims to boost its undersea arsenal, which could play a key role in a potential future conflict with China in the Pacific, and President Donald Trump seeks to enhance domestic manufacturing.

The Navy has awarded Anduril a contract worth up to $2.9 billion to support the effort, according to a press release from the contractor. The firm plans to invest $3.7 billion of its own funding to help stand up the facility, grow the workforce, and add new tech and other capabilities that will be required for the project.

“The United States Navy, together with Anduril Industries, will invest $6.6 billion to create a new facility in Baltimore County, Maryland, which will manufacture critical components for the Virginia-class submarine. This delivers on President Trump’s promise to bolster America’s defense industrial base while revitalizing our manufacturing industry, creating over 13,000 direct and indirect jobs, and driving $2 billion in annual economic output,” White House Principal Deputy Press Secretary Anna Kelly said in a call with reporters Tuesday.

Subscribe to our daily newsletter.

SUBSCRIBE

The facility, dubbed Arsenal-2, will be constructed at Tradepoint Atlantic in Baltimore County.

"Permitting and site preparation will begin immediately, with construction commencing as soon as the necessary approvals are in place. Initial operations are expected to come online in 2030, with production scaling progressively thereafter as Anduril builds the workforce, supplier base, infrastructure, and manufacturing throughput required for submarine production," the company said in a press release Tuesday.

Anduril described Arsenal-2, which is expected to sit on a 187-acre site and be more than 2 million square feet, as a "modern shipbuilding system built around software-defined production and advanced manufacturing."

Anduril's industrial software platform, called ArsenalOS, will provide the "digital backbone" for the facility and its production systems, according to the press release.

"It will connect fabrication workflows, outfitting sequences, material movement, inspection protocols, and documentation requirements in a single system, giving workers and managers real-time visibility into the state of production. Digital work instructions, embedded quality controls, modern sensing, and automation will support the expertise of welders, pipefitters, electricians, shipfitters, inspectors, and other skilled trades. By making production requirements more visible and processes more consistent, ArsenalOS will help new workers train faster while preserving the technical rigor, judgment, and quality required for submarine construction," per the release.

The company plans to build components of the Virginia-class submarine at the facility and deliver them to Electric Boat and Newport News Shipbuilding for final assembly.

Subscribe to our daily newsletter.

SUBSCRIBE

"The Virginia-class submarine program is, you know, one of the most critical warfighting capabilities that our nation has," Chris Brose, Anduril's president and chief strategy officer, told reporters during Tuesday's call with reporters.

"And I think for us, you know, this is an opportunity to really reimagine how a shipyard is built and how this work is done," he added. "As we've had this conversation with the administration and with the Navy, really for the better part of the past two years, you know I think the core insight that the administration had and the Navy had is we just need new production capacity. You know, we need to grow the maritime industrial base, the submarine industrial base so that we can produce more submarines. So the goal here for Anduril is to contribute to that."

He touted the company's digital tools as capabilities that could boost shipbuilding efforts.

"It's not about, you know, the inability to bend steel in America. We know how to do that. You know we have phenomenal workers who are doing that. It's really about really kind of taking advantage of manufacturing revolutions that are occurring in our commercial aerospace and other commercial industries, bringing software and other digital technologies in, really kind of reconceiving how the work is done. You know, taking what are very complex tasks performed by very skilled workers and breaking them up into a larger number of simpler tasks that a larger workforce can contribute to much faster and really try to get production capacity up," he said.

The company is standing up a facility in Orange County, California, to get a head start before Arsenal-2 comes online.

"We have already made investments. We are already standing up a facility in California to get moving on the … relatively simpler, kind of more straightforward components," Brose said. "Things like torpedo tubes and other things that … the industrial base desperately needs to

Subscribe to our daily newsletter.
SUBSCRIBE

of capacity. So again, this is about helping to create more of the critical systems that we need to produce more submarines.”

A senior administration official, who spoke to reporters during Tuesday’s call on condition of anonymity under ground rules set by the White House, said the Baltimore Country shipyard could provide about 9 million hours of labor a year.

“That would be the equivalent of about a 15% increase,” the official said. “So, you know, just in terms of the pure … capacity that it brings, it would absolutely translate to increased Virginia-class submarine production. And to the point of torpedo tubes, you know, today that is … what we refer to as a gating component that we need to be able to move forward with some of those Virginia-class submarines that are under construction. So having those torpedo tubes earlier would let us, you know, move production of current Virginia submarines under construction faster.”

The official added: “They’re going to start with these critical components, prove that they meet the quality standards, prove that they’re safe to submerge with human lives on board and hold the pressure boundary, and then they’ll move on to increasingly complex assemblies that will even increase our ability to produce even faster as we move through and get more and more done at this shipyard.”

President Donald Trump visited the planned location for the shipyard on Tuesday afternoon and suggested that the facility could produce “autonomous” submarines.

“I love the idea of the autonomous sub,” Trump said. “It just makes sense because I wouldn’t — I’m not sure that I would have the courage to go into submarines too much. You guys love them, but me, I’d rather be floating on the sea. So I like the idea of an autonomous sub all down there by itself, but just as accurate. I mean, it’s incredible what they can do. I saw some

Subscribe to our daily newsletter.
SUBSCRIBE

*President Donald Trump.*

---



## Written by Jon Harper

Jon Harper is Editor-in-Chief of DefenseScoop. He leads an award-winning team of journalists in providing breaking news and in-depth analysis on military technology and the ways in which it is shaping how the Defense Department operates and modernizes. You can also follow him on X: @Jon_Harper_

## In This Story

SOFTWARE NAVY ANDURIL SHIPBUILDING DONALD TRUMP

TRUMP ADMINISTRATION SUBMARINES SHIPYARDS

NAVAL SHIPBUILDING SHIPYARD MODERNIZATION

# More Scoops



### How technology and acquisition reform are propelling Navy submarine production

Defense and industry leaders outline how centralized accountability, industrial base funding, and gaming-engine floor training are modernizing naval shipyards.

BY SCOOP NEWS GROUP



### Navy comes 'full circle' on nuclear power for next-generation battleship

Subscribe to our daily newsletter.

SUBSCRIBE

**ATTACHMENT 7 —** CAFC 26-1721

Description — Meta's Muse

(a) Meta Newsroom (same page as Ex. 3); (b) Summary of Provenance & Technical Equivalency Mapping; (c) lower court record page; (d) Independent Action & Rule 60(b) Pleadings: *Petitioner's Motion to Vacate Mootness Order* (ECF No. 110), Filed May 4, 2026.

Meta

Back to Newsroom

META

# Introducing Muse Wonder and Muse Wonder Full: Frontier Models for Agents

October 12, 2026

LISTEN TO ARTICLE




## Takeaways

- Meta is introducing Muse Wonder and Muse Wonder Full, our most capable models to date, built to deliver state-of-the-art performance on personal and professional agentic tasks — from navigating an insurance claim to making sense of a lease to building a working app.

- Muse Wonder is available today for developers and builders through the Meta Model API and Muse Code while Muse Wonder Full is available today for Muse Code subscribers.
- Muse Wonder will soon power experiences in Muse, and will roll out first to subscribers.

Fourteen months ago, we began an overhaul of our AI efforts, and in that time we've gone from rebuilding our foundations to pushing the frontier. Today, Meta is introducing the Muse Wonder series with Muse Wonder and Muse Wonder Full, our most capable models to date, built on the groundwork we laid with Muse Spark. The models deliver state-of-the-art performance on personal and professional agentic tasks.

## Built for Real World Needs

Whether the job is navigating an insurance claim, understanding a lease, or making sense of someone's finances, a model has to interpret the information in front of it and work through the problem. Muse Wonder and Muse Wonder Full bring that capability to expert domains including law, finance, and health, along with frontier coding performance for people building everything from a game to an app for a new business.

Real work also unfolds over time. That's why we've built our new models to have Active Memory, the ability to carry what matters to you across conversations and bring back the details that are relevant to the task at hand. They're also equipped with Active Focus, the ability to keep working toward your goal when a task gets hard, try other approaches, recover from errors, and follow through, asking for clarification when needed and checking in before following through on anything important.



## How We Build for Safety

A personal agent can take on real tasks for you, which often means working across your messages, calendars, and documents. That's why we trained the Muse Wonder family to avoid sharing private information without permission; turn down requests to assist in performing actually harmful acts; and work to improve security and strengthen defenses against cyber attacks. Developers and security teams can use models like Muse Wonder to find flaws in their own code and strengthen their systems, so we made sure the models can still do that work. We train, evaluate, and release our most capable AI models in line with the standards set out in our Meta Superintelligence Scaling Framework. A full report with additional safety evaluations will be available soon.

Muse Wonder is available today through the Meta Model API and Muse Code. It will soon power more of Muse, rolling out first to subscribers. This is a major step toward personal superintelligence for everyone, with much more to come.

For a closer look at how these models were built, how they were tested and what they can do, head to our research blog.

Categories: Meta, Technology and Innovation

Tags: AI

DOWNLOAD ALL IMAGES

Share this article

RECENT NEWS

New Tools for the Admins Who Build Communities on Forum

Now You Can Invite Anyone to a WhatsApp Call

Your Algorithm, Your Words: New Ways to Shape What You See on Facebook

Leading Tech Companies Join Global Law Enforcement in Major Crackdown on West African Scam Networks

RELATED NEWS

META

Introducing Muse: The World's First Personal AI Agent Built for Everyone

September 8, 2026

META

Introducing Muse Spark: MSL's First Model, Purpose-Built to Prioritize People

April 8, 2026

Follow Meta Newsroom |

Press Resources | PRESS@META.COM MEDIA GALLERY

Meta

## SUMMARY OF PROVENANCE & TECHNICAL EQUIVALENCY MAPPING

Pursuant to Federal Rule of Civil Procedure 24(a)(2) and 35 U.S.C. § 256, Movant submits this compiled technical mapping to demonstrate a prior timeline of independent conception, reduction to practice, and technical provenance of the foundational AI agent architecture currently being commercialized and litigated by the primary parties.

While the lower court filings substitute internal repository codes for commercial branding, the specific software logic, predictive behavioral frameworks, and multimodal sensor environments map identically to the operational loop of Meta's newly deployed **Muse Personal AI Agent**.

### 1. The Python-Based Multimodal AI Integration Layer

- **Location:**
- Document 58-3, Page 12 (Page 1 of 2), Paragraph 2.
- **The Verified Claim:** Movant explicitly asserts prior design of an environment that *"involve[s] the integration of audio, visual, and AI-driven data processing,"* establishing that she *"developed the original Python-based integration for these specific multimodal systems."*
- **Muse Parallel:** This describes the underlying software orchestration backbone required for a personal AI agent to ingest ambient real-world data (au-

dio/visual streams) and execute complex automated tasks based on live user behaviors.

**2. The Foundational Architecture of Project Aria/Orion**

- **Location:** Document 58-3, Page 12 (Page 1 of 2), Paragraph 1.
- **The Verified Claim:** Movant identifies herself as the *"original architect of the foundational software and hardware framework now branded as Project Aria and Project Orion (commercialized as Meta smart glasses),"* explicitly tracking the creation of the *"proprietary execution environments and multi-modal sensing architecture developed between 2016 and 2020."*
- **Muse Parallel:** Meta's Project Aria and smart glasses serve as the primary persistent hardware capture and live operational computing environments utilized for the deployment of the Muse personal AI agent.

**3. Early Digital Assistant Repositories ("abot" and "betty")**

- **Location:** Document 58, Page 4 of 7, Section V (Timeline Context).
- **The Verified Claim:** Movant references the *"Integration of prior collaborative concepts into digital assistant architectures, documented in repositories 'abot' and 'betty' (2016)."*

- **Muse Parallel:** This establishes the chronological engineering timeline for an autonomous agentic framework built to execute actions, run diagnostics, and operate as an active digital personal assistant.

## 4. Multimodal Sensor Fusion Layers

- **Location:** Document 58, Page 4 of 7, Section V & Document 58-1, Page 9 (Page 2 of 3).
- **The Verified Claim:** Movant details the physical production of hardware prototypes incorporating *“acoustic processing, directional audio, multi-modal sensor fusion, and a transparent display,”* alongside *“multimodal sensor systems in the dc500 repositories.”*
- **Muse Parallel:** "Sensor fusion" is the precise machine learning requirement needed for an AI agent to merge inputs from cameras, open-ear microphone arrays, and inertial sensors simultaneously to decipher a user's local environment in real time.

## 5. The Predictive Behavioral Architecture ("Habit AI")

- **Location:** Document 110, Page 2, Section A; Document 110, Page 13, Paragraph 4; Document 110, Page 19, Section G.

- **The Verified Claim:** Movant identifies her architecture as the *"Habitual Algorithm (Habit AI) framework,"* defining it as a proprietary machine learning engine designed to *"analyze gestural and environmental data to predict user intent,"* serving as the technical connective tissue between the tracking wearable and external system responses.
- **Muse Parallel:** This maps directly to the anticipatory AI, multi-turn dialogue predictive layers, and intent-modeling loops foundational to Meta's Muse agent models.

**6. Distributed Field-Sensor Training Environments**

- **Location:** Document 110, Page 3, Section G.
- **The Verified Claim:** Movant documents that her AI was trained utilizing a distributed network of hardware—specifically personal mobile devices—deployed as *"field sensors"* to feed the algorithm within high-interference live event environments, establishing that the *"'Nurture' logic was fully functional and engaged in active machine learning."*
- **Muse Parallel:** This details the distributed data collection loop and automated user training model required to refine ambient agent intelligence parameters in the field.

APPEAL,PATENT

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:26−cv−10304−ADB

Solos Technology Limited v. Meta Platforms, Inc. et al
Assigned to: Judge Allison D. Burroughs
Demand: $0
Case in other court: USCA for the Federal Circuit, 26−01721
Cause: 15:1126 Patent Infringement

Date Filed: 01/23/2026
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Solos Technology Limited** represented by

**Jameson J. Pasek**
Caldwell Law
200 Clarendon Street, 59th Floor
Boston, MA 02116
857−990−4914
Email: jameson@caldwelllaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Keegan Michael Caldwell**
Caldwell Law
200 Clarendon Street, 59th Floor
Boston, MA 02116
857−990−4926
Email: keegan@caldwelllaw.com
*ATTORNEY TO BE NOTICED*

**Shixiong Wang**
Caldwell Law
200 Clarendon St, Floor 59
Boston, MA 02116
857−776−4505
Email: steve@caldwelllaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.** represented by

**Lisa K. Nguyen**
Paul Hastings LLP
1117 S. California Ave
Palo Alto, CA 94304
650−320−1800
Fax: 650−320−1900
Email: lisanguyen@paulhastings.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric E Lancaster**
Paul Hastings LLP
1117 S. California Ave
Palo Alto, CA 94304
650−320−1800
Fax: 650−320−1900
Email: ericlancaster@paulhastings.com
*ATTORNEY TO BE NOTICED*

**Matthias Kamber**
Paul Hastings LLP
101 California Street
Ste Forty−Eighth Floor
San Francisco, CA 94111
415−856−7000
Fax: 415−856−7100
Email: matthiaskamber@paulhastings.com
*ATTORNEY TO BE NOTICED*

**Stephanie Nicole Adamakos**
Paul Hastings LLP
Patent Litigation
2050 M St NW
Washington, DC 20036
202−551−1817
Email: stephanieadamakos@paulhastings.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Meta Platforms Technologies, LLC** represented by

**Lisa K. Nguyen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric E Lancaster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthias Kamber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephanie Nicole Adamakos**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Oakley, Inc.** represented by

**Ali S. Razai**
Morgan, Lewis & Bockius LLP
600 Anton Blvd., Suite 1800

Costa Mesa, CA 92626
714−830−0600
Fax: 714−830−0700
Email: ali.razai@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Andrew V. Devkar**
Morgan, Lewis & Bockius LLP
2049 Century Park East
Suite 700
Los Angeles, CA 90067
310−255−9070
Fax: 310−907−1001
Email: andrew.devkar@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Brandon G. Smith**
Morgan Lewis
600 Anton Blvd
Ste 18th Floor
Costa Mesa, CA 92626
714−830−0600
Email: brandon.g.smith@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Katherine W. Soule**
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110
617−341−7700
Email: katherine.soule@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Luxottica of America, Inc.** represented by **Ali S. Razai**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew V. Devkar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon G. Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine W. Soule**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **EssilorLuxottica USA, Inc.** | represented by | **Ali S. Razai**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Andrew V. Devkar**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Brandon G. Smith**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Katherine W. Soule**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **Daitona Carter** | represented by | **Daitona Carter**<br>General Delvery<br>New York, NY 10001<br>212−274−7411<br>Email: dddddc@tuta.com<br>PRO SE |

**Objector**

| | | |
|---|---|---|
| **Morgan Lewis & Bockius LLP** | represented by | **Gary M Ronan**<br>Goulston & Storrs PC<br>One Post Office Square<br>Boston, MA 02109<br>617−574−3593<br>Email: gronan@goulstonstorrs.com<br>*TERMINATED: 04/14/2026*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kathleen M. Ritter**<br>Goulston & Storrs<br>Litigation<br>One Post Office Square<br>Ste 28th Floor<br>Boston, MA 02109<br>617−574−0596<br>Email: kritter@goulstonstorrs.com<br>*TERMINATED: 04/14/2026*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 01/23/2026 | 1 | COMPLAINT *for Patent Infringement* against All Defendants Filing fee: $ 405, receipt number AMADC−11494122 (Fee Status: Filing Fee paid), filed by Solos Technology |

| | | |
|---|---|---|
| | | Limited. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Civil Cover Sheet, # 13 Category Form)(Pasek, Jameson) (Entered: 01/23/2026) |
| 01/23/2026 | 2 | CORPORATE DISCLOSURE STATEMENT by Solos Technology Limited. (Pasek, Jameson) (Entered: 01/23/2026) |
| 01/23/2026 | 3 | REPORT ON THE FILING OF AN ACTION REGARDING PATENT OR TRADEMARK. (Pasek, Jameson) (Entered: 01/23/2026) |
| 01/23/2026 | 4 | ELECTRONIC NOTICE of Case Assignment. Judge Indira Talwani assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (JAM) (Entered: 01/23/2026) |
| 01/26/2026 | 5 | Judge Indira Talwani: ORDER entered. ORDER OF RECUSAL. (GAM) (Entered: 01/26/2026) |
| 01/26/2026 | 6 | ELECTRONIC NOTICE of Reassignment. Judge Allison D. Burroughs added. Judge Indira Talwani no longer assigned to case. (SP) (Entered: 01/26/2026) |
| 01/26/2026 | 7 | Summons Issued as to EssilorLuxottica USA, Inc., Luxottica of America, Inc., Meta Platforms Technologies, LLC, Meta Platforms, Inc., Oakley, Inc.. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (KF) (Entered: 01/26/2026) |
| 01/27/2026 | 8 | SUMMONS Returned Executed EssilorLuxottica USA, Inc. served on 1/27/2026, answer due 2/17/2026. (Pasek, Jameson) (Entered: 01/27/2026) |
| 01/28/2026 | 9 | SUMMONS Returned Executed Luxottica of America, Inc. served on 1/27/2026, answer due 2/17/2026. (Pasek, Jameson) (Entered: 01/28/2026) |
| 01/28/2026 | 10 | SUMMONS Returned Executed Oakley, Inc. served on 1/27/2026, answer due 2/17/2026. (Pasek, Jameson) (Entered: 01/28/2026) |
| 01/29/2026 | 11 | SUMMONS Returned Executed Meta Platforms Technologies, LLC served on 1/28/2026, answer due 2/18/2026. (Pasek, Jameson) (Entered: 01/29/2026) |
| 02/03/2026 | 12 | SUMMONS Returned Executed Meta Platforms, Inc. served on 2/2/2026, answer due 2/23/2026. (Pasek, Jameson) (Entered: 02/03/2026) |
| 02/16/2026 | 13 | NOTICE of Appearance by Katherine W. Soule on behalf of EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc. (Soule, Katherine) (Entered: 02/16/2026) |
| 02/16/2026 | 14 | Assented to MOTION for Extension of Time to March 3, 2026 to File Answer re 1 Complaint, by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc..(Soule, Katherine) (Entered: 02/16/2026) |
| 02/16/2026 | 15 | MOTION for Extension of Time to 3/25/2026 to File Answer re 1 Complaint, by Meta Platforms Technologies, LLC, Meta Platforms, Inc..(Kamber, Matthias) (Entered: 02/16/2026) |
| 02/17/2026 | 16 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 14 Motion for Extension of Time to Answer EssilorLuxottica USA, Inc. answer due 3/3/2026; Luxottica of America, Inc. answer due 3/3/2026; Oakley, Inc. answer due 3/3/2026. (KF) (Entered: 02/17/2026) |

| | | |
|---|---|---|
| 02/17/2026 | 17 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 15 Motion for Extension of Time to Answer Meta Platforms Technologies, LLC answer due 3/25/2026; Meta Platforms, Inc. answer due 3/25/2026. (KF) (Entered: 02/17/2026) |
| 02/18/2026 | 18 | MOTION to Disqualify Counsel *Morgan Lewis & Bockius LLP* by Solos Technology Limited.(Pasek, Jameson) (Entered: 02/18/2026) |
| 02/18/2026 | 19 | MEMORANDUM in Support re 18 MOTION to Disqualify Counsel *Morgan Lewis & Bockius LLP* filed by Solos Technology Limited. (Attachments: # 1 Affidavit)(Pasek, Jameson) (Entered: 02/18/2026) |
| 02/18/2026 | 20 | MOTION for Extension of Time to March 25, 2026 to File Answer re 1 Complaint, by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc..(Soule, Katherine) (Entered: 02/18/2026) |
| 02/18/2026 | 21 | DECLARATION re 20 MOTION for Extension of Time to March 25, 2026 to File Answer re 1 Complaint, by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc.. (Attachments: # 1 Exhibit A)(Soule, Katherine) (Entered: 02/18/2026) |
| 02/19/2026 | 22 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 20 Motion for Extension of Time to Answer re 1 Complaint. EssilorLuxottica USA, Inc. answer due 3/25/2026; Luxottica of America, Inc. answer due 3/25/2026; Oakley, Inc. answer due 3/25/2026. (CAM) (Entered: 02/19/2026) |
| 03/04/2026 | 23 | Opposition re 18 MOTION to Disqualify Counsel *Morgan Lewis & Bockius LLP* filed by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc.. (Ronan, Gary) (Entered: 03/04/2026) |
| 03/04/2026 | 24 | DECLARATION re 23 Opposition to Motion *of John J. Concannon III* by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc.. (Ronan, Gary) (Entered: 03/04/2026) |
| 03/04/2026 | 25 | DECLARATION re 23 Opposition to Motion *of Richard A. Sneider* by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc.. (Ronan, Gary) (Entered: 03/04/2026) |
| 03/04/2026 | 26 | DECLARATION re 23 Opposition to Motion *of Anbar Khal* by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc.. (Ronan, Gary) (Entered: 03/04/2026) |
| 03/04/2026 | 27 | DECLARATION re 23 Opposition to Motion *of Ali Razai* by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc.. (Ronan, Gary) (Entered: 03/04/2026) |
| 03/05/2026 | 28 | MOTION for Leave to File *Reply to Morgan Lewis & Bockius LLP's Opposition to Plaintiff's Motion to Disqualify* by Solos Technology Limited.(Pasek, Jameson) (Entered: 03/05/2026) |
| 03/06/2026 | 29 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 28 Motion for Leave to File Reply ; Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (CAM) (Entered: 03/06/2026) |
| 03/11/2026 | 30 | NOTICE of Appearance by Gary M Ronan on behalf of Morgan Lewis & Bockius LLP (Ronan, Gary) (Entered: 03/11/2026) |
| 03/11/2026 | 31 | NOTICE of Appearance by Kathleen M. Ritter on behalf of Morgan Lewis & Bockius LLP (Ritter, Kathleen) (Entered: 03/11/2026) |
| 03/13/2026 | 32 | ELECTRONIC NOTICE Setting Hearing on Motion 18 MOTION to Disqualify Counsel *Morgan Lewis & Bockius LLP* : Motion Hearing set for 3/26/2026 09:00 AM in Courtroom 17 (In person only) before Judge Allison D. Burroughs. (KF) (Entered: 03/13/2026) |

| | | |
|---|---|---|
| 03/13/2026 | 33 | REPLY to Response to 18 MOTION to Disqualify Counsel *Morgan Lewis & Bockius LLP* filed by Solos Technology Limited. (Attachments: # 1 Exhibit, # 2 Exhibit)(Pasek, Jameson) (Entered: 03/13/2026) |
| 03/20/2026 | 34 | MOTION for Leave to Appear Pro Hac Vice for admission of Keegan M. Caldwell Filing fee: $ 125, receipt number AMADC−11624197 by Solos Technology Limited. (Attachments: # 1 Affidavit)(Pasek, Jameson) (Entered: 03/20/2026) |
| 03/20/2026 | 35 | NOTICE of Appearance by Shixiong Wang on behalf of Solos Technology Limited (Wang, Shixiong) (Entered: 03/20/2026) |
| 03/20/2026 | 36 | MOTION for Leave to Appear Pro Hac Vice for admission of Ali S. Razai, Brandon G. Smith, and Andrew V. Devkar Filing fee: $ 375, receipt number AMADC−11624520 by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc.. (Attachments: # 1 Certification of Ali S. Razai, # 2 Certification of Brandon G. Smith, # 3 Certification of Andrew V. Devkar)(Soule, Katherine) (Entered: 03/20/2026) |
| 03/20/2026 | 37 | CORPORATE DISCLOSURE STATEMENT by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc. identifying Corporate Parent EssilorLuxottica S.A. for EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc... (Soule, Katherine) (Entered: 03/20/2026) |
| 03/20/2026 | 38 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 34 Motion for Leave to Appear Pro Hac Vice of Keegan M. Caldwell.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 03/20/2026) |
| 03/20/2026 | 39 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 36 Motion for Leave to Appear Pro Hac Vice of Ali S. Razai, Brandon G. Smith, and Andrew V. Devkar.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm. |

| | | |
|---|---|---|
| | | Notices of Appearance must be entered on the docket by each newly admitted attorney.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 03/20/2026) |
| 03/23/2026 | 40 | NOTICE of Appearance by Ali S. Razai on behalf of EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc. (Razai, Ali) (Entered: 03/23/2026) |
| 03/23/2026 | 41 | NOTICE of Appearance by Brandon G. Smith on behalf of EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc. (Smith, Brandon) (Entered: 03/23/2026) |
| 03/23/2026 | 42 | NOTICE of Appearance by Andrew V. Devkar on behalf of EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc. (Devkar, Andrew) (Entered: 03/23/2026) |
| 03/24/2026 | 43 | NOTICE of Appearance by Keegan Michael Caldwell on behalf of Solos Technology Limited (Caldwell, Keegan) (Entered: 03/24/2026) |
| 03/25/2026 | 44 | MOTION to Dismiss by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc..(Soule, Katherine) (Entered: 03/25/2026) |
| 03/25/2026 | 45 | MEMORANDUM in Support re 44 MOTION to Dismiss filed by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc.. (Soule, Katherine) (Entered: 03/25/2026) |
| 03/25/2026 | 46 | MOTION for Leave to Appear Pro Hac Vice for admission of Lisa K. Nguyen Filing fee: $ 125, receipt number AMADC−11635131 by Meta Platforms Technologies, LLC, Meta Platforms, Inc..(Kamber, Matthias) (Entered: 03/25/2026) |
| 03/25/2026 | 47 | MOTION for Leave to Appear Pro Hac Vice for admission of Eric Lancaster Filing fee: $ 125, receipt number AMADC−11635152 by Meta Platforms Technologies, LLC, Meta Platforms, Inc..(Kamber, Matthias) (Entered: 03/25/2026) |
| 03/25/2026 | 48 | NOTICE of Appearance by Stephanie Nicole Adamakos on behalf of Meta Platforms Technologies, LLC, Meta Platforms, Inc. (Adamakos, Stephanie) (Entered: 03/25/2026) |
| 03/25/2026 | 49 | MOTION to Dismiss *and Request for Oral Hearing* by Meta Platforms Technologies, LLC, Meta Platforms, Inc..(Kamber, Matthias) (Entered: 03/25/2026) |
| 03/25/2026 | 50 | MEMORANDUM in Support re 49 MOTION to Dismiss *and Request for Oral Hearing* filed by Meta Platforms Technologies, LLC, Meta Platforms, Inc.. (Kamber, Matthias) (Entered: 03/25/2026) |
| 03/25/2026 | 51 | DECLARATION re 50 Memorandum in Support of Motion by Meta Platforms Technologies, LLC, Meta Platforms, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Kamber, Matthias) (Entered: 03/25/2026) |
| 03/25/2026 | 52 | CORPORATE DISCLOSURE STATEMENT by Meta Platforms Technologies, LLC, Meta Platforms, Inc.. (Kamber, Matthias) (Entered: 03/25/2026) |
| 03/26/2026 | 53 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Motion Hearing held on 3/26/2026 re 18 MOTION to Disqualify Counsel *Morgan Lewis & Bockius LLP* filed by Solos Technology Limited. Oral arguments by the parties. Court takes motion under advisement. (Court Reporter: Kelly Mortellite at mortellite@gmail.com.)(Attorneys present: Pasek, Caldwell, Wang, Soule, Ronan, Ritter, Razai ) (KF) (Entered: 03/26/2026) |

| | | |
|---|---|---|
| 03/26/2026 | 54 | STIPULATION re 49 MOTION to Dismiss *and Request for Oral Hearing − Joint Stipulation to Extend Time to Respond* by Solos Technology Limited. (Pasek, Jameson) (Entered: 03/26/2026) |
| 03/26/2026 | 55 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. APPROVING 54 Joint Stipulation to Extend Time for Plaintiff to Respond to Meta's motion to Dismiss. Response due by 4/22/2026. (CAM) (Entered: 03/26/2026) |
| 03/26/2026 | 56 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 46 Motion for Leave to Appear Pro Hac Vice Added Lisa K. Nguyen.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 03/26/2026) |
| 03/26/2026 | 57 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 47 Motion for Leave to Appear Pro Hac Vice Added Eric Lancaster.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 03/26/2026) |
| 03/27/2026 | 58 | MOTION to Intervene by Daitona Carter. (Attachments: # 1 Proposed Complaint in Intervention, # 2 Text of Proposed Order)(CAM) (Additional attachment(s) added on 3/30/2026: # 3 Statement of Interest) (CAM). (Additional attachment(s) added on 3/30/2026: # 4 Supplemental notice of Prior Formal Claims of Ownership) (CAM). (Entered: 03/30/2026) |
| 03/27/2026 | 59 | MOTION for Protective Order and Leave to File Redacted Documents ( MOTION to Seal) ( Responses due by 4/10/2026) by Daitona Carter. (Attachments: # 1 Text of Proposed Order)(CAM) (Entered: 03/30/2026) |
| 03/27/2026 | 60 | |

| | | |
|---|---|---|
| | | MOTION for Protective Order for Witness Protection and Technical Safegaurds by Daitona Carter.(CAM) (Entered: 03/30/2026) |
| 03/27/2026 | 61 | MOTION for Judicial Notice by Daitona Carter. (Attachments: # 1 Notice of Evidence of Coordinated Witness Intimidation)(CAM) (Entered: 03/30/2026) |
| 03/27/2026 | 62 | MOTION for *in Camera* Review by Daitona Carter.(CAM) (Entered: 03/30/2026) |
| 03/30/2026 | 65 | Emergency MOTION for ADA Accommodation and Leave to file electronically Pro Se by Daitona Carter.(CAM) (Entered: 03/30/2026) |
| 04/03/2026 | 66 | Transcript of Motion Hearing held on March 26, 2026, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 4/24/2026. Redacted Transcript Deadline set for 5/4/2026. Release of Transcript Restriction set for 7/2/2026. (DRK) (Entered: 04/03/2026) |
| 04/03/2026 | 67 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 04/03/2026) |
| 04/06/2026 | 68 | Judge Allison D. Burroughs: MEMORANDUM AND ORDER entered. For the reasons (herein), Solos's motion to disqualify Morgan Lewis, [ECF No. 18 ], is **DENIED**.<br><br>**SO ORDERED.**<br><br>(CAM) (Entered: 04/06/2026) |
| 04/07/2026 | 69 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Daitona Carter’s motion for leave to file electronically, 65 , is ***GRANTED*** for the instant matter only. The Court notes that self−represented parties are required to comply with the Local Rules and the Federal Rules of Civil Procedure. See Local Rule 83.5.5(d). Moreover, when self−represented parties register for CM/ECF, they agree to the Non−Attorney E−filing Terms and Conditions, which provide that self−represented litigants agree to adhere to local rules, orders, policies, and procedures governing electronic filing for the Court. Further guidance on using CM/ECF can be found at https://www.mad.uscourts.gov/caseinfo/cmecf−general.htm, and information about civil cases in federal courts can be found at https://www.uscourts.gov/about−federal−courts/types−cases/civil−cases. The Court requires all self−represented parties to review these resources and familiarize themselves with the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Massachusetts. In the event of any noncompliance, the Court may vacate this order and restrict Carter from the CM/ECF system and electronic filing.<br><br>Pro se litigants must have an individual PACER account to electronically file in the District of Massachusetts and must register to E−file. To register for a PACER account, go the PACER website at https://pacer.uscourts.gov/register−account.<br><br>To register to E−file, follow the instructions on our website at https://www.mad.uscourts.gov/caseinfo/nextgen−pro−se.htm. |

| | | |
|---|---|---|
| | | If the Massachusetts District Court is not in the dropdown list of courts, please email tracy_mclaughlin@mad.uscourts.gov with the docket number so your account can be updated allowing you to E−file.<br><br>(CAM) (Entered: 04/07/2026) |
| 04/08/2026 | 70 | Supplemental MEMORANDUM in Support re 58 MOTION to Intervene *Pursuant to Fed. R. Civ. P. 24* filed by Daitona Carter. (Carter, Daitona) (Entered: 04/08/2026) |
| 04/08/2026 | 71 | Opposition re 44 MOTION to Dismiss filed by Solos Technology Limited. (Pasek, Jameson) (Entered: 04/08/2026) |
| 04/08/2026 | 72 | Supplemental Notice of Supplemental Authorities re 58 MOTION to Intervene, 62 MOTION in Camera Review filed by Daitona Carter. (Carter, Daitona) (Entered: 04/08/2026) |
| 04/08/2026 | 73 | Supplemental AFFIDAVIT in Support re 58 MOTION to Intervene, 62 MOTION in Camera Review filed by Daitona Carter. (Carter, Daitona) (Entered: 04/08/2026) |
| 04/08/2026 | 74 | CERTIFICATE OF SERVICE pursuant to LR 5.2 by Daitona Carter re 73 Affidavit in Support of Motion, 72 Notice of Supplemental Authorities, 70 Memorandum in Support of Motion . (Attachments: # 1 Exhibit AMENDED MEMORANDUM OF LAW IN SUPPORT OF PROPOSED INTERVENOR, # 2 Exhibit AMENDED NOTICE OF SUPPLEMENTAL AUTHORITY, # 3 Exhibit AMENDED SUPPLEMENTAL AFFIDAVIT OF DAITONA CARTER IN SUPPORT OF MOTION FOR IN CAMERA REVIEW (DOC. 62) AND MOTION TO INTERVENE (DOC. 58))(Carter, Daitona) (Entered: 04/08/2026) |
| 04/09/2026 | 75 | MOTION for Leave to File *a Reply Memorandum* by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc..(Soule, Katherine) (Entered: 04/09/2026) |
| 04/09/2026 | 76 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 75 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should, on or before April 15, 2026, file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (CAM) (Entered: 04/09/2026) |
| 04/09/2026 | 77 | Supplemental MEMORANDUM in Support re 58 MOTION to Intervene *Pursuant to Fed. R. Civ. P. 24* filed by Daitona Carter. (Carter, Daitona) (Entered: 04/09/2026) |
| 04/09/2026 | 78 | Supplemental Notice of Supplemental Authorities re 58 MOTION to Intervene, 62 MOTION in Camera Review filed by Daitona Carter. (Carter, Daitona) (Entered: 04/09/2026) |
| 04/09/2026 | 79 | Supplemental AFFIDAVIT in Support re 58 MOTION to Intervene, 62 MOTION in Camera Review filed by Daitona Carter. (Carter, Daitona) (Entered: 04/09/2026) |
| 04/10/2026 | 80 | Proposed MOTION MOTION FOR STATUS CONFERENCE OR, IN THE ALTERNATIVE, FOR ORDER RESOLVING PENDING SEALING MOTIONS (Docs. 59 & 62) re 62 MOTION in Camera Review, 59 MOTION for Protective Order MOTION to Seal *Motions (Docs. 59 & 62)* by Daitona Carter. (Attachments: # 1 Text of Proposed Order [Proposed] Order on Motion for Status Conference or, in the Alternative, for Order Resolving Pending Sealing Motions (Docs. 59 & 62))(Carter, Daitona) (Entered: 04/10/2026) |
| 04/10/2026 | 81 | NOTICE of Appearance by Eric E Lancaster on behalf of Meta Platforms Technologies, LLC, Meta Platforms, Inc. (Lancaster, Eric) (Entered: 04/10/2026) |
| 04/10/2026 | 82 | |

| | | |
|---|---|---|
| | | RESPONSE to Motion re 58 MOTION to Intervene filed by Solos Technology Limited. (Pasek, Jameson) (Entered: 04/10/2026) |
| 04/10/2026 | 83 | Supplemental AFFIDAVIT in Support re 58 MOTION to Intervene, 62 MOTION in Camera Review *Pursuant to Fed. R. Civ. P. 24* filed by Daitona Carter. (Attachments: # 1 Exhibit Feb 2017 LinkedIn profile excerpt − Tech Lab 2017 − started July 2016 − and related technology projects, # 2 Exhibit July 27, 2017 LinkedIn post − Tech Lab Blog: Public Notes for AR/VR Development, # 3 Exhibit May 2017 Tesseract OCR / computer vision code, # 4 Exhibit Oct 25, 2017 folder − audio−related.wav files and Python script, # 5 Exhibit Early 2019 LinkedIn profile export − tech, audio engineering, marketing, and prototype development background, # 6 Exhibit June 15, 2019 YouNoodle Aria Entrepreneurship World Cup confirmation email., # 7 Exhibit Photos of early smart−glasses prototypes: frame construction, glass−cutting, and design sketches, # 8 Exhibit Screenshots of private video titles: Aria Smart Glasses and Aria Smart Glasses Pitch)(Carter, Daitona) (Entered: 04/10/2026) |
| 04/13/2026 | 84 | MOTION for Leave to File *to Supplement Evidence* by Daitona Carter. (Attachments: # 1 Exhibit Notice of Authentication (Exhibits G, H, and L), # 2 Text of Proposed Order (Proposed) Order re: Forensic Integrity and Digital Interference, # 3 Exhibit Exhibit G: 2017 Technical Sketches and Aria Prototypes, # 4 Exhibit Exhibit H: June 2019 EWC Third−Party Priority Confirmation, # 5 Exhibit Exhibit L: Forensic Map of Financial Interdependence ($35.2B Expansion) and Twilio)(Carter, Daitona) (Entered: 04/13/2026) |
| 04/13/2026 | 85 | Proposed MOTION for Leave to File *TO SUPPLEMENT THE RECORD PURSUANT TO FED. R. CIV. P. 15(d)* by Daitona Carter.(Carter, Daitona) (Entered: 04/13/2026) |
| 04/13/2026 | 86 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 84 Motion for Leave to File Document ; GRANTING 85 Motion for Leave to File Document ; movant, using the Electronic Case Filing System, should now file the documents for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Movant must include − Leave to file granted on (date of order)− in the caption of the document. (CAM) (Entered: 04/13/2026) |
| 04/14/2026 | 87 | NOTICE of Withdrawal of Appearance by Kathleen M. Ritter (Ritter, Kathleen) (Entered: 04/14/2026) |
| 04/14/2026 | 88 | NOTICE of Withdrawal of Appearance by Gary M Ronan (Ronan, Gary) (Entered: 04/14/2026) |
| 04/15/2026 | 89 | REPLY to Response to 44 MOTION to Dismiss filed by EssilorLuxottica USA, Inc., Luxottica of America, Inc., Oakley, Inc.. (Soule, Katherine) (Entered: 04/15/2026) |
| 04/15/2026 | 90 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Currently before the Court is pro se movant Daitona Carter’s (“Carter”) motion to intervene under Federal Rule of Civil Procedure 24. [ECF No. 58 ]. For the following reasons, that motion is denied.<br><br>An applicant may intervene as a matter of right under Rule 24(a) if (1) the application is timely, (2) the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) the applicant is so situated that the disposition of the action may as a practical matter impair or impede her ability to protect that interest; and (4) her interest will not be adequately represented by existing parties. Travelers Indem. Co. v. Dingwell, 884 F.2d 629, 637 (1st Cir. 1989). “Failure to satisfy any single requirement for intervention... is sufficient grounds to deny [the] request.” Victim Rights Law Center v. Rosenfelt, 988 F.3d 556, 560–61 (1st Cir. 2021). Under Rule 24(b)(1)(B), the |

| | | |
|---|---|---|
| | | Court may also “permit anyone to intervene... who has a claim... that shares with the main action a common question of law or fact.” Permissive intervention under Rule 24(b) is “‘wholly discretionary,’ and a court should consider whether intervention will prejudice the existing parties or delay the action.” In re Bos. Sci. Corp. ERISA Litig., 254 F.R.D. 24, 33 n.82 (D. Mass. 2008) (quoting In re Sonus Networks, Inc. Sec. Litig., 229 F.R.D. 339, 345 (D. Mass. 2005)). The Court accepts as true non−conclusory allegations made in support of the motion to intervene. B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 440 F.3d 541, 543 (1st Cir. 2006).<br><br>Here, Carter may not intervene under Rule 24(a) because she has not sufficiently alleged that she has a protectible interest in this action. Carter claims sole inventorship and ownership of the asserted patents under 35 U.S.C. § 256, based on her alleged “prior conception and reduction to practice of the of technologies embodied in the asserted patents.” [ECF No. 58 at 3]. She has not, however, presented non−conclusory allegations to support this claim. See, e.g., Ultravision Techs., LLC v. GoVision, LLC, No. 18−cv−00100, 2020 WL 7261089, at *5 (E.D. Tex. Dec. 9, 2020). To qualify as an inventor of the asserted patents, she must have “contribute[d] to the conception of the invention,” which is “‘the formation... of a definite and permanent idea of the complete and operative invention[,]’... includ[ing] every feature of the subject matter claimed in the patent.” Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998) (quoting Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed. Cir. 1986)). Neither Carter’s motion, [ECF No. 58 ], nor her proposed complaint in intervention, [ECF No. 58−1], nor any of her many other filings to date, [ECF Nos. 70 , 72 , 73 , 77 , 78 , 79 , 83 ], contain non−conclusory allegations suggesting that she contributed to the formation of a definite and permanent idea as to every feature of the subject matter claimed in the asserted patents. Ethicon, Inc., 135 F.3d at 1460; cf.Iceotope Group Limited v. LiquidCool Solutions, Inc., No. 20−cv−02644, 2022 WL 204923, at *3 (D. Minn. Jan. 24, 2022) (holding that allegations that inventors made “unspecified contribution[s] to an assortment of [the asserted] patents or patent applications” were too conclusory to support inventor change under § 256). Accordingly, Carter may not intervene under Rule 24(a).<br><br>The Court also denies Carter’s request for permissive intervention under Rule 24(b). Allowing Carter to intervene here would not only substantially expand the scope of the action to include disputes over inventorship; it would also “unduly hinder the efficient resolution” of this case. T−Mobile Ne. LLC v. Town of Barnstable, 969 F.3d 33, 42 (1st Cir. 2020).<br><br>Accordingly, Carter’s motion to intervene, [ECF No. 58 ], is ***DENIED***, and all her other pending motions are ***DENIED AS MOOT***. (CAM)<br><br>(Entered: 04/15/2026) |
| 04/17/2026 | 91 | Emergency MOTION for Reconsideration *AND RELIEF FROM ORDER* by Daitona Carter. (Attachments: # 1 Supplement, # 2 Supplement, # 3 Exhibit Granted Leave to File April 13, # 4 Exhibit Granted Leave to File April 13eave to File April 13, # 5 Exhibit Granted Leave to File April 13eave to File April 13, # 6 Exhibit Granted Leave to File April 13ave to File April 13, # 7 Exhibit 2009 Prior work and research with DSP/audio, # 8 Exhibit 2013 Earliest documented conception of context−aware AV system, # 9 Exhibit Conception of AI language translation device, # 10 Exhibit Earliest public conception of AI language device, # 11 Exhibit Thermal eye−tracking STL (M−97), # 12 Exhibit Meet Aria − M52−54 (Younoodle EWC Ex H, ), # 13 Exhibit Meetup.com − patent meetup, # 14 Exhibit Samsung |

| | | |
|---|---|---|
| | | patent published (M−100) matches M+ LinkedIn outreach, # 15 Exhibit Twitter post tagging @boztank & @fb about theft of $68B Project ARIA, # 16 Exhibit TIMELINE COMPARISON CHART, # 17 Exhibit Evidence Table)(Carter, Daitona) (Entered: 04/17/2026) |
| 04/17/2026 | 92 | −1 (Entered: 04/17/2026) |
| 04/17/2026 | 93 | CERTIFICATE OF SERVICE pursuant to LR 5.2 by Daitona Carter re 91 Emergency MOTION for Reconsideration *AND RELIEF FROM ORDER*, 92 Notice (Other) . (Attachments: # 1 Meeting to Confer Statement)(Carter, Daitona) (Entered: 04/17/2026) |
| 04/18/2026 | 94 | NOTICE by Daitona Carter re 91 Emergency MOTION for Reconsideration *AND RELIEF FROM ORDER*, 92 Notice (Other) *Notice of Filing Supplemental Evidence (Exhibits M−39 and N)* (Attachments: # 1 Exhibit Exhibit M−39 (The 95−page Security Logs), # 2 Exhibit Exhibit N (The Screenshots of the Docket 92 Error))(Carter, Daitona) (Entered: 04/18/2026) |
| 04/20/2026 | 95 | Emergency MOTION to Vacate 91 Emergency MOTION for Reconsideration *AND RELIEF FROM ORDER* , Emergency MOTION to Stay *Proceedings Pending Determination of Movants Senior Inventorship Rights Under 35 U.S.C. § 256* ( Responses due by 5/4/2026) by Daitona Carter. (Attachments: # 1 Affidavit DECLARATION OF DAITONA CARTER REGARDING NEWLY DISCOVERED EVIDENCE AND SUPPLEMENTAL DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(e), # 2 Exhibit AMAZON EMPLOYMENT − CHRONOLOGICAL OVERLAP IP DEVELOPMENT, # 3 Exhibit EXHIBIT P SUPPLEMENTAL DISCLOSURE OF DERIVATIVE INTEREST META MATERIALS INC. ESTATE (CASE NO. 24−50792, D. NEV.), # 4 Exhibit EXHIBIT Q SUPPLEMENTAL DEMONSTRATIVE EVIDENCE)(Carter, Daitona) (Entered: 04/20/2026) |
| 04/20/2026 | 97 | NOTICE OF APPEAL to the Federal Circuit as to 90 Order by Daitona Carter US District Court Clerk to deliver official record to Court of Appeals by 5/11/2026. (Attachments: # 1 Notice of appearance) **Received by the U.S. Court of Appeals for the Federal Circuit and forwarded to this court in accordance with Federal Rule of Appellate Procedure 4(d).** (CAM) (Entered: 04/21/2026) |
| 04/20/2026 | 98 | MOTION for Administrative Stay Pending Appeal by Daitona Carter. **Received by the U.S. Court of Appeals for the Federal Circuit and forwarded to this court in accordance with Federal Rule of Appellate Procedure 4(d).** (CAM) (Entered: 04/21/2026) |
| 04/21/2026 | 96 | NOTICE by Daitona Carter re 91 Emergency MOTION for Reconsideration *AND RELIEF FROM ORDER* (Carter, Daitona) (Entered: 04/21/2026) |
| 04/21/2026 | 99 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals for the Federal Circuit re 97 Notice of Appeal to the Federal Circuit, (MAP) (Entered: 04/21/2026) |
| 04/22/2026 | 100 | RESPONSE to Motion re 49 MOTION to Dismiss *and Request for Oral Hearing* filed by Solos Technology Limited. (Attachments: # 1 Exhibit, # 2 Exhibit)(Pasek, Jameson) (Entered: 04/22/2026) |
| 04/22/2026 | 101 | USCA for the Federal Circuit Case Number 26−1721 for 97 Notice of Appeal to the Federal Circuit, filed by Daitona Carter. (MAP) (Entered: 04/22/2026) |
| 04/23/2026 | 102 | MOTION for Leave to File *a Reply Memorandum in Further Support of Their Motion to Dismiss* by Meta Platforms Technologies, LLC, Meta Platforms, Inc..(Kamber, Matthias) (Entered: 04/23/2026) |

| | | |
|---|---|---|
| 04/24/2026 | 103 | NOTICE by Daitona Carter re 91 Emergency MOTION for Reconsideration *AND RELIEF FROM ORDER*, 95 Emergency MOTION to Vacate 91 Emergency MOTION for Reconsideration *AND RELIEF FROM ORDER* Emergency MOTION to Stay *Proceedings Pending Determination of Movants Senior Inventorship Rights Under 35 U.S.C. § 256* (Attachments: # 1 Affidavit Supp. Declaration of Daitona Carter re: August 2020 Zoom Meeting Metadata, # 2 Exhibit Exhibits T1−T3: Zoom Stills of John Rossant, Emily Yates; Chris Yeh Blitzscaling)(Carter, Daitona) (Entered: 04/24/2026) |
| 04/27/2026 | 104 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 102 Motion for Leave to File a Reply Memorandum in Further Support of Their Motion to Dismiss ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (KF) (Entered: 04/27/2026) |
| 04/27/2026 | 105 | RESPONSE to Motion re 91 Emergency MOTION for Reconsideration *AND RELIEF FROM ORDER* filed by Solos Technology Limited. (Pasek, Jameson) (Entered: 04/27/2026) |
| 04/29/2026 | 106 | MOTION for Leave to File Reply to Response by Daitona Carter. (Attachments: # 1 Exhibit V−1, # 2 Exhibit V−2)(CAM) (Entered: 04/29/2026) |
| 04/29/2026 | 107 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Pro se movant Daitona Carter's motion for leave to file a reply, [ECF No. 106 ], is **GRANTED**.<br><br>Carter moves for reconsideration of the Court’s order, [ECF No. 90 ], denying her request for intervention, [ECF Nos. 91 , 95 ], and for a stay pending her appeal of that order, [ECF No. 98 ].<br><br>The Court considers Carter’s motions for reconsideration under the Rule 59(e) standard. See Perez−Perez v. Popular Leasing Rental, Inc., 993 F.2d 281, 284 (1st Cir. 1993). The granting of a motion for reconsideration is “an extraordinary remedy” that is only warranted if “newly discovered evidence... has come to light or... the rendering court committed a manifest error of law.” Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006) (citation omitted). “[S]imple disagreement with the court’s decision is not a basis for reconsideration.” Ofori v. Ruby Tuesday, Inc., 205 F. App’x 851, 853 (1st Cir. 2006). Courts have “substantial discretion” and “broad authority” to allow or deny reconsideration. Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 81–82 (1st Cir. 2008).<br><br>Carter’s filings do not meet the standard for reconsideration. As an initial matter, Carter has not sufficiently shown that anything contained in the filings qualifies as “newly discovered” within the meaning of Rule 59(e), in the sense that it was not previously available to her. See Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 931 (1st Cir. 2014). More importantly, what she has submitted does not cure the defect identified in the Court’s prior order, namely, that Carter has not sufficiently alleged that she conceived of or contributed to the conception of the inventions at issue in this litigation. See Glob. Health Sols. LLC v. Selner, 148 F.4th 1363, 1371 (Fed. Cir. 2025) (noting that, to prove derivation, a party “must produce evidence sufficient to show (i) conception of the claimed invention, and (ii) communication of the conceived invention to the respondent prior to respondent's filing of that patent application”); BearBox LLC v. Lancium LLC, 125 F.4th 1101, 1118 (Fed. Cir. 2025) (noting that “[a]n alleged joint inventor must show that he contributed significantly to the conception... or reduction to practice of at |

| | | |
|---|---|---|
| | | least one claim” and that the “contributions... arise from ‘some element of joint behavior... ’ with the other inventors” (citation omitted)). As Solos notes, Carter’s filings reflect, at most, “generalized work in smart glasses technology, software concepts, or prior projects,” without identifying any “concrete, claim−level contributions.” [ECF No. 105 at 7]. Accordingly, Carter’s motions for reconsideration are ***DENIED***.<br><br>Before seeking a stay pending appeal from the court of appeals, a person “must ordinarily move first in the district court,” Fed. R. App. P. 8(a)(1), but the standard governing its issuance is “generally the same” in both, Hilton v. Braunskill, 481 U.S. 770, 776 (1987). A stay is “‘an exercise of judicial discretion’ and ‘[t]he propriety of its issue is dependent upon the circumstances of the particular case.’” Nken v. Holder, 556 U.S. 418, 433 (2009) (quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672–73 (1926)). To obtain a stay, Carter must “(1) make a ‘strong showing that [she is] likely to succeed on the merits’ in [her] appeal; (2) show that [she] ‘will be irreparably injured absent a stay’; (3) show that ‘issuance of the stay will [not] substantially injure the other parties interested in the proceeding’; and (4) show that the stay would serve ‘the public interest.’” New York v. Trump, 133 F.4th 51, 65 (1st Cir. 2025) (quoting Nken, 556 U.S. at 434). “The first two factors... are the most critical.” Nken, 556 U.S. at 434.<br><br>Carter is not entitled to a stay pending appeal. She has not made a strong showing that she is likely to succeed on the merits, identifying no authority that clearly supports her request for intervention under the circumstances. Given the weakness of her showing on the merits, even her assertions of serious harm—at least some of which appear unrelated to the present action, [ECF No. 98 at 1–2]—do not carry the day. See Braintree Lab'ys, Inc. v. Citigroup Global Markets Inc., 622 F.3d 36, 42 (1st Cir. 2010). Because Carter has not satisfied her burden on the first two factors, the Court need not consider the remaining factors. Carter’s motion for a stay pending appeal is ***DENIED***.<br><br>Finally, Carter is reminded that the local rules require motions and supporting materials to be filed at the same time, L.R. 7.1(a), and encouraged to refrain from filing further documents that substantially duplicate or repeat material contained in prior filings. Carter is further reminded that the Court has discretion to rescind electronic filing privileges if those privileges are abused.<br><br>(CAM) (Entered: 04/29/2026) |
| 04/30/2026 | 108 | REPLY to Response to 49 MOTION to Dismiss *and Request for Oral Hearing* filed by Meta Platforms Technologies, LLC, Meta Platforms, Inc.. (Kamber, Matthias) (Entered: 04/30/2026) |
| 04/30/2026 | 109 | DECLARATION re 108 Reply to Response to Motion *ISO Defendants' Motion to Dismiss* by Meta Platforms Technologies, LLC, Meta Platforms, Inc.. (Attachments: # 1 Exhibit 9, # 2 Exhibit 10, # 3 Exhibit 11, # 4 Exhibit 12, # 5 Exhibit 13, # 6 Exhibit 14, # 7 Exhibit 15)(Kamber, Matthias) (Entered: 04/30/2026) |
| 05/04/2026 | 110 | MOTION Vacatur of Order of Dismissal and Relief from Judgment pursuant to Fed. R. Civ. P. 60(b)(3), (b)(6), and 60(d)(3) re 107 Order,,,,,,,,,,,,,,,,,,,, Terminate Motions,,,,,,,,,,,,,,,,,,, , MOTION to Vacate 107 Order,,,,,,,,,,,,,,,,,,,, Terminate Motions,,,,,,,,,,,,,,,,,,, ( Responses due by 5/18/2026) by Daitona Carter. (Attachments: # 1 Exhibit Notice of Candor, # 2 Exhibit Federal Appeals − Emergency Report (Ongoing Interference), # 3 Exhibit |

| | | |
|---|---|---|
| | | state−sponsored malware discovery and the nexus to the ongoing obstruction of Petitioners legal work product, # 4 Exhibit 20172019 "Aria" Field Tests and Industry Validation, # 5 Exhibit "Verbatim Adoption", # 6 Exhibit Documentation of physical interference and theft, # 7 Exhibit Technical Specificity & Derivation Comparison, # 8 Exhibit Physical courier logs regarding the 200 lb feight, # 9 Exhibit Bank closure records and mail−tampering evidence, # 10 Affidavit [Proposed] Order Granting Movant Daitona Carters Motion To Vacate Order [Ecf No. 107] And For Relief From Judgment, # 11 Text of Proposed Order [Proposed] Order Granting Movant Daitona Carters Motion To Vacate Order [Ecf No. 107] And For Relief From Judgment)(Carter, Daitona) (Entered: 05/04/2026) |
| 05/05/2026 | 111 | CERTIFICATE OF CONSULTATION pursuant to LR 7.1 re 110 MOTION Vacatur of Order of Dismissal and Relief from Judgment pursuant to Fed. R. Civ. P. 60(b)(3), (b)(6), and 60(d)(3) re 107 Order,,,,,,,,,,,,,,,,,,,, Terminate Motions,,,,,,,,,,,,,,,,,,, MOTION to Vacate 107 Order,,,,,,,,,,,,,,,,,,,, Terminate Motions,,,,,,,,,,,,,,,,,,, by Daitona Carter. (Carter, Daitona) (Entered: 05/05/2026) |
| 05/07/2026 | 112 | RESPONSE to Motion re 110 MOTION Vacatur of Order of Dismissal and Relief from Judgment pursuant to Fed. R. Civ. P. 60(b)(3), (b)(6), and 60(d)(3) re 107 Order,,,,,,,,,,,,,,,,,,,, Terminate Motions,,,,,,,,,,,,,,,,,,, MOTION to Vacate 107 Order,,,,,,,,,,,,,,,,,,,, Terminate Motions,,,,,,,,,,,,,,,,,,, filed by Solos Technology Limited. (Pasek, Jameson) (Entered: 05/07/2026) |
| 05/08/2026 | 113 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Pro se movant Daitona Carter’s motion to vacate the Court’s prior order denying her request for reconsideration, [ECF No. 110 ], is ***DENIED***.<br><br>Carter’s motion invokes Federal Rules of Civil Procedure 60(b)(3), 60(b)(6), and 60(d)(3). [ECF No. 110 at 1]. Relief under Rule 60(b) is “extraordinary in nature,” and a district court does not abuse its discretion in summarily denying a Rule 60(b) motion that “simply restate[s] the arguments already fully considered and rejected by the court in its previous ruling.” Diaz v. Gonzales, 167 F. App'x 820, 822 (1st Cir. 2006). To satisfy Rule 60(b)(3), Carter “‘must demonstrate misconduct—such as fraud or misrepresentation—by clear and convincing evidence’ and ‘show that the misconduct foreclosed full and fair preparation or presentation of [her] case.’” Giroux v. Fed. Nat. Mortg. Ass'n, 810 F.3d 103, 108 (1st Cir. 2016) (quoting Karak v. Bursaw Oil Corp., 288 F.3d 15, 21 (1st Cir. 2002)). “[R]elief under Rule 60(b)(6) is available only in narrow circumstances,” that is, “when Rules 60(b)(1) through (b)(5) are inapplicable” and “extraordinary circumstances... justify reopening.” BLOM Bank SAL v. Honickman, 605 U.S. 204, 211 (2025) (citation modified). For a court to “set aside a judgment for fraud on the court” under Rule 60(d)(3), there must be a showing of “an unconscionable scheme or the most egregious conduct designed to corrupt the judicial process.” Fontanillas−Lopez v. Morell Bauza Cartagena & Dapena, LLC, 832 F.3d 50, 63 n.11 (1st Cir. 2016) (quoting LinkCo, Inc. v. NaoyukiAkikusa, 367 F. App’x 180, 182 (2d Cir. 2010)); see also Gillis v. Chase, 894 F.3d 1, 4 (1st Cir. 2018) (“[F]raud on the court requires interference with the judicial process itself, such as bribery of a judge.”).<br><br>Carter’s motion does not satisfy Rule 60(b) or (d). It appears primarily to restate arguments that the Court already considered and rejected in ruling on Carter’s prior motion to intervene and motions for reconsideration. See [ECF No. 90]; [ECF No. 107]. Carter has not shown misconduct, such as fraud or misrepresentation, by clear and convincing evidence, as required for relief under Rule 60(b)(3). By the same token, she has |

| | | |
|---|---|---|
| | | not shown any interference with the judicial process amounting to fraud on the court, as required for relief under Rule 60(d)(3). Finally, she has not shown extraordinary circumstances sufficient to satisfy the strict Rule 60(b)(6) standard. Accordingly, her motion to vacate, [ECF No. 110 ], is ***DENIED***.<br><br>The Court notes that this is Carter’s third motion for reconsideration of its denial of her motion to intervene, and that it substantially restates arguments advanced in Carter’s prior filings. See [ECF Nos. 91 , 95 , 110 ]. Accordingly, the Court orders that, during the pendency of her appeal, Carter must request leave of the Court before filing any further materials related to her request for intervention. Any further filings by Carter related to her request for intervention during the pendency of her appeal without prior leave of the Court will be struck. Should this not deter Carter, the Court will consider terminating her electronic filing privileges. As Carter is aware, her recourse now lies with the Court of Appeals.<br><br>(CAM) (Entered: 05/08/2026) |
| 05/17/2026 | 114 | NOTICE OF APPEAL to the Federal Circuit as to 90 , 107 , 113 Order on Motion for Miscellaneous Relief,,,,,,,,,,,,,, Order on Motion to Vacate,,,,,,,,,,,,, by Daitona Carter US District Court Clerk to deliver official record to Court of Appeals by 6/8/2026. (Carter, Daitona) Modified on 5/18/2026 to Create relationship to document #90, document #107. (CAM). (Entered: 05/17/2026) |
| 05/18/2026 | 115 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals for the Federal Circuit re 114 Notice of Appeal to the Federal Circuit. (CAM) (Entered: 05/18/2026) |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**SOLOS TECHNOLOGY LIMITED,**
*Plaintiff,*

**v.**

**META PLATFORMS, INC., et al.,**
*Defendants.*

**Case No. 1:26-cv-10304-ADB**
Judge Allison D. Burroughs

**In re: DAITONA CARTER**
*Petitioner/Intervenor.*

**PETITIONER'S MOTION TO VACATE MOOTNESS ORDER AND FOR RELIEF FROM JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)(3), (b)(6) AND 60(d)(3) AS AN INDEPENDENT ACTION**

## I. INTRODUCTION AND PRELIMINARY STATEMENT

Petitioner Daitona Carter ("Petitioner") respectfully moves this Court to vacate the Mootness Order and for relief from the Order entered on April 29, 2026 (ECF No. 107), pursuant to Fed. R. Civ. P. 60(b)(3), (b)(6), and 60(d)(3).

**NOTICE OF LODGING OF SENSITIVE PHYSICAL EVIDENCE:** Petitioner possesses the courier logs for the 200 lb private hardware box (which vanished and was systematically lightened in transit) and records of financial deplatforming. Due to the high risk of physical retaliation and the ongoing "constructive seizure" of Petitioner, these logs are withheld from the public docket and are available for *In Camera* review by the Court or the U.S. Marshals Service only.

This Independent Action is necessitated by a fraud upon the court and extraordinary circumstances that have rendered the prior proceedings a legal nullity. Pursuant to 28 U.S.C. § 1746, I, Daitona Carter, declare under penalty of perjury:

A) **Originality and Priority:** I am the original creator of the Smart Glasses architecture—including the software features, Habitual Algorithm (Habit AI) framework, multimodal sensors, and optical display—and owner/manager of the Acoustic Logic (MirrorMixing/DSP) case studies (2009–Present which predate the existence of Solos Technology Limited and Meta Platforms.

B) **Administrative Suppression:** I affirm that ECF No. 92 was suppressed and restricted (marked "-1") starting April 17, 2026. This administrative "blackout" of my technical record is inconsistent with the Court's April 29 finding that my work is "generalized," as the Court issued its ruling without access to the very evidence that proves claim-level specificity.

C) **Newly Discovered Evidence (APT):** On May 2, 2026, I discovered active APT/state-sponsored malware on utilized devices. This discovery, made after the Court's order, demonstrates a multi-channel effort to block my access to justice and compromise my legal work product.

D) **Physical Duress and Battery:** I have been subjected to ongoing physical battery and assault specifically timed during court filing windows to prevent me from rebutting Solos's misrepresentations and establishing my senior inventorship rights.

E) **Irreparable Harm:** I have suffered and continue to suffer irreparable physical, financial, and reputational harm due to the Court's verbatim adoption of Plaintiff's mischaracterizations into the public record while I am held in a state of constructive seizure.

F) **Reduction to Practice via Industry Validation:** Between 2017 and 2019, I conducted live field tests of the "Aria" multimodal prototype. These tests, documented via Instagram Live (Series @SEEMYBIAS.official), provided empirical data on directional audio tracking and sensor fusion. Industry validators, including V, J-Hope and RapMon of BTS, Jay Park, Dayhun of TWICE and Siwon Choi, directly interacted with the hardware, providing a "human timestamp" of the device's functionality. Public user feedback in the live-stream chats (e.g., "Jay Park keeps looking at you") confirms the real-time accuracy of the tracking logic I developed years before Meta's 2020 announcement.

G) **6. Distributed Data Collection and distributed "Nurture/SMB" Training:** Petitioner's AI was trained from scratch using a distributed network of hardware—specifically iPhones—to capture multimodal behavioral data. Between 2017 and 2019, Petitioner and the "SMB Fam" utilized their personal devices as "field sensors" during live events to feed the Habitual Algorithm. Unlike Meta's "Project Aria," which sought to simulate environmental data, Petitioner's methodology relied on Live Field Testing within the high-interference environment of the K-Pop industry. This distributed data collection proves that the "Nurture" logic was fully functional and engaged in active machine learning years before the Defendants' commercialized their versions.

H) **Creation of the Global "K-Pop Frenzy" as an AI Stress Test:** Petitioner spent 20 years in marketing and industry development, utilizing her personal budget to create the global "Korean Frenzy" that preceded the 2020 market explosion. Between 2016 and 2020, Petitioner utilized a massive, distributed field-testing network involving the SMB Fam and live-data capture from global icons, including but not limited to BTS, Blackpink, Big Bang, EXO, GOT7, Twice, Sunmi, WINNER, Sik-K, Red Velvet, Jay Park, Jessi, Monsta X, Day 6. Stray Kids**,** and major

festivals like KCON LA and KCON NYC including establishing relationship with recurrent panelists and content creators.

This was not "fan activity"; it was a coordinated Technical Stress Test for Petitioner's multimodal AI. The interactions with industry leaders like Jay Park, TWICE, Super Junior**,** etc provided the high-density behavioral and spatial audio data required to "Nurture" Petitioner's Habitual Algorithm. The Defendants' subsequent launch of "Project Aria" and "Smart Glasses" in 2020-2021 directly capitalizes on the market demand and technical infrastructure Petitioner alone established and financed. Petitioner identifies these industry leaders and events not as participants in the fraud, but as involuntary validators of Petitioner's prior art. Their recognition and participation in Petitioner's field tests provide the necessary 'Particularity' to overcome the Court's previous finding of mootness and to prove that Petitioner's architecture was the foundational engine for the global K-Pop tech market.

I) **Direct Executive Access and the "Insider Pipeline":** Petitioner's development of the "Aria" architecture was supported by a unique, non-commodifiable advantage: direct, bilingual access to the highest echelons of the Korean music and technology industries. Unlike the Defendants, who relied on generalized market research, Petitioner maintained personal and professional proximity to executives and celebrities—including the Bangtan Sonyeondan (BTS) circle—which provided a high-fidelity "Live" environment for the development of the Habitual Algorithm. This insider access allowed Petitioner to build the "Nurture" logic from within the industry, creating a proprietary technical and cultural "blueprint" that was subsequently extracted by the Defendants. This level of access represents a professional advantage that "money cannot buy" and serves as the foundation for Petitioner's senior inventorship claims.

**J) The "Double-Edged Sword" of Growing Notoriety and Systematic Extraction:** As Petitioner's reputation and access within the global Korean entertainment network expanded—

spanning members of Bangtan Sonyeondan (BTS) to the inner circles of journalists and executives—it created a "Double-Edged Sword." While this network served as the essential source of "live" data for the Habitual Algorithm, it simultaneously provided the Defendants with an ideal environment to monitor and misappropriated Petitioner's intellectual property. Petitioner's industry presence acted as a "beacon" for the systematic extraction of the Aria architecture.

Furthermore, the current posture of this litigation reveals a secondary layer of misappropriation: if Plaintiff Solos maintains that Meta is infringing upon its patents, it effectively concedes that its own portfolio is a derivative of the Petitioner's original work. Solos seeks to benefit from the Petitioner's innovation through litigation, while Meta remains the primary beneficiary of the initial theft. This transition from "Collaborator" to "Target" facilitated the laundering of Petitioner's technology into the Defendants' respective portfolios, occurring while Meta and its agents conducted the active surveillance, "constructive seizure," and physical battery described herein. Consequently, because the Defendants continue to benefit from and assert rights over this derivative property, the controversy remains live, necessitating the vacatur of the mootness ruling and the granting of the requested relief.

K) **Systematic Suppression and Misappropriation of Marketing Intellectual Property:** The Petitioner declares that the "SEEMYBIAS" marketing and global activation framework was systematically extracted and exploited by the Defendants and their coordinated third parties. While the Petitioner's business entities were subjected to targeted "shadowbanning" and administrative restrictions on Meta's platforms, the Petitioner's original marketing blueprints were utilized to scale CokoDive (subsequently acquired) and to facilitate Meta's Oculus x Blackpink VR activations. This sequence of events demonstrates a coordinated effort to "launder" the Petitioner's commercial goodwill and strategic infrastructure into the Defendants'

ecosystem while simultaneously silencing the Petitioner through platform-wide administrative suppression.

L) Technological Extraction and Patent Laundering: While Meta attempted to secure a position in the "Smart Glasses" market through a non-functional 2021 MIT study, the Petitioner was already managing a functional, insider-led technical pilot. The Defendants leveraged their platform dominance to engage in "data stripping" of the Petitioner's proprietary pilot results. This high-level industry work was effectively laundered into the Defendants' own patent filings, constituting a misappropriation of trade secrets and a breach of the competitive landscape. This transition from "Collaborator" to "Target" facilitated the unauthorized transfer of the Petitioner's Aria architecture into the Defendants' portfolios, occurring under the guise of the surveillance and "constructive seizure" detailed herein.

## II. ERROR OF LAW: INTERVENTION IS NOT A MINI-TRIAL

The Court's April 29 Order constitutes a manifest error of law by misapplying the standard for intervention under Fed. R. Civ. P. 24(a)(2) and conflating it with the evidentiary burdens of a patent infringement trial.

### A) The Erroneous Burden of "Concrete Contributions"

The Court erroneously required Petitioner to prove "concrete, claim-level contributions" at the threshold stage. Rule 24 governs party status, not the ultimate merits of the underlying dispute. Under the First Circuit standard, an intervenor need only show an "interest relating to the property or transaction that is the subject of the action." *Public Service Co. of N.H. v. Patch*, 136 F.3d 197, 204 (1st Cir. 1998).

1. **The Protected Interest:** Petitioner's 2009 audio notes and Acoustic Logic (MirrorMixing/DSP) case studies—which predate Solos's corporate existence—constitute a "significantly protectable interest" that is being irreparably harmed.

2. **Threshold vs. Merits:** By demanding a "mini-trial" on patent elements before granting status, the Court effectively required Petitioner to prove her case before she was even allowed into the courtroom.

**B) The Tactical Conflation of the Federal Rules**

Throughout this litigation, Plaintiff's counsel has used Rule 24, Rule 26(c), Rule 16, and Rule 65 interchangeably to obstruct Petitioner's entry. These rules serve distinct functions that the Court failed to keep separate:

1. **Rule 24 (Intervention):** Establishes the right to participate as a party.

2. **Rule 26(c) (Protective Orders):** Authorizes courts to protect a person from "undue burden" or "prejudice" upon a showing of good cause. It is  limited exclusively to active discovery disputes, as Plaintiff falsely claims.

3. **Rule 16 (Case Management):** Governs scheduling, not the stripping of constitutional Due Process rights.

4. **Rule 65 (Injunctions):** Governs the high bar for equitable relief, which is a separate inquiry from the right to protect one's intellectual property via intervention.

**D) Statutory Derivation under 35 U.S.C. § 102**

Petitioner's documentation—including 2009 technical benchmarks submitted to the Court as ECF No. 92—constitutes prior art under 35 U.S.C. § 102.

1. **The Derivation Link:** This evidence demonstrates that the technology claimed in the disputed patent is derived from Petitioner's pre-existing Acoustic Logic (MirrorMixing/DSP) casework.

2. **Impairment of Interest:** Under 35 U.S.C. § 102(b)(1)(A), the disposition of this action directly impairs Petitioner's legal interest. An adverse judgment between Solos and Meta could improperly validate a patent that was derived from Petitioner's invention without attribution.

3. **Inadequacy of Representation:** The named Defendant (Meta) cannot adequately represent Petitioner's interest, as Meta lacks both the knowledge of and access to Petitioner's proprietary 2009–2019 development record.

Petitioner satisfies all prongs of Rule 24(a)(2). The Court's adoption of a "mini-trial" standard is a reversible error of law that necessitates vacatur of the Mootness Order.

## III. THE PROCEDURAL CONTRADICTION: INHERENT LOGICAL ERROR

The Court's April 29 Order adopted Plaintiff's characterization of Petitioner's priority work (2009–2019) as "generalized." However, the record reflects that ECF No. 92 has been administratively suppressed (marked as "-1") since approximately April 17, 2026. This creates an unsustainable legal contradiction: The Court cannot simultaneously treat evidence as "generalized" or "unconceptualized" while it is subject to a high-level administrative suppression typically reserved for matters of National Security**.** If the material is sufficiently specific to warrant suppression from the public record, it is *per se* specific enough to satisfy the "significantly protectable interest" threshold for intervention under Fed. R. Civ. P. 24.

Furthermore, this administrative suppression itself evidences the specificity and sensitivity of Petitioner's prior work. Material that rises to the level of administrative classification or national security-related redaction necessarily contains technical particularity and substantive content—the precise opposite of "generalized" work product. The Court's simultaneous reliance on Plaintiff's "generalized" characterization while withholding the actual evidence from public disclosure is logically incoherent and undermines the judicial process. Petitioner cannot adequately defend against characterizations of work the Court has deemed sensitive enough to suppress, nor can the Court properly adjudicate Petitioner's intervention rights without examining the very evidence it has administratively restricted. This procedural anomaly further demonstrates that Petitioner has satisfied Rule 24(a)(2)'s requirement of a "significantly protectable interest" that cannot be adequately represented by existing parties.

The Court’s prior orders regarding mootness and reconsideration were predicated on a manifest procedural error: the failure to rule on Petitioner’s motions for a Protective Order and In Camera Review. This inaction created a legal impossibility for the Petitioner to establish the full scope of her 2009 priority work.

A) **The Blocked Disclosure:** Without a ruling on these protective motions, Petitioner was procedurally barred from disclosing a high-security evidentiary export: a full Facebook Data Export of her account. This export contains a 4,000-person Facebook contact list—including high-level politicians, celebrities, and venture capitalists—that establishes a direct, undeniable "nexus of access."

B) **Verification of the "State Actor" Nexus:** This suppressed export highlights that Quang Pham, Jahde Barnes, and Northrop Grumman were linked as "friends" or "contacts" as early as 2013. This evidence proves that the Defendants and their defense-contractor affiliates had direct

access to Petitioner’s technical logic long before the Solos patents were filed or Meta claimed inventorship.

C) **Priority of Invention:** Because this social media export predates the claims of both Plaintiff and Defendant, it is the "smoking gun" for 35 U.S.C. § 256 inventorship correction. The Court’s failure to provide a secure mechanism (In Camera review) to view this list resulted in a judgment based on a hollow record.

**IV. THE ALICE/SUPPRESSION CONTRADICTION: FRAUD ON THE TRIBUNAL**

The Court’s April 29 Order reflects a verbatim adoption of Plaintiff’s characterization that Petitioner’s 2009–2019 work is “generalized.” This triggers a fatal contradiction under 35 U.S.C. § 101 (The Alice Doctrine) and the Invention Secrecy Act (35 U.S.C. § 181).

1. **The Suppression:** The administrative suppression of ECF No. 92 (marked "-1" since April 17) suggests a determination that the technology is sensitive to National Security.

2. **The Contradiction:** Under the *Alice* standard, "generalized" or "abstract" ideas cannot be patented—nor do they warrant National Security suppression. By adopting Solos's "generalized" label while maintaining the suppression of the technical record, the Court is participating in a "legal fiction" that facilitates the theft of Petitioner's priority work. The court [cannot] suppress information for security reasons while simultaneously dismissing it as "unconceptualized."

The Court's April 29 Order adopted Plaintiff's characterization that Petitioner's 2009–2019 work is "generalized." However, the record reflects that ECF No. 92 has been administratively suppressed (marked as "-1" since approximately April 17, 2026. This creates an unsustainable legal contradiction: The Court cannot simultaneously treat evidence as "generalized" or "unconceptualized" while it is subject to a high-level administrative suppression typically reserved for matters of National Security. If

the material is sufficiently specific to warrant suppression from the public record, it is per se specific enough to satisfy the "significantly protectable interest" threshold for intervention under Fed. R. Civ. P. 24.

The Court’s adoption of the 'generalized' label is factually refuted by the Acoustic Logic (MirrorMixing)DSP documentation in ECF No. 92. This documentation includes specific algorithmic benchmarks for signal processing that predate Solos’s filing by a decade. Under the Alice Doctrine, specific technical improvements to signal processing are not 'abstract'—they are the definition of patentable subject matter.

Furthermore, the April 29 Order contains factually false findings directly contradicted by evidence Petitioner submitted to the Court. The Court states: "As Solos notes, Carter's filings reflect, at most, 'generalized work in smart glasses technology, software concepts, or prior projects,' without identifying any 'concrete, claim-level contributions.'" [ECF No. 107 at 3]. This statement is demonstrably false.

**A) The Documentary Evidence Contradicts the Court's Finding:**

Petitioner submitted ECF No. 83, Attachment 8, containing video screenshots with specific product titles: "Aria Smart Glasses" and "Aria Smart Glasses Pitch." These are not generalized concepts—they are evidence of a named, conceived product with specific implementation. The video snippets, publicly available on YouTube, Instagram, and restricted LinkedIn, demonstrate working prototypes with specific gestural interactions years before Solos or Meta patented or announced their projects.

Petitioner also submitted ECF No. 92: 65 files of lab notes and technical documentation spanning 2009–2019, with specific smart glasses development work from 2013–2019. These files constitute concrete, claim-level contributions—precisely the type of "conception and communication" evidence required under Federal Circuit derivation standards. See Global

Health Sols. LLC v. Selner, 148 F.4th 1363, 1371 (Fed. Cir. 2025); BearBox LLC v. Lancium LLC, 125 F.4th 1101, 1118 (Fed. Cir. 2025).

**B) The Court Did Not Examine the Evidence:**

The April 29 Order's language—adopting verbatim Solos's characterization from ECF No. 105 at 7—reveals that the Court did not independently review the evidence Petitioner submitted. The Court accepted Plaintiff's false description without examining ECF No. 83, ECF No. 92, or the public video demonstrations. This constitutes a failure to consider material evidence on the record, a reversible abuse of discretion.

**C) Priority Of Invention: The 2009–2019 Foundational Timeline**

Relief from judgment is necessitated by the Petitioner's clear priority of invention, which predates both the Plaintiff's and the Defendants' claims. This is not an abstract temporal logic; it is a calendar fact supported by the dated documentation within the suppressed ECF No. 92.

1. **Petitioner's Priority (2009–2019):** Petitioner's technical lab notes and multimodal sensor fusion logic began in 2009. Functional smart glasses prototypes, featuring the specific gestural implementations currently at issue, were reduced to practice between 2013 and 2019.

2. **Solos' Filing Dates (2019):** Plaintiff Solos Technology Limited was not spun off from Kopin Corporation until September 2019, and its primary patents cited in the complaint (e.g., USD900092S1) have priority dates no earlier than February 5, 2019.

3. **Meta's Timeline (2020–2021):** Defendant Meta did not announce Project Aria until September 16, 2020, and did not commercialize its first smart glasses (Ray-Ban Stories) until September 2021.

4. **The Blue Radios "Golden-I" Pretext And Procedural Fraud:** Plaintiff Solos attempts to insulate itself from Petitioner's claims of senior inventorship by invoking a 2004 BlueRadios priority date. This is a manifest misrepresentation of the technical record. The "Golden-i" technology associated with BlueRadios is fundamentally distinct from the patents-in-suit; it is an industrial data-headset lacking the multimodal sensor fusion, Digital Signal Processing (DSP) logic, and behavioral learning loops that Petitioner reduced to practice between 2009 and 2019. By tethering modern "Smart Glasses" architecture to 20-year-old legacy hardware that lacks the "Anticipatory AI" core, Plaintiff is perpetrating a procedural fraud. This "legal fiction" is designed to create a false timeline of invention that bypasses Petitioner's foundational Acoustic Logic (MirrorMixing) and Habit AI work. Petitioner's 2016–2019 technical blueprints—specifically the "Nurture" behavioral model—constitute the true functional engine of the disputed technology, rendering the Plaintiff's reliance on the BlueRadios portfolio a technical and legal nullity.

**D) Legal Implications of the Timeline:**

Petitioner's documented work predates the parties' filings by years, establishing statutory priority under 35 U.S.C. § 102 (Prior Art) and 35 U.S.C. § 101. Furthermore, the evidence of direct access by recruiters and defense contractors (Quang Pham and Northrop Grumman) as early as 2013 points to derivation without attribution under 35 U.S.C. § 102(b)(1)(A).

To "moot" the Petitioner's intervention without reviewing the 2009–2013 technical benchmarks in ECF No. 92 is to allow the Plaintiff and Defendant to litigate over a "secondary" invention while suppressing the primary foundational logic.

**E) The Suppression Enabled the False Characterization:**

The administrative suppression of ECF No. 92 since April 17, 2026, created an asymmetry that Solos exploited. By restricting access to the 65 files of technical documentation, the Court and Plaintiff could argue Petitioner had shown nothing concrete without fear of factual= contradiction. The suppression mechanism was instrumentally used to obscure evidence and upport a factually false ruling. The Court cited Plaintiff's characterization without ever examining the evidence it had administratively restricted—a procedural inversion that violates the basic fairness required for judicial decision-making.

Finally, Petitioner cannot be said to have received fair adjudication of its Rule 24(a)(2) intervention rights when the Court accepted false characterizations of evidence Petitioner actually submitted. The Court's simultaneous reliance on suppression (which presupposes specificity) and adoption of the "generalized" label (which presupposes the opposite) demonstrates not merely logical inconsistency, but a denial of due process. Petitioner must be permitted to intervene in order to present the evidence that proves its conception, priority, and significantly protectable interest—evidence the Court has now ruled on without examining.

## V. FEDERAL TAKINGS LIABILITY AND FRAUD ON THE COURT

If Petitioner's technology—the subject of this suppression—has been integrated into federal military or national security programs, the suppression involves state action beyond the scope of private discovery disputes. This integration constitutes state action that extends this matter beyond a mere private discovery dispute between Solos and Meta. Specifically:

**A) Evidence of Government Benefit and the Takings**

**Nexus** Petitioner has identified evidence that her foundational smart glasses technology and multimodal sensor fusion logic (Priority Date: 2009) are currently utilized by the Department of Defense via U.S. ARMY Project ARIA. If confirmed, the federal government is benefiting from Petitioner's IP without attribution or compensation, triggering Takings Clause liability under the Fifth Amendment.

Pursuant to 28 U.S.C. § 1491, such claims fall within the exclusive jurisdiction of the United States Court of Federal Claims. If the current suppression is part of a larger pattern to utilize Petitioner's IP without compensation, this District Court lacks jurisdiction to "moot" the matter, as doing so would shield a federal taking from constitutional scrutiny.

- **The Taking:** If the federal government is utilizing Petitioner's IP without attribution or compensation, it triggers a Takings Clause claim under the Fifth Amendment.
- **The Jurisdictional Conflict:** Under the Tucker Act (28 U.S.C. § 1491**)**, claims for "just compensation" against the United States fall under the exclusive jurisdiction of the U.S. Court of Federal Claims. By suppressing evidence of this integration (e.g., ECF No. 92), this District Court may be inadvertently shielding a federal taking from appellate and civilian oversight.

**B) "Detachment 201" and the State-Action Nexus**

The "State Actor" status of the Defendants is formalized via Detachment 201 **(**Executive Innovation Corps**)**. The direct commissioning of Meta CTO Andrew Bosworth and Palantir CTO Shyam Sankar as Lieutenant Colonels proves this unit serves as a bridge for integrating Petitioner's logic into national security assets.

Consequently, the "rubber stamped" suppression of 65 exhibits—including lab notes and technical documents in Exhibit 92 and ECF No. 94—serves a dual purpose: protecting corporate profits and shielding a military-industrial "venture" from civilian oversight. The government

cannot simultaneously claim Petitioner's invention must be suppressed for national security while integrating that same invention into military assets without attribution. This constitutes a misuse of the State Secrets Privilege to hide theft rather than protect secrets.

**C) Priority of Invention and the Recruiter Nexus**

While Solos Technology Limited sues Meta over five patents, Petitioner's foundational work predates both parties. Petitioner has evidence that technical recruiters mentioned in the Solos complaint—specifically Quang Pham and Jahde Barnes—were following Petitioner private/restricted account on social media as early as 2013. Further, Petitioner's work was possibly funneled to defense contractor Northrop Grumman (based on the company also following the Petitioner private account**)**, establishing that the "private" tech currently litigated is already absorbed into the national security infrastructure.

**D) MISUSE OF PRIVILEGE AND IRREPARABLE HARM**

If the technology in question is classified as a "military advisory asset" under the auspices of Detachment 201, the Defendants are effectively utilizing "sovereign privilege" to block the Petitioner's statutory rights under 35 U.S.C. § 256. This creates a procedural barrier that constitutes a manifest injustice under Rule 60(b)(6).

1. **Shielding Theft vs. Protecting Secrets:** The government cannot, consistent with the Fifth Amendment, simultaneously absorb Petitioner's foundational technology into military assets while claiming that evidence of Petitioner's prior invention (predating the parties' claims) must be suppressed for national security. Such a "dual-use" justification serves only to shield the act of misappropriation from judicial review.

2. **Misuse of the State Secrets Privilege:** If the suppression of Exhibit 92 or ECF No. 94 was directed or requested by federal agencies or independent federal contractors (e.g., Northrop Grumman), it constitutes a misuse of the State Secrets Privilege. The privilege

is intended to protect military tactics and assets—not to conceal the underlying misappropriation of intellectual property from a civilian inventor.

To allow a "sovereign privilege" to be invoked in a private patent dispute between Solos and Meta, where Petitioner has a 2009 priority claim, ensures irreparable harm by permanently sealing the evidence of the original theft.

**E) Equitable Implications for Relief from Judgment and Intervention**

The potential government role in the suppression and misappropriation of Petitioner's 2009 foundational work strengthens her rights under Rule 60(d)(3) and Fed. R. Civ. P. 24. The Court has an equitable duty to address the following:

1. **Hidden Beneficiaries and Moral Hazard:** Petitioner cannot receive a fair adjudication in this District Court when the U.S. Army—via the "State Actor" nexus of Detachment 201—is a hidden beneficiary of the suppression. Allowing the military to utilize technology misappropriated from a trafficking victim creates a profound moral hazard and a continuous constitutional violation.

2. **Correction of Inventorship under 35 U.S.C. § 256:** Until inventorship is corrected, the U.S. Army remains the ultimate, illicit beneficiary of "Project Aria" at the expense of the true inventor. The judicial error in denying intervention—compounded by the failure to rule on the Protective Order for the 4,000-person Facebook contact list—prevents Petitioner from asserting her statutory rights and her right to just compensation under the Fifth Amendment.

3. **Systemic Injustice:** The use of the State Secrets Privilege to conceal the misappropriation of 2009-2019-era technology, rather than to protect legitimate military tactics, constitutes a fraud on the court. Relief from judgment is the only mechanism to

ensure that "National Security" is not used as a shield for IP theft and the ongoing silencing of a victim of battery and trafficking.

**F) Systemic Suppression via Battery, Duress, and Cyber-Interference**

Relief under Rule 60(b)(6) is necessitated by the extraordinary circumstances of Petitioner's silencing:

1. **Criminal Battery:** Petitioner was subjected to battery via the very devices currently under Congressional inquiry and previously discovered in a backpack by Department of Homeland Security (DHS). When reported, Petitioner and entire household was unlawfully detained for four hours, threatened, fraudulently diagnosed (entire household same paperwork), provided with involuntary medication (sleeping pills) and told the "public would not understand", and if 'they came back' she would not be able to leave again. Petitioner did the opposite, created a Substack (daitonacarter.substack.com) to journal the offenses and begin reporting the incident to everyone and trying to seek legal counsel for the battery and theft despite being "fenced." The injuries and complications from weapons that can cause impairment preventing even living tasks, is what Solos, a defense contractor, considers a "litigation choice" when the Petitioner was being prevented from uploading the same files she previously uploaded.

2. **Compromised Venues:** Petitioner's 2024-2025 attempts to seek a TRO and survey the "Venue" apartment in Miami, FL, were thwarted when her state court records disappeared, a fact corroborated by the constructive seizure in *Camden Summit Partnership LP v. [Name Withheld]* (Case No. 2025-199197-CC-05).

3. **The Qilin/WNMU Hack:** In April 2025, following Petitioner's SOS communications to the **FTC** and **NYS AG**, her alma mater (**Western New Mexico University**) was targeted

by the **Qilin** hacking group, resulting in the targeted wiping of evidence regarding the "Seoul attack" and Petitioner's 2009-era technical data.

4. **Coordinated Suppression of Evidence and Interception of Communications:** In December 2020, exactly three days prior to the Federal Trade Commission's (FTC) announcement of the antitrust action against Facebook (now Meta), the Petitioner's LinkedIn account—which contained critical evidence including articles, lab notes, and prototype demonstrations—was restricted and remains inaccessible. Research indicates a nexus between Microsoft (LinkedIn's parent company) and the Paul Hastings ecosystem. This pattern of suppression extended to the Petitioner's private communication infrastructure; in 2021, a whistleblower with high-level security clearance signaled that the Petitioner's Microsoft Office 365 private domain emails were being intercepted and disseminated across the technology sector. This unauthorized access is further evidenced by the "doxxing" (2020-2023) and harassment (2022) of the Petitioner's relatives by third-party contractors (e.g., Uber), who utilized "stale" data and private messages dating back twenty years from Yahoo/AOL—entities also linked to the Paul Hastings/Apollo Global Management ecosystem. This coordinated digital "quarantine" and data harvesting directly facilitated the "constructive seizure" of the Petitioner's intellectual property.

### G) The Misappropriation Of "Habit AI": The Predictive Architecture

The Court's characterization of Petitioner's work as "generalized" is further refuted by the existence of Habit AI ( Nurture from the YouNoodle Seoul Global Startup 2016 compeitition, the precursor of Aria), a specific predictive behavioral architecture developed by the Petitioner.

1. **The Behavioral Engine:** Unlike standard AR interfaces, Petitioner's work included "Habit AI"—a proprietary machine learning framework designed to analyze gestural and environmental data to predict user intent. This architecture was the "connective tissue" between the Petitioner's smart glasses hardware and the external robotics (such as the UFC Sparring Robot).

2. **Derivation of "Learning" Algorithms:** Petitioner has documented her development of these behavioral models in her 2009–2019 lab notes (ECF No. 92). The integration of similar "Habitual" or "Predictive" AI into Meta's current AR roadmap is a direct derivation of Petitioner's conceptualization.

3. **The Nexus of Access:** The "Habit AI" logic was part of the technical packages accessible to the recruiters and defense contractors (Quang Pham, Jahde Barnes) identified. To claim this work is "generalized" is to ignore the specific, high-level algorithmic logic that differentiates Petitioner's work from the prior art.

## H) Architectural Misappropriation: From 2017 Sketches To The "UFC Sparring Robot"

The "generalized" label applied by the Court fails to account for the integrated hardware ecosystem Petitioner developed and publicly disclosed as a "survival priority" record.

1. The 2017 LinkedIn Sketch **vs.** Oppo 2019/2023 render**:** Petitioner's 2017 black-and-white LinkedIn sketch established the foundational "headgear" form factor. While Oppo's 2019 announcement highlighted headgear strikingly similar to Petitioner's 2017 designs, the later Oppo Air Glass 2 (MWC 2023) confirmed the industry-wide integration of Petitioner's specific architectural logic.

2. **The UFC Sparring Robot (2021):** The scope of the misappropriation extends beyond smart glasses into robotics and haptic gaming systems. In early 2021, Petitioner

disclosed her UFC Robot Sparring system on Twitter (now X). This system utilized the same multimodal sensor fusion and gestural logic found in her 2009–2019 lab notes. Two years later a 200 lb private courier box went missing for months with the weight grafeuclly reducing with each update.

3. **Meta's Attempted Incorporation:** Evidence suggests that Meta sought to incorporate this specific "sparring" and "gaming" architecture into its own VR/AR roadmap. This is not "abstract" work; it is a specific, high-fidelity implementation of AI-driven robotics and AR/VR/XR interface logic that Petitioner had already conceptualized and communicated.

4. **The "Gaming System" Priority:** Petitioner had created a comprehensive gaming system that integrated the glasses as a controller for external hardware (the Robot). This specific "Cross-Device Gestural Interface" is a primary feature of Meta's current "Project Aria" and "Quest" marketing. To dismiss this as "generalized" while the Petitioner is under Color of Law sequestration—prevented from commercializing the very "UFC Sparring" system she announced in 2021—is an equitable travesty.

**I) Systemic Spooliation: The Missing 200 Lb Courier And Financial Deplatforming**

The "Mootness" of Petitioner's claim is a result of a coordinated campaign of "constructive seizure" and the physical theft of evidentiary assets.

**J) The 2021 UFC Sparring Robot and the 200 lb Courier Box**

In early 2021, Petitioner disclosed her UFC Robot Sparring system on Twitter (now X), a system utilizing the same multimodal sensor fusion and Habit AI logic found in her 2009–2019 notes.

1. **The Missing Prototype/Hardware:** Two years following this disclosure, a 200 lb private courier **box** (containing hardware/evidence related to this architecture) went missing in transit for months.

2. **Documented Mail Tampering:** In a display of sophisticated interference, the weight of the package was "gracefully reduced" in carrier updates as it was held, indicating the systematic removal of components. This is part of a broader pattern of mail tampering involving UPS, FedEx, and USPS, where evidentiary packages are redirected, stolen, or opened to prevent the Petitioner from securing her "reduction to practice" hardware.

**K. Financial Warfare and the Paul Hastings Nexus**

The effort to silence the Petitioner includes the weaponization of the financial system to cause "legal invisibility."

1. **Coordinated Bank Closures:** Petitioner and her family have faced systematic bank account closures at every financial institution represented by Paul Hastings (the same firm often affiliated with the Defendants' network).

2. **Check Swapping and Theft:** To trigger these closures, mail-stolen checks were "swapped" or altered to create fraudulent activity, providing the banks a pretext for termination.

3. **Chase Bank Interference:** In 2018 (a $4,000 check) and 2023 (a $3,000 student refund), Chase Bank refused to honor valid funds without notice, occurring precisely while the family was in "constructive seizure" in Florida.

### L. The "LuckyASF" Entrapment and Defensive Diligence

When the Petitioner's family successfully defended against these fraudulent fees and interests using state law, the traffickers/harborers utilized a local SSID—**"**LuckyASF**"**—as a targeted taunt.

1. **Evidence of Entrapment:** This signals that the family was being "hunted" for any pretext (legal harassment, defamation, or imprisonment) that could be used to void the inventor's rights.
2. **Character Assassination:** There is an active campaign to manufacture "dirt" to justify the ongoing trafficking and sequestration. This Court must recognize that a Petitioner who is being financially strangled and physically "trapped" cannot be expected to meet standard procedural timelines without the Court's intervention.

## VI. REPUTATIONAL HARM, IRREPARABLE CREDIBILITY DAMAGE, AND SYSTEMIC SAFETY RISKS

Relief is warranted under Fed. R. Civ. P. 60(b)(6) because the Court's verbatim adoption of Plaintiff's misrepresentations creates a permanent, public record that destroys Petitioner's professional standing and endangers her physical safety.

### A) The "Rubber Stamping" of Non-Factual Statements

The Court's adoption of Plaintiff's narrative—labeling Petitioner's foundational Python source code and 2009–2017 prototypes as "generalized"—was done without an independent review of the 2009-2010 audio notes and technical lab notes.

1. **Abandonment of Judicial Function:** Verbatim adoption of a party's characterization of technical evidence, without *in camera* review, constitutes an abandonment of the judicial function.

2. **Irreparable Professional Harm:** This created a public record that prevents Petitioner from commercializing 15 years of R&D, as search engine algorithms and Large Language Models (LLMs) now ingest these "rubber-stamped" lies as judicial fact.

**B) Material Misrepresentation of Law: The "Inmate Case" Category Error**

Solos counsel relied on a case involving an incarcerated individual to justify the denial of witness protection for the Petitioner. This is a material misrepresentation of law and a category error:

1. **Jurisdictional Dissimilarity:** Precedents governing the safety of inmates (who are under the exclusive custody of the Bureau of Prisons) are inapplicable to a free citizen facing external, targeted violence. Petitioner has never been arrested or incarcerated; applying "prisoner-litigant" standards to a civilian inventor is a due process violation.

2. **Statutory Overrides:** A prisoner-litigant precedent cannot override the mandatory protections of the Crime Victims' Rights Act (CVRA), the Trafficking Victims Protection Act (TVPA), or the Americans with Disabilities Act (ADA). The stripping of Petitioner's ADA-protected ECF access based on this misapplied case law constitutes a manifest injustice.

**C) Custodial vs. External Threats and the Court's Inherent Power**

The Court's reliance on state-level or custodial precedents fails to account for the federal court's inherent authority:

1. **Inherent Authority:** Under federal common law, this Court possesses the inherent power to issue protective orders and refer matters to the U.S. Marshals Service to prevent the obstruction of justice, regardless of a witness's procedural status as a "non-party."

2. **External Violence:** Unlike an inmate, Petitioner faces external battery, stalking, and digital lockouts in the community. Denying protection by citing a "correctional facility" case is a failure to recognize the actual threat environment (harboring, limitations of movement, and communication blocks).

**D) The "Vexatious" Smear and ADA Discrimination**

The Court allowed Solos' counsel to use the "inmate case" as a tool to bias the proceedings against an ADA-protected whistleblower.

1. **The "Vexatious" Label:** By repeating the Plaintiff's "vexatious" characterization without investigating the underlying 2009 priority work, the Court has enabled a "smear campaign" that is now codified in the public docket.

2. **Safety Risk:** This misinformation increases the risk of crimes against the Petitioner and her family by signaling to traffickers and bad actors that the Petitioner is "unprotected" by the federal judiciary.

3. **The "LuckyASF" Entrapment and Defensive Diligence**

When the Petitioner's family successfully defended against these fraudulent fees and interests using state law, the traffickers/harborers utilized a local SSID—"LuckyASF"—as a targeted taunt.

a) Evidence of Entrapment: This signals that the family was being "hunted" for any pretext (legal harassment, defamation, or imprisonment) that could be used to void the inventor's rights.

b) Character Assassination: There is an active campaign to manufacture "dirt" to justify the ongoing trafficking and sequestration. This Court must recognize that a

Petitioner who is being financially strangled and physically "trapped" cannot be expected to meet standard procedural timelines without the Court’s intervention

4. **The Defendants rely on a 2021 MIT Sloan study to claim independent development.**

However, Petitioner’s October 2016 directory—specifically the file 'As technology advances...' (10/31/2016)—proves she had already identified the functional flaws in the MIT ' Objectivism' model and authored the 'Sequenced/Collectivism' fix. Meta did not 'invent' Anticipatory AI; they extracted the psychological and engineering bridge Petitioner built to fix a non-functional academic model.

## VII. FRAUD ON THE COURT AND NEW EVIDENCE OF SYSTEMIC EXTERNAL INTERFERENCE (MAY 2026)

Relief is warranted under **Fed. R. Civ. P. 60(d)(3)** for Fraud on the Court. The integrity of these proceedings has been compromised by material misrepresentations and the suppression of forensic evidence of an Advanced Persistent Threat (APT) targeting the Petitioner.

### A) Misrepresentation of Priority and Reduction to Practice

Counsel for Plaintiff induced the Court into error by characterizing Petitioner’s 2009–2019 work as "generalized." This is a demonstrable falsehood.

1. **Suppressed Evidence:** ECF No. 92 contains specific Python source code and functional hardware documentation.

2. **Intentional Oversight:** By advocating for the seal of these documents while simultaneously labeling the work as "vague," counsel engaged in a contradictory narrative designed to prevent the Court from recognizing Petitioner’s reduction to practice of the foundational smart-glasses IP.

### B) Forensic Discovery of State-Sponsored APT Activity (May 2, 2026)

Independent of the Court's April 29 decision, Petitioner discovered forensic evidence of APT (Advanced Persistent Threat) activity on May 2, 2026.

1. **Digital Sequestration:** This state-sponsored malware is engineered to facilitate the "digital sequestration" of the Petitioner, preventing the secure transmission of technical data to this Court.
2. **Ongoing Interference:** This May discovery proves that while the Court was "mooting" the intervention, a concurrent technical effort was underway to ensure the Petitioner remained silenced and unable to communicate the technical specifics of her 2009 priority work.

### C) Material Conflicts of Interest and "Common Identity" of Interest

Petitioner has uncovered evidence of a "revolving door" and concurrent representation that creates an undisclosed conflict under ABA Formal Opinions regarding conflicting interests:

1. **Samsung and Concurrent Representation:** Plaintiff's counsel (Caldwell) represents Samsung in various patent matters. Petitioner's claims specifically involve Samsung's use of derivative technology (e.g., Samsung Patent 10,866,417 B2, Exhibit N, Att. 25). This creates a "concurrent conflict" where counsel cannot advocate for the validity of the Solos patents without directly clashing with Petitioner's priority claims which impact Samsung's interests.
2. **The "Safe House Project" Nexus:** Caldwell's April 23, 2026, partnership with the Safe House Project (SHP) to protect "AI-powered anti-trafficking tools" is highly prejudicial. SHP's leadership includes board members affiliated with Wells Fargo, the same

institution that deplatformed the Petitioner and her family, facilitating a constructive seizure in Miami, FL.

3. **Data Laundering and Spoliation:** This network is linked to the Bending Spoons/Evernote deal, which Petitioner alleges served as a mechanism for data laundering and the spoliation of evidence foundational to this case.

4. **DOJ "Revolving Door":** Leadership at SHP includes former high-level DOJ officials who were in roles related to victim services during the years the Petitioner was reporting these crimes to the FBI and DOJ. The fact that the same DOJ is in possession of Petitioner's 2009–2019 reports—while counsel for the "anti-trafficking" partner seeks to suppress her evidence—points to a systemic fraud on the court.

**D) Identity of Interest Between Adversaries**

Evidence suggests a shared financier or network between Solos and Meta. In patent law, if a law firm is aware that their client and the "adversary" share a common financier, they have an ethical obligation to disclose.

1. **Camden Property Trust:** Defendant's counsel represents Camden Property Trust, the entity responsible for the constructive seizure of the Petitioner in Miami.

2. **The Result:** The Defendants' counsel represents the entities involved in the physical trafficking and sequestration of the Petitioner, while Plaintiff's counsel represents the entities (Samsung) utilizing the stolen technology. This "pincer" maneuver has left the Petitioner without an unconflicted venue to assert her rights.

The "rubber stamping" of narratives provided by conflicted counsel has allowed for the misuse of judicial power to shield a multi-billion dollar IP theft. Petitioner respectfully requests that the Court

vacate the mootness order and appoint a Special Master to untangle these documented conflicts and the May 2026 APT interference.

## VIII. THE "GRANT-AND-TERMINATE" PROCEDURAL NULLITY: A STRUCTURAL ERROR

Relief is mandatory under Rule 60(b)(1) and (b)(6) because the Court's simultaneous actions created a procedural nullity that violated Petitioner's Fifth Amendment rights.

### A) The Extinguishment of the Right to be Heard

The Court's April 29 Order "GRANTED" Petitioner leave to file a reply (ECF No. 106) regarding the Motion for Reconsideration. However, the Court simultaneously terminated the proceedings (ECF No. 107) before that reply—the Notice of Candor—could be docketed or considered.

1. **Structural Defect:** Under the Due Process Clause of the Fifth Amendment, a party has a right to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

2. **Procedural Nullity:** By mooting the case before the authorized Reply could be placed on the record, the Court rendered its own order granting leave a nullity. This effectively "gagged" the Petitioner at the precise moment the Court acknowledged her right to respond, preventing the disclosure of the Notice of Candor which contained facts central to the Court's jurisdiction.

### B) Impact on the Judicial Record

This "Grant-and-Terminate" maneuver prevented the Petitioner from correcting the record regarding the Samsung concurrent conflict, the May 2, 2026 APT discovery, and the

Facebook data export. A judgment entered while a permitted response is pending is inherently defective and must be vacated to preserve the integrity of the judicial process.

## CONCLUSION

The judicial error in denying intervention prevents the Petitioner from asserting her right to just compensation and allows for the potential abuse of the State Secrets Privilege to shield the misappropriation of foundational 2009 intellectual property. This Court's "Grant-and-Terminate" procedural defect, combined with the "rubber-stamping" of material misrepresentations regarding Petitioner's work, constitutes a manifest injustice that only vacatur can remedy.

The "State Actor" nexus established via Detachment 201 and the integration of Petitioner's logic into U.S. ARMY Project ARIA necessitates a stay of these proceedings to investigate whether the judicial machinery is being utilized to facilitate a Fifth Amendment Taking under the guise of a private patent dispute.

**NOTICE OF LODGING OF SENSITIVE PHYSICAL EVIDENCE**:

Petitioner possesses the courier logs for the 200 lb private hardware box (which vanished for weeks/months and was systematically lightened in transit). Due to the high risk of physical retaliation and the ongoing 'constructive seizure' of Petitioner, these logs are withheld from the public docket and are available for In Camera review by the Court or the U.S. Marshals Service only

**WHEREFORE**, Petitioner respectfully prays that this Court:

1. **VACATE** the April 29, 2026, Mootness Order pursuant to Fed. R. Civ. P. 60(b)(1), (3), (6) and 60(d)(3) to correct manifest procedural errors and address the documented fraud on the court;

2. **STAY** the May 6, 2026, appellate deadline and all underlying proceedings in *Solos v. Meta* (Case No. 1:26-cv-10304) to allow for the adjudication of this Motion and to prevent further spoliation of evidence;

3. **CONDUCT** an *In Camera* hearing to review the Facebook Data Export (2009–2019) and the technical contents of ECF No. 92, resolving the contradiction between the Court's "generalized" label and the Petitioner's specific "reduction to practice";

4. **RESTORE** Petitioner's ECF filing privileges immediately as a mandatory ADA accommodation, ensuring meaningful access to the Court for a whistleblower with documented disabilities;

5. **GRANT** the Motion to Intervene as a matter of right pursuant to Fed. R. Civ. P. 24(a);

6. **APPOINT A SPECIAL MASTER** to investigate the "State Actor" nexus involving Detachment 201, the forensic evidence of May 2, 2026 APT activity, and the potential misappropriation of Petitioner's IP into U.S. ARMY Project ARIA; or, in the alternative,

7. **TRANSFER** the relevant claims to the United States Court of Federal Claims pursuant to 28 U.S.C. § 1491 if the federal government is confirmed as the ultimate beneficiary of the misappropriated technology.

8. **ORDER** the U.S. Marshals Service to provide a secure channel for the submission of physical evidence (hardware/lab notes) to prevent further spoliation or interception in transit.

Dated: May 3, 2026

Respectfully submitted,

/s/ Daitona Carter

Daitona Carter, Pro Se

Address: NO FIXED ADDRESS

(Withheld for physical safety)
Phone: NONE
Email: On file with the Clerk of Court
(Omitted from public filing for physical safety and cyber-security)

**ATTACHMENT 8 —** CAFC 26-1721

Description — Palmer Luckey / Oculus / ZeniMax: Evidentiary Record of Technology Pipeline and Procedural Absolutions

• Item 8(a): The ZeniMax Jury Verdict and Damages Allocation (2017)

• Source Document: Jury Verdict Entry, *ZeniMax Media Inc. v. Oculus VR, LLC, No. 3:14-cv-01845 (N.D. Tex.).*

• The Evidence: The records establish that Oculus was found liable for $200 million for breaking a non-disclosure agreement (NDA), and Palmer Luckey was found personally liable for $50 million for false designation of origin regarding the underlying VR technology.

• Application to Section (f): This provides verified factual backing that a federal jury concluded Luckey took technology originating from other creators, scrubbed their names from it, and claimed it as his own commercial invention.

• Item 8(b): The Total Recall Technologies Procedural Judgment (2017)

• Source Document: *Case 3:15-cv-02281-WHA*, Document 214, Filed 03/09/17.

• The Evidence: The literal order entering final judgment in favor of Palmer Luckey and ordering the Clerk to "CLOSE THE FILE" based entirely on the procedural partner-authorization dispute.

• Application to Section (i): This serves as the direct historical example showing how defendants successfully used an internal contract loophole to stall a technology extraction claim for years before ever letting a jury look at the actual merits.

• Item 8(c): The Total Recall Technologies Final Jury Phase Documents (2021)

• Source Documents: *Case 3:15-cv-02281-WHA*, Document 515 (Proposed Charge, Filed 10/08/21) and Document 535 (Final Charge, Filed 10/12/21).

• The Evidence: The official jury instructions and special verdict forms forced before the panel by Judge William Alsup six full years after the initial complaint was filed.

• Application to Sections (f) & (i): This proves that the underlying claims regarding a breach of an NDA and the taking of an inventor's specifications were legally viable, triable merits that required massive judicial intervention to resolve, underscoring why an un-stayed standard remand in your current case would be entirely inadequate.

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TOTAL RECALL TECHNOLOGIES,

Plaintiff,

v.

PALMER LUCKEY and FACEBOOK TECHNOLOGIES, LLC (F/K/A OCULUS VR, LLLC),

Defendants.

No. C 15–02281 WHA

**COURT'S PROPOSED CHARGE TO THE JURY AND SPECIAL VERDICT FORM.**

Appended hereto are copies of the draft charge to the jury and special verdict form given to both sides on October 8, 2021, for discussion with the Court at the charging conference on **TUESDAY, OCTOBER 12, 2021, AT 7:30 A.M.** Counsel are reminded that all objections, additions or modifications must be made at the charging conference or in a memorandum filed by **NOON ON MONDAY, OCTOBER 11**, or else they shall be deemed waived.

**IT IS SO ORDERED.**

Dated: October 8, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TOTAL RECALL TECHNOLOGIES,

Plaintiff,

v.

PALMER LUCKEY,

Defendant.

No. C 15–02281 WHA

**COURT'S FINAL CHARGE TO BE READ TO THE JURY (SO COUNSEL CAN INCORPORATE INTO SLIDES)**

Appended hereto are copies of the final charge to the jury and special verdict form to be read to the jury.

**IT IS SO ORDERED.**

Dated: October 12, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

ars TECHNICA SECTIONS FORUM SIGN IN

GAMING

# Oculus, execs liable for $500 million in ZeniMax VR trial

Court finds Rift maker broke NDA but didn't steal trade secrets.

KYLE ORLAND – FEB 1, 2017 4:12 PM | 47



Credit: Oculus

TEXT SETTINGS

A jury has found Oculus and its executives liable for a combined $500 million in damages in a trial over improper use of technology created at Id Software parent company ZeniMax Media.

While the jury found that Oculus had not misappropriated trade secrets from ZeniMax—a major part of the case—it determined that Oculus co-founder Palmer Luckey had violated a non-disclosure agreement with the company when working on early prototypes of the Rift VR headset, according to a copy of the verdict obtained by Ars Technica. Oculus was also found liable for copyright and trademark infringement for misuse of certain ZeniMax code and logos. The company, Luckey, and Iribe were also found liable for false designation regarding misuse of certain ZeniMax trademarks.

Oculus is liable for $300 million in the verdict ($50 million for trademark infringement, $50 million for copyright infringement, and $200 million for breaking the NDA), while Luckey owes $50 million and former Oculus CEO Brendan Iribe owes $150 million (both for false designation). Oculus CTO John Carmack, who previously worked for ZeniMax and was accused of stealing code and destroying evidence, is not personally liable for any damages. ZeniMax had sought damages of $6 billion in the case.

The jury cleared Oculus parent company Facebook of alleged tortious interference with the ZeniMax NDA during its $2 billion acquisition in 2014, according to reports. Neither Oculus nor Facebook were found liable for unfair competition.

*ARS VIDEO*

**What Happens to the Developers When AI Can Code? | Ars Frontiers**



“The heart of this case was about whether Oculus stole ZeniMax’s trade secrets, and the jury found decisively in our favor,” Oculus said in a statement provided to Ars. “We’re obviously disappointed by a few other aspects of today’s verdict, but we are undeterred. Oculus products are built with Oculus technology. Our commitment to the long-term success of VR remains the same, and the entire team will continue the work they’ve done since day one—developing VR technology that will transform the way people interact and communicate. We look forward to filing our appeal and eventually putting this litigation behind us.”

ADVERTISEMENT

The verdict comes after three days of jury deliberations and roughly three weeks of testimony, including defense from Carmack, Luckey, and Facebook CEO Mark Zuckerberg. Oculus says it plans to appeal the false designation charge.

ZeniMax's case against Oculus dates back to 2014, when the company first publicly accused Oculus of illegally using code and technology that Carmack developed while at Id Software, before he joined Oculus as CTO in 2013. Carmack and Luckey had worked together under NDA to develop a 2012 E3 demo of an early Oculus Rift prototype running *Doom 3.*

But ZeniMax alleged Carmack's assistance went much further than that demo and that Luckey "lacked the training, expertise, resources, or know-how to create commercially viable VR technology" without Carmack's help. While the companies negotiated for ZeniMax to purchase a small ownership share of Oculus after their collaboration, those talks eventually broke down, and ZeniMax instructed Carmack to cease any and all work on VR projects.

Carmack admitted in testimony that he had copied thousands of e-mails to a personal hard drive on his last day at ZeniMax, but he maintained that he rewrote any code used on the Rift and Gear VR headsets from scratch.

ZeniMax also argued that Facebook failed to do its due diligence and ignored warning signs of misappropriated technology in its eagerness to purchase Oculus in 2014.

RELATED STORIES



**At trial, Zuckerberg is "highly confident" Oculus built its own technology**

Facebook CEO says he'd "never even heard of ZeniMax before" trial.

Listing image: Oculus



KYLE ORLAND *SENIOR GAMING EDITOR*

Kyle Orland has been the Senior Gaming Editor at Ars Technica since 2012, writing primarily about the business, tech, and culture behind video games. He has journalism and computer science degrees from University of Maryland. He once wrote a whole book about *Minesweeper*.

47 COMMENTS

PREV STORY NEXT STORY

MOST READ



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TOTAL RECALL TECHNOLOGIES,

Plaintiff,

v.

PALMER LUCKEY and OCULUS VR, LLC, as successor-in-interest to Oculus VR, Inc.,

Defendants.

________________________________________/

No. C 15-02281 WHA

**JUDGMENT**

For the reasons stated in the accompanying order lifting the stay and granting defendants' motion for summary judgment, **FINAL JUDGMENT IS HEREBY ENTERED** in favor of defendants Palmer Luckey and Oculus VR, LLC, and against plaintiff Total Recall Technologies. The Clerk **SHALL CLOSE THE FILE**.

**IT IS SO ORDERED.**

Dated: March 9, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**ATTACHMENT 9** — CAFC No. 26-1721

Description — AUKUS Resignations, June 11, 2026

(a) NYT; (b) CNN; (c) Sydney Morning Herald

The New York Times | https://www.nytimes.com/2026/06/11/world/europe/uk-defense-secretary-resigns-healey-starmer.html

# *U.K. Defense Secretary Resigns, in a Blow to Starmer*

John Healey unexpectedly announced that he was stepping down, saying Prime Minister Keir Starmer was failing to invest enough money in the British military.

Listen · 7:33 min



**By Michael D. Shear**
Reporting from London

June 11, 2026

See more of our coverage in your search results.
**Add The New York Times on Google**

John Healey, Britain's defense secretary, resigned on Thursday, accusing Prime Minister Keir Starmer of failing to invest enough money in its military and leaving the country "well short" of what it needed to protect itself in a dangerous world.

Mr. Healey, who has been one of the prime minister's staunch allies, said he was informed on Monday that Mr. Starmer intended to announce a  plan that would not increase military funding as much as Mr. Healey believes is necessary.

"I am being forced to make decisions that would reduce the readiness of our forces and increase the risk to personnel on operations, and could make the country less safe," Mr. Healey wrote in a letter to the prime minister that he posted on social media.

The unexpected resignation is a significant blow to Mr. Starmer, who is likely to face a challenge to his leadership of the Labour Party later this summer. Mr. Healey's clear lack of confidence in the prime minister bolsters the case of his critics, who insist the party needs a change at the top.

Mr. Healey said that Mr. Starmer's Defense Investment Plan would increase military spending to 2.68 percent of gross domestic product by 2030, short of the 3.0 percent that Mr. Healey and Mr. Starmer had discussed in the past.

"After explaining to you that I would not be able to accept a DIP settlement that does not give our forces the resources they need," Mr. Healey wrote, "I am now left with no other option than to submit my resignation as your defense secretary."

Mr. Healey viewing an unmanned ground vehicle at an international military exercise near Voru, Estonia, last month. Leon Neal/Getty Images

Mr. Starmer's office released a letter from the prime minister to Mr. Healey Thursday evening. In it, Mr. Starmer defended his investments in the country's military and said the choices he makes to pay for it will be "sustainable and fair."

"They will mean significant reallocations of funding from across government departments and the right choices to protect our nation," Mr. Starmer wrote to Mr. Healey. "Strong public finances are part of what keeps us safe — irresponsible borrowing only puts that at risk."

Questions about how much Britain plans to invest in the military have swirled through the government for months as Mr. Starmer delayed releasing the long-term defense plan.

A year ago, Mr. Starmer's government published a strategic defense review, which called for a significant improvement to military readiness, including the addition of British-built long-range weapons, the creation of a cyber command, and the development of drones and new ways to protect undersea cables.

In a speech at a British defense company last week, the prime minister warned of the dangers that Britain and Europe face.

"It is our intelligence assessment, and the assessment of other countries in NATO, that there could be an attack by Russia on NATO as soon as 2030," he said.

Mr. Healey took note of those comments in his resignation letter, saying they were evidence that "you know what defense needs."

There has also been immense pressure from President Trump, who has repeatedly accused Britain and European nations of failing to spend enough on defense. Mr. Trump has mocked the British Navy as being "too old," with aircraft carriers "that didn't work."

But the sluggish economy in Britain has made it challenging for Mr. Starmer to find the money for a big lift in military spending without making politically unpopular decisions such as tax increases, cuts in other domestic programs or large-scale borrowing.

Prime Minister Keir Starmer of Britain and President Trump at Chequers, an estate in England, in September. Mr. Trump has accused European nations of not spending enough on their own defense. Doug Mills/The New York Times

Each of those options comes with steep downsides. Tax increases would be highly contentious in a country where levies on the population are already relatively high. Many people in Britain remember with anger the steep cuts to popular services, known as austerity, put in place by previous Conservative Party-led governments. And financial markets would likely respond poorly to more government borrowing.

Mr. Starmer has come under pressure from the left flank of his party to invest more in the National Health Service, infrastructure, transport and other domestic programs that suffered years of capital underinvestment before Labour took power. That has been part of the argument made by Andy Burnham, the mayor of Greater Manchester, who is running for a seat in Parliament so he can try to replace Mr. Starmer as prime minister.

In his letter to Mr. Healey, the prime minister said he had already increased the defense budget after it was "hollowed out" by previous Conservative Party governments. He promised to go further in the plan he will release soon, but did not offer details in the letter.

"It will make the big strategic investments we need for the long term and give the certainty which private finance needs to invest," he wrote. "It will allow our armed forces to transform and modernize and back them with the tools they need to change the way we fight — and to deter our enemies."

In his own letter, Mr. Healey appeared to lay much of the blame for lower military spending on Rachel Reeves, Britain's top finance official, who oversees the Treasury. He told Mr. Starmer that he had initially been hopeful that there was agreement on the need to boost the country's military.

"Since then, you have been unable, and the Treasury has been unwilling, to commit the resources that the nation needs to defend the country at this time of rising threats," he wrote.

Ms. Reeves said this week that tax increases would be better than borrowing to pay for defense. Aides to Mr. Starmer have declined to say whether he agreed with her.

Government officials refused to say as recently as Wednesday afternoon what Mr. Starmer had decided to do. A spokesman told reporters on Wednesday that the investment plan would be unveiled before a NATO meeting at the beginning of July.

In Parliament on Wednesday, Kemi Badenoch, leader of the Conservative Party, accused Mr. Starmer of delaying because of concerns about how to pay for the defense investments.

"Projects have been put on hold, and Britain is getting weaker with every passing day," she said. "At a time of increased global instability and tension, with war in Europe and the Middle East, the prime minister is paralyzed, giving the armed forces less than half of the minimum that they need."

Mr. Starmer responded by noting that military spending had fallen during the 14 years that Ms.

Badenoch's party was in power. He noted that his government had already agreed to increase it to 2.6 percent, from 2.3 percent, by 2027.

"We have carried out a strategic review of defense, and we are committed to publishing the defense investment plan before the NATO summit," he said.

Tony Travers, a professor of politics at the London School of Economics, said that Mr. Healey's resignation carried weight in Britain because he was not regarded as a ruthlessly ambitious politician or someone prone to rash decisions.

A lifelong Labour politician, Mr. Healey has served in Parliament for decades, serving every Labour prime minister since Tony Blair, starting in 2001.

"He's a sort of rational moderate. Almost the ultimate exemplar of a rational politician," Mr. Travers said. "He's definitely not somebody who is prone to sudden and unexpected career moves, and so this suggests he was very, very disgruntled."

Michael D. Shear is the chief U.K. correspondent for The New York Times, covering British politics and culture and diplomacy around the world.

A version of this article appears in print on , Section A, Page 7 of the New York edition with the headline: With Smack at Starmer, Defense Secretary Quits

ADVERTISEMENT

Sign in to CNN with Google

Continue



# Two top UK defense officials resign over military spending in fresh blow to Keir Starmer

UPDATED JUN 11, 2026

By  Ivana Kottasová

ADVERTISEMENT



Britain's Defense Secretary John Healey announced his resignation on Thursday, criticising Prime Minister Keir Starmer for being unwilling to spend what is needed on defense. *(Yui Mok/Pool/Reuters/File)*

**London —** UK Prime Minister Keir Starmer suffered a fresh blow on Thursday after Secretary of Defense John Healey resigned over a budget dispute, saying the government is not willing to give the British Armed Forces the "resources they need."

Soon after, Minister of State for the Armed Forces Al Carns also announced his resignation in a letter posted to X, saying that the government is "failing" to give the armed forces what they need to do the job and the "loyalty to stand by them when it's done."

Starmer, whose government's popularity has collapsed just two years after a landslide general election victory, has been under pressure recently from within his own party.

In his letter addressed to the prime minister and shared on the social media platform X, Healey said the amount of money allocated to defense "falls well short of what is required for defence and the country at this dangerous time."

Carns said in his own letter addressed to Starmer that the "character of conflict is changing faster than our procurement can keep up with."

ADVERTISEMENT

calmer one," said the former Royal Marine.




British Minister of State for Armed Forces Al Carns in Kyiv, Ukraine, April 10, 2026. *(Alina Smutko/ Reuters)*

Downing Street announced later on Thursday that Security Minister Dan Jarvis has been appointed as Secretary of State for Defense.

The resignations come ahead of the government's announcement on how it will fund a much-needed overhaul of Britain's defenses, expected before a NATO summit next week. Publication of those plans has been postponed multiple times amid deep disagreements within the government.

Starmer doubled down on his government's position in a letter to Healy published Thursday, saying "I am proud of our record on funding."

He pointed to the UK government's efforts on leading the Coalition of the Willing on Ukraine, support for Gulf allies and working on a plan for the Strait of Hormuz.

"When we entered government in 2024, I took the decision to increase defense spending after the Conservatives hollowed out our armed forces. That required a cut to the international aid budget

ADVERTISEMENT

prime minister said.

**RELATED ARTICLE**



British leader’s complacency on defense puts country ‘in peril,’ former NATO chief warns

3 MIN READ

“I will always do what is needed to keep our country safe,” Starmer added. “I thank you for your work to deliver on all of this.”

Starmer said the government’s Defence Investment Plan helps increase defense spending in a “sustainable way” by providing the military with resources while also making sure that “the money spent is spent wisely and used to back jobs and growth here in Britain.”

He said the increased spending associated with the plan would mean “significant reallocations of funding” across government departments.

“Taking these decisions is never easy,” the UK prime minister said in the letter. “I am determined to rebuild our country after years of being buffeted by crises. I am sorry that you will not be part of that work going forward.”

ADVERTISEMENT



British Prime Minister Keir Starmer speaks during the Prime Minister's Questions at the House of Commons in London, Britain, on June 10, 2026. *(House of Commons/Handout/Reuters)*

Like other NATO members, the UK is under pressure to increase defense spending to prepare for a potential confrontation with Russia. Healey reminded Starmer in his letter that just last week, the prime minister said that British intelligence assessments indicate Russia could be ready to attack NATO countries as soon as 2030.

“You have been unable, and the Treasury has been unwilling, to commit the resources that the nation needs to defend the country at this time of rising threats,” Healey wrote in his letter, referring to the commitment made by Starmer to increase defense spending to 3.5% of GDP by 20235.

The loss of Healey and Carns is worrying news for Starmer, who was already fighting to keep his job. Many in his governing Labour Party have called for him to quit following disastrous results in last month’s local elections.

While no formal leadership bid has been launched, this could change after next week’s key by-election in Makerfield, northwest England, in which Starmer’s arch-rival, Manchester Mayor Andy Burnham, is running. Should he win that, Burnham is widely expected to challenge Starmer.

ADVERTISEMENT

CNN's Sharon Braithwaite contributed to this report.

## Up next



Why 0.1% of Britons could determine the prime minister's fate

8 MIN READ



Exclusive: West Coast emergency oil reserve sparks pushback from Senate Democrats

4 MIN READ



Warsh promises a new vision for the Fed, as his colleagues eye a rate hike instead of a cut

4 MIN READ

## Most popular

1 Trump approved allowing Flávio Bolsonaro to enter US after Brazil election loss, source says

2 Alexander brothers each sentenced to 30 years in federal prison for sex trafficking

3 Republican attack ads mocking Troy Jackson's relationship roil Maine Senate race against Susan Collins

4 Susan Saint James, Emmy-winning actor of 'McMillan & Wife' and 'Kate & Allie,' dies at 80

Search CNN...

Subscribe

Sign in

Listen

Watch

ADVERTISEMENT

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

About CNN

CNN World

FOLLOW CNN

DOWNLOAD THE CNN APP

Download on the App Store

GET IT ON Google Play

The Sydney Morning Herald

This was published 4 months ago

# UK defence minister quits hours before AUKUS meeting with Marles



David Crowe

Updated June 12, 2026 — 6:20am, first published 10:15pm

**Belfast:** Britain's defence minister has quit in frustration over cuts to spending on national security in an extraordinary move that has thrown the government into crisis and added to pressure for a leadership challenge to replace Prime Minister Keir Starmer.

Defence Secretary John Healey announced his resignation hours before he was due to meet Australian counterpart Richard Marles in Portsmouth to outline their ambitions for the crucial AUKUS alliance on nuclear-powered submarines.



UK Defence Secretary John Healey has resigned. GETTY IMAGES

In a widening crisis over national security and Starmer's authority, Armed Forces Minister Al Carns followed Healey by quitting the government, and they were joined by fellow Labour MP Pamela Nash, who resigned as the parliamentary private secretary in the defence portfolio.

The decisions confirmed a cabinet split over whether to increase defence spending and find savings in welfare programs to pay for the changes, while coming days before likely leadership challenger Andy Burnham hopes to win a seat in parliament and launch a formal bid for the top job.

Seen as one of the government's steadiest cabinet ministers, Healey declared he had "no other option" than resigning after discovering on Monday that new spending on defence would not meet the standards he believed were necessary for the nation's safety.

The decision stunned the government after Healey released a letter he sent to Starmer to complain about what he saw as dangerously weak spending in the Defence Investment Plan being negotiated among cabinet ministers.

"You have been unable, and the Treasury has been unwilling, to commit the resources that the nation needs to defend the country at this time of rising threats," Healey wrote to Starmer.

"As I've outlined to you, there are credible ways of meeting the mid-term funding challenges, working multi-nationally and as other European nations are doing, to allow us to protect our ability to deliver the missions of our Labour government.
"You know what defence needs. Without a DIP that meets the moment in this way, I am being forced to make decisions that would reduce the readiness of our forces and increase the risk to personnel on operations, and could make the country less safe."

The resignation comes one month after former health secretary Wes Streeting quit the cabinet and moved to the backbench over his frustrations with Starmer and the direction of the government, while declaring he was willing to stand for the leadership in a ballot among Labour Party members.



Foreign Minister Penny Wong (centre left), and Defence Minister Richard Marles (right), met with Healey (centre right) and UK Foreign Secretary Yvette Cooper (left) in London on Wednesday as part of the annual AUKMIN summit. BLOOMBERG

Burnham, the Greater Manchester Mayor, will have his fate decided by voters next week in a by-election for the seat of Makerfield, which he hopes to win so he can return to parliament in Westminster and begin a formal challenge to replace Starmer.

A survey of Labour Party members last month found that 59 per cent would choose Burnham and 37 per cent would back Starmer in a head-to-head contest.

Streeting, however, would struggle to topple the prime minister. YouGov found 65 per cent would choose Starmer and only 15 per cent would back Streeting in a similar head-to-head race.

Healey's sudden resignation complicates an Australian diplomatic mission to the United Kingdom this week to shore up the defence alliance and accelerate work on the AUKUS project at a time of deep concerns that British shipbuilders are moving too slowly to start a new fleet of nuclear-powered submarines.

Marles, who is deputy prime minister and defence minister, joined Foreign Minister Penny Wong at a meeting in London on Wednesday with Healey and the UK Foreign Secretary, Yvette Cooper.

Greens Senator David Shoebridge said Marles had suffered a "humiliation" in the UK and that Healey had left him "standing at the altar with not a nuclear-powered submarine to be seen".

He noted that Healey's resignation letter did not mention AUKUS, arguing this showed the pact was a low priority for the UK.

Healey sent a strong signal at the Wednesday meeting that he intended to remain in his job, saying he would be talking to Marles next week at a meeting about Ukraine and emphasising his personal commitment to the AUKUS program.

Asked by journalists on Wednesday about spending levels, Healey blamed the 14 years of Conservative government for doing too little on defence, and he vowed to make progress on building the new fleet of submarines, to be known as SSN-AUKUS and using a common design for UK and Australian vessels.

"You don't turn that around, you don't fix that overnight," he said of the spending.



Healey's resignation adds to the instability rocking Starmer's government. GETTY IMAGES

"But with submarines it's a personal priority for me, it's a personal priority for the new First Sea Lord to raise the levels, and pace, and effectiveness of our maintenance program, to raise the level of infrastructure that allows that maintenance to be better."

Marles was due to meet Healey again in Portsmouth on Thursday, local time (early on Friday, AEST) but the resignation disrupted the Australian mission. Marles visited naval facilities in Portsmouth but cancelled plans for a press conference, just as some Australian journalists arrived for the event.

The loss of Healey and the wider upheaval in the British government adds fuel to the Australian debate over AUKUS when the United States is falling behind on its ambitions to build more submarines, while the UK also needs to speed up construction.

Defence expert Sophia Gaston said the changes did not cast doubt on AUKUS because its budget was protected in the UK's defence investment plan.

Gaston, a senior fellow at the Centre for Statecraft and National Security at King's College London, said Healey's resignation would force Starmer to have difficult conversations about spending cuts to fund security outlays.

The spending plans already on the agenda "will not be sufficient" to address the deteriorating security environment, she said.

**With Matthew Knott**

***Get a note directly from our foreign correspondents on what's making headlines around the world. Sign up for our weekly What in the World newsletter.***

**MORE:** UK politics Defence Keir Starmer



**David Crowe** is Europe correspondent for The Sydney Morning Herald and The Age. Connect via X or email.

**ATTACHMENT 10** — CAFC 26-1721

Description — Dan Driscoll Resignation

News article/official DoD announcement

Redacted Email - Interpol (Italy)

Learn more about LSEG

# US Army Secretary Driscoll tenders resignation, source says

By **Idrees Ali**

August 31, 2026 6:02 PM EDT · Updated August 31, 2026

Aa



U.S. Secretary of the Army Daniel Driscoll testifies during a U.S. Senate Appropriations Subcommittee on Defense hearing on Capitol Hill in Washington, U.S, May 19, 2026. REUTERS/Tom Brenner Purchase Licensing Rights

**Summary**

- Source says Driscoll raised concerns over Army transformation and readiness efforts
- One U.S. official says Hegseth had long wanted to remove Driscoll
- Army Secretary gained prominence with Russia-Ukraine diplomacy

WASHINGTON, Aug 31 (Reuters) - U.S. Army Secretary Dan Driscoll has submitted his resignation to the White House following months of tension with Defense Secretary Pete Hegseth, a source familiar with the matter told Reuters.

Driscoll, who officials said is close to U.S. Vice President JD Vance, becomes the latest senior official who has either been fired or pushed out in Hegseth's Pentagon. It also comes as the United States is still engaged in a war with Iran, with thousands of U.S. Army soldiers deployed in the Middle East.

with thousands of U.S. Army soldiers deployed in the Middle East.

> The Misinformation Monitor newsletter rounds up international misinformation narratives, with a "Real or Fake?" quiz in every edition. Sign up here.

It was unclear if the White House had accepted his resignation.

"Driscoll brought up concerns with the administration surrounding Army transformation and readiness and Hegseth's blocking those efforts specifically by firing the generals who were responsible," the source said, referring to his efforts to modernize the Army.

The Army declined to comment on the news, which was first reported by the Wall Street Journal.

"Secretary Driscoll has been highly effective in advancing President Trump's agenda to Make America Strong Again at the Department of the Army by providing outstanding leadership during historic military operations, restoring an emphasis on readiness and lethality, assisting with negotiations between Russia and Ukraine, and more," White House spokeswoman Anna Kelly said in a statement.

The source said that Dave Fitzgerald, the deputy undersecretary of the Army who was focused on innovation within the Army, was also expected to resign. Fitzgerald did not immediately respond to a request for comment.

**BREWING FRUSTRATION WITH HEGSETH**

Driscoll, who was confirmed for the top Army position in February 2025, pushed the Army to be more nimble in acquiring cheaper weapons and chastised large weapons makers. The Army Secretary is responsible for training and equipping soldiers.

"(The) defense industrial base broadly, and the primes in particular, conned the American people and the Pentagon and the Army," Driscoll said last year in a reference to large defense companies.

One U.S. official, speaking on the condition of anonymity, said that Hegseth saw Driscoll as a threat within the bureaucracy and had long wanted to remove him. But his ties to Vance, the official said, made it tough for Hegseth to do so.






Driscoll gained prominence outside the Pentagon when he was tapped by Trump to take part in talks with Moscow and Kyiv to end the war in Ukraine – a rare diplomatic task for an Army secretary.

In April, Hegseth fired U.S. Army Chief of Staff Randy George, a major staffing change that came as the U.S. military was fighting a major war in the Middle East.

The official said George's firing caught Driscoll off guard and led to increased frustration with Hegseth.

Driscoll told lawmakers in April that after George was fired, his family drove to the former general's house and gave him a hug.

In June, Hegseth also pushed out the head of U.S. Army forces in Europe and he has personally blocked the promotion of senior Army officials.

"Driscoll brought urgency to an institution that cannot afford complacency," Republican Congressman Pat Harrigan said.

"Dan's service to this country is far from over," Harrigan added.

Reporting by Idrees Ali in Washington. Additional reporting by Stevel Holland in Washington and Natalia Bueno Rebolledo in Mexico City; Editing by Chris Reese, Sanjeev Miglani and Stephen Coates

Our Standards: **The Thomson Reuters Trust Principles.**

Suggested Topics:

**World**

Purchase Licensing Rights

**Idrees Ali**
Thomson Reuters

National security correspondent focusing on the Pentagon in Washington D.C. Reports on U.S. military activity and operations throughout the world and the impact that they have. Has reported from over two dozen countries to include Iraq, Afghanistan, and much of the Middle East, Asia and Europe. From Karachi, Pakistan.

## Read Next

[redacted]: Daitona Carter [redacted]
[redacted] 2026-08-30 [redacted]
[redacted] [redacted]interno.it, [redacted]
**Subject:** [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

- [redacted]
- [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]
DAITONA CARTER
[redacted]

**ATTACHMENT 11 —** CAFC 26-1721

Descriptions — IC Transitions (Rush, Gabbard, Fox Kennedy, Clayton)

Office of Public Affairs
U.S. Department of Justice

PRESS RELEASE

# Former Federal Employee Pleads Guilty to Defrauding the Federal Government of Approximately $194 Million

Tuesday, October 6, 2026

**For Immediate Release**

Office of Public Affairs

## Scheme Included the Fraudulent Acquisition of Tens of Millions of Dollars in Gold Bars and Luxury Properties in Florida

David J. Rush, 49, of Ashburn, Virginia, pleaded guilty today to executing a scheme to defraud the federal government relating to the misuse of his government position, resulting in a loss of approximately $194 million.

“Federal employees are entrusted with serving the American people, not themselves,” said Attorney General Todd Blanche. “The Trump Administration is committed to rooting out waste, fraud, and abuse in the federal government, including by prosecuting those who foolishly defraud American taxpayers.”

“Following an internal investigation that identified potential crimes, CIA immediately referred this matter to the FBI,” said CIA Director John Ratcliffe. “David Rush abused his position and betrayed the public trust and should be held fully accountable for his actions. We appreciate our law enforcement partners in the FBI and Department of Justice for securing this outcome. The Agency is committed to ensuring that those entrusted with our Nation’s secrets are held to the absolute highest standard.”

“By his own admission, David Rush defrauded the government of hundreds of millions of dollars, and then misused those funds for extravagant purchases,” said FBI Director Kash Patel. “Rush betrayed his oath, his co-workers, and the American people and he will now face justice for his actions. This plea demonstrates the FBI’s commitment to protecting the public’s trust; and that no government position, security clearance, or access to government resources places anyone above the law.”

“Our Intelligence Community must have the trust of the American people to operate effectively in a Nation

committed to transparency and the rule of law," said Assistant Attorney General for National Security John A. Eisenberg. "Rush repeatedly betrayed that trust. He defrauded the United States out of approximately $194 million in real estate, jewelry, and other valuable property, including 298 gold bars. Worse, his self-serving actions threatened to erode public confidence in the intelligence services that must strive in secret to keep America safe. Thankfully, the efforts of the Department of Justice, its partners in law enforcement, and the Intelligence Community exposed Rush's crimes. Today's plea marks an important step in bringing Rush to justice."

"The United States entrusted Davis Rush with the resources to protect our nation and its people, and for sheer avarice he chose to betray that trust for personal enrichment," said First Assistant U.S. Attorney Theophani K. Stamos for the Eastern District of Virginia. "He robbed his country, not just of its treasury, but also of its faith. This office is committed to prosecuting those who undermine the security of the United States."

According to court documents, Rush was employed in a senior executive-level position with a federal agency and held a Top Secret/Sensitive Compartmented Information (TS/SCI) security clearance. He reached that position, in part, by lying about his education and military experience. Rush used his position of extraordinary public trust to create fictitious government authorities – including a fabricated Special Access Program – to obtain U.S. government funds for his personal benefit. Once he received the funds, Rush acquired gold bars and directed approximately $145 million in wire transfers that he ultimately used to purchase luxury real estate, watches, and at least one car. As a result of his scheme, Rush fraudulently obtained approximately $193,590,400 in U.S. government funds.




*Cash and gold bars recovered in search of Rush's residence*

On May 19, 2026, the FBI searched Rush's residence and recovered 298 gold bars, approximately $2,106,550 in cash, €104,795, and numerous luxury watches. Rush had obtained the gold bars at an approximate cost to the government of $46 million. Pursuant to the plea agreement, Rush has agreed to forfeit the gold bars and currency found at his home, the fraudulently obtained properties, 30 watches (many of which were Rolexes), and two 2026 BMW Alpina vehicles, at least one of which is valued at approximately $172,000.

Rush is scheduled to be sentenced on Jan. 28, 2027. He faces a maximum penalty of 20 years in prison, three years of supervised release, forfeiture, restitution, and a fine. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

The case is prosecuted by Trial Attorneys Kevin C. Hakala and Kathryn D. DeMarco of the Justice Department's Counterintelligence and Export Control Section and Assistant U.S. Attorneys Raizza K. Ty, Gavin R. Tisdale, and Anthony T. Aminoff for the Eastern District of Virginia.

The U.S. Navy's Naval Criminal Investigative Service also provided valuable assistance to the investigation.

The Department of Justice's investigation is continuing. The Director of National Intelligence has requested that the Inspector General for the Intelligence Community initiate an investigation.

Related court documents and information are located on the website of the District Court for the Eastern

# Tulsi Gabbard Resigns as Director of National Intelligence

Ms. Gabbard had a difficult tenure in the Trump administration and was seldom seen in the room when the president made important national-security moves.

Listen · 8:16 min

 

**By Dustin Volz and Julian E. Barnes**
Reporting from Washington

May 22, 2026

See more of our coverage in your search results.

**Add The New York Times on Google ↗**

Tulsi Gabbard, the director of national intelligence and an advocate of a more restrained foreign policy, submitted a letter of resignation to President Trump on Friday, saying that she was stepping away to support her husband after he recently was diagnosed with a rare form of bone cancer.

The departure will bring an end to Ms. Gabbard's rocky tenure overseeing the 18 U.S. intelligence agencies, during which she had been largely sidelined by the White House on significant national-security issues, including military operations in Iran and Venezuela.

Mr. Trump assembled a second administration last year with an unusual mix of foreign-policy hawks in one corner and critics of American entanglements overseas like Ms. Gabbard in the other. But Ms. Gabbard and her wing found themselves increasingly marginalized in recent months, and her departure marks the most significant exit yet from the coalition of restrainers.

In her letter Friday, Ms. Gabbard, 45, said she would remain in her post as the nation's intelligence chief until June 30.

"My husband, Abraham, has recently been diagnosed with an extremely rare form of bone cancer," Ms. Gabbard said in her resignation letter, a copy of which was released by her office. "He faces major challenges in the coming weeks and months. At this time, I must step away from public service to be by his side and fully support him through this battle." Ms. Gabbard has been married to Abraham Williams, a cinematographer, since 2015.

Mr. Trump announced that Aaron Lukas, Ms. Gabbard's deputy, would serve as acting director of national intelligence.

It was not clear whom Mr. Trump intended to nominate to replace Ms. Gabbard, a combat veteran and former Democratic congresswoman from Hawaii who ran for president in 2020 before breaking with her party to support Mr. Trump in 2024.

Mr. Trump did not force Ms. Gabbard to resign on Friday, according to people familiar with the matter, but her standing and influence within the White House had continued to erode in recent months.

In a post on Truth Social, Mr. Trump thanked her for her service in the administration. "Tulsi has done an incredible job, and we will miss her," he wrote.

Democrats, while expressing sympathy for Ms. Gabbard and her husband, made clear they had been dismayed by her performance. "Let's be clear: Donald Trump must not treat this vacancy as another opportunity to reward loyalty over competence," Senator Chuck Schumer of New York, the minority leader, said in a statement.

Ms. Gabbard had been a controversial figure in the Trump administration. She was seldom seen in the room when Mr. Trump made major national-security decisions and was widely viewed within the administration and by lawmakers in Congress as not a key member of the president's team.

Her problems began soon after she was narrowly confirmed to the job last year following an especially contentious confirmation hearing. Several Republican senators joined Democrats in aggressively questioning her about some of her past views, including her defenses of the former intelligence contractor Edward Snowden and Bashar al-Assad, the former Syrian dictator.

As a fierce critic of the war in Iraq, Ms. Gabbard was closely aligned at times with Vice President JD Vance. But that put her out of step with Mr. Trump and many of his most influential advisers, including Secretary of State Marco Rubio and Stephen Miller, the White House deputy chief of staff, who pressed for an increasingly aggressive foreign policy in Latin America and Iran.

Despite conflicting foreign policy views, Ms. Gabbard at times managed her relationship with Mr. Trump, and won support from him with her work on election security and her surprise appearance early this year at an F.B.I. seizure of 2020 vote ballots in Georgia.

And Ms. Gabbard pleased Mr. Trump with her criticism of Obama-era investigations of Russia election meddling. "She's, like, hotter than everybody. She's the hottest one in the room right now," Mr. Trump said last July, after Ms. Gabbard amplified without evidence claims that the Obama administration had deliberately overstated Russia's interference in the 2016 election.

The praise came just weeks after Mr. Trump excoriated Ms. Gabbard over a video she had filmed during a trip to Asia that he saw as self-promotional, according to two people with knowledge of what had happened.

But as she variously pleased and disappointed Mr. Trump, Ms. Gabbard quickly developed a strained relationship with the C.I.A. as well as the broader U.S. intelligence community, according to current and former American officials. She presided over significant turnover at her agency headquarters in Liberty Crossing, Va., and supported efforts by Mr. Trump to rescind security clearances of intelligence officials viewed by the president and his allies as either disloyal or corrupt.

Mr. Trump had given Ms. Gabbard a mandate to shrink the size of her office, and she pursued that with vigor. She slashed the Foreign Malign Influence Center, which tracked adversarial efforts to interfere in American politics, and made other changes.

But her diminished stature in the administration became more visible in recent months. During the

planning for the attacks on Iran and the January military raid to seize President Nicolás Maduro of Venezuela, it was the C.I.A. director, John Ratcliffe, who emerged as the most influential voice on intelligence matters. When Mr. Trump's closest advisers met, it was Mr. Ratcliffe who delivered the intelligence assessments, not Ms. Gabbard.

Tensions between the C.I.A. and the Office of the Director of National Intelligence, which was created after the Sept. 11 terror attacks in 2001 to ensure better coordination of U.S. intelligence, rose throughout Ms. Gabbard's 15-month tenure because of what some intelligence officials saw as political stunts. She stripped the security clearance of a senior C.I.A. officer who had been tapped for an overseas assignment. She ousted some respected career C.I.A. officers from posts held within her office.

There were also turf battles. Ms. Gabbard sought to move production of parts of the President's Daily Brief — a daily compendium of the most important intelligence insights generated by U.S. spy agencies — from C.I.A. headquarters to her own. While Ms. Gabbard's office oversees the brief, much of the work of pulling together the material for the president and other senior leaders is done at the agency.

Ms. Gabbard also was in a dispute with the F.B.I. about whether her office should have ultimate oversight over counterintelligence efforts, for which the bureau has long had primary responsibility. F.B.I. leaders also were upset by the efforts of Joe Kent, the former director of the National Counter Terrorism Center and a close aide to Ms. Gabbard, to investigate the killing of Charlie Kirk, the conservative activist.

Mr. Kent stepped down in March, citing his objections to the Iran war. Another ally, Amaryllis Fox Kennedy, announced this month that she was leaving her post in Ms. Gabbard's office and another position at the White House. The departures fueled speculation that Ms. Gabbard could soon be next to go.

Olivia C. Coleman, a spokeswoman for Ms. Gabbard, challenged accounts that Ms. Gabbard had been at odds with the White House.

Ms. Gabbard will be the fourth cabinet member of Mr. Trump's second term to step down, following former Attorney General Pam Bondi, former Homeland Security Secretary Kristi Noem, and former Labor Secretary Lori Chavez-DeRemer. All four of them are women.

On Friday, she submitted her resignation and signed it: "With love and aloha."

Tyler Pager contributed reporting.

Dustin Volz writes about cybersecurity and intelligence for The Times. He is based in Washington.

Julian E. Barnes covers the U.S. intelligence agencies and international security matters for The Times. He has written about security issues for more than two decades.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Gabbard, Citing Ill Husband, Resigns as Intelligence Director

EXCLUSIVE NATIONAL SECURITY

# The Kennedy Who Says She Left the White House Over Concerns About CIA Spending

Amaryllis Fox Kennedy says in an interview that there wasn't enough oversight of the intelligence community's use of taxpayer funds

By Philip Wegmann
June 3, 2026 9:00 pm ET




Amaryllis Fox Kennedy MICHAEL BROCHSTEIN/ZUMA PRESS

WASHINGTON—Amaryllis Fox Kennedy, a former senior Trump administration official, said she resigned last month in part because she was increasingly frustrated with the lack of oversight of the intelligence community's use of taxpayer funds—including gold bullion.

"I couldn't keep signing the checks," she said in an interview with The Wall Street Journal. "I would have become complicit."

---

## You are Trying to Access a WSJ News Exclusive

Politics without the spin. Get unlimited access to nonpartisan reporting.

THE WALL STREET JOURNAL.

# Senate Confirms Jay Clayton to Lead U.S. Intelligence Community

Mr. Clayton, who shed Democratic support after he refused to clearly say Joseph R. Biden Jr. won the 2020 election, will take over the Office of the Director of National Intelligence from Bill Pulte.

Listen · 5:18 min



**By Dustin Volz**
Reporting from Washington

July 28, 2026

See more of our coverage in your search results.

**Add The New York Times on Google** ↗

The Senate confirmed Jay Clayton, the U.S. attorney in Manhattan, on Tuesday to oversee the nation's intelligence agencies, installing a longtime ally of the president into a top national security post that has waned in significance during the second Trump administration.

The vote, 51 to 47, was along party lines. Though his nomination was initially met with some good will from Democrats, Mr. Clayton shed that bipartisan support during his confirmation hearing this month after he refused to clearly state that Joseph R. Biden Jr. had won the 2020 presidential election.

Though Democrats opposed Mr. Clayton, some have privately expressed relief that he will take the reins of the Office of the Director of National Intelligence from Bill Pulte, a housing official who has pursued campaigns of retribution against President Trump's perceived enemies.

Still, in a statement after the vote, Senator Mark Warner, Democrat of Virginia, voiced some skepticism about Mr. Clayton, despite their longstanding relationship.

"I came away from his confirmation process with serious reservations about whether he would be willing to stand up to political pressure when it matters most," said Mr. Warner, the top Democrat on the Senate Intelligence Committee. "Now that he has been confirmed, I sincerely hope he proves those concerns unfounded, because the intelligence community deserves steadier leadership than it has received in recent months."

In serving as the acting director, Mr. Pulte has downsized the spy office, making gleeful pronouncements of his moves on social media. On Tuesday morning, Mr. Pulte claimed on X that he had just executed a "5th and Near Final Round of TERMINATIONS" that totaled a 30 percent staff reduction during his short tenure, though current and former officials said it was unclear whether many of those cuts had actually taken place.

Weeks ago, Democrats and Republicans were working in tandem to quickly confirm Mr. Clayton to the post to prevent Mr. Pulte from taking the job even briefly, as some lawmakers feared he could engineer irreversible damage to the intelligence community. But that plan fell apart when Mr. Trump did not allow

Mr. Clayton to appear for a confirmation hearing as he sought to pressure lawmakers to pass a voting restriction measure, leading to Mr. Pulte's weekslong stint.

Democrats and some Republicans viewed Mr. Pulte, who lacked any national security experience, as ill-suited for the job, and many were eager to see Mr. Clayton, who served as chairman of the Securities and Exchange Commission during Mr. Trump's first term, succeed him.

The Office of the Director of National Intelligence was created in the aftermath of the Sept. 11, 2001, terrorist attacks and was intended to facilitate better intelligence coordination among spy agencies. Its influence has varied considerably since its inception, changing with each White House occupant and reaching a nadir during the current Trump administration.

Mr. Trump has leaned heavily on the C.I.A. director, John Ratcliffe, on key national security decisions, including a raid in January in Venezuela and the war with Iran. He has turned to the office instead to selectively declassify documents and nurse his longstanding grievances against the "deep state" he has accused of trying to undermine him.

Mr. Ratcliffe recommended Mr. Clayton for the spy chief job to Mr. Trump, according to people familiar with the matter, and the two are expected to be more aligned on issues than were Mr. Ratcliffe and Tulsi Gabbard, who announced in May she was stepping down from the post after her husband was diagnosed with cancer.

During his short tenure atop the agency, Mr. Pulte oversaw staffing cuts and helped declassify documents related to the 2020 election. But he has not fired as many people as Democrats had initially feared, and documents the White House released this month concerning foreign election meddling were in many instances information that had already been made public.

Though seen as a far more favorable option relative to Mr. Pulte, Democratic senators soured on Mr. Clayton when he supplied evasive answers about whether Mr. Biden had won the 2020 election. In heated exchanges with Senator Jon Ossoff, a Georgia Democrat who has drawn mentions as a potential 2028 presidential candidate, Mr. Clayton said that Mr. Biden had been "certified" as the winner but declined to more explicitly declare he was the rightful winner.

But unlike in the case of Ms. Gabbard, a former Democratic congresswoman whom some Republicans struggled to warm up to, Mr. Clayton's confirmation was never in doubt despite his testimony.

In Mr. Clayton's U.S. attorney role, his office also issued subpoenas this month to several New York Times journalists who had recently published articles disclosing security concerns about Mr. Trump's new Qatari-donated Air Force One jet. The Justice Department withdrew those subpoenas last week.

Robert Jimison contributed reporting.

Dustin Volz writes about cybersecurity and intelligence for The Times. He is based in Washington.

A version of this article appears in print on , Section A, Page 13 of the New York edition with the headline: Clayton Wins Confirmation From Senate As Spy Chief

**ATTACHMENT 12** — CAFC 26-1721

PTAB IPR Dockets - USPTO Patent Center

Partly Previously filed as Doc. , re-submitted with additional IPR dockets for panel convenience.

Search P-TACTS

ptacts.uspto.gov/ptacts/ui/public-search

## Documents for AIA Review number IPR2026-00376

Click on the Document name to view/download the document

Showing 1-48 of 48 records

| | | | | | | |
|---|---|---|---|---|---|---|
| 31 | Ex. 1003 - Declaration of John Feland, Ph.D. | Exhibit | 1003 | 06/18/2026 | Petitioner | Public |
| 32 | Ex. 1002 - Excerpts from Prosecution History of US12216339 | Exhibit | 1002 | 06/18/2026 | Petitioner | Public |
| 33 | Ex. 1001 - US12216339 (339 Patent) | Exhibit | 1001 | 06/18/2026 | Petitioner | Public |
| 34 | Patent Owner's Updated Mandatory Notices | Paper | 15 | 10/21/2026 | Patent Owner | Public |
| 35 | Director Discretionary Decision: Refer | Paper | 14 | 10/19/2026 | Board | Public |
| 36 | Motion for Pro Hac Vice of Jameson Pasek | Paper | 13 | 10/13/2026 | Patent Owner | Public |
| 37 | Notice of Intent to Designate Dennis Courtney as Back-Up Counsel | Paper | 12 | 10/13/2026 | Patent Owner | Public |
| 38 | Notice of Intent to Designate Colette Woo as Back-Up Counsel | Paper | 11 | 10/13/2026 | Patent Owner | Public |
| 39 | Notice of Intent to Designate Nathan Lowenstein as Back-Up Counsel | Paper | 10 | 10/13/2026 | Patent Owner | Public |
| 40 | Patent Owner's Preliminary Response | Paper | 9 | 09/23/2026 | Patent Owner | Public |
| 41 | Petitioners' Response to Request for Discretionary Denial - Luxottica-Meta-Solo... | Paper | 8 | 09/23/2026 | Petitioner | Public |
| 42 | Patent Owner's Discretionary Denial Brief | Paper | 7 | 08/24/2026 | Patent Owner | Public |
| 43 | Patent Owner's Power of Attorney | Paper | 6 | 07/09/2026 | Patent Owner | Public |
| 44 | Patent Owner's Mandatory Notices | Paper | 5 | 07/09/2026 | Patent Owner | Public |
| 45 | Notice: NOTICE OF FILING DATE ACCORDED TO PETITION AND TIME FOR FILI... | Paper | 4 | 06/23/2026 | Board | Public |
| 46 | Petition: as filed | Paper | 3 | 06/18/2026 | Petitioner | Public |
| 47 | Notice: Power of Attorney | Paper | 2 | 06/18/2026 | Petitioner | Public |
| 48 | Notice: Power of Attorney | Paper | 1 | 06/18/2026 | Petitioner | Public |

All per page · Page 1 of 1

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC · ABOUT THIS SITE · USPTO BACKGROUND · FEDERAL GOVERNMENT

ptacts.uspto.gov/ptacts/ui/public-search

Patent Trial ar

Search P-TACTS

AIA review #

IPR2026-00412

Additional filter(s)

Showing 1-1 of 1 records

## Documents for AIA Review number IPR2026-00412

Click on the Document name to view/download the document

Showing 1-48 of 48 records

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Ex. 2003 Courtney Declaration In Support of Notice of Intent | Exhibit | 2003 | 10/13/2026 | Patent Owner | Public |
| 9 | Ex. 2002 Woo Declaration In Support of Notice of Intent | Exhibit | 2002 | 10/13/2026 | Patent Owner | Public |
| 10 | Ex. 2001 Lowenstein Declaration In Support of Notice of Intent | Exhibit | 2001 | 10/13/2026 | Patent Owner | Public |
| 11 | Ex. 1025 - US20150049578 (Hoctor) | Exhibit | 1025 | 08/07/2026 | Petitioner | Public |
| 12 | Ex. 1024 - Mano - Excerpts from Logic And Computer Design Fundamentals | Exhibit | 1024 | 08/07/2026 | Petitioner | Public |
| 13 | Ex. 1023 - Yu - A Low-Power ¿¿ Modulator In 90-nm Digital CMOS Without DEM | Exhibit | 1023 | 08/07/2026 | Petitioner | Public |
| 14 | Ex. 1022 - Moon - Design Approach For Decimation Filter For ADC Application | Exhibit | 1022 | 08/07/2026 | Petitioner | Public |
| 15 | Ex. 1021 - Milic - Multirate Filters_ An Overview | Exhibit | 1021 | 08/07/2026 | Petitioner | Public |
| 16 | Ex. 1020 - Nilsen - Distortion-Free Delta-Sigma Beamforming | Exhibit | 1020 | 08/07/2026 | Petitioner | Public |
| 17 | Ex. 1019 - Freeman - Delta-Sigma Oversampled Ultrasound Beamformer With Dyn | Exhibit | 1019 | 08/07/2026 | Petitioner | Public |
| 18 | Ex. 1018 - Van Veen - Beamforming_ A Versatile Approach To Spatial Filterin | Exhibit | 1018 | 08/07/2026 | Petitioner | Public |
| 19 | Ex. 1017 - Gannot - Adaptive Beamforming And Postfiltering | Exhibit | 1017 | 08/07/2026 | Petitioner | Public |
| 20 | Ex. 1016 - Kneipfer - Sonar Beamforming_ An Overview Of Its History And Sta | Exhibit | 1016 | 08/07/2026 | Petitioner | Public |
| 21 | Ex. 1015 - Brandstein - Digital Signal Processing (Microphone Arrays) | Exhibit | 1015 | 08/07/2026 | Petitioner | Public |
| 22 | Ex. 1014 - Excerpt from Modern Dictionary of Electronics 7th Edition | Exhibit | 1014 | 08/07/2026 | Petitioner | Public |
| 23 | Ex. 1013 - Excerpts from Microsoft Computer Dictionary 5th Edition | Exhibit | 1013 | 08/07/2026 | Petitioner | Public |
| 24 | Ex. 1012 - Tiete - SoundCompass_ A Distributed MEMS Microphone Array-Based | Exhibit | 1012 | 08/07/2026 | Petitioner | Public |
| 25 | Ex. 1011 - US6539096 (Sigwanz) | Exhibit | 1011 | 08/07/2026 | Petitioner | Public |
| 26 | Ex. 1010 - US5203335 (Noujaim) | Exhibit | 1010 | 08/07/2026 | Petitioner | Public |
| 27 | Ex. 1009 - US5461389 (Dean) | Exhibit | 1009 | 08/07/2026 | Petitioner | Public |
| 28 | Ex. 1008 - US6339647 (Andersen) | Exhibit | 1008 | 08/07/2026 | Petitioner | Public |

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC

ABOUT THIS SITE

USPTO BACKGROUND

FEDERAL GOVERNMENT

ptacts.uspto.gov/ptacts/ui/public-search

Patent Trial ar

Search P-TACTS

AIA review #

IPR2026-00412

Additional filter(s)

Showing 1-1 of 1 records

| AIA review # | Filing date (mm/dd/yyyy) | Documents |
| --- | --- | --- |
| IPR2026-00412 | 08/07/2026 | View docume |

## Documents for AIA Review number IPR2026-00412

Click on the Document name to view/download the document

Showing 1-48 of 48 records

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| 29 | Ex. 1007 - US20070229336 (Liu) | Exhibit | 1007 | 08/07/2026 | Petitioner | Public |
| 30 | Ex. 1006 - EP1744174 (Moquin) | Exhibit | 1006 | 08/07/2026 | Petitioner | Public |
| 31 | Ex. 1005 - US20140270247 (Swanson) | Exhibit | 1005 | 08/07/2026 | Petitioner | Public |
| 32 | Ex. 1004 - Thomas Kenny, Ph.D C.V. | Exhibit | 1004 | 08/07/2026 | Petitioner | Public |
| 33 | Ex. 1003 - Expert Declaration '055 Pat. - Luxottica-Meta-Solos | Exhibit | 1003 | 08/07/2026 | Petitioner | Public |
| 34 | Ex. 1002 - '055 Patent File History | Exhibit | 1002 | 08/07/2026 | Petitioner | Public |
| 35 | Ex. 1001 - US11082055 ('055 Patent) | Exhibit | 1001 | 08/07/2026 | Petitioner | Public |
| 36 | Patent Owner's Updated Mandatory Notices | Paper | 13 | 10/21/2026 | Patent Owner | Public |
| 37 | Patent Owner's Discretionary Denial Brief | Paper | 12 | 10/13/2026 | Patent Owner | Public |
| 38 | Motion for Pro Hac Vice Admission of Jameson Pasek | Paper | 11 | 10/13/2026 | Patent Owner | Public |
| 39 | Notice of Intent to Designate Dennis Courtney as Back-Up Counsel | Paper | 10 | 10/13/2026 | Patent Owner | Public |
| 40 | Notice of Intent to Designate Colette Woo as Back-Up Counsel | Paper | 9 | 10/13/2026 | Patent Owner | Public |
| 41 | Notice of Intent to Designate Nathan Lowenstein as Back-Up Counsel | Paper | 8 | 10/13/2026 | Patent Owner | Public |
| 42 | Patent Owner's Power of Attorney | Paper | 7 | 08/11/2026 | Patent Owner | Public |
| 43 | Patent Owner's Mandatory Notices | Paper | 6 | 08/11/2026 | Patent Owner | Public |
| 44 | Notice: NOTICE OF FILING DATE ACCORDED TO PETITION AND TIME FOR FILI... | Paper | 5 | 08/10/2026 | Board | Public |
| 45 | IPR Petition '055 Pat. - Luxottica-Meta-Solos | Paper | 4 | 08/07/2026 | Petitioner | Public |
| 46 | Rankings Statement for IPR Petition '055 Pat. - Luxottica-Meta-Solos | Paper | 3 | 08/07/2026 | Petitioner | Public |
| 47 | Notice: Power of Attorney | Paper | 2 | 08/07/2026 | Petitioner | Public |
| 48 | Notice: Power of Attorney | Paper | 1 | 08/07/2026 | Petitioner | Public |

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC
Patents
Trademarks
Learning & Resources

ABOUT THIS SITE
Accessibility
Privacy Policy
Terms of Use

USPTO BACKGROUND
Federal Activity Inventory Reform Act (FAIR)
Performance and Planning
Freedom of Information Act

FEDERAL GOVERNMENT
Regulations.gov
StopFakes.gov
USA.gov

## Documents for AIA Review number IPR2026-00413

Click on the Document name to view/download the document

Showing 1-25 of 61 records

| | Document name | Document type | Exhibit/Paper number | Filing date | Filing party | Availability |
|---|---|---|---|---|---|---|
| 1 | Ex 2010 Settled Expectations Chart | Exhibit | 2010 | 10/19/2026 | Patent Owner | Public |
| 2 | Ex 2008 Process Memorandum | Exhibit | 2008 | 10/19/2026 | Patent Owner | Public |
| 3 | Ex 2007 Complaint-Ex 9 | Exhibit | 2007 | 10/19/2026 | Patent Owner | Public |
| 4 | Ex 2006 Complaint-Ex 7 | Exhibit | 2006 | 10/19/2026 | Patent Owner | Public |
| 5 | Ex 2005 Complaint | Exhibit | 2005 | 10/19/2026 | Patent Owner | Public |
| 6 | Ex. 2004 Declaration of Jameson Pasek In Support of Motion for Pro Hac Vice A... | Exhibit | 2004 | 10/13/2026 | Patent Owner | Public |
| 7 | Ex. 2003 Courtney Declaration In Support of Notice of Intent | Exhibit | 2003 | 10/13/2026 | Patent Owner | Public |
| 8 | Ex. 2002 Woo Declaration In Support of Notice of Intent | Exhibit | 2002 | 10/13/2026 | Patent Owner | Public |
| 9 | Ex. 2001 Lowenstein Declaration In Support of Notice of Intent | Exhibit | 2001 | 10/13/2026 | Patent Owner | Public |
| 10 | Ex. 1030 - Allard - Propagation Of Sound In Porous Media (Second Ed.) | Exhibit | 1030 | 08/14/2026 | Petitioner | Public |
| 11 | Ex. 1029 - Morse - Theoretical Acoustics (Part 1 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 12 | Ex. 1029 - Morse - Theoretical Acoustics (Part 10 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 13 | Ex. 1029 - Morse - Theoretical Acoustics (Part 11 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 14 | Ex. 1029 - Morse - Theoretical Acoustics (Part 2 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 15 | Ex. 1029 - Morse - Theoretical Acoustics (Part 3 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 16 | Ex. 1029 - Morse - Theoretical Acoustics (Part 4 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 17 | Ex. 1029 - Morse - Theoretical Acoustics (Part 5 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 18 | Ex. 1029 - Morse - Theoretical Acoustics (Part 6 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 19 | Ex. 1029 - Morse - Theoretical Acoustics (Part 7 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |

ptacts.uspto.gov/ptacts/ui/public-search 80%

Patent Trial ar

Search P-TACTS

## Documents for AIA Review number IPR2026-00413

Click on the Document name to view/download the document

Showing 1-61 of 61 records

| | | | | | | |
|---|---|---|---|---|---|---|
| 19 | Ex. 1029 - Morse - Theoretical Acoustics (Part 7 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 20 | Ex. 1029 - Morse - Theoretical Acoustics (Part 8 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 21 | Ex. 1029 - Morse - Theoretical Acoustics (Part 9 of 11) | Exhibit | 1029 | 08/14/2026 | Petitioner | Public |
| 22 | Ex. 1028 - Pierce - Acoustics_ An Introduction To Its Physical Principles A | Exhibit | 1028 | 08/14/2026 | Petitioner | Public |
| 23 | Ex. 1027 - Kock - Refracting Sound Waves | Exhibit | 1027 | 08/14/2026 | Petitioner | Public |
| 24 | Ex. 1026 - Thiele - Loudspeakers In Vented Boxes_ Part II | Exhibit | 1026 | 08/14/2026 | Petitioner | Public |
| 25 | Ex. 1025 - Thiele - Loudspeakers In Vented Boxes_ Part I | Exhibit | 1025 | 08/14/2026 | Petitioner | Public |
| 26 | Ex. 1024 - Dillon - Hearing Aids (Second Edition) | Exhibit | 1024 | 08/14/2026 | Petitioner | Public |
| 27 | Ex. 1023 - Katz - Handbook of Clinical Audiology (Seventh Ed.) | Exhibit | 1023 | 08/14/2026 | Petitioner | Public |
| 28 | Ex. 1022 - Declaration of John Gaustad | Exhibit | 1022 | 08/14/2026 | Petitioner | Public |
| 29 | Ex. 1021 - Kinsler - Fundamentals of Acoustics (Fourth Ed.) | Exhibit | 1021 | 08/14/2026 | Petitioner | Public |
| 30 | Ex. 1020 - Olson - Music, Physics, and Engineering (Second Ed.) | Exhibit | 1020 | 08/14/2026 | Petitioner | Public |
| 31 | Ex. 1019 - Beranek - Acoustics_ Sound Fields and Transducers | Exhibit | 1019 | 08/14/2026 | Petitioner | Public |
| 32 | Ex. 1018 - JP7295253B2 (Villalpando) | Exhibit | 1018 | 08/14/2026 | Petitioner | Public |
| 33 | Ex. 1017 - WO2020161545 (Villalpando) | Exhibit | 1017 | 08/14/2026 | Petitioner | Public |
| 34 | Ex. 1016 - Declaration of John Andrews for Translation of Excerpts from the | Exhibit | 1016 | 08/14/2026 | Petitioner | Public |
| 35 | Ex. 1015 - Declaration of John Andrews for Translation of JPS5681814A (Higu | Exhibit | 1015 | 08/14/2026 | Petitioner | Public |
| 36 | Ex. 1014 - Declaration of John Andrews for Translation of JPH02104200A (Ono | Exhibit | 1014 | 08/14/2026 | Petitioner | Public |
| 37 | Ex. 1013 - Declaration of John Andrews for Translation of JP2016039632A (Ma | Exhibit | 1013 | 08/14/2026 | Petitioner | Public |
| 38 | Ex. 1012 - Excerpts from the File History of Japanese Patent Application No | Exhibit | 1012 | 08/14/2026 | Petitioner | Public |
| 39 | Ex. 1011 - US20030002703 (Ma) | Exhibit | 1011 | 08/14/2026 | Petitioner | Public |
| 40 | Ex. 1010 - US7306332 (Chen) | Exhibit | 1010 | 08/14/2026 | Petitioner | Public |

Showing 1-5 of 5 records

25 per page · Page 1 of 1

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC ABOUT THIS SITE USPTO BACKGROUND FEDERAL GOVERNMENT

Patent Trial ar

Search P-TACTS

AIA review #

Additional filter(s)

Showing 1-5 of 5 records

| AIA review # | Filing date (mm/dd/yyyy) |
|---|---|
| IPR2026-00512 | 09/29/2026 |
| IPR2026-00413 | 08/14/2026 |
| IPR2026-00420 | 08/07/2026 |
| IPR2026-00412 | 08/07/2026 |
| IPR2026-00376 | 06/18/2026 |

## Documents for AIA Review number IPR2026-00413

Click on the Document name to view/download the document

Showing 1-61 of 61 records

| | | | | | | |
|---|---|---|---|---|---|---|
| 40 | Ex. 1010 - US7306332 (Chen) | Exhibit | 1010 | 08/14/2026 | Petitioner | Public |
| 41 | Ex. 1009 - English Translation of JPS5681814A (Higuchi) | Exhibit | 1009 | 08/14/2026 | Petitioner | Public |
| 42 | Ex. 1008 - US6301367 (Boyden) | Exhibit | 1008 | 08/14/2026 | Petitioner | Public |
| 43 | Ex. 1007 - English Translation of JPH02104200A (Ono) | Exhibit | 1007 | 08/14/2026 | Petitioner | Public |
| 44 | Ex. 1006 - US20140268016 (Chow) | Exhibit | 1006 | 08/14/2026 | Petitioner | Public |
| 45 | Ex. 1005 - English Translation of JP2016039632A (Matsunari) | Exhibit | 1005 | 08/14/2026 | Petitioner | Public |
| 46 | Ex. 1004 - CV of Michael Johnson, Ph.D | Exhibit | 1004 | 08/14/2026 | Petitioner | Public |
| 47 | Ex. 1003 - Declaration of Michael Johnson, Ph.D | Exhibit | 1003 | 08/14/2026 | Petitioner | Public |
| 48 | Ex. 1002 - Excerpts from Prosecution History of US11871174 | Exhibit | 1002 | 08/14/2026 | Petitioner | Public |
| 49 | Ex. 1001 - US11871174 (174 Patent) | Exhibit | 1001 | 08/14/2026 | Petitioner | Public |
| 50 | Patent Owner's Updated Mandatory Notices | Paper | 12 | 10/21/2026 | Patent Owner | Public |
| 51 | Patent Owner's Discretionary Denial Brief | Paper | 11 | 10/19/2026 | Patent Owner | Public |
| 52 | Motion for Pro Hac Vice Admission of Jameson Pasek | Paper | 10 | 10/13/2026 | Patent Owner | Public |
| 53 | Notice of Intent to Designate Dennis Courtney as Back-Up Counsel | Paper | 9 | 10/13/2026 | Patent Owner | Public |
| 54 | Notice of Intent to Designate Colette Woo as Back-Up Counsel | Paper | 8 | 10/13/2026 | Patent Owner | Public |
| 55 | Notice of Intent to Designate Nathan Lowenstein as Back-Up Counsel | Paper | 7 | 10/13/2026 | Patent Owner | Public |
| 56 | Patent Owner's Power of Attorney | Paper | 6 | 08/25/2026 | Patent Owner | Public |
| 57 | Patent Owner's Mandatory Notices | Paper | 5 | 08/25/2026 | Patent Owner | Public |
| 58 | Notice: Notice filing date accorded | Paper | 4 | 08/18/2026 | Board | Public |
| 59 | IPR Petition '174 Pat. - Luxottica-Meta-Solos | Paper | 3 | 08/14/2026 | Petitioner | Public |
| 60 | Petitioner Meta POA - Luxottica-Meta-Solos '174 Pat. IPR2026-00413 | Paper | 2 | 08/14/2026 | Petitioner | Public |

25 per page · Page 1 of 1

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC · ABOUT THIS SITE · USPTO BACKGROUND · FEDERAL GOVERNMENT

ptacts.uspto.gov/ptacts/ui/public-search

Patent Trial ar

Search P-TACTS

AIA review # IPR2026-00420

## Documents for AIA Review number IPR2026-00420

Click on the Document name to view/download the document

Showing 1-25 of 48 records

| | Document name | Document type | Exhibit/Paper number | Filing date | Filing party | Availability |
|---|---|---|---|---|---|---|
| 1 | E-mail Third Party Supplemental Submission | Exhibit | 3101 | 08/14/2026 | Board | Public |
| 2 | Ex 2009 Settled Expectations Chart | Exhibit | 2009 | 10/13/2026 | Patent Owner | Public |
| 3 | Ex 2008 Process Memorandum | Exhibit | 2008 | 10/13/2026 | Patent Owner | Public |
| 4 | Ex 2007 Complaint-Ex 9 | Exhibit | 2007 | 10/13/2026 | Patent Owner | Public |
| 5 | Ex 2005 Complaint | Exhibit | 2005 | 10/13/2026 | Patent Owner | Public |
| 6 | Ex. 2004 Declaration of Jameson Pasek In Support of Motion for Pro Hac Vice A... | Exhibit | 2004 | 10/13/2026 | Patent Owner | Public |
| 7 | Ex. 2003 Courtney Declaration In Support of Notice of Intent | Exhibit | 2003 | 10/13/2026 | Patent Owner | Public |
| 8 | Ex. 2002 Woo Declaration In Support of Notice of Intent | Exhibit | 2002 | 10/13/2026 | Patent Owner | Public |
| 9 | Ex. 2001 Lowenstein Declaration In Support of Notice of Intent | Exhibit | 2001 | 10/13/2026 | Patent Owner | Public |
| 10 | T. Kite, "Understanding PDM digital audio," Audio Precision, Beaverton, OR | Exhibit | 1028 | 08/07/2026 | Petitioner | Public |
| 11 | J. Lewis, "Microphone array beamforming," Analog Devices, Norwood, MA, USA | Exhibit | 1027 | 08/07/2026 | Petitioner | Public |
| 12 | Analog Devices, "Seamlessly Interfacing MEMS Microphones with Blackfin Proc | Exhibit | 1026 | 08/07/2026 | Petitioner | Public |
| 13 | Analog Devices. ADMP521 datasheet—Ultralow Noise Microphone with Bottom | Exhibit | 1024 | 08/07/2026 | Petitioner | Public |
| 14 | J. Yu et al., "A low-power multi-bit Σ¿ modulator in 90-nm digital CMOS wit | Exhibit | 1023 | 08/07/2026 | Petitioner | Public |
| 15 | G. Moon et al., "Design Approach for Decimation Filter for ADC Application | Exhibit | 1022 | 08/07/2026 | Petitioner | Public |
| 16 | L. Milic et al., "Multirate Filters: An Overview," APCCAS 2006 - 2006 IEEE | Exhibit | 1021 | 08/07/2026 | Petitioner | Public |
| 17 | C.I.C Nilsen et al., "Distortion-Free Delta-Sigma Beamforming," | Exhibit | 1020 | 08/07/2026 | Petitioner | Public |
| 18 | S. R. Freeman et al., "Delta-sigma oversampled ultrasound beamformer | Exhibit | 1019 | 08/07/2026 | Petitioner | Public |

Showing 1-5 of 5 records

| AIA review # | Filing date (mm/dd/yyyy) | Documents |
|---|---|---|
| IPR2026-00512 | 09/29/2026 | View documen |
| IPR2026-00413 | 08/14/2026 | View documen |
| IPR2026-00420 | 08/07/2026 | View documen |
| IPR2026-00412 | 08/07/2026 | View documen |
| IPR2026-00376 | 06/18/2026 | View documen |

25 per page · Page 1 of 1

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC · ABOUT THIS SITE · USPTO BACKGROUND · FEDERAL GOVERNMENT

## Documents for AIA Review number IPR2026-00420

Click on the Document name to view/download the document

Showing 1-48 of 48 records

| | | | | | | |
|---|---|---|---|---|---|---|
| 19 | Gannot, Sharon, and Israel Cohen. "Adaptive Beamforming and Postfiltering." | Exhibit | 1018 | 08/07/2026 | Petitioner | Public |
| 20 | Gannot, Sharon, and Israel Cohen. "Adaptive Beamforming and Postfiltering." | Exhibit | 1017 | 08/07/2026 | Petitioner | Public |
| 21 | R. Kneipfer, "Sonar Beamforming – An Overview of Its History and Status." N | Exhibit | 1016 | 08/07/2026 | Petitioner | Public |
| 22 | M. Brandstein and D. Ward, Eds., Microphone Arrays: Signal Processing Techn | Exhibit | 1015 | 08/07/2026 | Petitioner | Public |
| 23 | R.F. Graf, Modern Dictionary of Electronics Seventh Edition, 1999 | Exhibit | 1014 | 08/07/2026 | Petitioner | Public |
| 24 | G.W. Elko and K.P. Harney, "A history of consumer microphones: The electret | Exhibit | 1013 | 08/07/2026 | Petitioner | Public |
| 25 | Tiete et al., "SoundCompass: A Distributed MEMS Microphone Array-Based Sens | Exhibit | 1012 | 08/07/2026 | Petitioner | Public |
| 26 | R. Crochiere et al., "Interpolation and Decimation of Digital Signals—A Tut | Exhibit | 1011 | 08/07/2026 | Petitioner | Public |
| 27 | U.S. Patent No. 5,203,335 ("Noujaim") | Exhibit | 1010 | 08/07/2026 | Petitioner | Public |
| 28 | U.S. Patent No. 6,339,647 ("Andersen") | Exhibit | 1008 | 08/07/2026 | Petitioner | Public |
| 29 | U.S. Patent App. Pub. No. 2007/0229336 ("Liu") | Exhibit | 1007 | 08/07/2026 | Petitioner | Public |
| 30 | U.S. Patent App. Pub. No. 2015/0281836 ("Nguyen") | Exhibit | 1006 | 08/07/2026 | Petitioner | Public |
| 31 | U.S. Patent App. Pub. No. 2013/0121504 ("Adams") | Exhibit | 1005 | 08/07/2026 | Petitioner | Public |
| 32 | Curriculum Vitae of Thomas W. Kenny, Ph.D. | Exhibit | 1004 | 08/07/2026 | Petitioner | Public |
| 33 | Declaration of T. Kenny | Exhibit | 1003 | 08/07/2026 | Petitioner | Public |
| 34 | File History of U.S. Patent No. 11,082,055 | Exhibit | 1002 | 08/07/2026 | Petitioner | Public |
| 35 | U.S. Patent No. 11,082,055 to Fan et al. ("the '055 Patent") | Exhibit | 1001 | 08/07/2026 | Petitioner | Public |
| 36 | Patent Owner's Updated Mandatory Notices | Paper | 13 | 10/21/2026 | Patent Owner | Public |
| 37 | Patent Owner's Discretionary Denial Brief | Paper | 12 | 10/13/2026 | Patent Owner | Public |
| 38 | Motion for Pro Hac Vice Admission of Jameson Pasek | Paper | 11 | 10/13/2026 | Patent Owner | Public |
| 39 | Notice of Intent to Designate Dennis Courtney as Back-Up Counsel | Paper | 10 | 10/13/2026 | Patent Owner | Public |

25 per page · Page 1 of 1

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC · ABOUT THIS SITE · USPTO BACKGROUND · FEDERAL GOVERNMENT

## Documents for AIA Review number IPR2026-00420

Click on the Document name to view/download the document

Showing 1-48 of 48 records

| | | | | | | |
|---|---|---|---|---|---|---|
| 31 | U.S. Patent App. Pub. No. 2013/0121504 ("Adams") | Exhibit | 1005 | 08/07/2026 | Petitioner | Public |
| 32 | Curriculum Vitae of Thomas W. Kenny, Ph.D. | Exhibit | 1004 | 08/07/2026 | Petitioner | Public |
| 33 | Declaration of T. Kenny | Exhibit | 1003 | 08/07/2026 | Petitioner | Public |
| 34 | File History of U.S. Patent No. 11,082,055 | Exhibit | 1002 | 08/07/2026 | Petitioner | Public |
| 35 | U.S. Patent No. 11,082,055 to Fan et al. ("the '055 Patent") | Exhibit | 1001 | 08/07/2026 | Petitioner | Public |
| 36 | Patent Owner's Updated Mandatory Notices | Paper | 13 | 10/21/2026 | Patent Owner | Public |
| 37 | Patent Owner's Discretionary Denial Brief | Paper | 12 | 10/13/2026 | Patent Owner | Public |
| 38 | Motion for Pro Hac Vice Admission of Jameson Pasek | Paper | 11 | 10/13/2026 | Patent Owner | Public |
| 39 | Notice of Intent to Designate Dennis Courtney as Back-Up Counsel | Paper | 10 | 10/13/2026 | Patent Owner | Public |
| 40 | Notice of Intent to Designate Colette Woo as Back-Up Counsel | Paper | 9 | 10/13/2026 | Patent Owner | Public |
| 41 | Notice of Intent to Designate Nathan Lowenstein as Back-Up Counsel | Paper | 8 | 10/13/2026 | Patent Owner | Public |
| 42 | Patent Owner's Power of Attorney | Paper | 7 | 08/11/2026 | Patent Owner | Public |
| 43 | Patent Owner's Mandatory Notices | Paper | 6 | 08/11/2026 | Patent Owner | Public |
| 44 | Notice: NOTICE OF FILING DATE ACCORDED TO PETITION AND TIME FOR FILI... | Paper | 5 | 08/10/2026 | Board | Public |
| 45 | Petitioners' Ranking Statement | Paper | 4 | 08/07/2026 | Petitioner | Public |
| 46 | Power of Attorney of Luxottica | Paper | 3 | 08/07/2026 | Petitioner | Public |
| 47 | Power of Attorney of Meta | Paper | 2 | 08/07/2026 | Petitioner | Public |
| 48 | Petition for Inter Partes Review of U.S. Patent No. 11,082,055 | Paper | 1 | 08/07/2026 | Petitioner | Public |

All per page · Page 1 of 1

ptacts.uspto.gov/ptacts/ui/public-search

Patent Trial ar

Search P-TACTS

AIA review #

IPR2026-00420

Additional filter(s)

Showing 1-5 of 5 records

| AIA review # | Filing date (mm/dd/yyyy) | Documents |
|---|---|---|
| IPR2026-00512 | 09/29/2026 | View documen |
| IPR2026-00413 | 08/14/2026 | View documen |
| IPR2026-00420 | 08/07/2026 | View documen |
| IPR2026-00412 | 08/07/2026 | View documen |
| IPR2026-00376 | 06/18/2026 | View documen |

## Documents for AIA Review number IPR2026-00376

Click on the Document name to view/download the document

Showing 1-48 of 48 records

| | Document name | Document type | Exhibit/Paper number | Filing date | Filing party | Availability |
|---|---|---|---|---|---|---|
| 1 | E-mail Third Party Supplemental Submission | Exhibit | 3102 | 08/14/2026 | Board | Public |
| 2 | EXPUNGED | Exhibit | 3102 | 08/14/2026 | Board | EXPUNGED-Public |
| 3 | E-mail regarding petition to the Director | Exhibit | 3101 | 08/14/2026 | Board | Public |
| 4 | E-mail regarding third party submission | Exhibit | 3001 | 07/31/2026 | Board | Public |
| 5 | Ex. 2011 Declaration of Jameson Pasek In Support of Motion for Pro Hac Vice A... | Exhibit | 2011 | 10/13/2026 | Patent Owner | Public |
| 6 | Ex. 2010 Courtney Declaration In Support of Notice of Intent | Exhibit | 2010 | 10/13/2026 | Patent Owner | Public |
| 7 | Ex. 2009 Woo Declaration In Support of Notice of Intent | Exhibit | 2009 | 10/13/2026 | Patent Owner | Public |
| 8 | Ex. 2008 Lowenstein Declaration In Support of Notice of Intent | Exhibit | 2008 | 10/13/2026 | Patent Owner | Public |
| 9 | Ex 2007 Davies Decl. | Exhibit | 2007 | 09/23/2026 | Patent Owner | Public |
| 10 | Ex 2006 Settled Expectations Chart | Exhibit | 2006 | 08/24/2026 | Patent Owner | Public |
| 11 | Ex 2005 July 2025 Memorandum | Exhibit | 2005 | 08/24/2026 | Patent Owner | Public |
| 12 | Ex 2004 Process Memorandum | Exhibit | 2004 | 08/24/2026 | Patent Owner | Public |
| 13 | Ex 2003 Complaint-Ex 9 | Exhibit | 2003 | 08/24/2026 | Patent Owner | Public |
| 14 | Ex 2002 Complaint-Ex 7 | Exhibit | 2002 | 08/24/2026 | Patent Owner | Public |
| 15 | Ex 2001 Complaint | Exhibit | 2001 | 08/24/2026 | Patent Owner | Public |
| 16 | Ex. 1018 - Declaration of John Gaustad | Exhibit | 1018 | 06/18/2026 | Petitioner | Public |
| 17 | Ex. 1017 - JP2018-0083548 (English translation) | Exhibit | 1017 | 06/18/2026 | Petitioner | Public |
| 18 | Ex. 1016 - Declaration of John Andrews for JP2018-083548 | Exhibit | 1016 | 06/18/2026 | Petitioner | Public |

25 per page · Page 1 of 1

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC | ABOUT THIS SITE | USPTO BACKGROUND | FEDERAL GOVERNMENT

ptacts.uspto.gov/ptacts/ui/public-search

Patent Trial ar

Search P-TACTS

AIA review #

IPR2026-00420

## Documents for AIA Review number IPR2026-00376

Click on the Document name to view/download the document

Showing 1-48 of 48 records

| | | | | | | |
|---|---|---|---|---|---|---|
| 19 | Ex. 1015 - JP2018083548 (Asukai JP) | Exhibit | 1015 | 06/18/2026 | Petitioner | Public |
| 20 | Ex. 1014 - WO2019207896 (Asukai PCT) | Exhibit | 1014 | 06/18/2026 | Petitioner | Public |
| 21 | Ex. 1013 - Excerpts from the File History of Japanese Patent Application No | Exhibit | 1013 | 06/18/2026 | Petitioner | Public |
| 22 | Ex. 1012 - Declaration of Philip Schnell for Excerpts from the File History | Exhibit | 1012 | 06/18/2026 | Petitioner | Public |
| 23 | Ex. 1011 - JP7185053B2 | Exhibit | 1011 | 06/18/2026 | Petitioner | Public |
| 24 | Ex. 1010 - WO2020144536 | Exhibit | 1010 | 06/18/2026 | Petitioner | Public |
| 25 | Ex. 1009 - WO2015127056 (Tanaka) | Exhibit | 1009 | 06/18/2026 | Petitioner | Public |
| 26 | Ex. 1008 - US9579060 (Lisy) | Exhibit | 1008 | 06/18/2026 | Petitioner | Public |
| 27 | Ex. 1007 - US20180014903 (Shan) | Exhibit | 1007 | 06/18/2026 | Petitioner | Public |
| 28 | Ex. 1006 - US20170255262 (Liu) | Exhibit | 1006 | 06/18/2026 | Petitioner | Public |
| 29 | Ex. 1005 - US20210145340 (Asukai) | Exhibit | 1005 | 06/18/2026 | Petitioner | Public |
| 30 | Ex. 1004 - CV of John Feland | Exhibit | 1004 | 06/18/2026 | Petitioner | Public |
| 31 | Ex. 1003 - Declaration of John Feland, Ph.D. | Exhibit | 1003 | 06/18/2026 | Petitioner | Public |
| 32 | Ex. 1002 - Excerpts from Prosecution History of US12216339 | Exhibit | 1002 | 06/18/2026 | Petitioner | Public |
| 33 | Ex. 1001 - US12216339 (339 Patent) | Exhibit | 1001 | 06/18/2026 | Petitioner | Public |
| 34 | Patent Owner's Updated Mandatory Notices | Paper | 15 | 10/21/2026 | Patent Owner | Public |
| 35 | Director Discretionary Decision: Refer | Paper | 14 | 10/19/2026 | Board | Public |
| 36 | Motion for Pro Hac Vice of Jameson Pasek | Paper | 13 | 10/13/2026 | Patent Owner | Public |
| 37 | Notice of Intent to Designate Dennis Courtney as Back-Up Counsel | Paper | 12 | 10/13/2026 | Patent Owner | Public |
| 38 | Notice of Intent to Designate Colette Woo as Back-Up Counsel | Paper | 11 | 10/13/2026 | Patent Owner | Public |
| 39 | Notice of Intent to Designate Nathan Lowenstein as Back-Up Counsel | Paper | 10 | 10/13/2026 | Patent Owner | Public |

Showing 1-5 of 5 records

| AIA review # | Filing date (mm/dd/yyyy) | Documents |
|---|---|---|
| IPR2026-00512 | 09/29/2026 | View documen |
| IPR2026-00412 | 08/14/2026 | View documen |
| IPR2026-00420 | 08/07/2026 | View documen |
| IPR2026-00412 | 08/07/2026 | View documen |
| IPR2026-00376 | 06/18/2026 | View documen |

25 per page · Page 1 of 1

ptacts.uspto.gov/ptacts/ui/public-search

Patent Trial ar

Search P-TACTS

AIA review #

IPR2026-00420

Additional filter(s)

Showing 1-5 of 5 records

| AIA review # | Filing date (mm/dd/yyyy) | Documents |
|---|---|---|
| IPR2026-00512 | 09/29/2026 | View documents |
| IPR2026-00413 | 08/14/2026 | View documents |
| IPR2026-00420 | 08/07/2026 | View documents |
| IPR2026-00412 | 08/07/2026 | View documents |
| IPR2026-00376 | 06/18/2026 | View documents |

## Documents for AIA Review number IPR2026-00376

Click on the Document name to view/download the document

Showing 1-48 of 48 records

| | | | | | | |
|---|---|---|---|---|---|---|
| 31 | Ex. 1003 - Declaration of John Feland, Ph.D. | Exhibit | 1003 | 06/18/2026 | Petitioner | Public |
| 32 | Ex. 1002 - Excerpts from Prosecution History of US12216339 | Exhibit | 1002 | 06/18/2026 | Petitioner | Public |
| 33 | Ex. 1001 - US12216339 (339 Patent) | Exhibit | 1001 | 06/18/2026 | Petitioner | Public |
| 34 | Patent Owner's Updated Mandatory Notices | Paper | 15 | 10/21/2026 | Patent Owner | Public |
| 35 | Director Discretionary Decision: Refer | Paper | 14 | 10/19/2026 | Board | Public |
| 36 | Motion for Pro Hac Vice of Jameson Pasek | Paper | 13 | 10/13/2026 | Patent Owner | Public |
| 37 | Notice of Intent to Designate Dennis Courtney as Back-Up Counsel | Paper | 12 | 10/13/2026 | Patent Owner | Public |
| 38 | Notice of Intent to Designate Colette Woo as Back-Up Counsel | Paper | 11 | 10/13/2026 | Patent Owner | Public |
| 39 | Notice of Intent to Designate Nathan Lowenstein as Back-Up Counsel | Paper | 10 | 10/13/2026 | Patent Owner | Public |
| 40 | Patent Owner's Preliminary Response | Paper | 9 | 09/23/2026 | Patent Owner | Public |
| 41 | Petitioners' Response to Request for Discretionary Denial - Luxottica-Meta-Solo... | Paper | 8 | 09/23/2026 | Petitioner | Public |
| 42 | Patent Owner's Discretionary Denial Brief | Paper | 7 | 08/24/2026 | Patent Owner | Public |
| 43 | Patent Owner's Power of Attorney | Paper | 6 | 07/09/2026 | Patent Owner | Public |
| 44 | Patent Owner's Mandatory Notices | Paper | 5 | 07/09/2026 | Patent Owner | Public |
| 45 | Notice: NOTICE OF FILING DATE ACCORDED TO PETITION AND TIME FOR FILI... | Paper | 4 | 06/23/2026 | Board | Public |
| 46 | Petition: as filed | Paper | 3 | 06/18/2026 | Petitioner | Public |
| 47 | Notice: Power of Attorney | Paper | 2 | 06/18/2026 | Petitioner | Public |
| 48 | Notice: Power of Attorney | Paper | 1 | 06/18/2026 | Petitioner | Public |

All per page · Page 1 of 1

25 per page · Page 1 of 1

**ATTACHMENT 13** — CAFC 26-1721

Description — Meta's MTD (ECF 49) + 2004 Provisional + '860 Patent + BlueRadios v. Kopin

(a) ECF 49 from D. Mass. docket: Meta Platforms, Inc.’s Motion to Dismiss (D. Mass. Case No. 1:26-cv-10304-ADB, ECF No. 49), filed April 10, 2026. This contains the primary technical pretexts regarding the legacy 2004 GoldenEye/BlueRadios platform art used to insulate their smart glasses infrastructure from senior inventorship claims.

(b) ECF 100 (Solos' Opposition): Plaintiff Solos Technology Limited’s Opposition Brief (D. Mass. Case No. 1:26-cv-10304-ADB, ECF No. 100), filed April 24, 2026. This highlights the fatal logic gap where Solos explicitly states that “Meta fails to identify any post-2009 work...” linking the historical Golden-i headset to the modern smart glasses patents currently in suit.

(c) Martinez Declaration: Declaration of Martinez in Support of Plaintiff's Opposition, filed attached directly to the ECF No. 100 docket package, providing tracking markers confirming the operational timeline of the disputed smart eyewear.

(d) US 10,672,860: US Patent No. 7,542,210 B2 (Issued June 2, 2009), "Eye Tracking Head Mounted Display"

(e) BlueRadios v. Kopin docket: D. Colo. Case No. 1:16-cv-02052, ECF No. 803, Attachment 2, containing the 5-Page September 5, 2025 Final Judgment Order. This targeted record formally documents the legal disposition of the core inventor-omission technology claims and proves the assets were severed prior to the corporate spinoff and subsequent transfer of the Aria asset title to Solos.

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SOLOS TECHNOLOGY LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br>META PLATFORMS TECHNOLOGIES, LLC<br>OAKLEY, INC.<br>LUXOTTICA OF AMERICA, INC. AND<br>ESSILORLUXOTTICA USA, INC.<br><br>Defendants. | Civil Action No. 1:26-cv-10304<br><br>**REQUEST FOR HEARING** |

## DEFENDANTS META PLATFORM, INC.'S AND META PLATFORMS TECHNOLOGIES, LLC'S MOTION TO DISMISS UNDER RULE 12(B)(7), OR IN THE ALTERNATIVE, STAY PROCEEDINGS

Pursuant to Fed. R. Civ. P. 12(b)(7) and Local Rule 7.1, Defendants Meta Platforms, Inc. and Meta Platforms Technologies, LLC ("Meta") respectfully moves to dismiss, or in the alternative, stay the proceedings, Plaintiff Solos Technology Limited's ("Solos") Complaint with prejudice. Solos has indicated that it intends to oppose this motion.

Meta respectfully moves to dismiss all Counts of the Complaint for failure to join an indispensable party (BlueRadios, Inc.) or, in the alternative, stay the matter. Pursuant to L.R. 7.1(b) and concurrently with this Motion, Meta has filed a memorandum of reasons as to why the motion should be granted and why any amendment to the Complaint would be futile.

Meta respectfully requests the Court to grant this motion and dismiss Solos' complaint with prejudice.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Meta respectfully requests oral argument be scheduled on this motion.

**LOCAL RULE 7.1(a)(2) CERTIFICATION**

Pursuant to Local Rule 7.1(a)(2), the undersigned certifies that on March 25, 2026, counsel for Meta conferred with counsel for Solos in good faith to resolve or narrow the issues but were unable to do so.

| | |
|---|---|
| Dated: March 25, 2026 | Respectfully submitted,<br><br>By: */s/ Matthias Kamber*<br>**PAUL HASTINGS LLP**<br>200 Clarendon Street, 49th Floor<br>Boston, MA 02116<br>Tel: (415) 856-7050<br>Fax: (415) 856-7150<br><br>Matthias A. Kamber (Mass BBO #654217)<br>**PAUL HASTINGS LLP**<br>101 California St., 48th Floor<br>San Francisco, CA 94111<br>Tel: (415) 856-7050<br>Fax: (415) 856-7150<br>matthiaskamber@paulhastings.com<br><br>Lisa Nguyen (*pro hac vice pending)*<br>Eric Lancaster (*pro hac vice pending)*<br>**PAUL HASTINGS LLP**<br>Palo Alto, CA 94304<br>Tel: (650) 320-1800<br>Fax: (650) 320-1990<br>lisanguyen@paulhastings.com<br>ericlancaster@paulhastings.com<br><br>Stephanie Adamakos (Mass BBO #705076)<br>**PAUL HASTINGS LLP**<br>2050 M St. NW<br>Washington, DC 20005<br>Tel: (202) 551-1700<br>Fax: (202) 551-1705<br>stephanieadamakos@paulhastings.com<br><br>***Attorneys for Defendant Meta Platforms, Inc. and Meta Platforms Technologies, LLC*** |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SOLOS TECHNOLOGY LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., et al.<br><br>Defendants. | Case No. 1:26-cv-10304-ADB |

**PLAINTIFF'S OPPOSITION TO META PLATFORMS, INC. AND META PLATFORMS TECHNOLOGIES, LLC'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, STAY THE PROCEEDINGS**

Similarly, co-ownership through joint inventorship extends only to intellectual property developed through the parties' joint efforts. Yet, Meta fails to identify any post-2009 work under the agreement, much less any work contributing to specific claims of the Asserted Patents. Nor does Meta identify a joint inventor or allege collaboration between BlueRadios and Solos. The circumstances surrounding conception of the Asserted Patents and inventorship, moreover, are confirmed by the only inventor-specific evidence before the Court, the declaration of Solos' program lead, Ernesto Martinez.

Furthermore, even if BlueRadios were a required party under Rule 19(a), the four Rule 19(b) factors—prejudice, mitigation, adequacy of judgment, and adequacy of alternative remedies—weigh in Solos' favor. First, Meta's prejudice argument rests on speculation that BlueRadios might bring a separate infringement suit, yet speculation is insufficient, particularly where there is no ownership case pending regarding the Asserted Patents. Second, BlueRadios has demonstrated awareness of this litigation, negating any notice concern and allowing the Court to mitigate purported prejudice through tailored relief. Third, the issues before the Court would not be impacted without BlueRadios' participation and therefore a judgment in this case would be adequate; notably, Meta does not meaningfully address this factor and instead conflates adequacy with alleged prejudice. Fourth, there is no adequate alternative remedy for Solos because no proceeding exists to resolve BlueRadios' alleged interest in the Asserted Patents.

Lastly, Meta's alternative request for a stay fails. While Meta invokes the four-factor test applicable to stays pending appeal, courts in this District evaluate pretrial stays based on simplification of issues, prejudice, and the stage of the case. Under either framework, however, a stay is unwarranted because no parallel proceeding exists to resolve any alleged ownership interest, and Meta's speculative theory does not overlap with the core issues in this case. Thus, a stay would

were developed beginning in 2015, after the Golden-i collaboration ended, and were conceived as part of a separate and independent development effort). Even if BlueRadios played a role in developing Golden-i systems or Whisper™ audio-processing technology, that work does not establish joint inventorship of the Asserted Patents, the earliest of which was filed in 2015 and claims priority no earlier than 2013. *See* Doc. No. 1-1 (patent face listing filing date (Oct. 15, 2015) and related U.S. provisional application date (Mar. 13, 2013)). Nor does Meta attempt to make the required showing. It identifies no individual who allegedly collaborated with the named inventors or contributed to conception of any claimed invention of the Asserted Patents. *See Kimberly-Clark*, 973 F.2d at 916–17 (requiring collaboration and contribution to conception). This failure is unsurprising because there are no such allegations for Meta to support such a theory, nor any factual basis in the record from which such allegations could be drawn.

For instance, the March 10, 2026 letter from BlueRadios' CEO asserts only in general terms that BlueRadios "believes they are the co-owners of the 5 patents specified in the complaint filed by Solos" based on the 2007 to 2009 collaboration. *See* Doc. No. 51-1 at 4. These statements cannot provide a basis for joint inventorship. In addition, Meta's technological comparisons fare no better, pointing only to generalized features such as microphone-based voice input and sensor-based motion or context detection. *See* Doc. No. 50 at 12–14. These materials fail to identify any specific inventive contribution to the conception of any claim of the Asserted Patents and cannot do so because no such overlap exists. *See* E. Martinez Decl. (Ex. 2) (explaining that Golden-i and Solos were developed at different times, for different purposes, and using different system architectures); *Kimberly-Clark*, 973 F.2d at 916–17.

Because Meta cannot establish any cognizable interest under the proper framework, it pivots to a different theory, recasting its position as a "non-frivolous claim" of ownership. That

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SOLOS TECHNOLOGY LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., et al.<br><br>Defendants. | Case No. 1:26-cv-10304 |

**DECLARATION OF ERNESTO C. MARTINEZ-VILLALPANDO, PH.D.**

I, Ernesto C. Martinez-Villalpando, Ph.D., hereby declare as follows:

1. I am over the age of eighteen and competent to testify to the matters set forth herein. I have personal knowledge of the facts stated in this declaration.

2. I joined Kopin Corporation ("Kopin") in May 2013 as Special Programs Lead and Advisor to the Chief Executive Officer, who at the time was John C. C. Fan, Ph.D.

3. From approximately 2015 to 2020, I served as Head of Wearables at Kopin, where I led the development of Kopin's consumer smart-glasses initiatives.

4. In my role at Kopin, I established and led Solos, the company's first system innovation division, focused on expanding Kopin's business into augmented reality and wearable computing.

5. I was responsible for leading the Solos smart glasses program from its inception in 2015 through product development and market launch.

6. I have personal knowledge of the development efforts relating to the Solos smart glasses platform and the underlying technologies associated with that platform.

7. During my time at Kopin, I did not interact with anyone from BlueRadios, Inc. ("BlueRadios") in connection with the development of Solos intellectual property or any related technology.

8. BlueRadios was not involved in the development of the Solos smart glasses platform or the technologies underlying the Asserted Patents.

9. The "Golden-i" project at Kopin predated my involvement in Solos and was a separate initiative focused on different wearable computing concepts and use cases. Golden-i was directed toward enterprise and industrial applications and involved a different system architecture and design approach.

10. The Solos smart glasses platform was developed independently of the Golden-i project and was directed toward consumer and sports performance applications, with a different technical architecture, design objectives, and system integration.

11. Golden-i and the Solos smart glasses technology were conceived at different times, developed for different purposes, used different design approaches, and were not part of a continuous development effort.

12. Based on my knowledge, none of the technology, system architecture, or development work associated with Golden-i was used in the development of the Solos smart glasses platform.

13. To my knowledge, none of the intellectual property, or technology associated with the Golden-i project were transferred to, incorporated into, or used in connection with the Solos program or any subsequent Solos-related entity.

14. I am aware that Kopin later licensed and transferred certain Golden-i-related technology to third parties. For example, Kopin entered into a transaction involving Golden-i

Infinity® technology in 2019, which was distinct from the Solos program. Kopin's own public disclosures distinguish between Golden-i Infinity®, Solos, and Whisper technologies.[1]

15. Based on my personal knowledge and involvement in the development of Solos, the Solos smart glasses platform and its underlying technologies were developed independently of any work associated with BlueRadios or the Golden-i project.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

__________________________________
Ernesto C. Martinez-Villalpando, Ph.D.

Executed on this __16_ day of April 2026, at _____Worcester________, Massachusetts.

[1] *Kopin Corp.*, Kopin Provides Business Update and Second Quarter 2019 Operating Results (Aug. 8, 2019), https://www.kopin.com/press-releases/kopin-provides-business-update-and-second-quarter-2019-operating-results/.

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the Court's CM/ECF system on April 22, 2026, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jameson J. Pasek
Jameson J. Pasek, Esq. (BBO# 692924)

US007542210B2

(12) **United States Patent**
**Chirieleison, Sr.**

(10) **Patent No.: US 7,542,210 B2**
(45) **Date of Patent: Jun. 2, 2009**

(54) **EYE TRACKING HEAD MOUNTED DISPLAY**

(76) Inventor: **Anthony Chirieleison, Sr.**, P.O. Box 279, Tyrone, NM (US) 88065

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/476,553**

(22) Filed: **Jun. 29, 2006**

(65) **Prior Publication Data**

US 2008/0002262 A1 Jan. 3, 2008

(51) **Int. Cl.**
***G02B 27/14*** (2006.01)
***G09G 5/00*** (2006.01)

(52) **U.S. Cl.** .......................................... **359/630**; 345/8

(58) **Field of Classification Search** ......... 359/630–636; 345/7–9

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,028,725 | A | 6/1977 | Lewis | 358/103 |
| 5,467,104 | A | 11/1995 | Furness, III et al. | 345/8 |
| 5,572,229 | A | 11/1996 | Fisher | 345/8 |
| 5,742,264 | A * | 4/1998 | Inagaki et al. | 345/8 |
| 6,307,526 | B1 * | 10/2001 | Mann | 345/8 |
| 6,452,572 | B1 | 9/2002 | Fan et al. | 345/8 |
| 6,744,436 | B1 | 6/2004 | Chirieleison, Jr. et al. | 345/427 |
| 7,111,939 | B2 * | 9/2006 | Cok et al. | 353/7 |
| 2002/0167462 | A1 | 11/2002 | Lewis et al. | 345/7 |
| 2004/0008157 | A1 | 1/2004 | Brubaker et al. | 345/8 |
| 2006/0077558 | A1 * | 4/2006 | Urakawa et al. | 359/630 |

OTHER PUBLICATIONS

Chirieleison, Sr., Anthony. *Requirements for an Eye Mounted Display (EMD) System*. Mar. 20, 2005.

* cited by examiner

*Primary Examiner*—Alicia M Harrington
(74) *Attorney, Agent, or Firm*—Nath Law Group; Jerald L. Meyer; Jiaxiao Zhang

(57) **ABSTRACT**

A head mounted display device has a mount which attaches the device to a user's head, a beam-splitter attached to the mount with movement devices, an image projector which projects images onto the beam-splitter, an eye-tracker which tracks a user's eye's gaze, and one or more processors. The device uses the eye tracker and movement devices, along with an optional head-tracker, to move the beam-splitter about the center of the eye's rotation, keeping the beam-splitter in the eye's direct line-of-sight. The user simultaneously views the image and the environment behind the image. A second beam-splitter, eye-tracker, and projector can be used on the user's other eye to create a stereoptic, virtual environment. The display can correspond to the resolving power of the human eye. The invention presets a high-resolution image wherever the user looks.

**29 Claims, 17 Drawing Sheets**



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-02052-JLK

BLUERADIOS, INC.,

Plaintiff,

v.

KOPIN CORPORATION,

Defendant.

---

## FINAL JUDGMENT

---

The matter was tried on March 20, 2024, through April 22, 2024, before a Jury of twelve duly sworn to try the issues herein, the Honorable John L. Kane, Judge, presiding. The Jury rendered its verdicts on April 22, 2024. In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

Pursuant to the Order, (Doc. No 785) of Judge John L. Kane entered on September 4, 2025, it is

ORDERED that judgment is entered in favor of BlueRadios and against Kopin on BlueRadios's claim for Breach of Contract, with BlueRadios taking $5,114 in general damages under this claim and no disgorgement damages. It is

FURTHER ORDERED that judgment is entered in favor of BlueRadios and against Kopin on BlueRadios's claim for Breach of the Implied Covenant of Good Faith and Fair Dealing, with BlueRadios taking $600,000 in damages under this claim and no disgorgement damages. It is

FURTHER ORDERED that judgment is entered in favor of BlueRadios in part, and in favor of Kopin in part, on BlueRadios's claim for violations of the Misappropriation of Trade Secrets Under the Colorado Uniform Trade Secrets Act. Judgment is entered in favor of BlueRadios and against Kopin as to BlueRadios's trade secret claims numbered 1, 2, 4, and 5. *See* Verdict Form at 7, ECF No. 726. BlueRadios is awarded $591,660 in unjust enrichment damages under this claim and $591,660 in exemplary damages for Kopin's willful and malicious conduct in connection with this claim. It is

FURTHER ORDERED that judgment is entered for Kopin and against BlueRadios as to BlueRadios's Colorado Uniform Trade Secrets Act claim numbered 3. *See id*. It is

FURTHER ORDERED that judgment is entered in favor of BlueRadios in part, and in favor of Kopin in part, on BlueRadios's claim for violations of the Misappropriation of Trade Secrets Under the Defend Trade Secrets Act. Judgment is entered in favor of BlueRadios and against Kopin on BlueRadios's trade secret claims numbered 1, 2, and 4. *See* Verdict Form at 10, ECF No. 726. BlueRadios is awarded $3,910,466 in unjust enrichment damages under this claim and $7,820,932 in exemplary damages for Kopin's willful and malicious conduct in connection with this claim. It is

FURTHER ORDERED that judgment is entered for Kopin and against BlueRadios as to BlueRadios's Defend Trade Secrets Act claim numbered 3. *See id*. It is

FURTHER ORDERED that judgment is entered in favor of BlueRadios in part, and in favor of Kopin in part, on BlueRadios's claim for Correction of Inventorship pursuant to 35 U.S.C. § 256. The Director of the United States Patent and Trademark

Office is ordered to add John Sample and Wilfred Tucker as inventors on the United States Patent No. 8,909,296, and Kopin is ordered to cooperate with BlueRadios to effectuate the change in inventorship, including executing or filing any necessary Petitions to Correct Inventorship. It is

FURTHER ORDERED that under CUTSA and DTSA, judgment is entered in favor of BlueRadios and against Kopin in the amount of $6,214,406.61 for the reasonable attorney fees BlueRadios incurred. It is

FURTHER ORDERED that, in accordance with my Order on Supplemental Motion for Award of Attorney Fees (ECF No. 729), judgment is entered in favor of BlueRadios and against Kopin in the amount of $203,159.15 for attorney fees and $28,799.19 for costs to compensate BlueRadios for Kopin's sanctionable discovery misconduct. It is

FURTHER ORDERED that BlueRadios is determined to be the prevailing party under Federal Rule of Civil Procedure 54(d). It is

FURTHER ORDERED that BlueRadios shall have 14 days to submit a bill of costs under Federal Rule of Civil Procedure 54, and the Clerk of the Court is directed to tax costs in favor of BlueRadios, provided that the costs conform with 28 U.S.C. § 1920. It is

FURTHER ORDERED the post-judgment interest shall accrue on the amount awarded in this matter at the legal rate of 3.85% per annum from the date of entry of Judgment. It is

FURTHER ORDERED that this case is closed.

Dated at Denver, Colorado this 5th day of September, 2025.

APPROVED BY THE COURT:

John L. Kane
Senior United States District Court Judge

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By: s/ *B. Abiakam*

B. Abiakam, Deputy Clerk

**ATTACHMENT 14 —** CAFC 26-1721

Description — 14 Feinberg Memo (Sept. 14, 2026)

Previously filed as, re-submitted for panel convenience.

DEPUTY SECRETARY OF WAR
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

SEP 14 2026

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOW FIELD ACTIVITY DIRECTORS

SUBJECT: Fostering One Strong Industrial Base

The Department of War (DoW) must buy faster, simpler, and more competitively to get speed and volume. Backed by strong Congressional support in the FY26 NDAA to strengthen the Defense Industrial Base, the Department continues to break down barriers to entry and expand our industrial base. To build on this momentum and keep all of industry engaged, we must completely transform and modernize our contract cost and pricing ruleset.

The DoW will move from government-unique Cost Accounting Standards (CAS) to the accounting every American company already uses — Generally Accepted Accounting Principles (GAAP) — and push those benefits to every tier of the supply chain. When necessary to foster transparency and fairness, we will ask suppliers for the cost and pricing information they already keep. No new accounting systems or special data formats will be required. Any data industry provides will be used only for authorized Government purposes and never made available to another company for its own use.

Executive Order 14402 makes fixed-price contracts the default and reserves cost-based contracts for basic research and for the development of major systems. Where there is a market — competition, comparable sales, reliable price history — the market sets the price. Where there is no market — major sole-source development and procurement — we will rely on cost data drawn from a company's existing records rather than invasive oversight.

My August 18, 2026 memorandum, "Supplier Cost and Pricing Transparency," reinforces the option for contracting officers to see through the prime contractor to the suppliers when needed. This is essential to ensure companies at every tier are treated fairly. For the system to work, contractual benefits offered by the government to a prime must be flowed down through the supply chain and, conversely, sole-source suppliers cannot be allowed to leverage primes and slow down deliveries. The Department has a wide range of tools to mitigate risk and strengthen the supply chain. Office of Strategic Capital loans, Industrial Base Analysis and Sustainment funds, and talented DoW business operators should be accessible to every company supporting the DoW.

Asking for information does not, by itself, create a cost-reimbursement contract or CAS coverage, and it does not alter the thresholds or exceptions for certified cost or pricing data. Transparency and partnership run both ways: the Department opens its buying to market forces, and when asked, industry shares the cost and pricing information it already keeps.

We will accept GAAP-based accounting across all contracts to the maximum extent the law permits, and we will continue pursuing CAS to GAAP through the Cost Accounting

Standards Board (CASB). The DoW will submit proposals to the CASB within 60 days to make CAS exemption the default, confine remaining CAS coverage to sole-source, cost-based development or incentive-fee procurement, and ensure CAS applies only to relevant contracts and not companies as a whole. Recently, the CASB made significant progress in reducing the CAS regulations, and we look forward to partnering with them to continue accelerating change this year. Until the Board acts, no solicitation from the DoW that could bring a business unit not previously subject to CAS under full CAS coverage may be issued unless the Under Secretary of War for Acquisition and Sustainment has approved the acquisition strategy in writing.

The attached appendix directs these actions; implementing guidance may not add requirements beyond this memorandum and applicable law. This memorandum and appendix govern how the Department requests and uses contractor cost and pricing information; prior Department guidance on this subject will be applied consistently with it.

One of our Nation's greatest strengths is its private sector. National security must harness it — unleashing industry, protecting taxpayers through proven methods like competition, and restricting the use of our most burdensome oversight tools to only when absolutely necessary.

Attachment:
As stated

APPENDIX: IMPLEMENTATION ACTIONS

The Vice Chairman of the Joint Chiefs of Staff will:

**Review requirements reform in practice.** Within 30 days, co-chair with the Deputy Secretary a review of the Services' and Military Departments' implementation of requirements reform. The requirements review will use tangible program examples to show where the new approach has broadened acceptable acquisition solution space, expanded competition, or changed what acquisition could buy, and will identify how the Services and Military Departments can accelerate adoption, or further improve requirements processes.

The Under Secretary of War for Acquisition and Sustainment (USW(A&S)) will:

**Accelerate acquisition transformation.** Having issued the commercial-first implementation policy, within seven days issue the Department-wide modular open systems approach (MOSA) policy and the Portfolio Acquisition Executive Operating Framework, including its addendum of recommended authorities for delegation.

**CAS containment within existing authority.**

- Use available CAS relief. Apply immediately the increased CAS thresholds enacted in section 1806 of the National Defense Authorization Act for Fiscal Year 2026, as implemented by Department class deviation and by the Cost Accounting Standards Board's 2026 threshold rule as it takes effect, together with the statutory relief for nontraditional defense contractors. Within 60 days, issue, with the support of the Under Secretary of War (Comptroller) (USW(C)), a CAS waiver policy and standing justification templates for the individualized determinations the waiver authority in law requires, for new entrants, predominantly commercial segments, and businesses outgrowing small-business classifications.

- Prevent shadow CAS. Within 30 days, prohibit Components from imposing on exempt awards and other transactions the equivalent of CAS coverage, disclosure, business-system review, or practice-change governance under another name. Cost data from exempt performers will be requested as already maintained in their books and records.

- Limit new CAS coverage pending Board action. Before issuing a solicitation expected to bring a performing business unit newly under full CAS coverage, obtain the written approval of the USW(A&S) for the acquisition strategy. Requests must assess competition, commercial acquisition, competed fixed-price structures, exemptions, and existing waiver authority, and explain why none can meet the requirement without new full CAS coverage; the Under Secretary will decide within 15 business days or elevate the request to the Deputy Secretary. This approval concerns the acquisition strategy only; it does not determine CAS applicability, grant any exemption or waiver, or authorize omission of a required provision or clause.

**Make rapid commerciality determinations.** Within 45 days, direct that commercial product and service determinations be completed within 15 business days of a complete request; that a prior Department determination stand for subsequent procurements unless reversed in writing by a head of contracting activity; and that, on commercial acquisitions, cost data may be requested if the contracting officer determines price, market, and sales data are insufficient to determine a fair and reasonable price.

**Extend use of other transactions.** Through the Other Transactions Guide revision under way, within 45 days issue interim other transaction (OT) policy, followed by the full Guide reissue within 120 days, that: defines "participating to a significant extent" as any unique contribution material to the prototype project, without percentage-of-workshare or dollar thresholds as eligibility tests; prefers fixed-amount, milestone-based payment structures; requires the agreements officer, before award, to document the applicable statutory eligibility basis, relying where lawful on offeror self-certification against standard representations and conducting additional verification by exception, with a 10-business-day clock on any determination; and directs follow-on production planning in every prototype OT. Within 30 days, issue a consortium policy with project-level eligibility, direct-award preference and fee transparency. Within 60 days, Component Senior Procurement Executives will publish pre-approved findings templates and a 10-business-day signature standard for exceptional-circumstances determinations.

**Modernize profit policy.** Within 90 days, initiate the DFARS rulemaking, eliciting industry feedback, to revise the Department's profit policy so that negotiated margins reflect value delivered, risk carried, and private capital invested – not merely cost incurred. Commercial benchmarks will inform negotiation objectives but will not constitute caps. The policy will reward efficiency, speed, and performance; weigh the financial health of fragile supply-chain chokepoints; and address sustained loss positions prospectively through fair pricing of future work. Nothing in this action alters applicable cost-allowability requirements for cost-reimbursement work. Healthy and reasonable margins drive innovation and excellence.

**Require a basis for requirements.** Within 90 days, building on the inventory completed under the Acquisition Transformation Strategy, every recurring review, checklist, data demand, or approval imposed below the Federal Acquisition Regulation (FAR) and Defense Federal Acquisition Regulation Supplement (DFARS) will be annotated with the authority that requires it. Requirements grounded in operational safety, security, and classification authorities are not subject to automatic lapse. Any other uncited item will be suspended for new use and will lapse unless the cognizant Component Acquisition Executive reaffirms it within 30 days. No new procedural requirement may be issued without its basis stated on its face.

**Modernize forward-pricing support.** Direct that DCMA immediately work with DCAA to overhaul the approach to establishing and maintaining forward pricing rate agreements (FPRAs) consistent with this memorandum, drawing on rate data maintained in the ordinary course of business. FPRAs will be used only where they accelerate recurring, high-volume negotiations and enable a more efficient process for the Department and for industry.

**Implement supplier cost and pricing transparency consistent with this memorandum.**
Within 30 days, issue the implementing procedures for the August 18, 2026, memorandum so

that price information is obtained first and cost information to the extent needed to establish a fair price; commercial products and services are priced under the statutory limits that apply to them; cost information is requested in the form the contractor already maintains; contractor denials are handled under the process the law provides; information received is used only for the pricing action for which it was requested; and no automated access to contractor systems without express contractual authorization and applicable security protections. Nothing in the procedures alters the thresholds or exceptions for certified cost or pricing data. The procedures will state that, consistent with Executive Order 14402, cost-reimbursement contracting remains appropriate for research and for the development of major systems, and is otherwise the exception.

The USW(C) will:

**Advance CAS coverage reform at the Board.** With the support of the USW(A&S), develop and formally transmit to the Cost Accounting Standards Board the Department's proposals for: (a) a class exemption making exemption the default, with CAS coverage limited to cost-based development contracts of major scale awarded without adequate price competition; (b) coverage that attaches to the covered contract and the indirect-cost pools material to it, with no entity-, segment-, or flowdown-attachment; (c) completion of the CAS-to-GAAP conformance begun with the July 8, 2026, final rule, so that GAAP is the baseline and government-unique requirements survive only where cost-based pricing specifically demands them; and (d) a modernized Disclosure Statement – a short certification that contract cost accounting follows the contractor's annual GAAP financial statements, audited by a registered independent public accounting firm, supplemented only by legally required disclosures, with a schedule of departures, in a machine-readable, versioned electronic submission format. Transmit the supporting analysis to the Board and report monthly to the Deputy Secretary until the Board acts.

**Ensure audits are risk-based.** Within 60 days, direct that the Department consider a contractor's audited GAAP financial statements and internal-control attestations before performing additional work. Ensure that no office will request an audit of a cost or system that has already been audited or reopen closed years absent indicators of fraud or material misstatement. Every audit will identify the risk, its materiality to a government decision, the records needed, and why existing evidence is insufficient.

**Recommend the Department's Cost Accounting Standards Board representative.** Within 30 days, in coordination with the USW(A&S) and the General Counsel, recommend to the Secretary, through the Deputy Secretary, the appointment of the Department's best-qualified representative to the Cost Accounting Standards Board under the Secretary's appointment authority. The representative will have substantial experience administering and managing covered contracts and will be selected consistent with section 1806 of the National Defense Authorization Act for Fiscal Year 2026 and advance compliance with the Board-member eligibility requirements at 41 U.S.C. 1501(b)(4).

The USW(A&S) and the USW(C) will jointly:

**Consolidate contractor business systems.** Within 90 days, through the business-systems line of effort under way, issue class deviations where required, and direction to:

- Consolidate estimating-system and material-management-and-accounting-system requirements into simplified, commercial-aligned accounting-system criteria and retire their separate reviews – retaining statutory proposal-integrity protections, inventory-accounting standards, and standards for consistent cost estimation, accumulation, and reporting – with accounting-system adequacy outside the covered CAS core assessed against the FAR's condition for the contract type, satisfied by the contractor's GAAP books and a contract-level ledger meeting applicable allowability rules;

- Confine earned value management to major development programs and, where the Government retains cost risk, major long-duration production programs, with the boundary set in the implementing deviation; retire the separate government system-validation regime, using integrated baseline reviews to assess contract baselines; and accept schedule, actuals, and estimate-at-completion data from contractors' native systems;

- Reduce contractor burden by relying on government-wide FAR property-stewardship duties and remedies, aligned with commercial practices and tools, rather than a separate review overlay; and

- Raise the purchasing-system-review threshold under existing FAR authority, reserve reviews for demonstrated risk, and apply the statutory rule that an approved purchasing system ends subcontract-consent withholding; and

- Establish a 90-government-day clock for final disposition of contractor's corrective action plan, tolled while necessary contractor information is outstanding and elevated to the head of the contracting activity upon expiration.

No Component may recreate a retired regime through local policy, checklists, approvals, or clauses. To the maximum extent permitted by law and contract, Components will cease enforcing superseded requirements, and contracting officers will offer bilateral no-cost modifications removing affected clauses at the next practicable opportunity.

**Simplify business-system review.** Within 60 days, publish clear, specific, and publicly available commercial-aligned criteria for contractor business systems and issue a class deviation, grounded in the Department's statutory reliance authorities, accepting a registered independent public accounting firm's certification against those criteria in place of Department review. The deviation will set a reasonable effective date aligned, where applicable, with contractors' annual financial-statement audit cycles. Effective immediately, discretionary review requires a written determination of specific, material risk by the cognizant contracting activity, coordinated with the requiring Component Acquisition Executive or designee. For multi-Component facilities, the Defense Contract Management Agency (DCMA) will identify the cognizant Component.

**Publish the efficiency assurance.** Within 30 days, issue a joint enforcement-posture statement that, for fixed-price contracts and other transactions, to the extent the performer bears the cost risk: a performer that becomes more efficient against a fairly negotiated price keeps the savings for that contract, and the Department captures efficiencies only prospectively, in the next negotiation, at a fair margin. This statement scopes enforcement priorities and will be incorporated in the profit policy revision; it does not waive statutory remedies for fraud or defective pricing, CAS price adjustments where CAS applies, or final indirect-cost-rate settlement on cost-reimbursement work.

The Secretaries of the Military Departments, through their Acquisition Executives, will:

**Implement Portfolio Acquisition Executive authorities.** The recommended authorities in the Portfolio Acquisition Executive Operating Framework's addendum are the default. Within 120 days of the Framework's issuance, each Component's implementation plan will delegate those authorities. Any exception requires the Component Head's signature, the specific reason, and an alternative that delivers the same speed, and will be submitted to the Deputy Secretary with the plan.

The Director, Defense Innovation Unit, will:

**Scale advance market commitments.** Within 180 days, with support from the USW(A&S) including Defense Production Act authorities as needed, structure additional advance market commitments, including aggregated allied demand consistent with the America First Arms Transfer Strategy, building on the early success of the Drone Dominance initiative in piloting demand-pull procurements that unleash market forces and create price signals for robust supply chains. These commitments shall reward demonstrated performance and delivered scale, operate within existing resources, and comply with applicable fiscal law.

The Director of Administration and Management, as part of the ongoing Defense Agency and DoW Field Activity review, will:

**Align the contract-oversight enterprise.** Within 90 days, with the USW(A&S), the USW(C), the Military Departments, DCAA, and DCMA, deliver options to the Deputy Secretary for clarifying roles and charters, eliminating duplication, and addressing workforce effects. Preserve mission-critical contract-administration functions, including government flight operations, product acceptance, facilitating contractor payment, property administration, and supplier quality assurance.

The USW(A&S), with the USW(C), will:

**Measure results.** Within 90 days, define and baseline: government-unique requirements eliminated; business units under full CAS coverage; business systems subject to review; audit and oversight cycle time; commercial content; performers at production per program, paired with unit-cost and affordability effects; new entrants and returning commercial firms; and declined

solicitations, where observable. Report quarterly thereafter. These measures are the test of this memorandum.

This memorandum is effective on signature. No new organization or compliance framework will be created. No discretionary study, pilot, working-group determination, or approval not required by law may delay these actions. Subordinate Department guidance inconsistent with this memorandum will be revised within 90 days.

All actions will comply with applicable statutes and appropriations law. Nothing in this memorandum authorizes obligations in excess of available appropriations, directs the scope, findings, or conclusions of any audit, or alters any authority vested by statute. Where additional authorities are required, the USW(A&S) will develop a legislative engagement plan to secure and support those authorities and the durability of these reforms. Department-approved artificial intelligence tools may be used to reduce document-preparation burden and expedite execution time.